UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


* * * * * * * * * * * * * *
MICHAEL E. WYATT,               * CIVIL ACTION 7:14-CV-00492
                                * APRIL 18, 2017   9:31 A.M.
            Plaintiff,          * JURY TRIAL
                                * VOLUME I OF III
vs.                             *
                                * Before:
JOHNNY OWENS, ET AL.,           * HONORABLE NORMAN K. MOON
                                * UNITED STATES DISTRICT JUDGE
            Defendant.          * WESTERN DISTRICT OF VIRGINIA
* * * * * * * * * * * * * * * AND A JURY

APPEARANCES:

For the Plaintiff:        BENJAMIN JOEL BEATON, ESQUIRE
                          CARLA MORGAN BRANCH, ESQUIRE
                          GORDON DWYER TODD, ESQUIRE
                          Sidley Austin, LLP
                          1501 K Street, N.W.
                          Washington, D.C. 20005




For the Defendant:        JIM H. GUYNN, JR., ESQUIRE
                          Guynn & Waddell, PC
                          415 S. College Avenue
                          Salem, VA 24153




Court Reporter:           Judy K. Webb, RPR
                          210 Franklin Road, S.W., Room 540
                          Roanoke, Virginia 24006
                          (540)857-5100 Ext. 5333

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

1          **I N D E X**

2  **OPENING STATEMENTS:**

3  By Mr. Todd                                        37

4  By Mr. Guynn                                       46

5

6         **PLAINTIFF'S EXAMINATION INDEX**

7                                              **PAGE NO.**

8  ROBERT V. WORSHAM:

9  Direct by Mr. Todd                                 53

10 Cross by Mr. Guynn                                 148

11 Redirect by Mr. Todd                              153

12

13 MICHAEL EDWARD YOUNG:

14 Direct by Mr. Beaton                              156

15 Cross by Mr. Guynn                                205

16

17

18

19

20

21

22

23

24

25

1                      **EXHIBIT INDEX**

2    **PLAINTIFF'S EXHIBITS:**           **MARKED**            **RECEIVED**

3    1 through 3                       53                    53

4    4                                 62                    64

5    5                                 71

6    6                                 89

7    7                                103

8    8                                110                   110

9    9                                139

10   10                               146                   146

11   11                               178

12   12                               197

13   13                               199

14

15

16

17

18

19

20

21

22

23

24

25

Case 7:14-cv-00492-NKM-RSB   Document 178   Filed 05/12/17   Page 3 of 214   Pageid#: 2695

1      (Court convened at 9:31 a.m.)

2          THE COURT:  Good morning.

3          Call the case, please.

4          THE CLERK:  *Michael E. Wyatt v. Johnny Owens, William*

5  *Harris, Scott Wyatt, M. D. Pickeral, and Robert Worsham*, Case

6  Number 7:14-CV-492.

7          THE COURT:  Are the parties ready?

8          MR. TODD:  Yes, Your Honor.

9          MR. GUYNN:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. GUYNN:  I think the list is wrong.

12          THE COURT:  I'm sorry?

13          MR. GUYNN:  I think the list of defendants is wrong.

14  There are only three defendants.  Harris and Pickeral are

15  not --

16          THE CLERK:  I think Mr. Guynn is saying.

17          THE COURT:  I thought we struck -- did you call them?

18          THE CLERK:  I struck the ones they told me this

19  morning.

20      (Sidebar on the record between the clerk and the Court.)

21          THE COURT:  Well, read the list of defendants.

22          THE CLERK:  Without the two?

23          THE COURT:  Yeah.

24          THE CLERK:  *Michael E. Wyatt v. Johnny Owens, Scott*

25  *Wyatt, and Robert Worsham*.  I apologize for that.

 1             THE COURT:  If we're ready, we will call the jury.

 2             THE CLERK:  Ladies and gentlemen, as your names are

 3    called, please answer and indicate your presence.

 4             Dorothy A. Clifton.

 5             JUROR CLIFTON:  Here.

 6             THE CLERK:  Prence King Craft.

 7             JUROR CRAFT:  Here.

 8             THE CLERK:  Seandra D. Crews.

 9             JUROR CREWS:  Here.

10             THE CLERK:  Jordan A. Easter.

11             JUROR EASTER:  Here.

12             THE CLERK:  Dustin R. Echols.

13             JUROR ECHOLS:  Present.

14             THE CLERK:  Michael B. Fain.

15             JUROR FAIN:  Here.

16             THE CLERK:  Joelkenda D. Farmer.

17             JUROR FARMER:  Here.

18             THE CLERK:  Theodis Faulkner, Jr.

19             JUROR FAULKNER:  Here.

20             THE CLERK:  Walter Flood, Jr.

21             JUROR FLOOD:  Here.

22             THE CLERK:  Christopher C. Ford.

23             JUROR FORD:  Here.

24             THE CLERK:  William H. Fowle, Jr.

25             JUROR FOWLE:  Here.

1          THE CLERK:  Iris K. Gillispie.

2          JUROR GILLISPIE:  Here.

3          THE CLERK:  Lindsey P. Hager.

4          JUROR HAGER:  Here.

5          THE CLERK:  Teresa A. Haislip.

6          JUROR HAISLIP:  Here.

7          THE CLERK:  Melvin Howerton.

8          JUROR HOWERTON:  Here.

9          THE CLERK:  Sharon D. Lee.

10         JUROR LEE:  Present.

11         THE CLERK:  Martha Marston.

12         JUROR MARSTON:  Here.

13         THE CLERK:  Ashley Mulero.

14         JUROR MULERO:  Here.

15         THE CLERK:  Amy F. Payne.

16         JUROR PAYNE:  Here.

17         THE CLERK:  Richard I. Pike.

18         JUROR PIKE:  Here.

19         THE CLERK:  Kevin Reynolds.

20         JUROR REYNOLDS:  Here.

21         THE CLERK:  Tameka Roberson.

22         JUROR ROBERSON:  Here.

23         THE CLERK:  Connie D. Rogers.

24         JUROR ROGERS:  Present.

25         THE CLERK:  Patricia P. Smith.

1          JUROR PATRICIA SMITH:  Here.

2          THE CLERK:  Sherry B. Smith.

3          JUROR SHERRY SMITH:  Here.

4          THE CLERK:  Tierney N. Stephens.

5          JUROR STEPHENS:  Here.

6          THE CLERK:  Janet M. Taylor.

7          JUROR TAYLOR:  Here.

8          THE CLERK:  Cynthia M. Thompson.

9          JUROR THOMPSON:  Here.

10         THE CLERK:  Vanessa M. Waddell.

11         JUROR WADDELL:  Here.

12         THE CLERK:  Herbert L. Wilson, Jr.

13         JUROR WILSON:  Here.

14         THE CLERK:  George Wooding.

15         JUROR WOODING:  Present.

16         THE CLERK:  Deborah Woodson.

17         JUROR WOODSON:  Here.

18         THE CLERK:  Rebecca Wright.

19         JUROR WRIGHT:  Here.

20         THE CLERK:  Ladies and gentlemen, please stand, raise

21    your right hands and be sworn.

22         (Venire is sworn.)

23         THE CLERK:  You may be seated.

24         Ladies and gentlemen, in order to serve as a juror in

25    this court, you must be a citizen of the United States who has

1  attained the age of 18 years and has resided in the Western

2  District of Virginia for one year.

3       You must not be under charge or have been convicted

4  in any court, state or federal, of a crime punishable by

5  imprisonment for a period of one -- I'm sorry, more than one

6  year, unless your civil rights have been restored.

7       You must be able to read, write, and understand the

8  English language, and must be able both physically and

9  mentally of rendering efficient jury service.

10      Do you and each of you qualify on these grounds?

11      You do.

12      Ladies and gentlemen, I will now ask you several

13 questions concerning the case which is to be tried today for

14 the purpose of ascertaining whether you can hear the facts

15 fairly and impartially and render a just verdict.

16      Would you please stand as your names are called.

17      The plaintiff in this case is Michael E. Wyatt.

18      Please stand.

19      The plaintiff is represented by Benjamin Joel Beaton,

20 Carla Morgan Branch, and Gordon Dwyer Todd of Sidley Austin,

21 LLP, in Washington, D.C.

22      Thank you.

23      The defendants in this case -- just one moment -- are

24 Johnny Owens, Scott Wyatt, and Robert Worsham.

25      The defendants are represented by Jim H. Guynn, Jr.

1  of Guynn and Waddell in Salem, Virginia.

2        The purpose of my mentioning this is to ask each of

3  you whether you are related by blood or marriage to any of the

4  parties you have just been introduced to in this action.  If

5  you are, please state so to the Judge.

6        You are not.

7        Do you know of any reason why you cannot hear the

8  facts of this case fairly and impartially and render a just

9  verdict?

10     (No audible response.)

11        THE CLERK:  Your Honor, do you have any additional

12  questions?

13        THE COURT:  Yes.

14        Members of the jury, this is a civil case in which

15  Mr. Wyatt is suing the defendants Scott Wyatt, Robert Worsham,

16  and Johnny Owens.

17        This case arises out of an incident that occurred

18  here in the City of Danville on July 3rd of 2012.

19        The defendants in this case are deputy sheriffs of

20  Pittsylvania County, and they were pursuing Mr. Michael Wyatt,

21  and his vehicle stopped here in the city of Danville, and they

22  arrested him at that time.

23        Now, the suit arises out of Mr. Wyatt's claim that

24  the three defendants used excessive and unnecessary force

25  against him during the arrest, and that he sustained injuries

1 as a result of what he alleges to be excessive and unnecessary

2 force.

3          Now, from what I've told you, do any of you know

4 anything about that case already -- about this case?  Do you

5 know anything?  If you do, raise your hand.  And I do mean

6 anything.

7          Have you heard it discussed, do you remember seeing

8 anything on TV, in the newspaper?  I don't suggest that there

9 was something.  But I'm asking you if you have any

10 recollection at all, raise your hand, because it's very

11 important that we know.

12          By no one raising their hand, I assume not.

13          Now, it's my practice to -- if I recall, this case is

14 scheduled to last during this week, that is, we expect to be

15 finished by Friday.

16          My practice is to always stop before 5:00 o'clock,

17 start at 9:30.  We try to get in a full day.  We take breaks

18 during the morning, and take a lunch hour, and during the

19 afternoon, we'll try to take breaks as needed.

20          But from what I've told you about the length of the

21 case, do any of you have any physical problem or any other

22 serious problem that would not -- that you just could not

23 reasonably be expected to sit and serve in this case during

24 this week?  If so, raise your hand.

25          (Hands are raised.)

1           THE COURT:  All right.  Now, thank you.  I will talk

2    to you in a minute, but if there's any matter that you don't

3    want to discuss with the whole group, I'm going to let you

4    come up and we can talk privately.  I don't want anyone to

5    feel any embarrassment about anything.

6           But, ma'am, can you tell me your --

7           JUROR CLIFTON:  I have panic attacks.  I have had

8    about five panic attacks today.  I can't control them.

9           THE COURT:  And your name is?

10          JUROR CLIFTON:  Dorothy Clifton.

11          THE COURT:  Okay.  And who else is there?

12          JUROR FAULKNER:  I can't hear that well.  I can't

13   hear that well.

14          THE COURT:  Well, and your name, sir?

15          JUROR FAULKNER:  Theodis Faulkner.

16          THE COURT:  And who else was there?

17          JUROR FLOOD:  I would like to come up there.

18          THE MARSHAL:  He wants to speak privately.

19          THE COURT:  Come up.

20       (Sidebar on the record.)

21          JUROR FLOOD:  I'm diabetic and I have blood clots in

22   my legs.  I just went back to work about three weeks ago, and

23   I could get a note from my doctor if you need it.

24          THE COURT:  What is your name?

25          JUROR FLOOD:  Walter Flood.

1        (End of sidebar.)

2            THE COURT:  Was there anyone else?

3            All right.  I'm going to let you three go now.  I

4    think we don't need to know anything else, but I think I will

5    let you go now.  You may file out.

6            All right.  The clerk asked you if you knew any of

7    the parties to the case, and having seen them stand, do any of

8    you -- has your recollection been refreshed so that you might

9    know any of them?  Raise your hand if so.

10           Do you know any of the attorneys in the case?  I

11   think it's probably unlikely, given none are from this area.

12   But have you been represented by any of the attorneys, or have

13   you ever had any dealings with the attorneys?

14           I'm going to ask the plaintiff to call the names of

15   your witnesses, and I'm going to ask the jury to listen to the

16   names of the witnesses.  After the names are called, I'm going

17   to ask you if you know any of the witnesses.

18           So would you call the names of your witnesses,

19   please.

20           MR. TODD:  Yes.  Thank you, Your Honor.

21           Good morning.  The plaintiffs will be calling first

22   off the three defendants who His Honor has already covered.

23   We'll be calling Michael Young.

24           Would it be helpful, Your Honor, to provide

25   additional detail?

Jury Voir Dire - 4/18/2017

```
1          THE COURT:  Yes, tell a little bit about who they
2    are.
3          MR. TODD:  Michael Young is a retired deputy with the
4    Pittsylvania County Sheriff's Office, who was responsible for
5    internal affairs.
6          THE COURT:  If any of you know Mr. Young, raise your
7    hand.  All right.
8          MR. TODD:  We'll be calling Dennis Waller, who is a
9    former police officer and expert witness who will testify on
10   the police use of force and police practice issues.
11         THE COURT:  If you know him, raise your hand.
12         MR. TODD:  We will call Dr. Jeffrey Smith, who is an
13   emergency medicine doctor from northern Virginia.
14         THE COURT:  If any of you know him, raise your hand.
15   Okay.
16         MR. TODD:  The plaintiff may call Chief Philip
17   Broadfoot, the chief of police in the City of Danville.
18         THE COURT:  Do any of you know him?
19         MR. TODD:  That's all for us, Your Honor.
20         THE COURT:  Okay.  Mr. Guynn.
21         MR. GUYNN:  Your Honor, in addition to the
22   defendants, a fellow named Bob Wershbale, who is a police
23   officer from Henrico County.  Tommy Nicholson is a major with
24   the sheriff's office in Pittsylvania County.
25         JUROR FOWLE:  (Raises hand.)
```

1    THE COURT:  You know him?  Your name, sir?

2    JUROR FOWLE:  William Fowle.

3    THE COURT:  Okay.

4    MR. GUYNN:  Allen Shelton, who is also with

5  Pittsylvania County Sheriff's office.

6    JUROR FOWLE:  (Raises hand.)

7    MR. GUYNN:  Mr. Fowle again.

8    Wilmer Abbott, who is a police officer in the City of

9  Danville, and Sheriff Michael Taylor from Pittsylvania County.

10   JUROR CRAFT:  (Raises hand.)

11   JUROR WOODSON:  (Raises hand.)

12   THE COURT:  All right.  Your name?

13   JUROR CRAFT:  Prence King Craft.

14   THE COURT:  Your name?

15   JUROR CRAFT:  Prence King Craft.

16   THE COURT:  Okay.

17   THE MARSHAL:  Ms. Craft.

18   THE COURT:  Right.  Okay.

19   JURY MEMBER:  Deborah Woodson.

20   JUROR FOWLE:  (Raises hand.)

21   THE COURT:  Any follow-up?

22   MR. GUYNN:  Those are all.

23   THE COURT:  I'll ask you, these persons, if they

24 testify in this case, do you think that the fact that you know

25 them, can you treat them like any other witness, or do you

1    think your knowledge of them would cause you to favor one side

2    or the other in the case?

3            JUROR FOWLE:  I could treat them fairly.

4            JUROR CRAFT:  So can I.  I can treat them fairly.

5            JUROR WOODSON:  I can, Your Honor.

6            THE COURT:  Okay.  Thank you.

7            All right.  Are any of you sensible to any bias or

8    prejudice in the case?  I mean, we have -- I mean, the

9    circumstances here is a person was arrested by the police.  It

10   will come out that he was convicted of an offense for which

11   they were pursuing him.

12           Are any of you conscious of any prejudice or bias or

13   any feeling that you could not serve as a juror and listen to

14   the evidence in the cases and arrive at a verdict that is

15   based only on the law and the evidence, a verdict that is fair

16   to both the defendants and the plaintiff in the case?

17           All right.  Have any of you served on a jury before?

18       (Hands are raised )

19           THE COURT:  In your case, was it a criminal or civil

20   case?

21           JUROR CRAFT:  I went in, but once I got in, I knew

22   some of the people, so I was excused.

23           THE COURT:  Okay.  Raise your hand again.

24           JUROR GILLISPIE:  It was a civil case.

25           THE COURT:  And your name?

1        JUROR GILLISPIE:  Iris Gillispie.

2        THE COURT:  All right.  Did the jury reach a verdict?

3        JUROR GILLISPIE:  Yes, sir.

4        THE COURT:  Okay.  Thank you.

5        JUROR SHERRY SMITH:  It was criminal case.

6        THE COURT:  Did the jury reach a verdict?

7        JURY MEMBER:  Yes.

8        THE REPORTER:  Your name, please?

9        JUROR SHERRY SMITH:  Sherry Smith.

10       JUROR WOODSON:  A civil case.

11       THE COURT:  Did the jury reach a verdict?

12       JUROR WOODSON:  Yes, they did.

13       THE REPORTER:  And your name, please?  Your name was

14  Woodson?

15       JURY MEMBER:  Deborah Woodson.

16       THE REPORTER:  Thank you.

17       JUROR WOODING:  Criminal.

18       THE COURT:  Your name?

19       JUROR WOODING:  George Wooding.

20       THE COURT:  Did you reach a verdict?

21       JUROR WOODING:  Yes.

22       JUROR WILSON:  Herbert Wilson.  Civil and criminal.

23       THE COURT:  Did you reach verdicts in the case?

24       JUROR WILSON:  Yes.

25       MR. TODD:  What was your name again, sir?

1          JUROR WILSON:  Herbert Wilson.

2          MR. TODD:  Thank you.

3          JUROR THOMPSON:  Cynthia Thompson.  Both civil and

4   criminal.

5          THE COURT:  Did you reach verdicts in the case?

6          JUROR THOMPSON:  Yes, sir.

7          THE COURT:  Okay.

8          JUROR LEE:  Sharon Lee.  Civil.  A verdict was

9   reached.

10          THE COURT:  You did reach a verdict?

11          JUROR LEE:  Yes, sir.

12          THE COURT:  Okay.

13          JUROR MARSTON:  Martha Marston.  Civil, and it was a

14   hung jury.

15          THE COURT:  Okay.

16          MR. TODD:  Could you say it again?

17          JUROR MARSTON:  Martha Marston.  Civil, and we didn't

18   reach a verdict.

19          MR. TODD:  Thank you.

20          JUROR PAYNE:  Amy Payne.  Criminal, and we did reach

21   a verdict.

22          JUROR PIKE:  Richard Pike.  Criminal.  We did reach a

23   verdict.

24          THE COURT:  Okay.  Thank you.

25          Are there any of you who have just lived in this

1  area -- have moved into the area within the last five years as

2  opposed to living here all of your life or longer?  Are any of

3  you relatively new?

4          And your name?

5          JUROR MULERO:  Ashley Mulero.  Ashley Mulero.

6          THE COURT:  How long have you lived in the area?

7          JUROR MULERO:  I have lived here for five years.

8          THE COURT:  And the lady behind you, if you would

9  pass the mic.

10         JUROR WADDELL:  Vanessa Waddell.  I just moved here

11  at the beginning of the year.

12         THE COURT:  All right.  Thank you.

13         The lady on the front row here.

14         JUROR LEE:  Sharon Lee.  I've been here seven years.

15         THE COURT:  Okay.  Thank you.

16         JUROR WILSON:  Herbert Wilson.  Three years.

17         THE COURT:  Thank you.

18         Have any of you ever served as a law enforcement

19  officer?

20         JUROR FOWLE:  State trooper for 32 years, deputy

21  sheriff for four years.

22         THE COURT:  Is that in Pittsylvania?

23         JUROR FOWLE:  In Pittsylvania County.

24         THE COURT:  Anyone else?  Do any of you have any

25  close relatives who are members of any law enforcement agency?

Jury Voir Dire - 4/18/2017

```
 1              JUROR EASTER:  State trooper, first cousin.

 2              THE COURT:  Is he a state trooper in this area?

 3              JUROR EASTER:  Roanoke area.  So I would say no.

 4              THE COURT:  And your name, sir?

 5              JUROR EASTER:  Jordan Easter.

 6              THE COURT:  Okay.  All right.

 7              JUROR REYNOLDS:  I have a nephew in -- he served in

 8   Pittsylvania County and now he is currently in Florida.

 9              THE COURT:  What is your name, sir?

10              JUROR REYNOLDS:  Kevin Reynolds.

11              THE COURT:  Okay.

12              JUROR WOODING:  I have a nephew that is a Virginia

13   state trooper.  George Wooding.  My nephew is in Halifax

14   County.

15              JUROR WILSON:  I have a son that works for the

16   Federal Protection Agency.

17              THE COURT:  And your name?

18              JUROR WILSON:  Herbert Wilson.

19              THE COURT:  Wilson.

20              All right.  The gentleman on the front row.

21              JUROR HOWERTON:  Matt Phillips.  He is married to my

22   family and friend.

23              THE REPORTER:  I'm sorry, can you repeat it?

24              JUROR HOWERTON:  Matt Phillips or Matthew Phillips.

25              THE REPORTER:  Can you repeat who it was?
```

1       JUROR HOWERTON:  He's a police officer.  Oh, Melvin

2  Howerton.

3       THE MARSHAL:  His name is Melvin Howerton.

4       THE REPORTER:  I didn't understand what the relation

5  was.

6       JUROR HOWERTON:  He is married to my first cousin and

7  now he is a friend of mine.

8       THE COURT:  All right.  Anyone else?  Those of you

9  who have answered, is there anything about your relationship

10 to these individuals that would make it more difficult for you

11 to be a fair and impartial juror in this case?

12      JUROR MARSTON:  Sir, does that mean now or ever?  I

13 have a son that was a deputy sheriff in Appomattox County back

14 in '58.

15      THE COURT:  Well, I would say ever would be okay.

16 And your name, please?

17      JUROR MARSTON:  Martha Marston.

18      JUROR WILSON:  My name is Herbert Wilson, and I will

19 be partial towards the police department.

20      THE COURT:  Would any of you refuse to vote for

21 someone to receive compensation for pain they suffered when it

22 was caused by someone else?  Do you have any feelings that no

23 one should recover for any pain and suffering regardless of

24 how it was caused?

25           The answer is no.

1    If you feel that way, please raise your hand.

2    Would any of you tend -- in this case, obviously,

3    there will be some conflict in the evidence.  Do any of you

4    feel there is no way you could listen to this evidence and

5    give -- without favoring the police and believing them over

6    the defendant, regardless of what the evidence was?  If you

7    have any such feeling, please raise your hand.

8    Have any of you had any experience with the police

9    that you found unpleasant or you think you were treated

10   unfairly in?  If so, raise your hand.

11   Have any of your family members been wronged in your

12   opinion, been wrongly charged or wrongly convicted or

13   mistreated by law enforcement?

14   Based on everything, now that you've had time, is

15   there any reason you could not serve as a juror in this case?

16   Is there any reason you could not sit and hear this evidence,

17   follow the Court's instructions, and decide this case based

18   solely upon what you hear in the courtroom and the law as I

19   give it to you?

20   Raise your hand if you cannot do it, be a fair and

21   impartial juror.

22   I will ask plaintiff's counsel if you have any

23   follow-up questions.

24   MR. TODD:  Thank you, Your Honor.  Just one question

25   for the venire.  Some of you identified that you had served

1  previously on a jury or been called for a jury in a civil or a

2  criminal case.  Based on His Honor's description of the facts

3  of this case, was there any similarity between the case in

4  which you served and what you've heard about this case today?

5          THE COURT:  If so, raise your hand, please.

6          MR. TODD:  Nothing further, Your Honor.  Thank you.

7          THE COURT:  Thank you.

8          Mr. Guynn?

9          MR. GUYNN:  We have no questions, Your Honor.

10          THE COURT:  Thank you.  Okay.  Do you wish to

11  approach for cause?

12      (Sidebar on the record.)

13          THE COURT:  Anyone for cause?

14          MR. TODD:  Yes, sir.  Mr. Fowle in the back row, he

15  knows the sheriff.  He knows the two dismissed defendants.  He

16  is a 30-year government employee.

17          MR. GUYNN:  He said he would be fair and impartial,

18  Your Honor.  The test is if he can say that.

19          MR. TODD:  I think it's not possible, knowing about

20  these people and having served, that he doesn't know the facts

21  of this case.  He admitted to --

22          THE COURT:  I didn't ask him when last he served.

23          MR. TODD:  He said he had served as deputy for four

24  years.  He didn't say when, but 30 years with the county.

25          MR. GUYNN:  He was 30 years a state trooper.

1          THE COURT:  Well, he said he could be fair and

2  impartial, so I'm not going to strike him.

3          MR. TODD:  One gentleman said he would be partial

4  towards the police.

5          THE COURT:  Yeah, I'm going to strike him.  Wilson.

6          MR. TODD:  Mr. Wilson.

7          And one gentleman said he currently has a nephew.

8  Mr. Reynolds said he currently has a nephew that is a deputy,

9  a deputy with Pittsylvania County.

10          THE REPORTER:  I'm sorry, Counsel, I'm having a hard

11  time hearing.  Excuse me.  I'm sorry, I'm having a hard time

12  hearing.

13          THE COURT:  You said it was a nephew.

14          MR. TODD:  Yes, nephew currently serving.

15          THE COURT:  I'm going to strike him.

16          MR. GUYNN:  Judge, he never said he couldn't be fair

17  and impartial.

18          THE COURT:  Do you want to follow up and ask any

19  questions?

20          MR. GUYNN:  No, Your Honor.

21          MR. TODD:  His name is Reynolds.

22          THE COURT:  Mr. Reynolds.  Mr. Reynolds, would you

23  come up to the podium.

24      (Juror Reynolds comes to the bench.)

25          THE COURT:  Mr. Reynolds, you said you had a nephew

1    that is with Pittsylvania County?

2              JUROR REYNOLDS:  Yes, sir.  That was -- he was there

3    four or five years, and then moved to Florida.

4              THE COURT:  But he's not there anymore?

5              JUROR REYNOLDS:  No, sir, currently not.

6              THE COURT:  How close are you to him?

7              JUROR REYNOLDS:  Very close.

8              THE COURT:  When was he last with Pittsylvania

9    County?

10             JUROR REYNOLDS:  It's been three years now.

11             THE COURT:  Three years?  Okay.  Thank you.

12         (Mr. Reynolds leaves sidebar.)

13             THE COURT:  That's the period of time this happened.

14   I think I'll excuse him.  Okay.

15             MR. GUYNN:  Note my objection, Your Honor.

16             THE CLERK:  We're striking Wilson and Kevin Reynolds,

17   and they'll both be struck for cause; is that correct?

18             THE COURT:  Yes.

19             Mr. Fowle.

20         (Juror Fowle comes to the bench.)

21             THE COURT:  Mr. Fowle, how are you doing?

22             JUROR FOWLE:  Hey.

23             THE COURT:  When were you last associated with

24   Pittsylvania County?

25             JUROR FOWLE:  '95.

1           THE COURT:  '95.

2           JUROR FOWLE:  Yeah.  Mike Taylor was supposed to work

3    for me, but we held a slot together.  Tommy Nicholson was one

4    of the investigators, and I believe the Shelton boy was a

5    local deputy.  There was Shelton, and I think that was him

6    that you called his name, or somebody called his name.

7           THE COURT:  Do you think you can hear this --

8           JUROR FOWLE:  Yes.  Yes, sir.  I've been in enough

9    trouble with police officers, supervisors, and stuff that I

10   know both sides of it.

11          THE COURT:  Okay.  Thank you.

12          MR. TODD:  One question.  What was your position?

13          JUROR FOWLE:  I was the field lieutenant with the

14   sheriff's office, and a senior trooper with the state police.

15   I worked narcotics years back, in '69 or something like that.

16   Basically, I --

17          THE COURT:  Do you know any of the defendants?

18          JUROR FOWLE:  No.  I can't place them.  No, sir.

19       (Juror Fowle leaves the sidebar.)

20          MR. TODD:  Nothing further, Your Honor.

21          MR. GUYNN:  No.

22          THE COURT:  Okay.  We'll leave it like that.  Leave

23   it like it is.

24          THE CLERK:  So we should have 12, 12 random strikes?

25          THE COURT:  12.

 1        THE CLERK:  Random if they have four apiece.  They

 2   have four apiece, and I would strike 12 randomly before they

 3   get the list.

 4        THE COURT:  Okay.

 5        THE CLERK:  Does that sound good?

 6        THE COURT:  Yes.

 7        MR. TODD:  We have four strikes.  Thank you, Your

 8   Honor.

 9      (End of sidebar.)

10        THE COURT:  Members of the jury, this process takes a

11   little while.  And just to make use of this time, I'm going to

12   read an instruction that will apply to those of you who

13   actually serve.  But I'm going to let everything else go on

14   with the strikes.

15        Oh, come back up here before.

16      (Sidebar on the record.)

17        THE COURT:  I want you to take three strikes, you

18   three, you one, and you one.  Okay.

19      (End of sidebar.)

20        THE COURT:  All right.  Ladies and gentlemen, I'm

21   going to read this instruction, and you will probably have the

22   same instructions later if you are selected to serve.  But

23   this would be the opening instruction and it will be your duty

24   to follow this instruction should you be selected to serve on

25   the jury.

1    Your duty in this case is to find from the evidence

2  what the facts are.  You and you alone are judges of the

3  facts.  You will then have to apply to those facts the law as

4  the Court will give it to you.  You must follow that law

5  whether you agree with it or not.

6    As the judge, I will decide all questions of law and

7  procedure.  From time to time during the trial and at the end

8  of the trial, I will instruct you on the rules of law that you

9  must follow in making your decision.

10    At this time, I will tell you a little bit more in

11  detail about the case, what the case is about.

12    As you've heard, the plaintiff in this case is

13  Michael Wyatt.

14    The defendants are Johnny Owens, Scott Wyatt, and

15  Robert Worsham, all of the Pittsylvania County Sheriff's

16  Office.

17    The plaintiff brought this lawsuit under Section 1983

18  of Title 42 of the United States Code, which is often referred

19  to as Section 1983.

20    That section provides a remedy for individuals who

21  have been deprived of their federal constitutional rights

22  under color of state law.  The plaintiff claims that the

23  defendants violated his rights under the 14th -- under the

24  Fourth Amendment of the United States Constitution.

25    The Fourth Amendment guarantees persons the right to

1   be free from unreasonable searches and seizures, which

2   encompasses the right to be free of arrests, investigatory

3   stops, or other seizures effectuated by excessive force.  In

4   general, a seizure violates the Fourth Amendment if the

5   officer uses more force than is reasonably necessary under the

6   circumstances to apprehend, restrain, and arrest the person or

7   defend himself.

8        In deciding whether the plaintiff has proven that

9   defendants used excessive force against him, I will tell you

10  that the defendants' intentions are not to be considered.  The

11  plaintiff must show only that the force used against him was

12  objectively unreasonable.

13       You may hear evidence about whether the defendants'

14  conduct complied with or violated a general -- a given rule or

15  policy.  You may consider this evidence in your deliberations,

16  but remember that the issue is whether defendants used

17  excessive force on plaintiff, in violation of the Fourth

18  Amendment, not whether a rule or policy might have been

19  violated.

20       Mr. Wyatt claims that on July 3rd, 2012, the

21  defendants used excessive and unnecessary force against him

22  during his arrest.  Plaintiff asserts that, as a result of the

23  defendants' actions or inactions, he suffered pain, injuries,

24  and emotional distress.  Always remember that this case should

25  be considered and decided by you as an action between persons

1  of equal standing in the community, of equal worth, and

2  holding the same or similar stations in life.

3        All persons stand equal before the law and are to be

4  dealt with as equals in a court of justice. All parties are

5  entitled to the same fair consideration. You are not to

6  afford any more credibility to statements made by a witness or

7  party because he is a government official. And you are not to

8  afford any less credibility to statements made by a witness or

9  party because he is or was a private citizen.

10       Furthermore, I tell you that a person who has been

11 charged with or convicted of a crime is entitled to the same

12 fair and impartial consideration of his case as is any person

13 before the Court. In this respect, a citizen does not forfeit

14 his constitutional rights merely by virtue of his arrest or

15 conviction.

16       In just a few moments, the plaintiff's and the

17 defendants' attorneys will make what is called an "opening

18 statement." Opening statements are neither evidence nor

19 argument. An opening statement is an outline of what that

20 party intends to prove, offered to help you follow the

21 evidence.

22       I tell you that what the plaintiff's and the

23 defendants' attorneys say in their opening statements is not

24 evidence.

25       After each party has had an opportunity to make an

1  opening statement, the plaintiff's attorney will present his

2  witnesses and the defendants may cross-examine those

3  witnesses.  Then the defendants' attorney will have the

4  opportunity to call witnesses and present evidence.  The

5  plaintiff's attorney may cross-examine any of the defendants'

6  witnesses.  After the parties' main case is completed, the

7  plaintiff's attorney may be permitted to present rebuttal

8  evidence.

9        Once again, I tell you that your duty is to consider

10  the evidence and find what the facts are.  The evidence from

11  which you will find the facts will consist of the testimony of

12  witnesses, documents, and other things received into the

13  record as exhibits, and any facts that the parties agree are

14  not disputed, and such matters as the Court may instruct you

15  to find.

16        Certain things are not evidence and must not be

17  considered by you.  I will list the items which you should not

18  consider as evidence in the case.  Statements, arguments, and

19  questions by the defendants' attorney and the plaintiff,

20  except when he is testifying as a sworn witness, are not

21  evidence.

22        The objections to questions are not evidence.  The

23  defendants' attorneys and the plaintiff's attorney must make

24  an objection when they believe evidence being offered is

25  improper under the rules of evidence.  You should not be

1  influenced by the objection or the Court's ruling on it.  If

2  the objection is sustained, ignore the question.  If it is

3  overruled, treat the answer like any other.

4          If you are instructed that some item of evidence is

5  received for a limited purpose only, you must follow that

6  instruction.

7          Testimony that the Court has excluded or told you to

8  disregard is not evidence and must not be considered.

9          No statement or ruling or remark which I may make

10 during the presentation of testimony is intended to indicate

11 my opinion as to what the facts are.  You are to decide upon

12 the believability of the evidence and its weight and value.

13         There are two kinds of evidence, direct and

14 circumstantial.  Direct evidence is direct proof of a fact,

15 such as testimony of an eyewitness.  Circumstantial evidence

16 is proof of facts from which you may infer or conclude that

17 other facts exist.

18         I will give you further instructions on these as well

19 as other matters at the end of the case, but have in mind that

20 you may consider both kinds of evidence.

21         Much of the evidence in the case will consist of the

22 testimony of witnesses.  It will be up to you to decide which

23 witnesses to believe, which witnesses not to believe, and how

24 much of any witness's testimony to accept or reject.

25         In considering the weight and value of the testimony

1  of any witness, you may take into consideration the

2  appearance, attitude, and behavior of the witness, the

3  interest of the witness in the outcome of the suit, the

4  relation of the witness to the parties, the inclination of the

5  witness to speak truthfully or not, the probability or

6  improbability of the witness's statements, and all other facts

7  and circumstances in evidence.  Thus, you may give the

8  testimony of any witness such weight and value as you may

9  believe the testimony of such witness is entitled to receive.

10        THE CLERK:  Each side will get four strikes.

11        THE COURT:  I told them three each side; plaintiff

12  three, defendant three, one, and one.

13        THE CLERK:  I thought you said four.

14        THE COURT:  It totals four.  They take three, they

15  take three, they take one, and one.

16        THE CLERK:  Okay.  They will get three, they will get

17  three, and then one, and one.

18        THE COURT:  They know.  They know what to do.

19        I now wish to say a few words about the burden of

20  proof which exists in this case.

21        That is a civil case.  The plaintiff has the burden

22  of proving his case by what is called a preponderance of the

23  evidence.  That means the plaintiff has to produce evidence

24  which, considered in light of all the facts, leads you to

25  believe that what the plaintiff claims is more likely true

1  than not.  If you consider the evidence like a scale, the
2  plaintiff must tip the scale at least slightly in his favor.

3        Those of you who have sat on a criminal case will
4  have heard the burden of proof beyond a reasonable doubt.
5  That requirement does not apply to a civil case and you
6  should, therefore, put it out of your mind.

7        In determining whether any fact has been proven by a
8  preponderance of the evidence in the case, you may, unless
9  otherwise instructed, consider the evidence of all the
10 witnesses, regardless of who may have called them, and all
11 exhibits received into evidence, regardless of who may have
12 produced them.

13        Now a few words about your conduct as jurors.  First
14 I instruct you that during the trial you are not to discuss
15 the case with anyone or permit anyone to discuss it with you.
16 Until you retire to the jury room at the end of the case to
17 deliberate on your verdict, you simply are not to talk about
18 the case.

19        Second, do not read or listen to anything touching on
20 the case in any way.  If anyone should try to talk to you
21 about it, bring it to the Court's attention promptly.

22        Third, do not try to do any research or make any
23 investigation about the case on your own.

24        Finally, do not form any opinion until all the
25 evidence is in.  Keep an open mind until you start your

1  deliberations at the end of the case.

2        If you would like to take notes during the trial, you

3  may do so, but you must leave them in the jury room each night

4  when you go home.  If you do take notes, be careful not to get

5  so involved in note taking that you become distracted and miss

6  part of the testimony.

7        Your notes are to be used only as aids in your

8  memory.  And if your memory should later be different from

9  your notes, you should rely on your memory and not your notes.

10 If you do take notes, they're for your own personal use and

11 are not to be given or read to anyone else.

12       If you do not choose to take notes, rely upon your

13 independent memory of the testimony.  Do not be unduly

14 influenced by notes of other jurors.  A juror's notes are not

15 entitled to any greater weight than the recollection of each

16 juror concerning the testimony.

17       Even though the court reporter is making stenographic

18 notes of everything that is said, a typewritten copy of the

19 testimony will not be available to you for your use during

20 deliberations.  On the other hand, the exhibits will be

21 available to you during the deliberations.

22       Until this trial is over, do not discuss the case

23 with anyone and do not permit anyone to discuss it in your

24 presence.  Do not discuss the case even with the other jurors

25 until all the jurors are in the jury room actually

1  deliberating at the end of the case.

2        You should not read any newspaper article, listen to

3  any radio broadcast, or view any television program which

4  discusses the case.

5        If anyone should attempt to discuss the case with you

6  or to approach you concerning the case, you should inform the

7  Court or one of the court officers immediately.

8        Hold yourself completely apart from the people

9  involved in the case: the parties, the witnesses, the

10  attorneys, and persons associated with them.  It is important

11  not only that you be fair and impartial in performing your

12  role, but also that you appear to be fair and impartial.

13        During the trial, it may be necessary for me to

14  confer with the lawyers out of your hearing, or to conduct a

15  part of the trial out of your presence.  I will handle these

16  matters as briefly and conveniently for you as I can, but you

17  should remember that they are a necessary part of the trial.

18        My general procedure is to take one midmorning break,

19  a lunch break, and a midafternoon break.  However, I will tell

20  you that the trial schedule is not written in stone.  If you

21  become uncomfortable and need to take a special break, let the

22  security officer know and a short break will be provided.

23        We want to make sure you are comfortable so that you

24  can concentrate on what is being said and properly consider

25  the evidence as it is received.

1          Once again, I tell you that the Court, all the court

2  officers, the plaintiff, the defendants, and their attorneys

3  all appreciate your presence here today, as well as your

4  effort in assisting in the resolution of this civil case.

5          Remember to adhere to the Court's instructions and to

6  consider the evidence fairly and impartially.  And, also, in a

7  very real way you are the judges, judges of the facts.  Your

8  only interest is to seek truth from the evidence in the case.

9          As soon as the jury is selected, we will give those

10 jurors who are going to serve a short break before we proceed.

11     (Pause in the proceedings.)

12          THE CLERK:  Ladies and gentlemen, I will now call the

13 names of the jurors who are to serve in this case.

14          THE COURT:  Just a minute, let's let these jurors

15 step out of the jury box.  If your name is called to serve, be

16 seated.

17          THE CLERK:  Okay.  As your names are called, please

18 come forward and take your seats in the jury box.  Those whose

19 names are not called should remain seated until excused by the

20 Court.

21          Prence Craft, Christopher Ford, Iris Gillispie,

22 Richard Pike, Connie Rogers, Janet Taylor, Cynthia Thompson,

23 and Vanessa Waddell.

24          THE COURT:  Will there be any motions before the jury

25 is sworn?

1           MR. GUYNN:  No, Your Honor.

2           MR. TODD:  No, Your Honor.

3           THE COURT:  Okay.  You may swear the jury.

4           THE CLERK:  Please stand, raise your right hands and

5  be sworn.

6       (Jury is sworn.)

7           THE CLERK:  You may be seated.

8           THE COURT:  All right.  You members of the jury panel

9  who are not serving are excused at this time.  I thank you

10 very much for you being here.  It was necessary for you to be

11 here for us to get to this point in the case.  I'm sorry for

12 any inconvenience, but thank you for doing your duty.

13          As soon as these jurors clear the courtroom, I'm

14 going to let you go back and take a break.  It will be 12 or

15 15 minutes, and then we'll bring you back and begin with

16 opening statements in the case.

17          All right.  Mr. Bryant, you can take them back.

18 We'll take about 12 or 15 minutes.

19      (Recess taken from 10:44 a.m. until 11:00 a.m.)

20          THE COURT:  You may take your opening statement.

21          MR. TODD:  Thank you, Your Honor.

22          Ladies and gentlemen of the jury, can you all hear me

23 okay?  Great.  If at any point you can't, let me know, let

24 Mr. Guynn know.  It's critically important you hear what we're

25 saying.  If you can't hear, I'm talking too fast, just let us

 1  know, okay?

 2          My name is Gordon Todd, and along with my colleagues

 3  Ben Beaton and Morgan Branch, we represent the plaintiff in

 4  this action, Mr. Michael Wyatt.

 5          This case is about the defendant police officers'

 6  beating of Mr. Wyatt at a time when he was unarmed, laying

 7  defenseless on the ground, and at a time when the defendants

 8  thought no one was watching.

 9          The facts of this beating will be largely undisputed,

10  and we believe the evidence will show that it was brutal,

11  unnecessary, and unlawful.

12          The defendants in this case, as you've already

13  learned, are all Pittsylvania County sheriff officers:  Robert

14  Worsham, Scott Wyatt, and Defendant Johnny Owens.

15          The evidence will show that on July 3rd, 2012, these

16  three defendants, along with two other officers who are not

17  defendants here today, Tommy Nicholson and Allen Shelton,

18  these five men arrested Mr. Wyatt.  In the course of that

19  arrest, they slammed him to the ground, pinned him down, and

20  proceeded to beat him.

21          Scott Wyatt punched Mr. Wyatt -- no relation, by the

22  way -- punched him up to eight times in the face and neck

23  area.  Johnny Owens punched Mr. Wyatt in the lower back, in

24  the kidney area, six times.  And Robert Worsham, while

25  Mr. Wyatt lay defenseless and pinned in, with his head

1   exposed, kneed him up to five times in the face area.

2        Now as I said, these facts will be largely

3   uncontested.  But you don't even need to take my word for it

4   or Mr. Wyatt's word for it, because in this case, unbeknownst

5   to the defendants at the time, these actions were actually

6   captured on videotape by a Danville city police cruiser that

7   rolled up on the scene.  Let's take a look at the key seconds

8   of that event.

9        There's a screen here and a screen here.

10       Go ahead.

11     (Video is played.)

12       MR. TODD:  Punches to the head, punches to the back,

13   knees to the face.

14       Now, in the course of discussing this evidence with

15   witnesses, we'll slow it down and break it out so you can see

16   exactly what you're seeing.

17       The evidence will show that this beating left

18   Mr. Wyatt, bloody, bruised, and laying senseless on the

19   asphalt.  Again, you don't need to take my word for it,

20   because the aftermath of this beating was captured by a second

21   Danville police cruiser that also arrived on the scene.

22     (Video is played.)

23       MR. TODD:  The evidence will show that Mr. Wyatt laid

24   there for nearly ten minutes before he was able to roll over

25   and sit up under his own power.  And even more time passed

Opening Statement by Mr. Todd

1  before Mr. Wyatt -- before anyone called an ambulance to

2  transport Mr. Wyatt to the hospital, to the emergency room

3  where he was treated for his injuries: blunt force trauma,

4  broken rib, collapsed lung, damage to his eye, and traumatic

5  brain injury.

6          Now, some of you are probably asking yourselves a

7  good question:  What brought these gentlemen together in that

8  parking lot on July 3rd, 2012?  It's a good question, and,

9  honestly, it's one that I wish I had a better answer for, one

10 that Mr. Wyatt wishes he had a better answer for.  The fact is

11 Mr. Wyatt has made pretty poor decisions in his life,

12 including the day before this beating occurred, July 2nd,

13 2012.  That day, Mr. Wyatt went to a party, drank some

14 alcohol, used some substances he should not have used, and

15 under their influence, while high, he robbed a convenience

16 store.

17         He was recognized, he was reported as an armed and

18 dangerous felon.  So the following day some Pittsylvania

19 County officers, including the defendants, were sent out to

20 find him, to look for him.  Two officers, one of whom is

21 Defendant Owens, spotted him in a motel on Piney Forest Road

22 north of Danville.  They spotted his car.  They staked it out

23 hoping to spot him, and, indeed, a few minutes later along

24 came Mr. Wyatt, got in his car.

25         The officers raced out to cut him off and arrest him.

1   Unfortunately, as you can see from the video, they were all
2   wearing plain clothes.  They weren't wearing badges, they
3   didn't announce themselves in any way as police officers, they
4   were driving an unmarked car, and for reasons known only to
5   them, they did not turn on their police lights or use their
6   sirens.  In short, nothing identified them as a police
7   officers.

8          Mr. Wyatt, seeing these strange men rush at him and
9   being fearful, took off in his car.  The officers followed,
10  other officers joined the chase, and it ended some minutes
11  later in that parking lot on Cahill Court.

12         Now, Mr. Wyatt recognizes he should not have run from
13  the police or committed any of these crimes, but he has atoned
14  for his wrongdoing by pleading guilty and now, as His Honor
15  mentioned, is serving a prison sentence for his actions.

16         This case is not about Mr. Wyatt.  This case is about
17  the defendants' decision to beat Mr. Wyatt before he was
18  arrested, before he pled to anything, before he was convicted
19  of anything.  That's what this case is about.

20         So let's return now to Cahill Court on July 3rd,
21  2012, and talk about how the scene unfolds.  Mr. Wyatt turns
22  in to the parking lot in his vehicle, his car engine is giving
23  out.  As his car slows, he opens the door, looks out and then
24  gets out.  At the point that he steps out of his car, he is
25  surrounded.  To his back is his own car, to his left is a

1  silver Maxima driven by Defendant Wyatt, and there's also

2  another officer inside.

3       Up on Memorial Drive, in front of Mr. Wyatt, is a

4  blue Maxima and a silver Charger driven by Robert Worsham up

5  on Memorial Drive.

6       And to Mr. Wyatt's right is Johnny Owens and another

7  officer, Tommy Nicholson, who was driving in front of

8  Mr. Wyatt's car.  So he is surrounded.

9       Now, at this point the testimony will likely vary

10  between the plaintiff and the defendants and among the

11  defendants themselves, because when people view the same scene

12  from different vantage points, they see different things and

13  they describe it differently.

14       But none of the differences that you will hear will

15  matter, because what the evidence will show clearly and

16  unambiguously is that within seconds of getting out of his

17  car, Mr. Wyatt was tackled and taken to the ground by two,

18  then three, then four, and ultimately five officers.

19       The first officer to reach him was nondefendant Allen

20  Shelton.  Investigator Shelton grabbed Mr. Wyatt around the

21  legs, pinning them together and immobilized him.  In almost

22  the same instant, Defendant Scott Wyatt reached Mr. Wyatt and

23  grabbed his upper body, pinning him in a bear hug, pinning his

24  arms to his side and riding him to the ground.  Mr. Wyatt's

25  face hits the floor.  Scott Wyatt leverages himself on

1  Mr. Wyatt's back, uses his right hand, pulls Mr. Wyatt's head

2  back and punches him with his left hand in his face up to

3  eight times.

4        The third officer to reach this pile was then Captain

5  Tommy Nicholson, also not a defendant here.  Nicholson

6  approaches carefully, views the scene, kneels down and grabs

7  Mr. Wyatt's right arm, which was beneath him.  It had been

8  pinned beneath him when he fell.  He grabs his right arm and

9  pulled it out so it can be put in handcuffs.

10        The fourth officer to reach him is Defendant Johnny

11  Owens.  In clear contrast to Captain Nicholson's measured

12  approach, Mr. Owens rushes up, steps between Scott Wyatt and

13  Allen Shelton, leans down and delivers six sharp punches to

14  Mr. Wyatt's lower back and kidney region.  That's four

15  officers at this point who are on top of or holding Mr. Wyatt

16  to the ground.

17        At this point enters the fifth officer, Robert

18  Worsham.  Mr. Worsham was not in the parking lot, he was up on

19  Memorial Drive.  He saw the first two officers take Mr. Wyatt

20  down, then he proceeded to drive along Memorial, turn right

21  onto Cahill Court, and turn right again into the parking lot.

22        He comes to a halt a few feet away, gets out of his

23  car.  He runs over and with hardly any hesitation at all goes

24  to his knees and delivers five sharp knee strikes to

25  Mr. Wyatt's head area.  He is pinned, defenseless, and his

1  head exposed.

2        These are the facts of the beating, and they are, as

3  I said, largely uncontested.

4        What you will hear from the defendants is not so much

5  denials of the use of force but, rather, excuses,

6  justifications and excuses.  Some may tell you, "Well, these

7  were merely distraction blows.  They were not really punches

8  or kicks or knee strikes.  They were just to distract

9  Mr. Wyatt while he was being handcuffed."  Well, the medical

10  evidence and the video evidence will suggest otherwise.

11        Some may tell you that r. Wyatt was struggling and

12  trying to escape, resisting arrest; this, of course, while

13  he's laying on the ground beneath a pile of officers.

14        And, lastly, some will tell you -- no, in fact, all

15  will tell you that they believed that while he was falling

16  Mr. Wyatt somehow produced a gun, or was holding a gun in his

17  right hand, beneath his body, and that at any second, he was

18  going to rise off the ground and start shooting them.  That's

19  the fear that you will hear from the defendants.

20        Well, ladies and gentlemen, the evidence, again, will

21  be to the contrary.  The clear and undisputed evidence will be

22  that Mr. Wyatt had no gun.  The evidence will be that the

23  officers who had the clearest view saw Mr. Wyatt's hands and

24  saw that he had no gun.  And the evidence will be that the

25  defendants' conduct from start to finish was completely

1  inconsistent with behavior you would expect from police

2  officers who reasonably believed someone has a gun.

3        You will hear, as I mentioned earlier, from an expert

4  in police tactics, police training procedures, and use of

5  force, Mr. Dennis Waller, who will explain to you the training

6  that police officers receive, the procedures they follow, and

7  how the defendants' conduct here wasn't consistent.

8        At the end of the day, nothing will distract you from

9  the simple fact that these three officers held Michael Wyatt

10 to the ground, immobilized, and beat him.  And that's what

11 this case is about.

12        The last evidence that you will hear will be medical

13 evidence, evidence of Mr. Wyatt's injuries and how it was

14 caused.  You will hear from an emergency room doctor, an

15 emergency medical specialist, Dr. Jeffrey Smith, who will

16 testify to you about the blunt force trauma that Mr. Wyatt

17 suffered to his head, his neck, and his shoulders; the

18 bruisings and abrasions across his entire body; collapsed

19 lung; broken rib; ocular contusion, damage to his eye; and

20 traumatic brain injury.

21        Now, Mr. Wyatt, to be sure, has largely healed.  The

22 beatings aren't visible today.  This was some time ago.  But

23 he does still suffer headaches that were caused and

24 exacerbated by the defendants' actions; his eyesight has never

25 fully healed, he still suffers blind spots; and he continues

1  to suffer posttraumatic distress.

2       At the close of the evidence, after you've had a

3  chance to hear from all the witnesses that we will call and

4  all the witnesses that Mr. Guynn will call, His Honor will

5  instruct you on the law, and I'll be back again to talk to you

6  about what the evidence has shown, what the facts are, and how

7  they should be viewed under the law.

8       And at that point, we'll ask you to return a verdict

9  in Mr. Wyatt's favor, and ask you to make an award of

10 compensatory damages against all the defendants to compensate

11 Mr. Wyatt for his injuries, his pain, and his suffering.  And

12 we'll ask you to make a special award of damages, punitive

13 damages against Defendant Worsham for what we believe the

14 evidence will prove to be his particularly vicious and callous

15 disregard to Mr. Wyatt's constitutional rights.

16      I look forward to speaking to you throughout the

17 trial and again at the close.  Thank you.

18      THE COURT:  Mr. Guynn.

19      MR. GUYNN:  Good morning again, ladies and gentlemen.

20      Again, my name is Jim Guynn and I'm here on behalf of

21 the defendants, who are officers with the Pittsylvania County

22 Sheriff's Office.

23      This case, as counsel just said, begins on July 2nd,

24 with some poor decisions by Mr. Michael Wyatt.  It continues

25 with more poor decisions by Michael Wyatt on July 3rd.

 1          On the morning of July 3rd, the officers received

 2    notification and instructions from the sheriff that Michael

 3    Wyatt was suspected of an armed robbery in Danville.  He was

 4    also under investigation for some breaking and enterings in

 5    Pittsylvania County.  The sheriff said, "We need to go and

 6    look for him," and they did.

 7          And you will hear that in their assignment to look

 8    for him the officers went to speak with his wife, they went to

 9    various places, they went to a hotel.  And they were almost

10    ready to stop when Officer Owens got to the hotel and they

11    said, "Hey, that looks like the car we were informed he was

12    driving."

13          The hotel had two levels in the parking lot.  They

14    come up, and as they pull up behind the car, Mr. Wyatt jumps

15    in it, takes off over the grass, jumps the curb, and down the

16    road he goes.

17          They turn on their lights and siren, because even in

18    an unmarked vehicle, there are lights in the grille and also a

19    siren.  He doesn't stop.  More people join the chase.  He

20    doesn't stop.  Fails to obey the lights and siren.  Gets to

21    the point to where he jumps the curb median, I think on

22    Memorial Avenue, and then goes up an off-ramp.  So he's

23    driving in the wrong lane, goes up the ramp that people use to

24    get on to the road there and cuts around, goes down, finally

25    gets to Cahill Court.

1    He jumps out of his car at Cahill Court.  He leaves

2  the car running, doesn't put it in park, doesn't put it -- put

3  the brake on, and leaves it to roll backwards into traffic on

4  Memorial.

5    You will hear from several people who saw it, who

6  were concerned about what was going to happen, because there

7  was some traffic and, obviously, it was going to roll in.

8    He then takes off running.  And as he is running, the

9  officers tackle him.  As he is running, he is running kind of

10  funny.  He is not running like you would ordinarily see

11  somebody, say, in the Olympics or, say, TV whatever.  He is

12  running like this (demonstrating), with his right hand in his

13  front waistband.

14    The officers see this from behind.  They don't know

15  what's in his waistband.  They know he is suspected of armed

16  robbery the night before.  And each of them will tell you, "We

17  thought and believed he had a gun."

18    They tackled him, they get him down, and they start

19  yelling, "Give us your hands.  Stop resisting."  But, again,

20  he makes a bad decision.  He doesn't give them his hands, he

21  doesn't stop resisting.

22    They start trying to pull his hands out from under

23  him.  He doesn't want them to come out and he is fighting

24  them.  So they're there scrambling around, fighting in a

25  parking lot, trying to get his arms out, trying to make sure

1  that he is not going to somehow use that gun.

2          The first thing that happens to get his left hand out

3  is that Officer Owens uses five or six -- it's in the video.

4  One thing you're not going to hear from us, you're not going

5  to hear us argue whether it's four, five, you know, whatever.

6  You're going to be able to see what he does.

7          What you're going to see is he throws jabs.  He

8  doesn't throw haymakers, he doesn't throw roundabouts.  I

9  mean, he throws five quick jabs.  They're designed to make

10 somebody stop and think about what that is, distract them a

11 little bit so you can jerk that arm out.

12         Lo and behold, they do get the left arm out, and

13 Johnny Owens is able to get a little bit of a wristlock on it

14 to try and get control of it and get up behind him.

15         Can't get the right arm out.  Tommy Nicholson will

16 tell you he was trying to get the right arm out and he just

17 stepped away from him.  By the way, the other thing Nicholson

18 will tell you is when he got out of the car and started out

19 after him, he had his gun pulled, because he was very

20 concerned that if Michael Wyatt had pulled a gun out and

21 turned, that he was going to have to use it.  It's really an

22 officer's nightmare, but, nonetheless, he had to be ready for

23 that.

24         In comes Robert Worsham who attempts to get his arm

25 out, and uses his knee to hit him in the arm.  Nobody will say

1   they saw him hit him in the head.  He finally gives up his

2   arm.  They get behind him and they handcuff him.

3       They get up.  Believe it or not, wrestling with

4   somebody like that is pretty doggone exhausting.  They're

5   stepping away, whatever.  Two more other officers come in and

6   they have to search him.  And that's what you see at the end

7   of it.  Officers Harris and Ford come in, search him, pick him

8   up, put him over in the grass.  And that's what happened.

9       There were, and you can count as many as you want, a

10  number of times that Michael Wyatt could have taken an action

11  and this never had to happen.  He didn't have to run.  And if

12  he truly was running because he didn't think they were police,

13  once the lights and siren came on, he could have stopped.  He

14  could have stopped his car and stayed in it and not let it

15  roll back into traffic and not run from the police.  He could

16  have given them his arms.  Any of those things would have

17  stopped all of this, any of them.  But as the evidence will

18  show, it didn't happen.

19      And the damages in the case, you're not going to hear

20  any of the treating physicians.  The emergency room doctor

21  that comes has read basically the same records that you'll

22  have, and he is giving his opinion on the injuries themselves.

23  As you'll see in the medical records, many of the diagnoses

24  that this emergency room doctor, who is being paid to come

25  down from DC and talk to you, were not diagnosed at the

1 hospital.

2          You will see, I believe, that Michael Wyatt has made

3 a pretty good recovery.  You know, does the picture look bad?

4 Of course it does.  Did he land face first?  Yeah.  He was

5 tackled on a parking lot.  But you know, based on your common

6 sense and based upon the evidence that you're going to hear,

7 that the reason he landed on his -- on his face in the parking

8 lot is because when he was tackled, they got his arms around

9 him, he didn't have his arms to break the fall.  And, yes,

10 they were -- you know, when your face lands on a parking lot,

11 it certainly is a difficult situation.

12          As far as the officers are concerned, they used

13 force.  We don't disagree with that.  All we can tell you is,

14 in those situations you believe that the other guy has a gun

15 and he's not giving his hands up, you have to do something to

16 get those hands.

17          A fellow named Robert Wershbale is going to come down

18 from Henrico County, and Sergeant Wershbale is with the

19 Henrico County Police Department.  I think all of you know

20 that's outside of Richmond.  He trains the police department

21 in the county, and he is going to explain to you why officers

22 do what they do under the circumstances.  And he'll explain to

23 you that there is regimen that they follow called a continuum

24 of force, and that officers are supposed to use one level of

25 force above that which the suspect is using.  And the reason

1  for that is that you've got to empower officers to be able to

2  take control of the situation.

3          And in these circumstances, that's exactly what went

4  on.  It was their duty, based upon everything they knew about

5  the case, the reason that they were chasing him, his response

6  to it, and his refusal to follow their directions to give up

7  his hands indicated to them that he was armed.

8          I would submit to you that, based on all the

9  evidence, that that's what you will be asked to find at the

10  end of the case.

11          Judge Moon is going to give you instructions, he has

12  already given you some, and he is going to tell you what the

13  law is for officers in a situation.  I believe he is going to

14  tell you that you're supposed to look at it from the officer's

15  viewpoint, you're supposed to look at it without the benefit

16  of 20/20 hindsight, you have to place yourself there, and you

17  have to determine whether or not those officers acted

18  reasonably given the circumstances that they faced and that

19  they knew about.

20          I would suggest to you that, after hearing all of the

21  evidence, that it won't take you long to conclude that these

22  officers acted reasonably under the circumstances.

23          Thank you.

24          THE COURT:  Okay.  Call your first witness.

25          MR. TODD:  Thank you, Your Honor.

1          The plaintiff calls Robert Vaughan Worsham.

2          ROBERT V. WORSHAM, PLAINTIFF'S WITNESS, SWORN

3          MR. TODD:  Your Honor, while the notepads are being

4    handed out, may we go ahead and mark the two videos we've

5    already seen and the cellphone video as Exhibits 1, 2, and 3?

6          THE COURT:  Yes.  Without objection?

7          MR. GUYNN:  No, Your Honor.

8        (Plaintiff's Exhibit Numbers 1 through 3 were marked and

9    received.)

10         MR. TODD:  And we'll make those available on an iPad

11   to go back to the jury.  Thank you.

12                      DIRECT EXAMINATION

13   BY MR. TODD:

14   Q    Good morning, sir.

15   A    Good morning.

16   Q    Would you introduce yourself to the jury, please.

17   A    Investigator Robert Worsham with the Pittsylvania County

18   Sheriff's Office.

19   Q    Could you pull the microphone a little closer, perhaps.

20         THE CLERK:  Left one, please.

21   BY MR. TODD:

22   Q    Investigator Worsham, on July 3rd, 2012, you participated

23   in the arrest of Michael Wyatt; correct?

24   A    That's correct.

25   Q    And you were joined in that arrest by defendant Scott

1  Wyatt, defendant Johnny Owens, Tommy Nicholson, and Allen

2  Shelton; is that right?

3  A    That's correct.

4  Q    You don't dispute, do you, that while arresting Mr. Wyatt

5  you struck him with your knee up to five times?

6  A    Yes.

7  Q    You're not the only officer who struck Mr. Wyatt that

8  day, are you?

9  A    No.

10  Q    Defendant Owens told you that he struck Mr. Wyatt, right?

11  A    Correct.

12  Q    And Investigator Scott Wyatt told you that he also

13  punched Michael Wyatt, right?

14  A    Correct.

15  Q    Now, by the time that you reached Michael Wyatt on that

16  day, he was already laying prone on the ground, right?

17  A    He was oriented face down, and, also, Investigator Wyatt

18  was also beside him, on his left side.

19  Q    In fact, there were four officers already on top of him,

20  right?

21  A    Yes.  Around him, right.

22  Q    Now, when you arrived, you weren't concerned about

23  Mr. Wyatt's left hand, were you?

24  A    No.

25  Q    His left hand was already secured, it wasn't of any

1  concern to you?

2  A    Correct.

3  Q    When you arrived, Investigator Shelton had control of

4  Mr. Wyatt's legs, right?

5  A    He was around, around his legs.

6  Q    Well, you weren't concerned about Mr. Wyatt's legs, were

7  you?

8  A    No.

9  Q    Mr. Wyatt could not use his right hand because it was

10  pinned underneath him; isn't that right?

11  A    It was up underneath his body, yes.

12  Q    Mr. Wyatt was being held down forcibly by four officers

13  and, therefore, could not get up, right?

14  A    We were still trying to gain control of Mr. Wyatt on the

15  ground -- they were, as I got to where they were at.

16  Q    My question to you, sir, is:  Was Mr. Wyatt able to get

17  up, or was he being held down by four officers?

18  A    He was still down with all the rest of them.

19  Q    He was not able to get up?

20  A    He didn't get up.

21  Q    At no point did you see Mr. Wyatt hit any of the

22  officers?

23  A    I didn't.

24  Q    Okay.  You didn't see him try to kick any of the

25  officers, did you?

1  A    Not that I'm aware of.

2  Q    You didn't see him try to bite or spit at anyone, did

3  you?

4  A    Not that I'm aware of.

5  Q    You didn't see him try to lash out in any way at any of

6  the officers, correct?

7  A    Correct.

8  Q    And as of this point, when he was pinned to the ground

9  and hadn't taken any affirmative action towards any of you,

10  you or any of your colleagues, it was at this point that you

11  decided to strike him with your knee, correct?

12  A    That's not exactly the sequence, but I did end up

13  striking him with my knee.

14  Q    If I understand correctly, sir, it's your contention that

15  Mr. Wyatt was resisting arrest, and the fact that his hand was

16  underneath him somehow posed a threat to you and your

17  colleagues; is that right?

18  A    I thought he had a gun up under his waistband.

19  Q    We'll talk more about that later.  At the time that you

20  struck Mr. Wyatt, you did not know that you were being

21  videotaped, did you?

22  A    No, I wasn't aware.

23  Q    Now, you did know that Danville police cruisers have dash

24  cams, right?

25  A    Correct.

1  Q    And you knew that because you used to be a Danville
2  police officer?
3  A    Correct.
4  Q    You weren't aware that Danville police showed up until
5  after Mr. Wyatt was in handcuffs?
6  A    Correct.
7  Q    Now, sir, we'll talk more about July 3rd later.
8       What I would like to do is step back and introduce you to
9  the jury a little bit and talk about some of your training and
10 your past experiences, okay?
11 A    Okay.
12 Q    You're currently employed by the Pittsylvania County
13 Sheriff's Department, correct?
14 A    Correct.
15 Q    And you're a member of the sheriff's Special
16 Investigations Division?
17 A    Correct.
18 Q    You've been with -- how long have you been with
19 Pittsylvania County?
20 A    Right around eight years.
21 Q    I guess an easy way to ask that:  Do you remember when
22 you joined the County?
23 A    2006.
24 Q    If I suggested it was November of 2008, does that sound
25 about right?

1  A    Yes.  Very possibly, yes.

2  Q    Before that, as I said, you were with Danville?

3  A    Correct.

4  Q    And you started in Danville, I think, around 2002?  Does

5  that sound right?

6  A    No, in 2000.

7  Q    2000.  Okay.  Great.

8       Around the time you joined the Danville police force,

9  either right before or right after, I'm not sure how it works,

10 did you go to the police academy?

11 A    Yes.

12 Q    And where did you attend the police academy?

13 A    The Piedmont Regional training academy in Martinsville.

14 Q    And I assume you received training in a variety of law

15 enforcement subjects?

16 A    Yes.

17 Q    Would that have included the use of offenses and

18 defensive physical tactics?

19 A    Yes.

20 Q    Would that also have included how to conduct high-risk

21 stops or felony stops?

22 A    Yes.

23 Q    And is a felony stop or a high-risk stop one where there

24 may be weapons involved or a high propensity for violence?

25 A    Yes.

1    Q    When conducting a stop of this nature, where there may be

2    a gun, there may be a weapon, there may be a risk of violence,

3    are officers trained that all officers should rush in and

4    physically engage with the suspect immediately?

5    A    If the person that you're trying to pull over is -- has

6    stopped his vehicle, and he's somewhat cooperative by staying

7    in the vehicle, then, no, you're not taught to run in.  You're

8    taught to hang back and give commands and give him a chance to

9    come out of the car on his own free will and come back to you.

10   Q    There are some situations where you may take cover behind

11   your door, your engine block, use verbal commands, right?

12   A    Correct.

13   Q    When there are multiple officers involved, even if some

14   are physically engaged with the suspect, some others may hang

15   back to provide cover, right?

16   A    No, not if they were physically engaged with the

17   subject -- suspect.

18   Q    Right.  So if there are multiple officers, four or five,

19   and some are physically engaged, one or two, you're not all

20   trained to all rush in, are you?

21   A    Yes, you're trained to go in and try to get the suspect

22   in custody as quick and safely as you can.

23   Q    So it's your understanding that in a high-risk stop where

24   there may be a weapon, the training is that no officer should

25   ever hang back, maybe pull their weapon and provide cover,

1  lethal cover, in case a suspect does produce a gun which poses

2  a threat to the officers who are close up and physically

3  engaged?

4  A    That's if you're not physically engaged in with the

5  suspect, then the other ones may hang back and provide backup.

6  Q    Some are engaged, but a later arriving officer may hang

7  back, pull their weapon to provide cover for those who are

8  engaged, right?

9  A    No.

10 Q    No?

11 A    Not in my experience.

12 Q    Give me one second.

13     So your testimony is that every single officer arriving

14 on a scene should rush in and engage physically with the

15 suspect?

16 A    If you have officers fighting with a subject, then, yes,

17 they should help go get the subject under control.  But you

18 were speaking about a felony stop, so that's where it differs

19 in my opinion.

20 Q    Okay.  In your training, you also receive training in the

21 use of force, including punches and knee strikes, right?

22 A    Yes.

23 Q    And in your training, were you taught that there are some

24 parts of the body that one preferably would target or not

25 target?

1  A     Yes.

2  Q     In fact, there are certain parts of the body that --

3  well, physical strikes are supposed to be targeted to fleshy

4  or muscular parts of the body; is that right?

5  A     Yes.

6  Q     And you are trained to avoid, for example, punches to the

7  head?

8  A     Yes.

9  Q     You're trained not to punch or kick or knee strike

10 suspects in the head, spleen, kidney, or other internal

11 organs, right?

12 A     That's to avoid, yes.

13 Q     Now, in addition to your training at the academy, you're

14 also familiar today with the sheriff's department's policies,

15 right?

16 A     Correct.

17 Q     And specifically the sheriff's department's policy on the

18 use of force?

19 A     Correct.

20        MR. GUYNN:  Your Honor, I want to preserve my

21 objection to this line of questioning with regard to the

22 policy.

23        THE COURT:  Members of the jury, I will instruct

24 you -- you will hear this a lot -- that you will hear evidence

25 about whether the defendant's conduct complied with or

1  violated a given rule or policy.  You may consider this

2  evidence in your deliberations, but remember that the issue is

3  whether the defendants used excessive force on plaintiff, in

4  violation of the Fourth Amendment, not whether a rule or

5  policy might have been violated.  So just remember at all

6  times you are considering whether the defendants used

7  excessive force in violation of the Constitution.

8       Go ahead.

9     (Plaintiff's Exhibit Number 4 was marked for

10  identification.)

11       THE COURT:  You're talking about now the -- I'm

12  sorry.  Just a minute before you go ahead with the --

13       MR. TODD:  Hand this to the witness, Your Honor?

14       THE COURT:  Yes.  Members of the jury, you're going

15  to hear some evidence now only for a limited purpose, and it

16  is not the fact that -- it is only for you to determine the

17  credibility of the witness in this case, and such other

18  limited purposes as I will tell you.  But just because there

19  may have been some other incident similar does not mean that

20  the defendant is guilty of doing the same thing in this case.

21  You can only consider this for a limited purpose of the

22  credibility of the witness with regard to the incident in

23  question, or for any other purpose where you can consider

24  whether it was an accident or a mistake of some sort that

25  occurred at this particular time, and maybe for an item that I

1   will instruct you on later.

2       But just remember this evidence is for a limited

3   purpose only.  The fact that something like this happened

4   similar, may have occurred at another time, is not proof that

5   what is alleged here occurred.

6       MR. TODD:  Your Honor, may we approach for a second?

7       THE COURT:  Yes.

8     (Sidebar on the record.)

9       MR. TODD:  To be clear, Your Honor, I was going to

10  ask Investigator Worsham about his familiarity with the

11  policies generally.

12      THE COURT:  These were the --

13      MR. TODD:  I will do that pretty quickly.  But what

14  I'm asking about right now is not subject to the instruction

15  that you gave.

16      THE COURT:  I saw those exhibits and it looked like

17  the things that I had before.

18      MR. TODD:  I will stop and flag it very clearly

19  before I go there.

20    (End of sidebar.)

21      THE COURT:  Members of the jury, the instructions

22  that I just gave you about the evidence will come a little

23  later.  But right now we're dealing with the policies.  And

24  like I told you, the fact that a policy or rule might have

25  been violated does not necessarily mean that the Constitution

 1  was violated.  We're dealing with excessive force in violation

 2  of the Constitution.

 3          I'm sorry.  You may proceed.

 4          MR. TODD:  Thank you, Your Honor.

 5  BY MR. TODD:

 6  Q    Mr. Worsham, have you had a chance to look at Exhibit 4

 7  there?

 8  A    Yes.

 9  Q    Are you familiar with that document, sir?

10  A    Yes.

11  Q    Is that a document that you're familiar with from your

12  work at the sheriff's department?

13  A    Yes.

14  Q    Can you identify it?

15  A    It's the Use of Force policy for the sheriff's office.

16          MR. TODD:  I move to admit Exhibit 4, Your Honor.

17          THE COURT:  It will be admitted.

18          MR. GUYNN:  Same objection, Your Honor.

19          THE COURT:  Yes, sir.

20      (Plaintiff's Exhibit Number 4 was received.)

21          MR. TODD:  As documentary exhibits go in, we'll put

22  them up on the screen so everyone can see what we're talking

23  about.

24  BY MR. TODD:

25  Q    Let me direct you, Investigator Worsham, first to the

1  second page of the exhibit, the paragraph entitled "1 Policy."

2  A    Yes.

3  Q    The policy, looking about the middle of the paragraph,

4  "This policy establishes that it is the policy of the

5  sheriff's office that all officers will only employ the

6  minimum force necessary to accomplish a legal purpose."

7       Do you see that?

8  A    Yes.

9  Q    And is that consistent with the training you received at

10 the academy?

11 A    Yes.

12 Q    You're familiar with something that Mr. Guynn actually

13 mentioned in his opening, the use of force continuum or the

14 use of force wheel?

15 A    Yes.

16 Q    If you turn to the last page of the exhibit, you'll see

17 it there.  And do I understand correctly this wheel describes

18 the use of force options that may be available to an officer

19 depending on a subject's behavior at that particular point in

20 time?

21 A    Correct.

22 Q    And it's a wheel because you don't have to start at no

23 force and go to a little bit of force, more force, a lot of

24 force, a tremendous amount of force.  You don't have to go

25 through that progression, do you?

```
1   A     No.

2   Q     If a suspect starts off really violent, you're allowed to

3   respond to that with appropriate force, right?

4   A     Correct.

5   Q     If a suspect poses more danger, or starts off posing a

6   little danger and then poses more danger, your permissible

7   options and response also escalate, right?

8   A     You said from less to more?

9   Q     Less to more.

10  A     Yes, correct.

11  Q     And the converse is true as well, the opposite is true,

12  that if a suspect who has been dangerous becomes docile,

13  compliant or in any way less dangerous, the officer's use of

14  force options also diminish, right?

15  A     Correct.

16  Q     And, in fact, the policy sets that forth.  Let me direct

17  you to page 3, paragraph IV A-5.  And this reads, "Officers

18  will be familiar with all alternative options on the 'Use of

19  Force Continuum Wheel' and should be prepared to respond to

20  the level of the threat present at the specific moment in

21  time," a specific moment in time, "e.g. compliance,

22  escalation, de-escalation."

23        Did I read that correctly?

24  A     Yes.

25  Q     And you've been trained to respond to de-escalation by
```

1  using less force, correct?

2  A    Correct.

3  Q    And you understand, sir, that it is -- per the policy, it

4  is never appropriate to make a suspect simply comply with

5  verbal orders -- to use force to force compliance with verbal

6  orders unless an imminent threat of physical violence exists,

7  right?

8  A    I didn't understand.  Can you repeat the question,

9  please.

10 Q    I mangled it horribly.  Let me try it again.

11     Do you understand that the use of force is never

12 appropriate to make a subject comply with verbal orders when

13 physical violence is not imminent?

14 A    Correct.

15 Q    Let's talk a little bit about your employment history.

16     So you're currently with the sheriff's office in the

17 Special Investigations Division.  Could you tell the jury what

18 sort of duties, what sort of things -- it's called S-I-D --

19 what sort of things SID does?

20 A    A little bit of everything from mostly drug -- that's the

21 main focus, investigation of drugs, large scale, small scale.

22 We have different people in the unit that's on different

23 outside task forces, that work with different federal agencies

24 as far as the marshals, FBI, the DEA, so on and so forth.  And

25 then anything in between that the sheriff wants us to work on.

1  Q    Fugitives?

2  A    Sorry?

3  Q    Fugitives?

4  A    Yes.

5  Q    So drugs, fugitives, task forces.

6       Before you joined SID, you were a patrol deputy, right?

7  A    Correct.

8  Q    And what kind of things did you do as a patrol deputy?

9  A    Answered calls, just in general patrol, checks of

10 buildings.

11 Q    How would you compare your duties in the two different

12 roles?

13 A    It's more responsive, I guess.  You respond to a call or

14 you respond to something that you need to get done on a

15 regular basis.  And then investigations, a lot of it is

16 self-initiated type of work where you have to go out and

17 investigate.

18 Q    Sorry.  You have more independence with SID?

19 A    That's correct.

20 Q    And is SID generally riskier?

21 A    Yes, it can be.

22 Q    And you wanted to do SID work, right?  You volunteered

23 for it?

24 A    Yes.

25 Q    Now, we mentioned earlier that before you were with the

1    County, you were a police officer with the Danville City

2    Police Department, right?

3    A    Correct.

4    Q    You said you started in 2000.

5         Now, are you familiar with Chief Philip Broadfoot of the

6    Danville City Police Department?

7    A    Yes.

8    Q    And he was your ultimate boss when you were at the police

9    department, right?

10   A    Yes.

11   Q    How many officers are there in Danville?

12   A    I don't know.

13   Q    Orders of magnitude, 50, 100, 200?

14   A    A hundred plus.

15   Q    How about the county?

16   A    A little less than the city.  I don't know.

17   Q    Now, when Chief Broadfoot was your boss, how frequently

18   did you interact with him?

19   A    Not very frequently.

20   Q    You did on occasion, though?

21   A    Yes.

22   Q    And you did on occasion specifically with regard to use

23   of force and your interactions with citizens, right?

24   A    Yes.

25   Q    Isn't it a fact, sir, that when you were with the

1  Danville City Police Department --

2          MR. GUYNN:  I'm going to object, Your Honor, to

3  relevance.

4          MR. TODD:  I think, Your Honor, you've already

5  addressed this.

6          THE COURT:  Overruled.

7  BY MR. TODD:

8  Q   Isn't it a fact --

9          THE COURT:  Well, members of the jury, this

10 evidence -- I think they're anticipating what I said

11 earlier -- is only being admitted for the credibility, whether

12 there was a mistake -- I mean, whether there might have been

13 or might not have been a mistake made at this point.  It's for

14 a very limited purpose.  The mere fact that something happened

15 in the past is not evidence that that same thing happened

16 here.

17         MR. GUYNN:  Your Honor, may we approach for just one

18 half a second?

19         THE COURT:  Yes.

20      (Sidebar on the record.)

21         MR. GUYNN:  Judge, just to clarify, we aren't

22 claiming there was a mistake.  In fact, we stipulated that's

23 not the case, Your Honor.

24         THE COURT:  Okay.  Well, I think the jury understands

25 at this point --

1          MR. GUYNN:  I understand.  I just wanted the Court

2    to --

3          THE COURT:  I understand.

4      (End of sidebar.)

5    BY MR. TODD:

6    Q    Isn't it a fact, sir, that when Chief Broadfoot was your

7    boss, that you were not always honest with him about your use

8    of force in your citizen interactions?

9    A    No.

10   Q    Your testimony here today is that you were always honest

11   with him?

12   A    Yes.

13   Q    Do you recall, sir, did there come a time in about

14   October of 2006 when Chief Broadfoot required you to wear an

15   audio recorder to tape all of your interactions with citizens?

16   A    Correct.

17       (Plaintiff's Exhibit Number 5 was marked for

18   identification.)

19          MR. TODD:  Where do you want the used exhibit to go?

20   Stay here now?

21          THE CLERK:  If you would put them to the left when he

22   is finished, that would be great.

23   BY MR. TODD:

24   Q    Sir, do you recognize this document?

25   A    Yes.

1  Q    Do you recall receiving this letter from Chief Broadfoot?

2  A    Yes.

3  Q    And, in fact, you met with Chief Broadfoot back in 2006

4  to discuss this letter, right?

5  A    Yes, I did.

6         MR. TODD:  Move to admit Exhibit 5, Your Honor.

7         MR. GUYNN:  Object, Your Honor, relevance and

8  hearsay.

9         MR. TODD:  I'm happy to address either if you think

10 it is necessary, Your Honor.

11        THE COURT:  You may cross-examine about the letter.

12        MR. TODD:  I'm sorry, Your Honor?

13        THE COURT:  You may cross-examine concerning the

14 letter before I admit it to see.  I'm not sure it's necessary.

15        MR. TODD:  Mr. Guynn or me, Your Honor?

16        THE COURT:  I mean, you had him on direct.  But I

17 mean your -- he is an adverse witness, I guess.  Go ahead.

18 BY MR. TODD:

19 Q    In this letter, in this letter does Chief Broadfoot

20 impose on you what we were talking about a minute ago, the

21 requirement to wear an audio recorder?

22 A    Correct.

23 Q    And does the letter set out terms and conditions that you

24 are to follow in using the recorder?

25 A    It has multiple conditions on the back, on the second

1  page.

2  Q    Okay.  And did you always follow all of those conditions?

3  A    Yes, as best as I could.

4  Q    You don't recall at some point down the road there was a

5  question whether you had, in fact, recorded all citizen

6  interactions?

7         MR. GUYNN:  Your Honor, objection, Your Honor.  It is

8  collateral.  This doesn't have anything to do with it.

9         THE COURT:  Sustained.

10        MR. TODD:  Your Honor, may we approach?

11        THE COURT:  Yes.

12     (Sidebar on the record.)

13        MR. TODD:  Your Honor, this goes specifically to the

14  witness's honesty and trustworthiness with regard to the use

15  of force.  The letter talks about his prior use of force

16  history.  I'm happy to do a redacted version of the letter to

17  take this stuff out if you think it is objectionable; that's

18  fine.  But Chief Broadfoot required him to wear an audio

19  recorder, and during the time he wears it, these force

20  complaints stopped against him completely, no problems at all.

21        It turns out the reason is while he was forced to

22  wear it, he basically stopped policing, he sat in his car,

23  didn't interact with citizens.  He goes back to Chief

24  Broadfoot and Chief Broadfoot says, "This is great.  You know

25  how to change your behavior, you know what you should do" and

1 takes the recorder away.

2      As soon as the recorder is gone, the complaints go up

3 again.  Chief Broadfoot has to come back again and require him

4 to wear the recorder again.

5      So he does, then later, within a year or so, there is

6 a complaint, an internal affairs investigation, and Officer

7 Worsham is incapable of producing the recordings he was

8 required to make because he hadn't been making them.  He

9 didn't tell Chief Broadfoot that.  He led Chief Broadfoot to

10 believe he was properly interacting with citizens.  Didn't

11 tell him he wasn't interacting with citizens.  And this is

12 about this officer's behaviors when he is being recorded and

13 not recorded.  It goes exactly with this situation.

14      MR. GUYNN:  It doesn't have anything to do with this

15 situation.  This is an administrative issue.  In fact, the

16 letter, he doesn't say anything about that.  He didn't say

17 anything about trustworthiness or anything else.  He basically

18 says these complaints were all determined to be unfounded.

19      MR. TODD:  I'm happy to take that out.  This is the

20 first of three letters.  It might help if Your Honor sees all

21 three of them.  The pattern develops over the course of about

22 a year and a half.

23      He leaves the City because the sheriff is requiring

24 him to tape his interactions with the citizens, and he goes to

25 a jurisdiction where there is no recording, which is how we

1  find ourselves in this case.

2          THE COURT:  Why couldn't you just ask him:  Isn't it

3  a fact that you had no complaints when you were recording but

4  you did when you were?

5          MR. TODD:  I can, but the letters are the

6  contemporaneous record of that.  I'm happy to take out the use

7  of force stuff which he found objectionable.  The letter is

8  not hearsay.  It is offered to show motive for Chief Broadfoot

9  enforcing the requirement, and it contains the requirements

10  that he later ignores.  It is very important.  It's

11  contemporaneous evidence and it is directly on point.

12          MR. GUYNN:  It's a letter written six years before.

13  It is collateral and has nothing to do with this.

14          MR. TODD:  It is not about collateral.

15          THE COURT:  It has to do with credibility.

16          MR. TODD:  Exactly, Your Honor.  Receiving it in

17  writing is that much more important.  That shows how important

18  Chief Broadfoot thought this was.  He eventually was required

19  to sign the letters.

20          THE COURT:  Okay.  At this point I'm not going to let

21  the letters go to the jury.  You can ask him about it, and

22  then you can show it to him.

23          MR. TODD:  So I can question but don't publish?

24          THE COURT:  Yes.

25          MR. TODD:  Thank you.

```
1              THE COURT:  Come back.  I mean, just ask him whether
2   he was put under these restrictions.  Don't read the letter,
3   but ask him about the restrictions he was put on, and if he
4   denies it, then you can show him the letter.
5              MR. TODD:  Well, okay.
6              MR. GUYNN:  My objection remains, Your Honor.  You
7   don't want me to repeat it each time, do you?
8              THE COURT:  No, not necessarily.  I understand you
9   are objecting to this.
10             THE CLERK:  We have a question as far as the
11  exhibits.  Are you marking this exhibit but not admitting it?
12  Will it go to the jury?
13             THE COURT:  No, not at this point.
14             THE CLERK:  Okay.  So it's marked but not admitted.
15  Thank you.
16        (End of sidebar.)
17             MR. GUYNN:  Your Honor, if I may?  I'm sorry.
18        (Sidebar on the record.)
19             MR. GUYNN:  Nobody made a motion to exclude
20  witnesses.
21             THE COURT:  Are there witnesses in the courtroom?
22             MR. GUYNN:  I don't know.
23             MR. TODD:  Our expert is, but he's allowed.
24             MR. GUYNN:  Not necessarily.  I would object to him
25  being here.
```

1          THE COURT:  Do you have an expert?

2          MR. GUYNN:  Yes.

3          THE COURT:  Where is he?

4          MR. GUYNN:  He's in Richmond.  He will be here

5   tomorrow.

6          MR. TODD:  I would have raised the issue of a fact

7   witness, but an expert takes all the testimony into account.

8          THE COURT:  Well, normally we let the -- what's he

9   going to testify to?

10         MR. TODD:  About the appropriateness of the officers'

11  use of force and training and policy.

12         THE COURT:  If there's no agreement, he will have to

13  stay out.

14         MR. TODD:  Okay.

15      (End of sidebar.)

16         MR. TODD:  Ready to proceed, Your Honor?

17         THE COURT:  Yes.

18  BY MR. TODD

19  Q    Investigator Worsham, do you recall why Chief Broadfoot

20  imposed the requirement that you wear a recorder?

21  A    For this letter?

22  Q    Yes, sir.

23  A    For this one, that I had -- they had found out that I had

24  a hit contract on me for $5,000, and -- with my aggressive

25  behavior when dealing with citizens.  That was the reason

 1  given to them by an informant.  And that I was the leading --

 2  led the department in uses of forces completed, just the

 3  actual paperwork, from January of '03 to September of '06.

 4  Q    In connection with the recorder, did the chief require

 5  you to record all of your interactions with citizens with whom

 6  you engaged while performing enforcement actions of any kind?

 7  A    Yes.

 8  Q    And did he tell you that to the extent you had a question

 9  as to whether a particular conversation should be recorded,

10  that you should err on the side of recording it?

11  A    Correct.  That was one of the points in this letter.

12  Q    And were you required to maintain the recorder in a

13  proper working order?

14  A    Correct.

15  Q    And to know how to use it?

16  A    Yes.

17  Q    And did he require you to maintain all of your recordings

18  for all of these interactions for a year?

19  A    Yes.  Well, he required me to keep them.  And at first I

20  was to keep them myself, and then he had me just put them in

21  the vault.

22  Q    Put them in the property vault?

23  A    Correct.

24  Q    Okay.  Now, you weren't happy about having to wear this

25  recorder, were you?

1  A     No.

2  Q     Are you aware of any other officer ever required to wear

3  such a recorder?

4  A     No.

5  Q     Did Chief Broadfoot explain to you or ever suggest that

6  wearing the recorder was for your protection and for the

7  protection of the department?

8  A     That sounds correct.

9  Q     How would having a recording of your interactions with

10 citizens protect you?

11 A     If they made a false complaint, then it could be played

12 and rebut what they were saying.

13 Q     If someone made a false complaint, it would be good for

14 you to play the recording to show that it was false?

15 A     Correct.

16 Q     And that would similarly be good for the department,

17 correct?

18 A     I'm sorry, say it again.

19 Q     That would also be good for the department to have those

20 recordings in case you were accused of use of force

21 improperly?

22 A     Correct.

23 Q     After you received this instruction from Chief Broadfoot

24 and began wearing the recorder, do you recall whether your use

25 of force incidents increased, stayed the same, or decreased?

1   A    Decreased.

2   Q    How about complaints against you -- well, I should

3   clarify one thing.  A use of force incident is where you,

4   yourself, fill out a form saying, "I was involved in some use

5   of force incident," right?

6   A    Yes.  You have to fill out a form if you were involved in

7   any of their criteria for what they require for reporting,

8   drawing your gun or doing a felony stop.

9   Q    And a use of force complaint is something that a citizen

10  might file with the department specifically complaining about

11  an officer's use of force, right?

12  A    Correct.

13  Q    So you testified the first forms, the forms you had to

14  fill out, that decreased.  How about complaints against you?

15  Do you recall if that went up, stayed the same, or went down?

16  A    I believe it went down.

17  Q    Isn't it actually true, sir, that during the ten months

18  that you were required to wear this recorder, that citizen

19  complaints against you went to zero, you had none?

20  A    That's correct.

21  Q    Now, seeing that drop, someone might assume, might they

22  not, that you did something to change your behavior, took

23  Chief Broadfoot's injunctions to heart, right?

24  A    Can you say the question again?

25  Q    Sure.  Given the complaints against you went to zero,

1  someone might reasonably assume that you changed how you

2  interacted with citizens during that ten-month period; is that

3  fair?

4  A    They could.

5  Q    Okay.  That would be a bad assumption, right?

6  A    Yes.  I stayed the same.

7  Q    In truth, wearing the recorder didn't change how you

8  interacted with citizens at all, right?

9  A    It just changed the volume that I did.

10  Q    Right.  Because while you were wearing the recorder, what

11  you did was -- actually, you just engaged in less police work,

12  you slowed down, right?

13  A    I changed from doing the proactive police work to doing

14  what everyone else is required to do, which is just

15  patrolling, working accidents, responding to calls, check my

16  buildings.  I wasn't doing any extra.

17  Q    You stopped doing extra police work?

18  A    Correct.

19  Q    You just did the minimum that everyone else does?

20  A    Correct.

21  Q    You performed your patrols?

22  A    Correct.

23  Q    You stayed in your car?

24  A    Correct.

25  Q    You didn't go looking for drug dealers?

1  A     No.

2  Q     You didn't go looking for thieves?

3  A     No.

4  Q     No extra police work?

5  A     Correct.

6  Q     So, really, complaints against you dried up because you

7  just stopped going looking for trouble, right?

8  A     I stopped doing any proactive police work.

9  Q     And during this period, in fact you never paid any mind

10  at all to why there were more complaints against you, why

11  there were more -- you had more use of force incidents than

12  any of your fellow officers, right?

13  A     No.

14  Q     No?

15  A     No.

16  Q     You did give that some thought?

17  A     No, I did not give that any thought.

18  Q     Now, Chief Broadfoot, you testified earlier, had required

19  to you wear the recorder for a year, but he took it off you

20  after about ten months.  Does that sound right?

21  A     That sounds about right.

22  Q     As soon as the recorder came off, what happened?

23  A     I don't know the amount of time to be exact, but it was

24  off for a while and then I got it back.

25  Q     It was off for a while and then you got it back?

1  A    Correct.

2  Q    Isn't it in fact the case that as soon as the recorder

3  was off, complaints against you started up again?

4  A    Like I said, I don't know the dates to say when they

5  started and when they didn't.

6  Q    But once the recorder was removed, complaints against you

7  started up again, right?

8  A    Yes, I received complaints after I got it removed.

9  Q    Because you had started engaging in extra policing again,

10  right?

11  A    Yeah, some.

12  Q    When there was nothing to record what you were doing,

13  right?

14  A    Still the in-car camera.

15       MR. TODD:  Your Honor, may we approach for a second?

16       THE COURT:  Yes.

17    (Sidebar on the record.)

18       MR. TODD:  I'm sorry.  One of my colleagues looked up

19  the law while I was talking, and the law is an expert is

20  allowed to remain in the courtroom.  I wanted authority to

21  bring to Your Honor, and this is critical testimony for

22  Mr. Waller's opinions, so if we could have a few minutes to

23  revisit the ruling.  I wanted to look at that before I

24  objected to your ruling, make sure I wasn't wasting your time.

25       MR. GUYNN:  I would like to enter an objection.

1          THE COURT:  We're going to have a lunch recess now.

2      (End of sidebar.)

3          THE COURT:  Members of the jury, we're going to

4  recess for lunch now.  I have about 10 minutes after 12:00.  I

5  don't know how close that is.  And try to be back by 1:15.

6  Recess until 1:15.

7          Remember what I told you:  Don't discuss the case

8  with anyone, allow anyone to discuss it with you.  Do not

9  remain within hearing of anyone discussing it.  When you come

10  back, go directly to the jury room and wait until you are

11  called.

12      (Recess taken from 12:10 p.m. to 1:15 p.m.)

13      (Court reconvened outside the presence of the jury.)

14          THE COURT:  We'll take up the matter about the expert

15  remaining in the courtroom.

16          MR. BEATON:  Your Honor --

17          THE COURT:  I'm familiar with the rule, but you are

18  to demonstrate why he should be excepted.

19          MR. BEATON:  Happy to, Your Honor.  Thank you.

20          I believe the rule is phrased in terms of the

21  necessity of the witness to the party's case.

22          THE COURT:  Why it is necessary that he be in the

23  courtroom.

24          MR. BEATON:  Be in the courtroom, exactly.  I would

25  offer two reasons.  One, we have no law enforcement personnel

 1    on our side of the aisle.  We have my client, who is not

 2    trained, and so the presence of an expert to listen to,

 3    respond to, tie together the law enforcement testimony from

 4    the other side, where there are three trained law enforcement

 5    officers on the other side, is helpful.  And the rule, I

 6    believe, contemplates, you know, that sort of leveling the

 7    playing field.

 8            And then the second reason I would offer is that so

 9    much of this case, as Your Honor knows, is not about the

10    actual force used but about the reasons given, the why and

11    when and how this force was used.

12            Now, my expert has carefully reviewed the statements,

13    the force reports, and the deposition testimony.  That's what

14    he is prepared to address.  But, obviously, the jury is going

15    to be responding to their words on the stand, and he will be

16    need to be responding to that current statement of

17    justification, not what they said in their deposition months

18    ago.

19            THE COURT:  Okay.

20            Mr. Guynn.

21            MR. GUYNN:  Your Honor, assuming that there's

22    something that's different that the defendants testified to as

23    compared to their deposition testimony, there's no reason why

24    that can't be communicated to the expert otherwise.

25            What we're going to get into here is, and the expert

1  has to some degree in his opinion, basically him judging the

2  credibility of the witnesses, and having him sitting here and

3  then saying, "Well, you know, I watched them testify yesterday

4  and I don't believe their reason for doing this" --

5          THE COURT:  He can't say that.

6          MR. GUYNN:  Well, he shouldn't be able to say it, I

7  agree.  But that would be the only reason he would need to be

8  in here, would be judging their credibility.  Otherwise --

9          THE COURT:  Well, I mean, why wouldn't he be -- even

10 assuming --

11         MR. GUYNN:  I'm sorry, I didn't hear you, Your Honor.

12         THE COURT:  Why wouldn't he be able to examine the

13 screen and look and listen to the witnesses testify?  I mean,

14 he wouldn't necessarily have to talk about their credibility.

15 He is rendering an expert opinion.

16         MR. GUYNN:  If that's all he is doing, that's fine.

17         THE COURT:  Okay.

18         MR. BEATON:  I'm certainly not going to ask my

19 witness anything about the credibility of the witnesses on the

20 stand.  It's only responding to the substance of their

21 testimony.

22         THE COURT:  Well, okay.  I think the witness is --

23 there's enough showing that he is essential to present the

24 case to for plaintiff, so I will allow the witness to stay.

25         All right.  Ready to recall the jury?

1     MR. TODD:  Yes, Your Honor.

2     THE COURT:  Call the jury.

3     (Jury in at 1:19 p.m.)

4     MR. GUYNN:  Your Honor, should we go ahead and let

5  Mr. Worsham resume the stand?

6     THE COURT:  Yes.

7     All right.  Mr. Todd, you may proceed.

8     MR. RIDER:  Thank you, Your Honor.

9  BY MR. TODD:

10 Q    Investigator Worsham, we were talking this morning about

11 the use of force incidents and interactions with the public,

12 and the audio recorder that Chief Broadfoot required you to

13 wear for some period of time.  Do you recall that?

14 A    Correct.

15 Q    And the upshot of that, sir, was that when you wore the

16 recorder, you did your job differently, right?

17 A    Yes, I did just what was asked.

18 Q    You did your job differently with regard to interactions

19 with the public and use of force incidents, and the complaints

20 dropped off?

21 A    Yes, the complaints dropped off; there were none.  And I

22 didn't do as much proactive policing.

23 Q    You never told -- you never explained to Chief Broadfoot

24 that during this period you were just doing less proactive

25 policing, right?

1 A    I don't believe so.  We may have had a conversation about

2 it.

3 Q    You don't recall telling him?

4 A    No, not specifically.

5 Q    You allowed him to believe that you had changed how you

6 were interacting with the public, right?

7 A    It was never brought up with him.

8 Q    You testified earlier that after the recorder came off,

9 there were some more use of force incidents and the recorder

10 then went back on, right?

11 A    Correct.

12 Q    Do you recall getting another letter from him?

13 A    Reinstatement letter, yes.

14 Q    Do you recall that letter contained the same types of

15 requirements with regard to the recorder?

16 A    Correct.

17 Q    Tape all your interactions with the public?

18 A    Correct.

19 Q    Maintain the recorder in good working order?

20 A    Correct.

21 Q    Know how to use it?

22 A    Yes.

23 Q    Preserve your recordings?

24 A    Yes.

25 Q    And put them in the evidence locker?

```
 1   A      Yes.

 2          (Plaintiff's Exhibit Number 6 was marked for

 3   identification.)

 4   BY MR. TODD:

 5   Q      I'm going to hand you what's been marked for

 6   identification purposes as Exhibit 6.  Let me know when you've

 7   had a chance to read that, Mr. Worsham.

 8   A      Okay.  Yes, sir.

 9   Q      Do you recognize this document, sir?

10   A      Yes.

11   Q      Is that your signature at the end of the second page?

12   A      Yes.

13   Q      Do you recognize receiving this letter?

14   A      Yes.

15   Q      Are you familiar with the contents of this letter?

16   A      Yes, I am.

17   Q      This is not the letter you mentioned a second ago that

18   reimposed the recorder requirement, right?

19   A      Yes.

20   Q      This letter is even later in time, correct?

21   A      I'm not sure of the date of the other one.

22   Q      You testified this morning that you always followed Chief

23   Broadfoot's requirements with regard to the recorder.  This

24   letter suggested that's not true, correct?

25   A      Yes, it is.
```

1    MR. TODD:  Your Honor, move to admit 6.

2    MR. GUYNN:  We object, Your Honor.

3    THE COURT:  It will be marked for identification.

4    MR. TODD:  It has been marked for identification.

5    THE COURT:  Okay, but --

6    MR. GUYNN:  We object.

7    THE COURT:  Okay.  At this point, you can ask him

8    questions, but I'm not going to admit the letter at this

9    point.

10    MR. TODD:  Your Honor, I can argue from here or

11    should we approach?

12    THE COURT:  You may approach.

13    (Sidebar on the record.)

14    MR. TODD:  We have established relevance of its use,

15    and credibility; he has testified to the familiarity of the

16    letter, so I have foundation; and he just testified that it

17    impeaches his earlier testimony that he complied with all the

18    requirements.  I'm happy to examine him in the abstract, but I

19    think this is ready for admission so the jury can see it and

20    discuss it.

21    THE COURT:  I don't know.  If he made a promise to do

22    something that he didn't fulfill, that doesn't necessarily

23    affect his credibility.  You say that he said he --

24    MR. TODD:  I can elicit this first if you would like.

25    THE COURT:  Sure.

1          MR. TODD:  He testified that he complied with Chief

2     Broadfoot's requirements that he record all of his

3     interactions with the public and preserve them.  In this

4     letter, Chief Broadfoot comes back and said, "You didn't

5     preserve them.  I ordered you to produce them and you

6     couldn't."  And he said in the second to the last paragraph,

7     "Because you clearly have the skills to perform this task

8     without problems, I can only conclude that you are approaching

9     this very serious matter with a dismissive and insubordinate

10    attitude."

11         He is purposefully behaving differently when he is

12    being recorded, and not reporting to his superiors about use

13    of force incidents the way he is supposed to, which is

14    directly germane to this case.

15         MR. GUYNN:  First off, it's not directly germane to

16    the case, Your Honor.  More importantly, this dismissive and

17    insubordinate attitude has nothing to do with his credibility.

18    It's simply a matter of an attempted character assassination.

19         THE COURT:  I don't think that they show -- I mean, I

20    think you can show false pretenses in the past, but I don't

21    think that -- and you can show that he acted differently when

22    he knew he was under observation, but I don't think it's

23    sufficient to show dishonesty.  You can ask him.

24         MR. TODD:  I will inquire further.  Thank you, Your

25    Honor.

1          MR. GUYNN:  Wait.  The subject of the letter is not

2     sufficient to show dishonesty.

3          THE COURT:  I mean, just ask him.

4          MR. GUYNN:  Right.  But it's so collateral, Your

5     Honor.  It's so far removed.

6          THE COURT:  His credibility is not collateral here.

7       (End of sidebar.)

8     BY MR. TODD:

9     Q    While you were wearing the recorder after it was

10    reimposed, did there come a time when you were asked to

11    produce some of the recordings?

12    A    Yes.

13    Q    In fact, do you recall there was a use of force complaint

14    against you and internal affairs asked you to produce the

15    recording so they could check to see whether the complaint was

16    true or false?

17    A    Correct.

18    Q    And you were unable to produce that recording, correct?

19    A    Yes.  It was an error in the file.

20    Q    And in that particular instance, for whatever reason, you

21    had not complied with Chief Broadfoot's requirements, correct?

22    A    I think it was whole recorder, because they ended up

23    giving me two more recorders.  I ended up having, I think,

24    three as backups.  But one had a corrupt file, something along

25    that lines, so all of the recordings off of there was just

1  gone off the recorder.

2  Q    It was the recorder that wasn't working properly?

3  A    I don't know if it was the recorder or if it was the

4  files on the computer that had came off the recorder.

5  Q    And do you recall -- I assume you explained this to the

6  chief?

7  A    Yes.

8  Q    And wasn't the chief's reaction to this to ask you to

9  produce a sampling of recordings of other interactions you had

10 with the public, correct?

11 A    Correct.

12 Q    And you were also unable to produce those recordings,

13 correct?

14 A    That is correct.

15 Q    And isn't it a fact that the chief determined that you

16 were --

17          THE COURT:  Wait, just a minute.

18          MR. GUYNN:  Objection.

19          THE COURT:  All right.  Sustained.

20 BY MR. TODD:

21 Q    Can you think, Officer Worsham, of a single allegation of

22 a use of force complaint against you ever made that you have

23 not challenged?

24 A    Say the question again, please.

25 Q    Has there ever been a complaint made against you that you

1  have not disputed?  In other words, you have disputed every

2  single use of force complaint against you, correct?

3         MR. GUYNN:  I object to the relevance.

4         THE COURT:  Overruled.

5  A    I cannot recall a use of force that has came up that I

6  had not had my version of it that was different than somebody

7  else's version.

8  BY MR. TODD:

9  Q    The answer is, yes, you've disputed every single one?

10 A    The complaint, yes.

11 Q    As we discussed this morning, having a recording of those

12 would have been helpful to you to make your case, right?

13 A    Outside of the in-car camera and the microphone, I don't

14 know that a separate little individual microphone would have

15 helped that much more.

16 Q    You mentioned in-car camera this morning.  That captures

17 what is happening in front of the car, right?

18 A    And the audio, where it is clipped to your belt.  It's a

19 digital audio recorder that records to the car's camera

20 system.

21 Q    So if you didn't have that audio recorder -- well, the

22 video recording wouldn't capture what happened anywhere other

23 than in front of the car, right?

24 A    On --

25 Q    You would have a picture of what happened in front of the

1  car?

2  A    Yes.  Yes, just the camera on the car just faced forward.

3  The audio is with you.

4  Q    Chief Broadfoot imposed the audio recorder, the portable

5  audio recorder in addition to your car system, correct?

6  A    Correct.

7  Q    And these various use of force incidents where he asked

8  you to produce a recording, there wasn't an in-car system

9  recording either, otherwise he wouldn't need the recording he

10  asked you for?

11  A    Say it one more time, please.

12  Q    These use of force incidents where you were asked to

13  produce a recording and you could not produce a recording,

14  there wasn't a recording from your car system, right,

15  otherwise he wouldn't have needed your separate recording?

16  A    I don't know that I can answer that.

17  Q    Okay.  This letter that you received from Chief Broadfoot

18  calling into question whether you had properly recorded

19  incidents, even this letter didn't change your behavior, did

20  it?

21       Let me rephrase that.  This letter didn't change how you

22  interacted with citizens and how you handled use of force

23  incidents, correct?

24  A    No.  I continued policing as I policed.

25  Q    You continued to police how you police?

1  A    Correct.

2  Q    How would you characterize your relationship with Chief

3  Broadfoot today?

4          MR. GUYNN:  Objection.

5          THE COURT:  Sustained.

6  BY MR. TODD:

7  Q    What's your personal view of Chief Broadfoot?

8  A    As in --

9          MR. GUYNN:  Objection.

10 BY MR. TODD:

11 Q    As a police officer.

12         THE COURT:  Sustained.

13         MR. GUYNN:  I'm sorry.  Your Honor, I can't

14 understand what's being said.  I apologize.

15 BY MR. TODD:

16 Q    You testified earlier that you prefer to be a proactive

17 police officer?

18 A    Correct.

19 Q    And in your view, is it your view that Chief Broadfoot is

20 not a sufficiently proactive police officer?

21         MR. GUYNN:  Objection.

22         THE COURT:  I'll sustain that.  I think we're getting

23 too far away from the case.

24 BY MR. TODD:

25 Q    You left Danville, the Danville Police Department in

1  2008?

2  A    Correct.

3  Q    And you left in part because of this recorder and this

4  disagreement you had with Chief Broadfoot, right?

5  A    One of the reasons.

6  Q    You started in Pittsylvania County effective

7  November 1st, 2008?  Does that sound right?

8  A    I think that's about right.

9  Q    And at the time, the County didn't use video recorders in

10 their cars at all, right?

11 A    As I recall, some had video recorders and some didn't.

12 Q    Well --

13 A    The older cars hadn't been retrofitted, and they did it

14 as they got new cars and put those in there.

15 Q    The County didn't use body recorders, though, right?

16 A    Yes, they had in-car cameras with the body mics, as far

17 as I remember.

18 Q    But nothing separate like we were talking about a minute

19 ago?

20 A    No.

21 Q    And to this day, SID cars, Special Investigative Division

22 cars, don't have any recording devices at all, correct?

23 A    Correct.

24 Q    Earlier today we talked about the sheriff's use of force

25 policy.  Do you recall that?

1  A    Yes.

2  Q    And the sheriff, the department, also has a policy for

3  recording use of force complaints -- sorry, for investigating

4  use of force complaints, correct?

5  A    Yes.

6  Q    Are you familiar with that process?

7  A    Yes, I'm familiar.

8  Q    Are you familiar with an officer by the name of Sergeant

9  Michael Young?

10 A    I am.

11 Q    Who is he?

12 A    He used to work for the sheriff's office.

13 Q    Do you recall what his duties were?

14 A    I believe he may have been on the road, maybe worked for

15 a school, and then he was internal affairs.

16 Q    Did you ever interact with Sergeant Young in the context

17 of internal affairs?

18 A    Yes.

19 Q    Are you familiar with how use of force complaints are

20 adjudicated?

21 A    I'm not sure.

22 Q    Let me clarify my question.  How they're ultimately

23 resolved?  If I told you that they are -- let me just tell you

24 this and you tell me if I'm right or wrong.

25      There can be three types of findings in use of force

1  complaints against an officer: sustained, meaning the

2  complaint is upheld, it is found to be factually correct;

3  unfounded, meaning it's wrong, it's a false complaint, like we

4  were talking about earlier; or not sustained, which means

5  there is not enough evidence to tell whether it's true or

6  whether it's false.  Does that sound right?

7  A    I'm not exactly sure on the unsustained part, but, yes,

8  it is progressive.  It is the complaint is correct; and then

9  there's one that, you know, the officer was incorrect; and

10 then there's nothing either way you can go with.

11 Q    I got the categories right even if my words are a little

12 wrong?

13 A    Right.

14 Q    All right.  Now, since you moved to Pittsylvania County,

15 have you been the subject of any use of force complaints?

16 A    I have.

17 Q    Any idea how many?

18        MR. GUYNN:  Objection, Your Honor.

19        THE COURT:  Overruled.

20 BY MR. TODD:

21 Q    Ballpark.

22 A    Three or four.

23 Q    Three or four?

24 A    Something like that.

25 Q    Are you sure?

1  A    No.

2  Q    It could be higher?  It could be lower?

3  A    I don't know.

4  Q    Is that something you pay attention to?

5  A    I don't keep up with that record.

6  Q    Were any of those complaints ever sustained, found to be

7  meritorious?

8  A    No.

9  Q    Were any of then dismissed, found to be false?

10 A    They were either dismissed or unsustained.

11 Q    Did any of these complaints result in any discipline?

12 A    Use of force complaints, no.

13 Q    Did any of them result in any other activity or any other

14 results, such as extra training?

15 A    Yes.

16 Q    Did that extra training pertain specifically to the use

17 of force?

18 A    It did.

19 Q    Did you find it helpful?

20 A    It was just a refresher training.

21 Q    Did it help you understand the types of force that can be

22 used and can't be used?

23 A    No, I wouldn't say it hit on that.  It just went over the

24 basics again type thing.

25 Q    Did it help you understand when force is proper or

1  improper?

2  A    It's something they went over, but nothing that I already

3  didn't know.

4  Q    None of this really jumps out at you?

5  A    No.  I mean, it was all just refreshing stuff you had

6  already been taught.

7  Q    Do you recall -- I want to talk about three particular

8  instances, okay?  Do you recall in 2010 arresting a man named

9  Cook?  You and Investigator Wyatt arrested him at the GNS

10 Market in connection with some drug activity?

11 A    Yes.

12 Q    Do you recall that he alleged that you and Defendant

13 Wyatt beat him up when you arrested him?

14 A    I don't remember the exact words in the complaint, but he

15 had a use of force complaint that he filed.

16 Q    Internal affairs would have investigated this complaint,

17 right?

18 A    Yes, I would assume so.

19 Q    And you would have been interviewed as part of that

20 investigation --

21 A    Yes.

22 Q    -- by Sergeant Young?

23 A    At the time, yes.

24 Q    And a written summary of the findings of that

25 investigation would have been prepared?

1  A    By --

2  Q    By Sergeant Young.

3  A    Yes, I would assume so.

4  Q    You arrested Mr. Cook on June 23rd, 2010.  Does that

5  sound about right?  I wouldn't expect you to recall the exact

6  date.

7  A    Roughly.

8  Q    Do you recall Mr. Cook was a passenger in a car that you

9  pulled over in connection with -- or on suspicion of

10  narcotics-related activity?

11  A    Yes.

12  Q    Sound right?

13      You were in plain clothes and driving an unmarked car; is

14  that right?

15  A    Correct.

16  Q    And when you were arresting Mr. Cook -- you were

17  searching Mr. Cook, do you recall that he was bobbing his

18  shoulders?

19  A    I remember he tried to run away.

20  Q    Tried to run away?

21  A    Yes.

22  Q    He wasn't just bobbing his shoulders?

23  A    I don't exactly know what you mean by "bobbing his

24  shoulders."

25  Q    Your recollection is he was actually trying to run away?

1  A    Yes, he tried to run away.

2       (Plaintiff's Exhibit Number 7 was marked for

3  identification.)

4  BY MR. TODD:

5  Q    Sir, does this look like a summary of the incident we

6  were just discussing?

7  A    Can I have a second?

8  Q    Yes, sir.

9            MR. GUYNN:  Your Honor, I --

10           MR. TODD:  If there's an objection, I would ask that

11  we approach.

12           MR. GUYNN:  If you want to.

13       (Sidebar on the record.)

14           MR. GUYNN:  Judge, there's a foundation problem here.

15  We looked at it last week.  There's no indication he has ever

16  seen this before.

17           MR. TODD:  That's why I was about to ask to approach.

18           THE COURT:  Well, this is somebody else.  This is an

19  investigation --

20           MR. TODD:  That's right.

21           THE COURT:  -- about this bobbing.  But he says it

22  wasn't bobbing, he was running away.  I don't think this --

23           MR. TODD:  I was going to come up and ask.  This is

24  Sergeant Young's summary of the incident.  It's admissible.

25  It's not hearsay.  It's admissible under the public

1  investigations exception.  He is going to be our next witness

2  and he will authenticate this.  So I was hoping that I could

3  get a committal and use that committal subject to his

4  authenticating it; otherwise, I can do it later in trial, but

5  that's a little peculiar.

6       There's no authentication issue as to what it is,

7  because Sergeant -- I can do his deposition as well.  He is

8  sitting in the hallway, but he prepared this.  This is his

9  findings.

10       THE COURT:  If it's authenticated, what is the

11  problem?

12       MR. GUYNN:  But he hasn't seen it before, number one.

13       MR. TODD:  He can say that.

14       MR. GUYNN:  I think he's got to be shown to have seen

15  it before, number one.  Number two, it is still hearsay.

16       THE COURT:  Well, what about the resulting

17  investigation?

18       MR. TODD:  I think it's 803(8).  I can get the exact

19  rule.  803(8), "A record or statement of a public office if it

20  sets out factual findings from a legally authorized

21  investigation."  One of those use of force summaries that

22  Sergeant Young prepared includes conclusions and

23  recommendations, and that's what this is.  I would ask that he

24  testify as he did in his deposition.

25       MR. GUYNN:  That's not what -- that rule is more

 1  towards investigations by the government and other things.

 2  It's not for internal affairs investigations.

 3          MR. TODD:  That's the only summary of investigation.

 4          THE COURT:  What's your thoughts on that?

 5          MR. GUYNN:  The way it's read it, it talks about --

 6  it doesn't talk about internal affairs investigations.

 7          THE COURT:  Well, but it just says, "investigations."

 8          MR. GUYNN:  By the government, not by the sheriff's

 9  deputy.

10          THE COURT:  Which one -- that's public records.

11          "A record or statement of a public office if it sets

12  out the office's activity... a matter observed while" --

13          THE LAW CLERK:  That's 803(8), right?

14          THE COURT:  -- "from a legally authorized

15  investigation."

16          MR. TODD:  If I could see that for a second.

17  Actually, it's 803(8)(A) little (c).  "The records of a public

18  office if it sets out in a civil case, or against the

19  government in a criminal case, factual findings from a legally

20  authorized investigation."

21          Internal affairs investigation, that's done by the

22  government.  And it was a legally authorized investigation.

23  And this amendment sets forth the conclusions of that

24  investigation as authenticated by its officer.

25          THE COURT:  Okay.

1          MR. GUYNN:  Also, Your Honor, it is irrelevant,

2   because it's not a knee strike investigation.  They're not

3   alleging a knee strike investigation.  It has nothing to do

4   with the issues in this case.

5          MR. TODD:  In this instance, it's relevant.

6          THE COURT:  I think it is shown this is an officer

7   that is being very abusive.  And then if the jury finds in his

8   favor, find in favor of the plaintiff, then with the issue of

9   the punitive damages, it's relevant for the damages.

10          MR. TODD:  Damages, credibility.  And also this is

11  the first of the three investigations.  I was trying to

12  actually -- the investigation of this is similar to what

13  happened here.

14          MR. GUYNN:  Punitive damages should be based on this

15  incident and not on previous instances before.

16          THE COURT:  Part of the issue is, is it necessary for

17  punitive damages to keep somebody from doing the same conduct?

18  And conduct that may be done over and over and over may be --

19  I mean, that's the instruction, I think.  I understand your

20  objection.

21          MR. TODD:  Punitive damages can consider a pattern.

22          THE COURT:  Yeah.

23          MR. GUYNN:  Not on a Section 1983 case.

24          THE COURT:  I understand.

25          MR. GUYNN:  But it's not the same.  There still has

1  to be some similarity, Your Honor.

2          THE COURT:  There doesn't have to be exactness.

3  Okay.

4      (End of sidebar.)

5          MR. TODD:  Your Honor, move to admit Exhibit 7.

6          THE COURT:  Well, subject to authentication.

7          MR. TODD:  Yes, Your Honor.  May we publish it at

8  this point with --

9          THE COURT:  No, we're not, not until it's

10 authenticated.

11         MR. TODD:  Thank you, Your Honor.

12 BY MR. TODD:

13 Q   Mr. Worsham, when you arrested Mr. Cook, isn't it a fact

14 that he was bobbing, simply bobbing his shoulders?

15 A   I see where he used that to explain the action, but he

16 was trying to run away from where I had ahold of him.

17 Q   Isn't it a fact, sir, your response to Mr. Cook bobbing

18 his shoulders was to -- well, Mr. Cook was not complying with

19 your orders to give him your arm so you could cuff it; isn't

20 that right?

21 A   Yes.  Myself and Investigator Wyatt were both trying to

22 get him cuffed.

23 Q   And your response to this was to punch Mr. Cook, correct?

24 A   Try to hit the back of his arm so that he could pull his

25 arm back.

1  Q    But you, in fact, hit him in the kidney, right?

2  A    Somewhere along in the low back area.  I don't know if it

3  was the kidney.  I'm not exactly sure where the kidney is.

4  Q    As we discussed earlier today, you're not supposed to

5  punch people in the kidneys, correct?

6  A    As somewhere you're going to target.

7  Q    But having punched Mr. Cook in the kidney, you told

8  Sergeant Young that you had in fact just intended to punch him

9  in the arm?

10 A    No, I actually intended to punch him in the back of the

11 arm.

12 Q    Now, there's no question in this particular instance,

13 this Cook arrest, that you used force, right?  You acknowledge

14 that?

15 A    Correct.

16 Q    And the only question is really whether the force used

17 there was necessary to effect the arrest, right?

18 A    As far as kneeing him, yes.

19 Q    Do you recall that the complaint in the case was not

20 sustained, meaning not enough evidence to find either way?

21 A    I recall -- I just read it here that I think he just

22 wouldn't answer back or get back with him or something like

23 that, I think.

24 Q    In this instance, there was no recording, right?  There

25 was no audio recording of your arrest of Mr. Cook?

1  A    Not that I'm aware of.

2  Q    There was no video recording of your arrest of Mr. Cook?

3  A    No.

4  Q    There was just your word and Wyatt's against his,

5  correct?

6  A    Correct.

7  Q    Sheriff Taylor would have reviewed Sergeant Young's

8  findings, right?

9  A    I don't know how they do what they -- I don't know.

10 Q    Is it the sheriff who ultimately makes determinations on

11 whether use of force complaints against his officers will be

12 sustained, not sustained?

13 A    I believe so, yes.

14 Q    And do you recall Sheriff Taylor's determination in this

15 case?

16 A    I believe this is when they just sent us to the

17 refresher.

18 Q    We'll get to that in a minute, sir.  But my question is,

19 do you recall that Sheriff Taylor determined in this case, in

20 the Cook arrest, that there was insufficient evidence to

21 determine whether Mr. Cook's complaint against you was valid

22 or not valid?  It was simply not sustained?  Do you recall

23 that?

24 A    It's very possible, yes.

25 Q    Let's nail this down.  Handing you what's been marked as

1  Exhibit 8 for identification.

2      (Plaintiff's Exhibit Number 8 was marked for

3  identification.)

4  BY MR. TODD:

5  Q    Do you recognize this letter, sir?

6  A    Yes, sir.

7  Q    Is this a letter from Sheriff Taylor to you?

8  A    Yes.

9  Q    And does this pertain to the Cook incident we've just

10 been discussing?

11 A    Yes.

12 Q    And does this set forth Sheriff Taylor's conclusion?

13 A    Yes.

14     MR. TODD:  Move to admit Exhibit 8, Your Honor.

15     MR. GUYNN:  It's still irrelevant.  I object because

16 it's irrelevant, just as the whole line of questioning is,

17 Your Honor.

18     MR. TODD:  I'm happy to preserve Mr. Guynn's

19 objection on that point for all of these exhibits.

20     THE COURT:  Well, overruled.  Go ahead.  He has read

21 the letter.

22     (Plaintiff's Exhibit Number 8 was received.)

23 BY MR. TODD:

24 Q    And Sergeant -- sorry.  Investigator Worsham, what was

25 Sheriff Taylor's conclusion in the Cook case?

1  A    It was unsustained.

2  Q    Not sustained?

3  A    Right, unsustained.

4  Q    Let me read this.  You tell me if I read it correctly,

5  the paragraph above.

6       MR. TODD:  You can put it up on the screen.

7  BY MR. TODD:

8  Q    "After reviewing this complaint, I find there is

9  insufficient evidence to either prove or disprove Mr. Cook's

10 allegation that you used excessive force on him during his

11 arrest on June 23rd of 2010."

12      Did I read that correctly?

13 A    I believe.  I was reading myself, but I believe so, yes.

14 Q    Okay.  Thank you.  Now, the sheriff's decision here was

15 the final official word on Mr. Cook's complaint against you,

16 right?

17 A    The last I heard about it, yes.

18 Q    It resolves the complaint?

19 A    Correct.

20 Q    But as you started to testify a minute ago, it wasn't

21 actually the last ramification of the Cook arrest, right?

22 A    Yes.  We had the training.

23 Q    Sergeant -- or Sheriff Taylor required you and Defendant

24 Worsham to go do supplemental use of force training, correct?

25 A    Correct, a refresher course.

Worsham - Direct

1  Q    Isn't it a fact that the sheriff required you to go have

2  that training because he was concerned that you and Defendant

3  Wyatt were too quick to go to hands-on with Mr. Cook instead

4  of using some other tactics or options?  Do you know that?

5  A    No.  I mean, he just sent us to the refresher course.

6  Q    Do you recall where you attended that supplemental

7  training?

8  A    It was at some old school in Bassett, Virginia.

9  Q    And presumably you covered a range of use of force

10 topics?

11 A    Yeah.  It was just kind of hitting the highlights going

12 through.

13 Q    Different types of force?

14 A    Yes.

15 Q    Different types of scenarios?

16 A    Not really scenarios, not that I remember.

17 Q    Not scenarios?

18 A    Just hands-on type training.

19 Q    There was one thing, more than anything else, that really

20 stood out for you from that training, though, wasn't there?

21 A    It was the one thing that they focused on the most, yes.

22 Q    And that was knee strikes, wasn't it?

23 A    Correct.

24 Q    And what you took away from that training, sir, was that

25 when you throw a knee, you should really drive it home.  Don't

1  just tickle the subject, but actually throw it all the way

2  through, drive it home, correct?

3  A    That's the way they taught us, yes.

4  Q    The day-long course, refresher on use of force, that's

5  what you took away, right?

6  A    That was his instruction.

7  Q    This remedial training didn't change how you interact

8  with the public, though, did it?

9  A    No, I still continued.

10  Q    It didn't change how you use force with the public, did

11  it?

12  A    Only when it was necessary.

13  Q    I don't mean when it's necessary, sir.  I mean, in your

14  police practices, your use of force practices did not change

15  in any way because of this training; isn't that right?

16  A    Yes, I still policed.

17  Q    You went on doing things the way you've always done them?

18  A    Just as I was taught when I first started.

19  Q    Let's discuss the second incident.  Do you recall

20  arresting a man named Reynolds in 2011 who also complained

21  that you used excessive force against him?

22  A    Yes.

23  Q    Mr. Reynolds fled from a traffic stop and you had to

24  chase him, right?

25  A    He didn't flee from a traffic stop.

1  Q    He didn't flee from a traffic stop?

2  A    No.

3  Q    Regardless how it started, you pursued him in your

4  vehicle?

5  A    Yes.  It was a vehicle pursuit, yes.

6  Q    He eventually pulled over, right?  He stopped?

7  A    That's correct.

8  Q    You ordered him out of his car?

9  A    That's correct.

10 Q    And he claimed in his complaint against you that he laid

11 down on the ground, complying with your orders, right?

12 A    I don't remember what he complained, what he put in the

13 complaint.

14 Q    Do you recall that he complained that after he laid down

15 on the ground, you punched him in the face two or three times?

16 A    I still don't remember what was on his complaint, what he

17 filled out.

18 Q    Do you recall that he complained that you told him that,

19 quote, "I should have shot you," unquote?

20 A    I don't remember ever saying that.  I think I was quoted

21 as saying that he could have been shot for doing what he did.

22 And that was in the heat of the moment, after the arrest.

23 Q    That was your version of what happened.  I was simply

24 asking if you recall his version.

25 A    I do not recall his version.

1  Q    Now, do you recall that your claim in this instance was

2  that he lowered himself to the ground, and as he got near the

3  ground, his right hand suddenly went underneath him?  Do you

4  recall that?

5  A    Yes.

6  Q    And you claim that you feared he had a gun.  Do you

7  recall that?

8  A    I did.

9  Q    And so you then punched him two or three times?

10  A    Correct.

11  Q    And, in fact, Mr. Reynolds did not have a gun in his

12  hand, right?

13  A    No.

14  Q    Do you recall receiving a letter from Sheriff Taylor in

15  this case, giving his adjudication of the complaint?

16  A    I remember it being adjudicated.  I don't remember it

17  word for word what it says.

18  Q    In this case, just like in the Cook case, Sergeant Young

19  would have investigated and would have made some findings, and

20  would have written them up, and they would have gone to the

21  sheriff, right?

22  A    Right.

23  Q    But you don't recall the sheriff's resolution of this

24  case?

25  A    I recall the resolution.  I just don't remember -- I

1  can't quote you --

2  Q    You remember it being resolved, you just don't remember

3  how it was resolved; is that right?

4  A    No, that sounds like --

5  Q    Let me ask it this way:  Isn't it a fact that this case,

6  the Reynolds arrest, was resolved in the same way as the Cook

7  arrest, that Sheriff Taylor determined there was not enough

8  evidence to either prove or disprove the allegations of use of

9  force against you?

10 A    Yes.

11 Q    That's right?

12 A    Yes.

13 Q    We're talking over each other.

14 A    Yes.

15 Q    In Mr. Reynolds' arrest, there was no video of what

16 happened, right?

17 A    No, not I'm aware of.

18 Q    And there was no audio recording?

19 A    No.

20 Q    And it was just your word against his?

21 A    Yes.

22 Q    Let me ask you about one more, sir.  Do you recall in

23 2012, shortly before you arrested Mr. Wyatt, arresting a man

24 named Brandon?

25 A    Yes, I do.

1  Q    Do you recall -- well, you and Defendant Wyatt again

2  pulled over a car in which Mr. Brandon was a passenger, right?

3  A    Correct.

4  Q    And you searched him, right?

5  A    Correct.

6  Q    And while you were searching him, you spotted some drugs

7  concealed in his butt checks, right?

8  A    Correct.

9  Q    And isn't it a fact that, according to your statement in

10 this case, Mr. Brandon began pulling away from you?

11 A    Correct.

12 Q    And your response to this was to sweep his legs and knee

13 him in the side, right?

14 A    It was to take him to the ground so that he couldn't

15 break free and run.  And then there was one distraction knee

16 and he was cuffed.

17 Q    So the answer to my question is, yes, you swept his legs,

18 took him to the ground, and kneed him in the side?

19 A    Correct.

20 Q    And you at no point in connection with the Linwood

21 Brandon arrest were ever afraid that he had a gun, right?

22 A    I didn't think Linwood Brandon had a gun, no.

23 Q    Do you recall this episode being investigated by internal

24 affairs, the Brandon episode?

25 A    It was investigated some, but it was never concluded.

1  Q    This episode from 2012 has never been finally

2  adjudicated?

3  A    Not that I'm aware of.

4  Q    Are you aware that it was recommended that you be

5  disciplined for this episode?

6  A    I found out after the fact, when all this was -- when I

7  saw the paperwork, but not before that.

8  Q    And that recommendation has been outstanding for five

9  years now?

10        MR. GUYNN:  I object.  If he doesn't -- if the

11  investigation is concluded, he wasn't aware it.

12        THE COURT:  Sustained.

13  BY MR. TODD:

14  Q    When you were interviewed by Sergeant Young in connection

15  with the Linwood Brandon arrest, Sergeant Young asked you

16  specifically about the knee strikes, your knee strike, right?

17  Do you recall that?

18  A    Correct.

19  Q    And isn't it a fact, sir, that in justifying your

20  behavior towards Mr. Brandon --

21        MR. GUYNN:  I object.

22        MR. TODD:  I'm going to confront the witness with a

23  statement corroborated by --

24        THE COURT:  Go ahead with the question.

25        MR. TODD:  Thank you, Your Honor.

1        THE COURT:  I haven't heard the question.

2        MR. GUYNN:  I just know what's coming, Your Honor.

3   BY MR. TODD:

4   Q    Isn't it a fact that you stated to Sergeant Young, in a

5   mocking voice, quote, "That school, that lovely school in

6   Ridgeway taught us to deliver body knees," unquote?

7   A    I didn't said "body knees."  I said "knee strikes."

8   Q    Otherwise, what I said is accurate?

9   A    Correct.

10  Q    Thank you.

11       And what you were referring to by "that school" was the

12  remedial use of force training that you and defendant Wyatt

13  had to go to after the Cook arrest, correct?

14  A    Correct.

15  Q    There was no recording of your arrest of Mr. Brandon,

16  right?

17  A    I'm sorry, say it again.

18  Q    There was no video recording of your arrest of

19  Mr. Brandon?

20  A    There was a Danville police officer there with us, and he

21  had his in-car camera running.  But I believe, from looking

22  over the documents after I got them, not until just recently,

23  that it showed that the officer thought it would already be

24  gone, because it was so long before Mike Young asked him about

25  it.  But it was on recording and audio recording.

1 Q    That recording wasn't preserved as part of the Linwood

2 Brandon file, right?

3 A    No, he didn't -- he didn't go and ask for it until, I

4 guess, some time later.

5 Q    And you never went and asked for it either, right?

6 A    No, I didn't.  It was -- it was knowledge that he was

7 there, the Danville police officer was there.

8 Q    And you knew, as we discussed earlier, you knew the

9 Danville cars have recorders?

10 A    Correct.

11 Q    And you never mentioned to Sheriff Taylor, Michael Young,

12 or anyone else in Pittsylvania County that there may be a

13 video recording, may be a recording of your arrest of

14 Mr. Brandon, right?

15 A    I made them aware that he was there, yes.

16 Q    But Sergeant Young had to go separately and find out

17 there was a recording.  And by the time he did, it was too

18 late, the recording was already gone, right?

19 A    That's what I take from the example that he showed that

20 Mike Young was saying in his summary, I think it was.  But

21 that would be up to him during his course of his

22 investigation.  We don't do that.  As far as if we're being

23 complained on, we don't go get our own tape from Danville.

24 Q    So, in short, you made no effort to preserve the

25 recording either, correct?

1  A    No, I did not.

2  Q    Let's turn back to Mr. Wyatt and July 3rd, 2012, okay?

3  On July 3rd, you were part of an SID team, a group of officers

4  from SID looking for Mr. Wyatt, correct?

5  A    Correct.

6  Q    And you were tasked to go check motels out on South

7  Boston Road, right?

8  A    Motels and just in general looking for him, yes.

9  Q    And that's out to the west -- or to the east of Danville,

10  right?

11 A    Yes, east side.

12 Q    You were not among the officers who first spotted

13 Mr. Wyatt, right?

14 A    No.

15 Q    And as you understand today, that happened north of

16 Danville, up on Piney Forest Road?

17 A    Correct.

18 Q    So let's -- so you joined the chase once it was already

19 in progress around -- after it was already in progress?

20 A    Somewhere around Central Boulevard, yeah, Golden Corral.

21 Q    Let's pick it up on Memorial, right around Cahill Court.

22 You've seen the Danville police cruisers' videos of the

23 arrest, correct?

24 A    Correct.

25       MR. TODD:  Your Honor, we premarked the three videos

1  in this case as Exhibits 1, 2, and 3, and there's no

2  authenticity question.  If I could go ahead and have them

3  admitted at this point?

4           THE COURT:  Yes.

5           MR. TODD:  Thank you, Your Honor.

6           MR. GUYNN:  I'm sorry, Your Honor, I don't know which

7  one is which.

8           MR. TODD:  Exhibit 1 will be Abbott's car, the one

9  that shows the arrest, Exhibit 2 will be the one that shows

10 after the arrest in the parking lot, and Exhibit 3 is a cell

11 phone video.

12          MR. GUYNN:  I object to C.

13          THE COURT:  To which?

14          MR. GUYNN:  The third one.

15          THE COURT:  What is the third one now?

16          MR. TODD:  Perhaps we should approach.

17     (Sidebar on the record present.)

18          THE REPORTER:  I'm having a hard time hearing counsel

19 at the bench.  And if you could slow down, please.

20          MR. TODD:  Slow down?

21          THE REPORTER:  Speak up and slow down.

22          MR. TODD:  What I'm proposing as Exhibit C is -- 3,

23 I'm sorry, Jim confused me by saying C -- is a video that this

24 witness took using his cell phone.  He went into the Danville

25 police officer's car, played the beating tape on the screen in

1  the car, and taped the tape using his cell phone.  There was

2  no authenticity objection to that pretrial, so I thought I

3  would get it admitted now.  I can do it later.

4       MR. GUYNN:  It is irrelevant.  Outside of

5  authenticity, it is irrelevant.

6       THE COURT:  What does it show?

7       MR. TODD:  It shows this officer, as soon as the

8  beating was over, was concerned that there was a videotape.

9  He used extremely unorthodox police practice to secure it.  He

10  made no effort to get it formally from Danville and bring it

11  back to Pittsylvania County.  Instead, he taped it with his

12  own cell phone, showed it around the office, which is strange

13  behavior.

14       MR. GUYNN:  Strange behavior isn't relevant to a 1983

15  case, your Honor.

16       MR. TODD:  I'm sorry, Your Honor.

17       THE COURT:  But it doesn't show anything that the

18  other tape doesn't show?

19       MR. TODD:  Well, it does.  It shows that he was --

20  the fact of him going to get it is itself relevant and calls

21  into question his credibility.  Also, Mr. Brandon preserved

22  this before trial, which is why I thought I could go ahead.

23  There was no objection made of this nature.

24       THE COURT:  You mean --

25       MR. TODD:  Perhaps we can take the middle path.  It's

1    the last thing I'm going to ask him about.

2         THE COURT:  Just ask him if he -- you can ask him if

3    he did it.

4         MR. TODD:  I will.  And we can revisit it at that

5    point.

6         THE CLERK:  I need clarification real quick.  I have

7    Exhibit 1, the video.  That's the dash cam?

8         MR. TODD:  They're both Danville.  1 is the one that

9    shows the beating.  2 is the one that shows Mr. Wyatt getting

10   carried to the grass.

11        THE CLERK:  And I have as 3 the photos as you showed

12   in the opening.

13        MR. TODD:  I'm sorry.  You're right.

14        THE CLERK:  We don't have any indication of this

15   other video.

16        MR. TODD:  We'll get to it later.  Thank you for

17   pointing that out.

18        THE CLERK:  We have those three, and then at the

19   beginning --

20        MR. TODD:  Okay.  We'll deal with it.  3 is already

21   in.

22        THE CLERK:  3 is the photos.

23        (End of sidebar.)

24   BY MR. TODD:

25   Q    Let me start off here with the second video.

1       THE COURT:  I'll tell you, I hate to stop you right

2   now, but I think it's probably a good time to take a break,

3   because --

4       MR. TODD:  Excellent time.

5       THE COURT:  We'll take about a 15-minute recess at

6   this time.  You may retire to the jury room.

7       (Recess taken from 2:15 p.m. until 2:31 p.m.)

8       THE COURT:  All right.  Are you ready?

9       MR. TODD:  Ready, Your Honor?

10       THE COURT:  Yes.

11  BY MR. TODD:

12  Q    Welcome back.  Finally getting into the meat of the

13  action here.

14       Investigator Worsham, I would like to start with the

15  second video that we saw this morning, which shows after

16  Mr. Wyatt was in handcuffs.  What I want you to do at this

17  point is to identify yourself and your colleagues over here,

18  and the two other officers who were involved in the arrest.

19  Okay?

20  A    Okay.

21  Q    And it may be easiest to have you actually step down,

22  with Your Honor's permission?

23       THE COURT:  Yes.

24  BY MR. TODD:

25  Q    Step down, and we can go to either screen.  It might be

1   easiest to go to the one closest to the jury here.  We'll play

2   the video through, and Jason here is going to control it.

3       And let's identify yourself, Mr. Wyatt, Mr. Nicholson,

4   Johnny Owens, and Shelton.  Okay?

5   A   Okay.

6   Q   Step down next to the screen.  And if you want to stop it

7   while you point at someone, just go ahead and sing out.

8       (Video is played.)

9   A   Stop it or do it as it's playing?

10          MR. TODD:  Stop it.

11  BY MR. TODD:

12  Q   I'm sorry, say again?

13  A   Is it going to be -- do you want me to do it while it is

14  playing or when you freeze it?

15          MR. TODD:  I'm not sure that microphone is on, is it?

16          THE CLERK:  Push the button up.

17          If you could check it.

18          MR. TODD:  Let's back it up to as the car just comes

19  around and Michael Wyatt comes into view.  Right there.

20  BY MR. TODD:

21  Q   The gentleman in the left-hand -- the leftmost person

22  there wearing a pink shirt, pink polo, is that Scott Wyatt?

23  A   Right here?

24  Q   No, further over.  Right by the -- right by the white

25  Ford Explorer.  There you go.

1  A    I believe so.  You'd have to play it forward just a

2  little.

3          MR. TODD:  Roll it forward a few clicks.

4      (Video is played.)

5          MR. TODD:  Stop.

6  A    Yes, that's Investigator Scott Wyatt.

7  BY MR. TODD:

8  Q    And he is now -- Scott is now blocking him.  If you roll

9  forward or back, there's a gentleman wearing a light yellow

10 polo, bending over there by the Explorer.  Is that Allen

11 Shelton?

12 A    I don't know.  I can't tell from right here.

13 Q    You're not sure?  Okay.

14      In the middle of the parking lot, wearing the pink shirt,

15 is that Tommy Nicholson?

16 A    I believe so.

17 Q    Okay.  And let's play it a little bit, and sing out when

18 you come into view.

19      (Video is played.)

20          MR. TODD:  Stop.

21 BY MR. TODD:

22 Q    That's you right there in the green, right, sir?

23 A    Correct.

24          MR. TODD:  Play.

25      (Video is played.)

1      MR. TODD:  Stop.

2 BY MR. TODD:

3 Q    The gentleman who just entered the scene, is that Johnny

4 Owens?

5 A    Yes.

6 Q    You can retake the stand, sir.

7 A    Excuse me?

8 Q    You can have a seat again.

9      So while we see a lot of officers in the video here, the

10 five officers who effected the arrest were all wearing plain

11 clothes that day, right?

12 A    Correct.

13 Q    Now, as this car pulled in, it passed another cruiser

14 that was already sitting there.

15      MR. TODD:  Let's pull up the video, the first video

16 that we watched, which is from that other cruiser.

17      (Video is played.)

18      MR. TODD:  Let's go ahead and, with the Court's

19 indulgence, we're going to play it through one time, and then

20 we'll back up.

21 BY MR. TODD:

22 Q    And I want to identify the various cars so we understand

23 where everyone was, okay?

24 A    Okay.

25      MR. TODD:  Let's play it through once and then we'll

1  back up.

2       (Video is played.)

3          MR. TODD:  Let's take it back to about the 6 second

4  mark.

5  BY MR. TODD:

6  Q    In this shot, can you identify your car?  I guess you

7  should to step down again.  Yes.

8       Is that your silver Charger right --

9  A    I'm pretty -- pretty sure it's right there.  If it starts

10 rolling a little bit, I can -- I'm pretty sure it is.

11 Q    I want you to be sure, so if we need to roll forward or

12 backward -- why don't you just follow it as it goes, and you

13 will see the police lights in a second, I think.

14      (Video is played.)

15 BY MR. TODD:

16 Q    That's your car, right, sir?

17 A    Yes.

18         MR. TODD:  Okay.  If you go back to about the 8

19 second mark.

20      (Video is played.)

21         MR. TODD:  Stop.

22 BY MR. TODD:

23 Q    You see where your car is in this shot, right?

24 A    Correct.

25 Q    You still see your car, and you're looking into the

1  parking lot, which is to the left of the screen here, right?

2  A    Yes.  My right.  This view, left.

3  Q    Right.  Correct, I should say.

4  A    Correct.

5  Q    Unfortunately, there is a car parked right on the side of

6  Memorial -- or driving on Memorial there, actually on

7  Memorial.  But behind it, can you identify what vehicles we

8  can see just poking out from behind?

9  A    I can't tell from here.

10 Q    Well, think about from your perspective, where you're

11 sitting up there on Memorial Drive, you're looking -- at this

12 point in time, you're looking into the parking lot and looking

13 at Michael Wyatt's car and Scott Wyatt's car, correct?

14 A    I want to say I'm still moving.

15 Q    To the extent you're looking at what's going on, you

16 would be looking into -- at the conclusion of the car chase

17 you talked about earlier, you would be looking at Michael

18 Wyatt's car and Scott Wyatt's car in the parking lot, correct?

19 A    Correct.

20 Q    And can you identify where they are in this scene?

21 A    No.

22      MR. TODD:  Go ahead and bring it on around into the

23 parking lot.

24      (Video is played.)

25      MR. TODD:  Stop.  Back just a little bit so we can

1  see the car.  Okay.

2  BY MR. TODD:

3  Q    At this point, sir, can you identify the cars that we're

4  looking at?

5  A    Yes.  That appears to be Scott Wyatt's Maxima, and the --

6  Q    Let me just narrate.  That's the car -- we're at time

7  stamp 15:44:50 on the top of the screen, and you've identified

8  the car to the far left of the picture as being Scott Wyatt's

9  Maxima?

10  A    Yes, bottom -- bottom left.

11  Q    Right.  Correct.  And the car to its right?

12  A    Is the car that Michael Wyatt was driving.

13  Q    Okay.  And just beyond that, you see a white SUV.  Do you

14  see that?

15  A    Yes.  Right here between them?

16  Q    Correct.

17  A    Yes.

18  Q    And what vehicle is that?

19  A    I want to say that's Investigator Owens', the vehicle he

20  was driving.

21  Q    That's the unmarked white SUV that Investigator Owens was

22  driving?

23  A    Yes.  As far as I know, yes.

24  Q    Now, at this point in time, we're watching the

25  perspective from the Danville police cruiser, correct?

```
 1  A     Yes.

 2  Q     And at this point in time, where are you located?

 3  A     Still on Memorial Drive, off camera left.

 4        MR. TODD:  So let's roll the video.

 5  BY MR. TODD:

 6  Q     And you identify, sir, when your car comes into view.

 7  Just say, "There I am."

 8        MR. TODD:  Go ahead and play it.

 9  A     There I am.

10  BY MR. TODD:

11  Q     So at about 15:44:57, the silver Charger pulling into the

12  parking lot is your car?

13  A     Correct.

14        MR. TODD:  Go ahead and play it again until someone

15  comes out of that car.

16      (Video is played.)

17        MR. TODD:  Stop.

18  BY MR. TODD:

19  Q     Is that you, sir, coming out of the car?

20  A     Correct.

21  Q     You can go ahead and take a seat again, sir.

22      If at any point it would be helpful to go back to the

23  video to narrate, I'm happy to do that with you, just let me

24  know.  Okay?

25  A     Okay.
```

1  Q    We saw you on Memorial Drive, and you executed a U-turn

2  on Memorial Drive.  You saw that?

3  A    Correct.

4  Q    And unlike your colleagues who followed Mr. Wyatt into

5  the parking lot, you stayed up on Memorial Drive, right?

6  A    Correct.

7  Q    And while you were up there, you were watching your

8  colleagues, you were watching the cars in the parking lot,

9  correct?

10 A    Correct.

11 Q    Did you stop on Memorial Drive?

12 A    Just barely rolling from what I can recall.

13 Q    You pulled alongside Michael Wyatt, or you pulled

14 parallel to Michael Wyatt, correct?

15 A    On Memorial Drive, yes.

16 Q    He is in the parking lot, you're on Memorial, you pulled

17 up next to him?

18 A    Right.

19 Q    You were about, what, 15 feet away?

20 A    No, I think it would be farther than that.

21 Q    15?  20?  20?

22 A    Maybe.

23 Q    You saw Michael Wyatt get out of his car?

24 A    Correct.

25 Q    And at the time he got out of his car, you saw both his

1  hands, didn't you?

2  A    I saw one hand on the door, the other up on the top roof

3  area, and he was, like, surfing the car, like riding on the

4  doorjamb.

5  Q    The answer to my question is, yes, you saw both of his

6  hands?

7  A    Yes, correct.

8  Q    And both of his hands were empty, correct?

9  A    From my position, as far as I could tell, yes.

10 Q    After Mr. Wyatt got out of his car, you saw him run; is

11 that right?

12 A    Correct.

13 Q    And he was running normally, correct?

14 A    As far as I have ever known him, yes.

15 Q    Now, when you were up on Memorial Drive and Mr. Wyatt was

16 down in the parking lot, you didn't communicate with him in

17 any way, did you?

18 A    No, not from my position.

19 Q    You didn't try to say anything to him?

20 A    No.

21 Q    You didn't use the -- do you have a loud speaker in your

22 car?

23 A    I do.  It wasn't feasible.

24 Q    You didn't try to use it?

25 A    No.  He wouldn't have heard it.

1  Q    Because you were in your car, there were sirens going

2  off, he would have never heard you, right?

3  A    Correct.

4  Q    And while you were in your car, you couldn't hear

5  anything that was being said down in the parking lot, right?

6  A    No.

7  Q    Now, you saw Investigator Wyatt and Investigator Shelton

8  take Michael Wyatt down to the ground, right?

9  A    I didn't see Shelton, but I remember seeing Wyatt.  I was

10  just focused --

11  Q    You saw Wyatt tackle Wyatt?

12  A    Right.  I was focused on Mr. Wyatt, and I saw

13  Investigator Wyatt come up behind him and take him down.

14  Q    At this point, you did not get out of your car?

15  A    No.

16  Q    You didn't proceed down the embankment to help?

17  A    No.

18  Q    You didn't pull your gun?

19  A    No.

20  Q    You didn't make any effort to provide cover for your

21  colleagues down in the parking lot?

22  A    No.

23  Q    Instead, you remained in your car and you drove around

24  the corner and entered the parking lot from the other end,

25  like we saw in the video, right?

1  A    Correct.

2  Q    It took you, what, a few seconds to drive around the

3  corner?

4  A    That's fair.

5  Q    When you stopped in the parking lot and you're looking

6  out your front window, you saw Mr. Wyatt laying prone on the

7  ground with defendants Wyatt and Owens, as well as Officers

8  Shelton and Nicholson already engaged with him, correct?

9  A    Correct.

10 Q    You got out of your car, right?

11 A    Yes.

12 Q    You ran over to the pile?

13 A    I did.

14 Q    Dropped to your knees?

15 A    Correct.

16 Q    You tried to punch Mr. Wyatt?

17 A    Correct.  I tried to punch him in the back of his arm.

18 Q    And then you kneed him five times?

19 A    Four to five times, yes.

20 Q    In the head?

21 A    No.

22 Q    You did not knee him in the head?

23 A    No.

24 Q    In fact, sir, you actually have no idea where you kneed

25 him, do you?

1  A    I know where I was lined up beside his body.  I was lined

2  up right in front, before his arm, in between his elbow and

3  his shoulder.  I was not looking straight down at my knee, but

4  I was -- I literally went -- because I was looking at his

5  right arm that was shoved up under him, and I saw multiple

6  hands trying to pull his arm out, and everybody was moving

7  back and forth.

8  Q    I asked a pretty simple question, Investigator.  I asked,

9  you have no idea where you actually hit him, do you?

10  A    No.  I knew where I was aiming.

11  Q    You knew where you were aiming, but you have no idea

12  where you hit him?

13  A    No.

14  Q    You may have hit him in the shoulder?

15  A    Possibly.

16  Q    You may have hit him in the neck?

17  A    It's possible.

18  Q    You may have hit him in the head, right?

19  A    It's possible, but I don't think so.

20  Q    It's possible; you don't think so?  You may have hit him

21  in the head?

22  A    Anything is possible, but I never targeted anywhere up

23  near his head.

24  Q    The bottom line is you have no idea where you hit him?

25  A    I was kneeing him in his arm, because I was working on

1  his arm.

2  Q     You testified you intended to knee him in his arm, but

3  you have no idea where you actually hit him, correct?

4  A     No.  I wasn't watching straight down where I was hitting.

5  Q     Now, you testified earlier you were unaware that you were

6  being video recorded at this time, right?

7  A     That's correct.

8  Q     You were unaware you were being video recorded when you

9  were kneeing him?

10  A     During the whole incident.

11  Q     Now, the truth of the matter, sir, is that when you get

12  in a fight with a suspect, you get tunnel vision, right?

13  A     Sometimes you do get tunnel vision when you're in extreme

14  situations, that's correct.

15  Q     You specifically, you get locked into what you're doing

16  and don't pay attention to anyone else or anything else going

17  on, right?

18  A     That's not correct.

19  Q     That's not correct?

20  A     Negative.

21  Q     It's not the case, then, when you're locked in and you're

22  fighting someone, someone would have to come along and, I

23  don't know, hit you in the head with a brick to get to you pay

24  attention to something else?  That's not your testimony?

25  A     No.  My testimony is that you try to fight off tunnel

 1  vision, i.e. in a vehicle pursuit or when you're fighting

 2  somebody, so that somebody doesn't come behind you and hit you

 3  in the head with a brick, so you're aware of your

 4  surroundings, so you don't get ambushed.

 5  Q    Sir, you recall that you gave a deposition in this case,

 6  right?

 7  A    I do.

 8  Q    My colleague, Mr. Beaton, who has stepped out, asked you

 9  some questions?

10  A    Say that again.

11  Q    My colleague, Mr. Beaton, sat down with you for a while

12  and asked you questions?

13  A    Yes, one of the lawyers.

14  Q    And you raised your right hand and you swore to tell the

15  truth that day, right?

16  A    I did.

17  Q    Just like you did today?

18  A    Yes.

19  Q    Did you answer questions honestly that day?

20  A    Yes.

21  Q    Hold on a second.  We're going to pull up the transcript

22  of your deposition.

23       (Plaintiff's Exhibit Number 9 was marked for

24  identification.)

25  BY MR. TODD:

1  Q    Let me direct your attention to page 103.  Well, I should

2  ask you this.  I have handed you a copy of your deposition

3  transcript, correct?

4  A    Correct.

5  Q    Page 103, picking up on line 15, tell me when you are

6  there.

7  A    Okay, I'm at 15.  Wait.  I'm at 15.

8  Q    Actually, you know what?  Put that aside.  I'm going to

9  move on.

10      While you were fighting with -- while you were striking

11 Mr. Wyatt, you had no idea what Scott Wyatt's status was,

12 correct?

13 A    What do you mean by "status"?

14 Q    Status.

15 A    I knew where he was.

16 Q    What he was doing?

17 A    I knew -- no, I knew where he was.  I wasn't focused on

18 him.

19 Q    How about Investigator Owens?

20 A    I knew roughly where he was, but I was not watching what

21 he was doing.

22 Q    In fact, you didn't even know -- I think you mentioned

23 this a few minutes ago.  You didn't even know that Allen

24 Shelton was there until after the fight, right?

25 A    No, I knew Allen Shelton was there.  I said that I did

1  not see him when Michael Wyatt got taken down because I was

2  focused on Wyatt and Wyatt.

3  Q    Back to Owens.  You testified that you knew where he was?

4  A    Say it again.

5  Q    You testified that you knew where Owens was?

6  A    I knew roughly that he was there.

7  Q    Okay.  But you didn't actually know where he was

8  positioned and what he was doing, right?

9  A    Somewhere on the left side, dealing with the left arm.

10  Q    Okay.  Pull out that transcript again.  Let me take you

11  to page 105.

12  A    Okay.

13  Q    5 through 7.  Tell me when you're there.

14  A    105?

15  Q    Yes, sir.

16  A    I'm there.

17  Q    At the time, were you asked the following question, and

18  did you give the following answer:

19      "Question:  And what about Owens?  How was he positioned

20  relative to Michael?"

21      "Answer:  To see the -- at the time, no idea."

22      Did I read that correctly?  Did I read those words

23  correctly, sir?

24  A    I'm reading it.

25  Q    Shall I read them again?

1  A   Okay, I read it.

2  Q   Pardon?

3  A   I read it.

4  Q   Okay.  So page 105, line 5, follow along with me as I

5  read.

6      The question was:  "And what about Owens?  How was he

7  positioned relative to Michael?"

8      And your answer with regard to the time, answering about

9  what you knew at the time was:  "To see the -- at the time, no

10 idea."

11     Did I read that correctly?

12 A   Yes, you read it correctly.

13 Q   You were focused on what you were doing to Michael Wyatt,

14 correct?

15 A   I was focused on his right arm.

16 Q   And your testimony today, to this jury, is that you

17 struck him because he would not release his right arm, he

18 wouldn't give you his right arm, right?

19 A   Correct, to keep him from pulling it out and --

20 Q   Which is the same testimony you gave, the same excuse you

21 gave with regard to Mr. Cook, Mr. Reynolds, and Mr. Brandon,

22 correct, they wouldn't give you their arm?

23 A   Correct.

24 Q   Now, one more line of questioning, sir.

25     After Mr. Wyatt was in custody, you learned for the first

1  time at some point that afternoon that you had been

2  videotaped, right?

3  A    Correct.

4  Q    And you wanted to get a copy of that video, didn't you?

5  A    Correct.

6  Q    But you didn't go and ask the Danville Police Department

7  to give you a copy, did you?

8  A    No.

9  Q    You didn't ask your superiors at Pittsylvania County to

10 go get a copy?

11 A    No.

12 Q    You didn't say, "There was a videotape of our arrest.  It

13 might be helpful to our investigation or in case of a use of

14 force complaint?"  You didn't say any of that, right?

15 A    I don't recall.

16 Q    Instead, what you did was you arranged with a Danville

17 police officer to meet you somewhere in the city, right?

18 A    Correct.  I was given the person's number and I called

19 him and I met -- he was actually working, so I met him in his

20 beat, which is an assigned area where you work at.

21 Q    You called him, you met somewhere up on I think Piney

22 Forest Road somewhere?

23 A    Correct.

24 Q    In a parking lot?

25 A    That's correct.

1  Q    And you took out -- and you had him -- and this was the

2  driver of the car that shot the first video we saw, right,

3  that shows the beating?

4  A    I don't remember which.  I think so, from the car, the 13

5  car, I think.

6  Q    We can look at it and see which video it was.

7  A    Okay.

8  Q    You had him play the videotape that the jury has seen

9  today on his in-car monitor, right?

10 A    That's correct.

11 Q    And you took out your cell phone and you videotaped the

12 videotape, right?

13 A    Correct.

14 Q    And you didn't even videotape the entire incident.  You

15 videotaped just the portion where you are kneeing Mr. Wyatt,

16 correct?

17 A    The whole use of force incident.

18 Q    That's your recollection, that you taped the entire use

19 of force incident?

20 A    That's what I remember.  It looked just like the video

21 you just played from what I recall.

22 Q    Well, let me show you the video.

23       MR. TODD:  Is there a way of doing it so just

24 officer -- Your Honor, it hasn't been admitted yet so I don't

25 want to show it to the jury.  But to have Officer Worsham

1  authenticate it, he needs to see it.

2          THE COURT:  Okay.

3          MR. TODD:  Is there a way of showing it just to --

4          THE CLERK:  Yes.

5          MR. TODD:  Can we play it without volume on his

6  monitor?

7  BY MR. TODD:

8  Q    Take a look at this video, sir, and tell me if it's the

9  video that you made.

10        (Video is played.)

11  A    Okay.

12  BY MR. TODD:

13  Q    That's the one we're talking about, right?

14  A    It is the whole use of force incident, from the time

15  before I got out of my car until we was done.

16  Q    This is the video that you made, correct?

17  A    Yes.

18  Q    Just for authentication purposes.

19  A    That's correct.

20        MR. TODD:  What are we up to?

21        THE CLERK:  10.

22        MR. TODD:  10.  Mark it as 10 for identification

23  purposes.

24        And then, Your Honor, I will move to admit it.

25        MR. GUYNN:  I object on the grounds of relevance.

```
 1            THE COURT:  All right.  Go ahead.  It's admitted.

 2            MR. TODD:  I'm sorry, it's admitted, Your Honor?  Is

 3  it admitted?

 4            THE COURT:  Yes.

 5            MR. TODD:  Yes.  Thank you, Your Honor.

 6        (Plaintiff's Exhibit Number 10 was marked and received.)

 7            MR. TODD:  Can we play this for the jury, please.

 8        (Video is played.)

 9  BY MR. TODD:

10  Q    So you captured on video your use of force, correct?

11  A    Everyone's use of force.

12            MR. TODD:  Start it again.

13        (Video is played.)

14            MR. TODD:  Stop right there.

15  BY MR. TODD

16  Q    When this video starts, your colleagues are already

17  engaged with Mr. Wyatt, correct?

18  A    They're involved in the use of force right now.

19  Q    This didn't capture Scott Wyatt's punches, it didn't

20  capture Johnny Owens' punches, right?

21  A    None of the other videos did either.

22  Q    It captured your knee strikes?

23  A    It captured the exact same thing as all the other videos

24  did.  I took it off of the video.

25  Q    You used your cell phone to record your knee strikes,
```

1  your portion of this use of force episode, correct?

2  A    No.

3  Q    Well, the jury can see the video, sir.

4      Now, it's not -- this isn't the official policy of

5  Pittsylvania County Sheriff's Department, this is how you

6  secure video evidence from another jurisdiction, correct, on

7  your cell phone?

8          MR. GUYNN:  Objection to policy.

9          THE COURT:  Excuse me?

10         MR. GUYNN:  Objection to policy.

11         THE COURT:  I sustain the objection.  It's just going

12  too far with this line.

13 BY MR. TODD:

14 Q    After you took this video recording, you took it back to

15 the office, right?

16 A    I did, and I turned it over to my sergeant or my captain.

17 Q    And before that, you showed it around, right?

18 A    In the office.

19 Q    And you showed it to everyone, right?

20 A    We reviewed it, yes.

21 Q    You showed it to the other defendants, right?

22 A    Yes.

23 Q    How tall are you, sir?

24 A    Six --

25         MR. GUYNN:  Objection.  It's irrelevant.

```
 1          THE COURT:  Overruled.
 2  BY MR. TODD:
 3  Q    Sir, how tall are you?
 4  A    Six three and a half, maybe.
 5  Q    I say I'm six one in the morning, six foot later in the
 6  day.
 7       Six three?  Six four?
 8  A    Six three and a half.
 9  Q    How much do you weigh?
10          MR. GUYNN:  Same objection.
11          THE COURT:  Overruled.
12  A    About 280.
13  BY MR. TODD:
14  Q    Is that about what you weighed in July of 2012?
15  A    Roughly.
16  Q    You didn't suffer any injuries, did you, sir, when you
17  arrested Michael Wyatt?
18  A    No.  It turned out I wasn't injured.
19          MR. TODD:  No further questions, Your Honor.
20          THE COURT:  Okay.  Any questions?
21                    CROSS—EXAMINATION
22  BY MR. GUYNN:
23  Q    Investigator, when you were employed for the City of
24  Danville in 2006, from 2006 through 2008, were you assigned to
25  a particular part of the city?
```

1   A    Yes.

2   Q    What part of the city were assigned to?

3   A    High crime, high drug area.

4   Q    And you are a patrol officer at the time?

5   A    I was.

6   Q    I think you said in response to questions earlier that

7   your responsibilities and duties were to respond to calls?

8   A    Correct.

9   Q    And patrol the area?

10  A    Correct.

11  Q    But you didn't see your responsibilities as initiating

12  investigations?

13  A    I'm sorry, say it again.

14  Q    The difference between that and being an investigator,

15  you said, was initiating investigations?

16  A    Correct.

17  Q    Did you initiate investigations as a patrol officer?

18  A    Yes.

19  Q    And you were describing earlier your change when you had

20  this recording device on.  Explain to the jury what you meant

21  by that.

22  A    It's that I kept -- my behavior was exactly the same when

23  I was getting no complaints or getting complaints, having the

24  recorder on or not having it on.  I just stopped doing all the

25  proactive stuff, the extra stuff, trying to get drugs off the

1  street or trying to get drug dealers or, you know, anything I

2  could working CIs.  When they did that, I just stopped doing

3  all of that, so there was slim chance of me getting in

4  trouble.

5  Q    When you say the extra things, what sort of extra things

6  would you do?

7  A    Anything from just trying to hunt down drug dealers and

8  catching some drugs or cleaning street corners where they are

9  selling drugs, catching them with that.  Just very

10 aggressively going after whatever the problem is at the time,

11 not just laying back and collecting a check.

12 Q    And who was making the complaints?

13 A    Either the person that I had arrested or his family which

14 would have been directly affected by me stopping them from

15 selling drugs or some type of illicit monies.

16 Q    From an income standpoint?

17 A    Right, from income, yes.

18 Q    Now, you were asked questions about these three folks in

19 Pittsylvania.  What were their crimes?

20 A    Alonzo Cook was trying to get rid of drugs and evidence.

21 And Linwood Brandon had drugs on him.  And Jerome Reynolds

22 threw out a whole big huge flashlight of drugs that he was

23 selling.  They were all drug users and drug sellers.

24 Q    When you arrived on the scene as shown in the video, what

25 did you hear being said there around Michael Wyatt?

1  A    "You're under arrest.  Stop resisting.  Put your hands

2  behind your back."  And multiple people were saying that,

3  trying to get him to stop resisting, to actually just give his

4  hands up.  That's all they wanted.

5  Q    Did he appear to be giving his hand up?

6  A    No.  It was two people pulling on his arm, and his arm

7  wasn't coming out.

8  Q    Did you consider using a taser?

9  A    I didn't.

10 Q    Why not?

11 A    I didn't have any of them on me.  I didn't have any other

12 means, my vest or anything, on my person.

13 Q    How about a baton, one of those, what do they call it,

14 ASP that you can pull out?

15 A    I didn't have one of those either.

16 Q    How about the pepper spray?

17 A    I didn't have that.

18 Q    Have you been taught to use pepper spray?

19 A    If you can, yes.

20 Q    And is a situation where there's a scuffle going on like

21 that a good choice?

22 A    No.

23 Q    Why?

24 A    Because you end up spraying everybody, so you disable

25 pretty much the whole pile and who is actually trying to --

1 because it goes everywhere.

2 Q    What alternative did you have other than knee strikes?

3 Well, actually, you started with a punch, didn't you?

4 A    Yes.

5 Q    What happened with that?

6 A    When I went to punch the back of his arm, because

7 everybody was trying to yank his arm out from under him and

8 get control of his other arm, as I came up, I was looking

9 straight at his arm.  I came down, and about halfway down, his

10 whole body moved over and there was nothing under him but just

11 pavement.  I tried to stop but I punched the concrete, and I

12 thought I broke my hand.

13 Q    And why did you then use knee strikes?

14 A    That was the next thing available to me that wasn't

15 already -- because everybody else was covered, either trying

16 to keep him from getting up by his legs or, you know, on the

17 left side of him.  And that was the next thing that was

18 immediately readily available to me that I could throw quickly

19 and get a result out of.

20 Q    Where were you aiming?

21 A    On his arm.

22 Q    And were you in a position to keep him from moving?

23 Obviously he had moved before.

24 A    No.

25        MR. GUYNN:  Those are my questions, Your Honor.

1    THE COURT:  All right.  Any redirect?

2    MR. TODD:  Just a couple of quick points, Your

3  Honor.

4                 REDIRECT EXAMINATION

5  BY MR. TODD:

6  Q    Mr. Worsham, Mr. Guynn asked you about the criminal

7  activity that the three individuals we talked about had been

8  engaged in.  Do you remember that?

9  A    Correct.

10 Q    You answered his question.  Now, you're not suggesting to

11 the jury, are you, that simply because someone has committed a

12 crime justifies any later use of force?

13 A    He asked me what they were doing.

14 Q    Right.  I'm just making sure that you're not suggesting

15 that the mere fact that someone committed a crime, later let's

16 you beat on them, right?

17 A    That's definitely not the case.

18 Q    Now, you testified that you didn't have various other use

19 of force options: ASP, pepper spray, taser.  Do you recall

20 that?

21 A    That's correct.

22 Q    You did actually have some of those available to you

23 earlier in the day, right?

24 A    What do you mean by "earlier in the day"?

25 Q    Earlier in the day, when you were out searching for

1  Mr. Wyatt.

2  A    I wasn't out searching for Mr. Wyatt earlier.

3  Q    Really?  I thought you were in South Boston.

4  A    No.  I just stopped by a couple of hotels.  I was looking

5  for the vehicle, yes, but I didn't have on a vest and I was

6  just riding around hotels.

7  Q    You never put your vest on?

8  A    Not that whole day.

9  Q    Okay.  You were called up -- well, do you keep that other

10 gear on your vest?

11 A    Yes.

12 Q    You were called up and asked to go search for Mr. Wyatt,

13 right?

14 A    Correct.

15 Q    And you simply never put your vest on?  That's your

16 testimony?

17 A    Yes.

18 Q    Okay.  Now, you testified earlier on direct that you

19 never saw Mr. Wyatt lash out at anyone, kick anyone, punch

20 anyone, bite anyone.  Do you remember those questions?

21 A    Yes.

22 Q    And as you were driving around on Memorial and down to

23 Cahill Court, you couldn't hear or see what was going on in

24 the pile, right?  You were driving your car?

25 A    Correct.

1  Q    So what you know is based on what you saw in the few

2  seconds between when you exited your car and ran over to the

3  pile, right?

4  A    Correct.

5  Q    And is it your testimony that you saw Mr. Wyatt resisting

6  arrest?

7  A    Correct.

8  Q    Because he was moving around?

9  A    The whole pile was moving around, and he wouldn't let his

10  arm be pulled out by two people.

11  Q    And the fact is that the other officers were pulling on

12  Michael Wyatt, right?

13  A    Yes.

14  Q    They were actually moving his body, right?

15  A    They were pulling on his arm I know of.

16  Q    And they were moving his body when they were doing it,

17  right?

18  A    Yes.

19  Q    And you heard people yell, "Give us your arm"?

20  A    "Stop resisting."

21  Q    "Stop resisting"?

22  A    "You're under arrest."

23  Q    What you never heard, sir, was anyone yell "gun," right?

24  A    No.

25       MR. TODD:  No further questions.

1          THE COURT:  Okay.  Thank you.  Step down.

2          MR. TODD:  Your Honor, the next witness is Sergeant

3    Michael Young.  He is actually out in the hallway with my

4    colleague, Mr. Beaton, who is going to put him on.

5          THE COURT:  Okay.

6          THE CLERK:  Sir, please raise your right hand to be

7    sworn.

8        MICHAEL EDWARD YOUNG, PLAINTIFF'S WITNESS, SWORN

9                    DIRECT EXAMINATION

10   BY MR. BEATON:

11   Q    Good afternoon, Mr. Young.

12   A    Hello.

13   Q    Would you please introduce yourself to the jury?

14   A    Michael Edward Young.

15   Q    Where do you live, Mr. Young?

16   A    In Pittsylvania County.

17   Q    And where do you work?

18   A    I'm presently retired.

19   Q    What type of work did you do before you retired?

20   A    I was a law enforcement officer for 36 years.

21   Q    And where did you wrap up your law enforcement career?

22   A    The last six and a half years were Pittsylvania County

23   Sheriff's Office.

24   Q    Okay.  And what job did you have at Pittsylvania County

25   when you retired?

1    A    I was head of the Internal Affairs Division Unit, which

2    also did training and personnel.

3    Q    What was your first job in law enforcement?

4    A    I was a patrol officer in the City of Norfolk, Virginia,

5    where I served for almost 30 years.

6    Q    And when you were a young officer, before you made

7    sergeant, what sort of work did you do for the police

8    department?

9    A    I was a patrol officer in uniform.  Then I was assigned

10   to a unit in patrol, we called the 5th Platoon.  We conducted

11   stakeouts, ABC investigations.  We were a plainclothes unit,

12   eight-man unit within the precinct.  I bought narcotics

13   undercover at times.

14       And after that, I transferred to the detective division

15   where I started out as a larceny investigator with the larceny

16   squad.

17       And then I went to the robbery division.  We investigated

18   armed robberies and every crime that went with them, shy of

19   homicide.  If it was a robbery/abduction, robbery/shooting,

20   that's what we did.

21   Q    And then you made sergeant?

22   A    I did.

23   Q    And what were your roles as a sergeant?

24   A    I made corporal.  I'm sorry.  But, yes, I made corporal.

25   I went back to the precinct, which is what they did when you

1  got promoted.

2      And then I went to the tactical unit in that precinct as

3  the executive officer of the eight-man unit.

4      From there, I went to the internal affairs division as an

5  investigator, where I stayed for 18 months until I made

6  sergeant.

7  Q    What duties, generally, did you have as sergeant?

8  A    Back to the patrol division.  Went to the detective

9  division as a sergeant in charge of the auto squad, spent

10 about a year and a half as a chief investigator with the

11 Commonwealth Attorney's Office, assigned there from the

12 Detective Division.

13     And then I became selected by the chief to be the

14 executive assistant to the chief of police, which was

15 basically his aide.

16 Q    And at that point, did you become part of the leadership

17 in the office?

18 A    Yes.  I promoted up from there and made lieutenant.  I

19 went to the patrol division, selected to the FBI national

20 academy; went there for 10 and a half, 11 weeks and came back.

21 Went back into patrol, made captain; was assigned the unit

22 called the special enforcement division, which I had traffic,

23 K-9, harbor patrol, metro tactics, which at the time became a

24 25-man stakeout unit.  And with the traffic division, I had

25 all the school guards, so it was the largest command in the

1  department, with 180 people.

2      From there I was selected to go to the detective division

3  as commanding officer.  I had four –– three lieutenants under

4  me there, several sergeants, 115–man detective division.

5  Stayed there four years.

6      The chief selected me to be the commanding officer of the

7  internal affairs division, where I went.  And was there

8  approximately 10, 11 months before I retired.

9  Q    So captain of special investigations unit, captain at the

10  detective unit, and captain at internal affairs.  Did I get

11  that right?

12  A    Yes, sir.

13  Q    And I think you said, but how long did you put in all

14  told with Norfolk?

15  A    29 years and seven months.

16  Q    And did you leave?

17  A    I did.  I retired.

18  Q    Where did you go?

19  A    I retired and started dressing up my house to put it up

20  for sale.  When that was done, I was up here in the county.  I

21  had bought 100 acres of land back in 1995.  Ended up at a job

22  interview for Ferrum College, where I hired on to be a

23  patrolman with their six–man police department.  Stayed there

24  for six months.  A very good job; it was just an 80–mile round

25  trip.

1  Q    You were living in Pittsylvania County at this time?

2  A    I was living up here at the time.  I was living in a

3  camper trailer while I was having my house built.  And I was

4  offered a job with the sheriff's office May of 2007.  Took

5  that job and stayed six and a half years.

6  Q    So the Pittsylvania County Sheriff pulled you out of

7  retirement?

8  A    I got a phone call from their office and was asked if I

9  would be interested in applying, and I was.  It was a whole

10 lot better than a six-man department and an 80-mile drive.

11 Q    What roles did you have with the Pittsylvania County

12 Sheriff's Office?

13 A    I started out as a patrol deputy answering calls for

14 service.  Did that approximately for five months.  Became the

15 school resource officer at Gretna High School where I was

16 there for about a year and a half.

17      The captain of the internal affairs unit was retiring.

18 Sheriff Taylor knew me and my career, knew -- he and I at the

19 time were the only ones who had been to the FBI national

20 academy, knew I had been in internal affairs a couple times.

21 He selected me to run the internal affairs training personnel

22 area and promoted me to sergeant.

23 Q    How long did you run internal affairs at Pittsylvania

24 County Sheriff's Office?

25 A    Approximately three and a half years.

1  Q    Why did you leave the Pittsylvania County Sheriff's

2  Office?

3  A    At the time, I had 36 years in.  When I took the job, I

4  had three children in college at the same time.  All of them

5  had finished, graduated, and I decided instead of putting the

6  salary towards college educations, it was time for me to

7  retire and let the younger ones move up.

8  Q    I don't think anyone is going to argue with that.

9       Did you leave on good terms with the Pittsylvania County

10 Sheriff's Office?

11 A    Yes.

12 Q    Have any problems with anyone over there?

13 A    No.

14 Q    Has anything changed -- I'm sorry.  Has anything changed

15 in that regard since you left the sheriff's office?

16 A    No, nothing has changed.

17 Q    Mr. Young, are you here testifying today because you want

18 to be?

19 A    No, I'm not.  I'm not comfortable with this at all.

20 Q    Why are you here testifying in front of these jurors

21 today?

22          MR. GUYNN:  Objection, irrelevant.

23          THE COURT:  Sustained.  I take it he had a subpoena.

24          MR. BEATON:  Excuse me?

25          THE COURT:  He got a subpoena, I suppose.

1          MR. BEATON:  I think that was going to be his answer.

2          THE COURT:  Well, that's all you need.

3    BY MR. BEATON:

4    Q    All right.  Sergeant Young, let's focus on your time as

5    head of internal affairs at Pittsylvania County.

6          What was the gist of your job at internal affairs?

7    A    To investigate violations of any policy, procedure, or

8    rules and regulations within the sheriff's office, and to make

9    sure that the employees, both civilian and sworn, followed

10   those policies and procedures so we could do the best and

11   project the best possible service we could to the citizens of

12   the county.

13   Q    Thank you.

14         MR. BEATON:  I hand a document to counsel.

15         THE COURT:  Yes.

16         MR. GUYNN:  Objection as to the policies on

17   relevance, Your Honor.

18         THE COURT:  All right.

19         MR. BEATON:  Your Honor, this is the policy that

20   explains what it was Mr. Young did and how he came to conduct

21   the investigations that form the basis for his testimony.

22         THE COURT:  He can just testify to that.  We don't

23   need all this.

24         MR. BEATON:  That's fine.

25         THE COURT:  Just ask him.

1        MR. BEATON:  May I hand him a copy?

2        THE COURT:  Well, if he needs it to refer to it.

3        MR. BEATON:  Do you mind if he looks at a copy?

4        MR. GUYNN:  He hasn't suggested he doesn't remember.

5        THE COURT:  Sir?

6        MR. GUYNN:  He hasn't suggested that he doesn't

7    remember.  I don't know that he needs his recollection

8    refreshed.

9        THE COURT:  Okay.  Let's go ahead.  Come on.

10        MR. BEATON:  So I can hand it?

11        THE COURT:  Well, he is technically correct, if he

12   doesn't need it --

13        MR. BEATON:  It's fine.

14   BY MR. BEATON:

15   Q    Sir, Sergeant Young, back in 2013 when you were at

16   internal affairs, was there a policy that governed your job

17   responsibilities as head of internal affairs?

18   A    Yes, sir, there was.

19   Q    Do you remember that policy?

20   A    I remember that policy.

21   Q    Okay.

22        MR. GUYNN:  The objection applies to subject matter

23   as well as the document.

24        THE COURT:  Sir?

25        MR. GUYNN:  The objection applies to the subject

1 matter as well as the document.

2          THE COURT:  Okay.  I take it he is going to tell us

3 that it was his job to investigate.

4          MR. GUYNN:  I think that's all it is, and that's what

5 he just needs to say.

6          MR. BEATON:  May I proceed?

7          THE COURT:  I mean, what's the point?  Go ahead.

8 BY MR. BEATON:

9 Q    Sergeant Young, was there a policy that called for you to

10 investigate use of force incidents from time to time at

11 Pittsylvania County Sheriff's Office?

12 A    Yes, there was.

13 Q    When were you called on by this policy to investigate use

14 of force incidents?

15 A    When I was instructed by a supervisory officer, captain,

16 undersheriff, sheriff when citizens came in and made

17 complaints, or called in, whatever.  When I received a

18 legitimate -- what appeared to be a legitimate complaint --

19 and I would look into it before I made a determination whether

20 it was legitimate -- then I would conduct an investigation of

21 that alleged wrongdoing of policy by the sheriff's office

22 personnel.

23 Q    And could you describe that investigation for the jury,

24 please?

25 A    I would photograph any injuries or noninjuries that

1  someone would make.  If someone claimed they were roughed up

2  or beaten by police officers, if they didn't have any

3  injuries, I would take pictures to show that's not really what

4  I'm seeing here.  I would take pictures if there were

5  injuries, I would try to go to the scene of where it occurred,

6  I would interview all witnesses, I would interview the

7  complainant, all law enforcement officers involved, and,

8  generally, the last person I would interview would be the

9  person that was complained on.  So I would have the totality

10 of facts before I dealt with the officer or deputy.

11 Q    Why was it important for you to go through this process

12 and conduct this investigation in response to a use of force

13 incident?

14 A    It was important for the integrity of the police

15 department and law enforcement to make sure that we were

16 conducting business in an appropriate and lawful manner.

17 Q    And when you finished that investigation, did you write

18 it up?

19 A    I did.  I would write a summary of what occurred.  And by

20 that, policy dictated that I make a recommendation to the

21 sheriff.  I reported only to him; no one was between him and

22 I.  And I would take that investigation and that

23 recommendation to the sheriff.

24 Q    And was the sheriff a part of the investigation or did he

25 just respond to your report?

1  A    The sheriff was not part of the investigation unless

2  somehow he had become a participant, a witness or something in

3  an incident that happened.  But, no, he was not part of the

4  investigation.  He could order me not to conduct the

5  investigation, but he was not part of an investigation.  It

6  was complete when he got it by me.

7  Q    Now, we're talking about use of force investigations as

8  opposed to others you may have conducted.  Sitting here today,

9  do you recall the standard or the rule that you applied to an

10 officer's conduct when you conducted a use of force

11 investigation?

12 A    I'm not certain I understand that question.

13 Q    When you set out to do an investigation, was your goal to

14 determine whether some violation had occurred?

15 A    Yes.  It was the -- my job was to gather and produce the

16 facts, and if those facts showed that a violation occurred, so

17 be it.  Oftentimes in an investigation it would show that they

18 had not occurred.  My job was to, as clearly as I could,

19 decipher the facts of what occurred, then look at those facts

20 versus our policies and procedures and regulations, and see if

21 any had been violated.

22 Q    And my question to you is whether you remember the

23 policy, the rule that applied to officer conduct when there

24 was a use of force incident?

25 A    Yes.  We had a use of force policy, and it dictated when

1    and what situations use of force would be appropriate and to

2    what degree you could use force.

3    Q    And what did that policy say about when force was or

4    wasn't appropriate?

5    A    It was a continuum.  If that's the right word, and I

6    don't know that it is.  It's kind of like explaining a clock.

7    There were several steps involved in the use of force, and you

8    would try to transcend through those steps.

9    Q    My question goes to a step -- something before you get to

10   the continuum that you're describing.  And this is why I was

11   hoping -- and I might be able to refresh your recollection

12   with the policy.  Is there a standard that you recall, sitting

13   here today, that governed the use of force investigation?  Do

14   you recall that?

15   A    Again, without seeing that paper, I don't know exactly

16   where you're going or what the answer is.  But the question

17   is --

18            THE COURT:  Well, show it to him and see if it

19   refreshes his recollection.

20            MR. GUYNN:  My objection is just that it is

21   irrelevant.

22   BY MR. BEATON:

23   Q    Mr. Young, could you look at the first page of that

24   document and tell me if it's what you recall?

25   A    Yes, it is.  This is Complaints Against Sheriff's

1  Personnel Policy.

2  Q    This is what we've been talking about the last few

3  minutes?

4  A    Yes, it is.

5  Q    Could you turn to page 4, please?

6  A    Okay.

7  Q    And look at Rule Number 35.

8  A    Okay.

9  Q    Read that, and please tell me if that reminds you of the

10 policy that applied to a use of force investigation.

11 A    Yes.  It says, "Use of unnecessary and excessive force

12 during arrest or custody is one of the items that will be

13 investigated by internal affairs."

14 Q    And that's the policy you applied when you conducted use

15 of force investigation?

16 A    It is.

17 Q    Thank you.

18          THE COURT:  Who generated that policy?

19          THE WITNESS:  Sir?

20          THE COURT:  Who authored the policy?  Who generated

21 the policy?

22          THE WITNESS:  The policy -- this policy was in effect

23 when I came there.  It was signed off by the sheriff when he

24 became sheriff.  He reviewed the policies, and Sheriff Taylor

25 then put his signature on the ones that he wanted or changed,

 1  and they became the policies of the sheriff's office under his

 2  governance.

 3           MR. BEATON:  That's all I have to ask you about for

 4  that document.  My next question relates to a previously

 5  admitted Exhibit Number 4.

 6           Do you want me to use the prior --

 7           THE CLERK:  It's here.

 8           MR. BEATON:  Thank you.

 9  BY MR. BEATON:

10  Q    It's also up on the screen.  Do you recognize this

11  document, Sergeant Young?

12  A    Yes, I do.  I do.

13  Q    What is it?

14  A    It's a use of force policy/procedure for the Pittsylvania

15  County Sheriff's Office.

16  Q    And is this the use of force policy you mentioned a

17  moment ago?

18  A    Yes, it is.

19  Q    Could you look at Section 1 on page 2, please?

20  A    All right.

21  Q    Do you see the third sentence there that starts,

22  "Therefore"?

23  A    Yes, I do.

24  Q    "Therefore, it is the policy of this sheriff's office

25  that officers will only employ the minimum force necessary to

1  accomplish a legal purpose."

2  A    Yes.

3  Q    Now, is this a standard that you applied --

4  A    Yes, it is.

5  Q    -- in conducting your investigations?

6  A    Yes.

7  Q    Why is it important -- or is it important that this

8  standard refers to the minimum force necessary to accomplish a

9  legal purpose?

10 A    Because all law enforcement should be after in a stop, a

11 confrontation, an arrest is to get compliance with the minimum

12 amount of force necessary and not be heavy-handed and treat

13 people or hurt people or engage in some sort of physical

14 conduct that is beyond the pale of the resistance that you're

15 dealing with.

16 Q    Could you turn to the last page of that policy, please.

17 A    Yes, sir.

18 Q    The use of force continuum wheel.

19 A    Yes.

20 Q    How would you explain how this continuum applied to your

21 investigations?

22 A    I would look at the situation that was occurring, that

23 the defendant or whomever was stopped was being -- whatever

24 his resistance level was, and I would look at that resistance

25 level and look at this continuum and see that we had used only

1  the force necessary to cease those actions and get compliance.

2  I looked at it as a clock.

3      You didn't want to start at 9 or 10 if your mere presence

4  would serve the purpose.  If a command of "Stand still.  Show

5  me your hands" would serve the purpose, you did not want to go

6  past the necessary force in this continuum than as needed.

7  Q    Now, just so I'm clear, the standard that you mentioned a

8  moment ago, a couple of them that you mentioned that you

9  applied about minimum force and reasonable force to accomplish

10 a lawful purpose, are those the same standards that apply with

11 this continuum, just in a different representation?

12 A    Yes.  Yes.

13 Q    Thank you.  You can set that to the side.

14      THE COURT:  Well, before you go on, I'm going to

15 instruct the jury again regarding something I've already

16 brought up, but it's important here.

17      You have heard evidence as -- you may hear evidence

18 as to whether the defendant's conduct complied with or

19 violated a given rule or policy.  You may consider this

20 evidence in your deliberations.  But remember that the issue

21 is whether the defendants used excessive force on plaintiff in

22 violation of the Fourth Amendment, not whether a given rule or

23 policy might have been violated.

24      You remember you're looking at whether the plaintiff

25 may show that the force used against him was objectively

1  unreasonable, not that it merely violated a rule or some

2  procedure.

3          MR. BEATON:  Thank you, Your Honor.

4  BY MR. BEATON:

5  Q    Sergeant Young, do you know Investigator Robert Worsham?

6  A    I do.

7  Q    How do you know him?

8  A    I knew him from being a member of the sheriff's office,

9  seeing him around the hallway, out in the parking lot, talking

10 to him on occasion casually.

11 Q    And did you have specific dealings with him in your role

12 as head of internal affairs?

13 A    I did.

14 Q    And what were those dealings?

15 A    Those dealings were in complaints that I had regarding

16 his conduct.  I brought him up and talked to him regarding

17 those investigations.

18 Q    Were these the same sort of investigations you described

19 to the jury a moment ago?

20 A    Yes.

21 Q    And did you conduct more than one of these use of force

22 investigations involving Investigator Worsham?

23 A    Yes, I did.

24 Q    Based on your dealings and investigations of Investigator

25 Worsham, did these reveal Investigator Worsham's

1  justifications that he gave for his use of force to be

2  credible?

3  A    No, they did not.

4        MR. GUYNN:  Objection.  May we approach the bench,

5  Your Honor?

6        THE COURT:  Yes.

7       (Sidebar on the record.)

8        MR. GUYNN:  The question was, is my client credible?

9  That's not an appropriate question.

10       MR. BEATON:  This is what we discussed at the

11  pretrial conference.

12       THE COURT:  No, I didn't say you could ask whether

13  somebody's credible.  Nobody can testify as to whether a

14  witness is credible or not credible.

15       MR. BEATON:  I agree.  He wasn't saying anything

16  about intensity level in this case.

17       THE COURT:  We've got these investigations and

18  whatever factual findings, but he can't characterize -- he

19  can't put things in about some witness's character in an

20  investigation.  It's whatever facts he found.

21       MR. BEATON:  So these are -- I hear you.  I'm going

22  to respect that.  I do not want to create an issue.

23       What I'm trying to accomplish here, which is what we

24  discussed, I believe, on Wednesday, under 404(b), the type of

25  evidence that can be used to prove, among other things, a

 1  character for truthfulness which was, I believe, Your Honor's

 2  main basis for recognizing Investigator Young.

 3          What I want him to emphasize is not whether he is

 4  simply telling a lie on the stand.  The question that's

 5  relevant in this case is whether his explanations for the use

 6  of force are believable.  And this is the person --

 7          THE COURT:  Well, it may be error, but I absolutely

 8  will not let you say it wasn't believable or isn't credible.

 9  You can testify -- he can testify what his official findings

10  of fact were under the role that has been previously cited of

11  the official investigations, the factual findings, but you

12  can't ask him if he's credible.

13          MR. BEATON:  That won't cross my lips again.  I

14  apologize.  I was trying to lay the foundation.  But I do want

15  to say that the hearsay exception for government records is

16  what allows this evidence.  There's a separate question of

17  credibility that goes to the character for truthfulness.

18          THE COURT:  You can't ask a witness about the

19  credibility of another witness, specifically do they tell the

20  truth.  You can ask the reputation, but you can't ask if

21  somebody is credible.

22          MR. BEATON:  The reputation for truthfulness.

23          MR. GUYNN:  In the community.  In the community.

24          MR. BEATON:  This is the relevant community.

25          THE COURT:  Where he lives and works and spends his

1  time, socializes.

2       MR. GUYNN:  That wasn't -- okay, I understand that,

3  but that wasn't what he was identifying.

4       THE COURT:  No, it wasn't.

5       Go on, you just can't ask that question.

6       MR. GUYNN:  Those reports also include summaries

7  which are his opinion -- not summaries, recommendations which

8  are his opinion.  He's not an expert.  I presume you're not

9  going to allow that?

10      THE COURT:  The rules say a factual finding.  That's

11 not necessarily limited to that, but not the recommendations.

12 The factual findings are admissible.

13      MR. BEATON:  So that includes his determination

14 whether this was a valid use of force or not?  That's the

15 whole --

16      THE COURT:  You can get the report in.  The rules say

17 you can get the report in.  It doesn't say anything about you

18 can call a bunch of people and ask about their opinions.

19 That's not what the rule allows.

20      MR. BEATON:  Just so I'm clear, because I don't want

21 to get in trouble, is the question -- I believe what Mr. Guynn

22 is concerned with is the disciplinary recommendation.  That's

23 what I heard you say.

24      MR. GUYNN:  Yeah, his opinion that there's a

25 violation of this, or his opinion that this ought to be done,

 1  his opinion that there should be a five-day suspension.

 2  That's opinion.

 3          MR. BEATON:  I will not touch the five-day

 4  suspension, but the whole investigation is about whether use

 5  of force is appropriate or not.  That's what the whole

 6  record --

 7          THE COURT:  Right.

 8          MR. GUYNN:  He can testify to what he found.  He

 9  can't testify to his conclusion as to -- that's an opinion.

10          THE COURT:  Well, the opinion is the problem.  The

11  fact is the question -- he cannot testify somebody was not

12  credible.  He can say what facts he found that are set forth

13  in the -- as set forth in the official investigation report.

14  I mean, that's -- what did you do with my rule?

15          THE LAW CLERK:  It's 803(8).  Not that far.

16          MR. GUYNN:  My concern with opinion, Your Honor, he

17  has not been identified as an expert to give opinion.

18          THE COURT:  Factual findings from the legally

19  authorized investigation.

20          MR. BEATON:  Each of these investigations is to aid

21  him to determine whether factually the use of force --

22          THE COURT:  It's not -- he can't go around and

23  testify if it presupposes there was some working of an opinion

24  by the agency, whoever did the investigation.  It's from a

25  legally authorized investigation and whatever the facts are.

1    I mean, there must be some facts that he determined to be

2    true.

3              MR. BEATON:  He will lay the foundation for --

4              THE COURT:  I don't understand why we're still

5    talking.  I mean --

6              MR. GUYNN:  As long as it's just the facts that he

7    found.  My objection was previous -- I don't think I need to

8    make it again -- that the rules doesn't apply to internal

9    affairs investigations.

10             THE COURT:  Are there any factual findings in the

11   report.

12             MR. BEATON:  He found what happened.

13             THE COURT:  You can ask him what factual findings he

14   made.

15        (End of sidebar.)

16             THE COURT:  Members of the jury, there was an

17   objection to the last question and answer, and I don't

18   particularly want to repeat it since I'm going to sustain the

19   objection.  I will ask you to disregard the question,

20   disregard the answer regarding something to the fact about

21   whether the explanation was credible or not.  But, anyway, you

22   should disregard the question and disregard the answer.

23             MR. BEATON:  Thank you, Your Honor.

24   BY MR. BEATON:

25   Q    Sergeant Young, let's talk about some of the -- some of

Young – Direct

```
 1  those investigations you mentioned a moment ago involving

 2  Investigator Worsham.

 3          MR. BEATON:  I understand, Your Honor, that Exhibit 9

 4  has been conditionally admitted subject to authentication?

 5          THE CLERK:  Number 7.  Number 7.

 6      (Discussion off the record between Mr. Beaton and the

 7  clerks.)

 8          MR. BEATON:  I apologize for the miscommunication

 9  about the exhibit number.

10          I would like to hand the witness and mark for

11  identification the next exhibit, which I will mark as 10.

12          THE CLERK:  11.

13          MR. BEATON:  11.

14      (Plaintiff's Exhibit Number 11 was marked for

15  identification.)

16          MR. GUYNN:  This is a -- we would just note our

17  previous objection.

18          THE COURT:  Excuse me?

19          MR. GUYNN:  We'll rely on our previous objection.

20          THE COURT:  All right.

21  BY MR. BEATON:

22  Q    Sergeant Young, do you recognize this document?

23  A    Yes, I do.

24  Q    Could you identify it, please, for the record?

25  A    This is a summary I wrote up after a complaint I handled
```

1  regarding a Linwood Brandon.

2  Q    When would you have prepared this report?

3  A    After I was through interviewing everyone, all the

4  evidence that I could find was gathered, when I was satisfied

5  as I could be that all the information was there, I would then

6  summarize what occurred for the sheriff to review.

7  Q    So what information was this report based on?

8  A    This information in this report is what I found from

9  interviewing deputies or officers, complainants, or witnesses,

10  and any paperwork that was associated, that was applicable to

11  the arrest or detention.

12  Q    So this represents the findings after you conducted an

13  investigation?

14  A    That is correct.

15  Q    Did you make --

16  A    Sir?

17  Q    Did you make reports like these as part of the normal,

18  ordinary duties --

19  A    Yes.

20  Q    -- you had as head of internal affairs?

21  A    Yes, I did.

22        MR. BEATON:  Your Honor, I'd move the admission of

23  Exhibit 11 as reflecting the factual findings of an official

24  government investigation.

25        MR. GUYNN:  We have the same objection.

1          THE COURT:  Well, can you point out to me the

2    findings?  It refers to what people said, but I don't see the

3    findings.

4          Members of the jury, we're going to go pretty much to

5    5:00 o'clock.  I'm going to let you take a stretch break

6    anyway.  We'll take about a ten-minute recess at this time.

7          MR. BEATON:  Should we come forward now or wait?

8          THE COURT:  We'll let the jury out and then you won't

9    have to come forward.

10        (Jury out at 3:53 p.m.)

11         THE COURT:  Okay.  Would you gentlemen like to take

12   Mr. Wyatt so he can use the restroom?  He doesn't need to be

13   here now.

14         THE MARSHAL:  Yes, sir, Your Honor.

15         THE COURT:  Okay.

16         MR. BEATON:  Should we approach?

17         THE COURT:  Well, you can just go from there.

18         MR. BEATON:  Sure.  So this is, Your Honor, why I

19   was -- I felt a bit between a rock and a hard place a moment

20   ago.  This exhibit, this document that the witness prepared

21   has one section called "Summary" and another called

22   "Recommendation."  The summary summarizes the factual -- you

23   know, the facts at issue.  And then what he makes of the facts

24   is set forth in the recommendation.  And so I don't know if a

25   summary of the --

1          THE COURT:  What is the recommendation?

2          MR. BEATON:  The recommendation is -- it's entitled

3   "Recommendation."  I'm happy to show you a copy.

4          THE COURT:  Well, read it.

5          MR. BEATON:  What it concludes in this instance is

6   that, "The amount of force necessary [sic] to overcome the

7   resistance was unnecessary," which is the finding he reached

8   after accounting for all the evidence, from his interviews,

9   from the records, and so forth.

10         THE COURT:  Okay.

11         MR. BEATON:  What that doesn't get to and what I

12  believe I understand is my friend's objection is the

13  recommendation that the officer would receive a five-day

14  suspension, that being the recommended discipline for this

15  factual finding.

16         THE COURT:  Okay.

17         MR. BEATON:  And so I'm happy to stop short of that.

18  And we can, you know, redact this last paragraph if that makes

19  life easier.  But the conclusion, the finding of this

20  investigation is that there was -- there was unnecessary force

21  used and this was conduct as part of an ongoing pattern.

22  That's what he found.  What that meant under the policy was

23  left for the third paragraph, and I'm happy to leave that

24  behind.

25         THE COURT:  Okay.  All right.  You object, I know.

1          MR. GUYNN:  I do, Your Honor.  It's an impermissible

2     opinion.  It's not even an opinion about this case.  And what

3     we're essentially doing is now trying another case, and it's

4     inappropriate under the rule.  The rule should --

5          THE COURT:  The other case is already tried, so --

6          MR. GUYNN:  I would also point out that I think

7     Mr. Young has already testified that the sheriff was the

8     ultimate authority and the sheriff did not impose the five-day

9     suspension.

10          THE COURT:  Well, this is the official investigation

11     report.

12          MR. GUYNN:  But that's not a factual finding, Your

13     Honor.

14          THE COURT:  Well, guilty is not -- what is guilty?

15     If this jury, if we had -- we're going to ask this jury to

16     find unnecessary force.  If they find unnecessary force, is

17     that factual?

18          MR. GUYNN:  No, it's their opinion.

19          THE COURT:  Well, but it's their finding of fact.

20     They only find the facts.

21          MR. GUYNN:  I understand that, but we don't give --

22     we don't give that authority to witnesses that aren't defined

23     as experts.

24          THE COURT:  Well, under the rule now, you know, Rule

25     803(8)(A)(iii), (i), (ii), (iii), Roman iii.

1          MR. GUYNN:  I'm sorry, I didn't hear you.

2          THE COURT:  I'm saying the finding of fact is

3    admissible.

4          MR. GUYNN:  But unnecessary force is not a fact.

5    It's an opinion.

6          THE COURT:  I agree with you, but I think -- I think

7    the Supreme Court of the United States might have said that

8    it's not -- these reports are not necessarily confined only to

9    bare facts in the report.  It's basically the report that's

10   important.  But, anyway, I'm saying the finding -- the finding

11   is what the fact finder was making here.  He heard all the

12   witnesses and then he said it was -- the force was

13   unnecessary.

14         MR. GUYNN:  And he reports that, Your Honor, as, "It

15   appears the force used, at the time it was used, was

16   unnecessary force."

17         THE COURT:  All right.  I understand your position.

18   And I understand that it could be an opinion.  But I think

19   it's a finding of an investigative report, an official,

20   duly-authorized investigation.

21         MR. GUYNN:  I would also submit that it is irrelevant

22   to the issue today.

23         THE COURT:  All right.  I understand.  Okay.  Why

24   don't we all take about five minutes?

25         MR. BEATON:  Your Honor, while we break, would you

1  like me to redact that paragraph or simply not have the

2  witness touch it?

3         THE COURT:  I wouldn't let the witness touch it.  I

4  would just ask him about it.

5         MR. BEATON:  I'm happy to, thank you.

6     (Recess taken from 3:59 p.m. until 4:03 p.m.)

7     (Court reconvened outside the presence of the jury.)

8         THE COURT:  Is everybody ready?

9         MR. GUYNN:  I have one question about your ruling.

10 There's a second paragraph that begins, "Another issue that

11 needs to be addressed is whether this conduct is an ongoing

12 pattern."  And I would submit to the Court that's certainly

13 opinion, it's not factual.  There's no other basis in here for

14 it.

15        MR. BEATON:  There is a factual basis in there.  The

16 internal affairs officer said this is a part of a pattern that

17 includes this particular prior incident that he compares it

18 to.  So this is the factual finding he reached, that this was

19 part of an ongoing pattern.

20        MR. GUYNN:  An ongoing pattern is opinion, Your

21 Honor.

22        THE COURT:  Well, I know it's an opinion, but that's

23 what --

24        MR. GUYNN:  He wasn't identified to give opinions.

25        THE COURT:  He is the person who conducts the

Young - Direct

```
 1  investigation, and it's an authorized investigation.  Okay,
 2  I'm going to admit it.  We spent a lot of time on less
 3  complicated legal issues the other day, and I'm sorry these
 4  didn't come up.
 5          THE CLERK:  Number 11 is admitted then?
 6          THE COURT:  Well, I'm going to let him ask a
 7  question -- I have not admitted it as such, no, I have not.
 8  You can ask the question.
 9          MR. BEATON:  Your Honor, there's an exhibit that
10  includes the paragraphs we were just discussing not separately
11  from the summary.  The version you have in front of you is
12  just the summary.  I'm happy to put it in as a separate
13  exhibit or I'm happy to give you a new Exhibit 11 that has it
14  all together, whatever is going to be cleaner for the record.
15          THE COURT:  Well, for the time being, you may ask him
16  if the -- what the findings are, those separate findings.
17  Well, this is Broadfoot, isn't it?  This is Colonel Broadfoot?
18          MR. BEATON:  No, this is not from Danville.  This is
19  Pittsylvania County.
20          THE CLERK:  You're talking about Pittsylvania County,
21  Number 11?
22          MR. BEATON:  Yes.
23          THE COURT:  All I have is the summary.
24          MR. BEATON:  Correct.  And that was my question,
25  whether you wanted that third page in as a separate exhibit?
```

 1  Or since we haven't done anything with it, I have the full

 2  boat right here, with the recommendation.

 3          THE COURT:  I'll tell you what I want you to do.  You

 4  can ask him what the findings were for the time being, because

 5  I need to look -- I want to be sure before I admit the whole

 6  exhibit.  For the time being, the rule is you can ask him

 7  about the findings.

 8          MR. BEATON:  May I give him a complete copy?

 9          THE COURT:  Yes.

10          MR. BEATON:  Because the one he has now is

11  incomplete.

12          THE COURT:  All right.  Call the jury back.

13      (Jury in at 4:08 p.m.)

14          MR. BEATON:  Your Honor, may I note one thing for the

15  Court's attention that was related to our earlier discussion?

16  You mentioned Supreme Court authority related to what we've

17  been discussing, and I believe Your Honor may be referring to

18  the case of *Beech Aircraft against Rainey,* R-A-I-N-E-Y,

19  Supreme Court 1988, that deals with these questions.

20          So if it is of use to the Court, I wanted to mention

21  it sooner rather than later.

22          THE COURT:  All right.

23  BY MR. BEATON:

24  Q    Thank you for your patience, Sergeant Young.  Do you

25  recognize the document you're holding in your hand?

1  A     I do.

2  Q     Could you identify it for us?

3  A     Summary that I compiled and typed regarding the

4  investigation I had conducted alleging unnecessary use of

5  force by Deputy Worsham.

6  Q     Okay.  Is the information in this three-page document

7  factual findings from your use of force investigation?

8  A     It is.

9  Q     And was that -- were those findings based on your own

10 personal investigation?

11 A     Yes, sir.

12 Q     And this was part of your ordinary duties as head of

13 internal affairs?

14 A     Yes, sir.

15 Q     Why, Sergeant Young, did you investigate the Linwood

16 Brandon case?

17 A     I received a complaint -- the sheriff received a

18 complaint from a gentleman with the local NAACP regarding

19 someone he knew who was complaining about the conduct of the

20 deputy during his arrest.  The sheriff brought me that, I

21 contacted that individual, got him in and went on with the

22 investigation.

23 Q     Can you tell from the first page here, third paragraph,

24 what force was at issue in this case?

25 A     The force that was at issue here was a leg sweep taking

1  the defendant to the ground, and a strike in his back with the

2  deputy's knee.

3  Q    Did Investigator Worsham deny using this force to you

4  during the investigation?

5  A    No, he did not.

6  Q    Or using the knee to the side?

7  A    He did not.

8  Q    So if the force was admitted, what was the question left

9  for you to investigate?

10 A    Whether necessary force had been applied or did it exceed

11 that and become unnecessary force.

12 Q    In the course of your investigation, did you reach a

13 factual conclusion in response to that question?

14 A    I did.

15 Q    What was your finding and conclusion?

16 A    That unnecessary force was used during this incident.

17 Q    What was the reason Investigator Worsham gave you for

18 using the force at issue?

19 A    He thought the defendant was going to flee on foot.  And

20 when he did a leg sweep and took him to the ground, he felt he

21 was reaching towards his waistband, with his arm under him,

22 and there could be a weapon involved, so he then administered

23 a knee strike into his back.

24 Q    This is what Investigator Worsham told you during the

25 investigative interview?

1  A    Yes.

2  Q    And how did you reach a conclusion that this was

3  unnecessary based on the facts that you had gathered?

4       THE COURT:  Not how.  You can ask what the conclusion

5  in the report is, but not how.

6       MR. BEATON:  I believe -- I'm sorry, I thought he had

7  already answered that question, whether -- I'm happy to ask it

8  again.

9  BY MR. BEATON:

10 Q    Did you reach a factual conclusion on the question of use

11 of force?

12 A    I did.

13 Q    And what was your finding and conclusion on that?

14 A    That the use of force exceeded what was necessary, and

15 unnecessary force was used by Deputy Worsham.

16      THE COURT:  Okay.

17 BY MR. BEATON:

18 Q    May I ask why you -- or how you reached that conclusion?

19      MR. GUYNN:  That's not a factual finding.

20      THE COURT:  I sustained the objection.  Well, I mean,

21 he interviewed witnesses.  I mean, that's understood, right?

22      MR. BEATON:  Fine to leave it alone.

23 BY MR. BEATON:

24 Q    Was this the only conclusion that you reached in your

25 investigation of the Brandon incident?

1  A    No.  I came to several conclusions after interviewing

2  everyone, but the issue at hand was whether unnecessary force

3  was used.  And during my conducting investigations, the facts

4  that became known, I felt that unnecessary force was used,

5  stated so to the sheriff, and made a recommendation for

6  disciplinary action.

7  Q    And if you will look at page 3, please.

8  A    Yes, sir.

9  Q    And the second paragraph.

10 A    Yes.

11 Q    Does that paragraph indicate that you made a second

12 factual finding in this investigation?

13 A    I found that this complaint was like others, almost

14 identically, that I had conducted with Investigator Worsham.

15 Q    Did that apply to the force at issue?

16 A    Yes.

17 Q    And did that apply to the reason given for the force at

18 issue?

19 A    The reason was almost always identical, given by

20 Investigator Worsham, in the complaints that I conducted.

21 Q    And what was that reason?

22 A    He always felt like his safety, physical safety was in

23 peril, or that the individual could be or was reaching for a

24 weapon.  Almost cut and paste every time.

25 Q    Did you find that was the case in this incident, or did

1  you find something different?

2  A    I didn't find that was the case, no.

3  Q    How, if at all, did those other incidents that you're

4  referring to in your finding differ from this one?

5           MR. GUYNN:  Objection.

6           THE COURT:  Overruled.

7  BY MR. BEATON:

8  Q    You can answer.

9  A    They differed very little.  Almost every one there was a

10  knee strike that was administered somewhere on the body with

11  Investigator Worsham.  I had never heard that technique used,

12  while with the sheriff's office, by anyone else there or

13  during my career.  But we always -- not always.  It seemed

14  like most often we went to knee strikes and it was due to fear

15  for personal safety or a weapon.

16       In these investigations that were conducted, I found all

17  the witnesses I could, to include deputies and officers, none

18  of those other deputies or officers --

19           MR. GUYNN:  Objection.  That's hearsay, Your Honor.

20  That's about investigations that aren't even in evidence.

21           THE COURT:  Okay.  Sustained.

22  BY MR. BEATON:

23  Q    Okay.  We'll move on to the next question.

24       Was this the only time you concluded there was a problem

25  with a pattern of Investigator Worsham's use of force?

```
 1  A    No, he is not --

 2          MR. GUYNN:  Objection.  That's an opinion, Your

 3  Honor.  It's not a finding of fact in this case.

 4          THE COURT:  If you have a report, another

 5  investigation, that's okay.  But he's not an expert.  He is

 6  not identified as an expert.

 7  BY MR. BEATON:

 8  Q    Did you complete other reports related to the use of

 9  force involving Investigator Worsham?

10  A    I did.

11  Q    And did you reach factual conclusions in those cases?

12  A    Yes.  Some of those conclusions reached were that they

13  were unsubstantiated --

14          THE COURT:  Wait.  This is not --

15          MR. BEATON:  I will have him move on from this

16  incident.

17          THE COURT:  Okay.

18  BY MR. BEATON:

19  Q    Sergeant Young, were you familiar with the training that

20  was utilized with the Pittsylvania County sheriff's deputies?

21  A    I'm sorry, I didn't hear the question.

22  Q    Sure.  My apologies.

23      Were you familiar with the techniques that were trained

24  to the Pittsylvania County sheriff's deputies?

25  A    Some of them, yes; possibly not all of them.
```

1  Q    And how was that training relevant to your

2  investigations?

3  A    I would look at the facts of what occurred in any

4  techniques or pain compliance that was used and see if that

5  was a legitimate, recognized way of self-defense for an

6  officer or deputy.

7  Q    On the third page of this exhibit, the third sentence,

8  does this -- does your report refer to training that was

9  relevant to your conclusion about Investigator Worsham's use

10  of force?

11  A    I noted in this report that he had been back to defensive

12  tactics retraining at my suggestion to the sheriff, because --

13          MR. GUYNN:  I object to the suggestion to the

14  sheriff.  It's not a factual finding.

15          THE COURT:  Sir?

16          MR. BEATON:  I believe this is already in evidence,

17  Your Honor.  He is just explaining how he reached his

18  conclusion.

19          THE COURT:  Well, how he reached his conclusion is

20  irrelevant.  We know what it is.  He talked to witnesses, he

21  decided facts, and that's what I've ruled as admissible.  And

22  his thought processes, we don't need to get into.

23  BY MR. BEATON:

24  Q    You can set that to the side, Sergeant Young.

25  A    Sir?

1 Q    You can set that to the side for the time being.

2         MR. BEATON:  I would like to hand the witness what I

3 believe to be Exhibit 7, which has been conditionally admitted

4 subject to authentication.

5 BY MR. BEATON:

6 Q    Do you recognize this document, Sergeant Young?

7 A    Yes, I do.

8 Q    Could you identify it for me?

9 A    It's a summary of a complaint I investigated against two

10 deputies with the sheriff's office.

11 Q    And do you know when you compiled this report?

12 A    By the date on it, I would say in 2010.  The alleged

13 incident occurred on June 23rd, 2010.

14 Q    Was that close in time to your factual investigation?

15 A    Yes.  Shortly after this occurred, the complaint came to

16 my desk.

17 Q    And was this report -- was preparing this report part of

18 the normal course of your duties as head of internal affairs?

19 A    Yes, sir.

20 Q    Does this document include the factual findings of your

21 investigation?

22 A    Yes, sir.

23         MR. BEATON:  Your Honor, at this time I would like to

24 move for admission of Exhibit 7 that you conditionally

25 admitted earlier.

1          THE COURT:  Do I have it?

2          MR. GUYNN:  Same objection.

3          THE COURT:  All right.  Go ahead.  Ask him about it

4    first.

5          MR. BEATON:  Okay.  I'm happy to.

6    BY MR. BEATON:

7    Q    Do you recall this investigation, Sergeant Young?

8    A    I do.

9    Q    What caused you to conduct the investigation?

10   A    Somehow a complaint landed on my desk.  I believe it was

11   Mr. Cook himself that made it, but I'm not certain.  But a

12   complaint, official complaint was made and I conducted the

13   investigation.

14   Q    And did you reach a conclusion at the end of that

15   investigation?

16   A    I did.

17   Q    What force was at issue in this investigation?

18   A    The subject was kneed twice in the stomach area and

19   struck once in the back and the kidney area.

20   Q    Was that force in dispute or was it admitted?

21   A    It was admitted to by the officers.  There was no dispute

22   whether it occurred or not.  It did occur.

23   Q    And so was the question for you whether the force was

24   justified?

25   A    Yes, sir.

1  Q    And what sort of investigation did you conduct to answer

2  that?

3  A    I again interviewed any witnesses possible, any law

4  enforcement possible, the complainant.  I attempted to see if

5  they had a tape recording -- it was at a convenience store --

6  and for whatever reason, I did not get one.  Whether it wasn't

7  taped or had been taped over, but it was not available.  There

8  was no tape any longer by the time I got to them to attempt to

9  get it.

10  Q    And did you reach a conclusion --

11  A    I did.

12  Q    -- about the force at issue in this case?

13       MR. GUYNN:  Your Honor, it's not contained in the

14  document.

15       MR. BEATON:  I'm asking.  This contains the factual

16  basis and I'm going to ask him if he reached a conclusion.

17       THE COURT:  Is there a report of investigation?

18       MR. BEATON:  There's a separate document that I'm

19  happy to --

20       THE COURT:  Well, that's what I've ruled is

21  admissible.  I mean, not his summary.  What are the factual

22  findings?  That's what we've been talking about all afternoon,

23  unless I've been somewhere else.

24       MR. BEATON:  No.  And I apologize if there's any

25  confusion, Your Honor.  In this case, the document that we

```
 1  looked at a moment ago exists in two pieces.  It's the same
 2  material as we looked at a moment ago.
 3             THE COURT:  What is this?  I mean, is the summary the
 4  only thing that exists?
 5             MR. BEATON:  No, Your Honor.
 6             THE COURT:  Okay.  Well, I mean, the record of your
 7  conclusions, does that exist somewhere?
 8             THE WITNESS:  It should.
 9             MR. BEATON:  Yes.  It's Exhibit 8, Your Honor.
10             THE COURT:  Okay.  Well, let's get it to him.  I
11  don't think I have it.
12             THE CLERK:  We'll make sure you do.
13             THE COURT:  Maybe I do.
14             MR. BEATON:  I apologize.  I'm going to give you a
15  new document.  I apologize.
16          (Plaintiff's Exhibit Number 12 was marked for
17  identification.)
18  BY MR. BEATON:
19  Q    Sergeant Young --
20  A    Yes, sir.
21  Q    -- does this Exhibit 12 include a factual finding you
22  made in the Cook case?
23  A    Yes.
24  Q    What is this document?
25  A    Sir?  I didn't hear you.
```

1  Q    Sorry.  What is this document?

2  A    I gave the sheriff the summary and the investigation with

3  everything in it.  This is a memo back to me regarding his

4  determination after reviewing my investigation, with notes

5  that -- what he wanted me to do regarding closing out this

6  complaint.

7  Q    What was the factual finding you made in your report and

8  gave to the sheriff?

9  A    The factual finding was that the use of unnecessary force

10  was unsubstantiated, meaning not enough evidence either way.

11  But I recommended to the sheriff that the deputies receive

12  retraining, which is not a disciplinary action, in an effort

13  to bring them up to the newest tactics available and have on

14  their mind what is acceptable speed of escalating physical

15  prowess upon a suspect.

16  Q    Physical what?

17  A    Prowess.  The amount of physical force that they exude

18  upon someone.  I felt, and my recommendation was, that they

19  and the sheriff's office would be best served by simply

20  retraining and no disciplinary action taken.

21  Q    Okay.  So was the finding that the allegation was

22  unsustained one way or the other the only factual finding that

23  you made reflected here?  If you could just take a minute to

24  review the memo.  My question is whether there was another

25  factual finding.

1  A    I found that they used hands-on actions when I felt

2  lesser actions, such as mace, chemical, pepper spray, verbal

3  commands were not used.  We seemed to speed ahead in the

4  continuum, and I felt it was obvious that other actions were

5  left out before the physical began.

6  Q    And was this -- did this lead to the training you

7  mentioned a moment ago?

8  A    Yes.  There were witnesses to this incident, nonpolice

9  witnesses that I was not able to find.  People were in the

10  parking lot, they -- I didn't know their names, didn't know

11  who they were, left information with the clerks, who said, "I

12  know some of them.  I'll try to get them to call you."  They

13  never did, so there was this murky, gray area.

14       But what became clear was that if we could retrain and

15  get sharper knowledge of where we should go with our physical

16  actions, it may benefit both the deputies and the community.

17  Q    Thank you.  You can set that memo to the side.

18           MR. BEATON:  I would like to ask the Court to mark

19  for identification this next exhibit, Number 13.

20           MR. GUYNN:  Same objection, Your Honor.

21           THE COURT:  Noted.

22       (Plaintiff's Exhibit Number 13 was marked for

23  identification.)

24  BY MR. BEATON:

25  Q    Do you recognize this document, Sergeant Young?

1  A    I do.

2  Q    Could you identify it for us, please?

3  A    This is summary I compiled from another investigation I

4  conducted against Investigator Worsham for excessive force.

5  Q    Was this the same sort of investigation that you

6  described for the jury previously?

7  A    Almost identical.

8  Q    And did you prepare this document at the conclusion of

9  your investigation?

10  A    I did.

11  Q    Was it prepared in the ordinary course of performing your

12  duties at internal affairs?

13  A    Yes, sir.

14  Q    Does this document reflect actual findings and

15  conclusions you reached at the end of your investigation?

16  A    It does.

17  Q    And what was the force at issue?

18  A    Sir?

19  Q    What was the force at issue in this incident?

20  A    The defendant stated he lied on the ground in basically a

21  spread eagle position to give himself up after a car chase.

22  And he said that Investigator Worsham came up and struck him

23  in the side of the head with his fist, head, face area twice.

24  He said, "I was wrong" -- the defendant told me in his

25  complaint, "I was wrong.  I knew the gig was up.  When Worsham

1   went to pull me, I stopped, got out, laid down and offered no

2   resistance."

3   Q    So in this complaint, was the use of force disputed or

4   was it admitted by Investigator Worsham?

5   A    Investigator Worsham admitted to the use of force.

6   Q    So was the question for you the same one regarding the

7   justification for that force?

8   A    Yes, sir, it was.

9   Q    And did you reach a conclusion in your investigation?

10  A    The conclusion regarding the use of force was that it

11  would be unsubstantiated.  It was a he said/he said, the bad

12  guy and Worsham on a country road, on a dark night, and there

13  were no other witnesses to either dispute or solidify what

14  either of them had told me.  But I did uncover violations of

15  other rules and regulations while investigating the complaint.

16  Q    Were those -- are those reflected here as factual

17  findings in your report?

18  A    They are.

19  Q    And what were those findings?

20  A    One finding was that Worsham had cursed at the

21  individual.  And one of our rules and regulations is about

22  being civil and courteous.  And another one states that you

23  will fill out a use of force report by the end of your tour of

24  duty, and when I got the one from Worsham, it was not filled

25  out until three days later.  And there's an important reason

1  why you would want them at the end of the shift, and that did
2  not occur.
3  Q    What was the reason why you would want it at the end?
4  A    If a complainant comes in at 8:00 o'clock in the morning
5  and wants to complain about being arrested the night before,
6  it's nice to be able to go get these use of force reports.  If
7  it's nothing else but what I have to say, "And your actions
8  weren't this?  And you didn't do this?  And you weren't in
9  possession of this?"
10      And if you have that, it oftentimes levels the playing
11  field and let's the complainant realize, oh, I do know
12  something about it.  And oftentimes it brings down his level
13  of possible exaggeration to get right closer to the facts.
14  Q    Thank you.  You can set that to the side.
15      Sergeant Young, these three reports we've looked at, are
16  those the only three use of force incidents that you were
17  aware of as internal affairs head?
18  A    No, they're not the only ones.
19  Q    Involving Investigator Worsham, I should say?
20  A    No, they're not the only ones I'm aware of.
21  Q    What was your involvement with other use of force
22  incidents and Investigator Worsham?
23  A    I would file them away.  I was the internal affairs
24  investigator, was the keeper of these reports of use of force,
25  and I would file them away after they'd come up through the

 1  chain of command from a deputy supervisor.  Captains would

 2  sign off; oftentimes the undersheriff, lieutenant colonel; and

 3  ultimately sheriff, if he was there.  The lieutenant colonel

 4  was acting.  They would sign off either "I am satisfied" or

 5  "not satisfied" with the actions.  And unless I was directed

 6  to conduct an investigation, they went into a file.

 7  Q    And so just to be clear, these three incidents were not

 8  the only ones you are familiar with involving Investigator

 9  Worsham, correct?

10  A    Correct.

11  Q    Were there other incidents in which you reached formal

12  conclusions at the end of an investigation --

13  A    I don't understand.

14  Q    -- that you recall today?  Are you recalling other

15  investigations that led to a formal report or are you

16  recalling other incidents that did not, to your recollection,

17  lead to that sort of formal reports?

18  A    I'm thinking of use of force reports that weren't

19  accompanied by a complaint or an order from the sheriff for me

20  to conduct an investigation.  I would review -- part of my job

21  is to review these reports, and I wasn't quite sure why, when

22  they had already been signed off and said "I am happy" or "not

23  happy."  But I would read them and I would file them.  And

24  some of them seemed -- I question --

25          MR. GUYNN:  Your Honor --

```
 1              THE COURT:  I sustain the objection.  You've got to
 2  confine --
 3              MR. BEATON:  I'm sorry.  He went beyond the scope of
 4  my question.
 5  BY MR. BEATON:
 6  Q    Sergeant Young, based on your knowledge of Investigator
 7  Worsham and of the entire Pittsylvania County Sheriff's
 8  Office, did Investigator Worsham have a reputation for
 9  truthfulness in the department?
10              MR. GUYNN:  Objection.
11              THE COURT:  I think you have to ask the question a
12  little bit differently.
13              MR. BEATON:  Excuse me?
14              THE COURT:  In the community where he knows.
15  BY MR. BEATON:
16  Q    Let me start over.
17       In the community here, are you aware whether Investigator
18  Worsham had a reputation for his truthfulness as a law
19  enforcement officer?
20  A    No, I don't think he has a reputation of truthfulness as
21  a law enforcement officer.
22  Q    Did he have a reputation on that subject one way or the
23  other?
24  A    Oftentimes people I encounter would, in their opinion,
25  think --
```

1          MR. GUYNN:  Objection, Your Honor.

2          THE COURT:  The question is:  What was his

3  reputation?

4          MR. BEATON:  Yes.

5  BY MR. BEATON:

6  Q    Without getting into anyone's opinion, my question is

7  directed just at the existence or not of a reputation across

8  the community.

9  A    Generally speaking, it's not good.

10         MR. GUYNN:  I think he answered it.

11         MR. BEATON:  Give me one second, please.

12 BY MR. BEATON:

13 Q    Thank you, Sergeant Young.  That's all the questions I

14 have.

15         THE COURT:  Mr. Guynn.

16         MR. BEATON:  I will pass the witness.

17                       CROSS-EXAMINATION

18 BY MR. GUYNN:

19 Q    Mr. Young, you decided in the Jerome Reynolds complaint

20 that the use of force reports weren't turned in in three days?

21 A    At the end of the -- yes, that's correct.

22 Q    At the end of the day?

23 A    Yes.

24 Q    Did you check with the supervisors to determine whether

25 or not they knew of that?

```
 1  A    I don't recall.

 2  Q    You don't -- okay.

 3  A    I looked at the date of the incident and the date that

 4  Worsham signed the report, and there was three days'

 5  difference.

 6  Q    I'm not suggesting to you there's not, but you don't know

 7  whether a supervisor authorized that or not, do you?

 8  A    No.

 9  Q    That didn't seem to be important to you at the time, to

10  check with the supervisor?

11  A    None whatsoever, no.

12  Q    And to make sure, you mentioned the possibility that

13  someone would come in and make the complaint, and you wouldn't

14  have the use of force report in hand.  And you thought it

15  would be handy to have it in hand, didn't you?

16  A    Yes, sir.

17  Q    And do you recall that being the case in the Jerome

18  Reynolds incident?

19  A    No, I don't recall.

20  Q    In fact, he made his complaint on June 28, 2011.  Does

21  that sound about right?

22  A    I don't know.  Can I look?

23  Q    Sure.

24  A    Don't know that I have that one.  Yes, I do.  What was

25  the question again, sir?
```

1  Q    What day did he make the complaint?

2  A    I don't have the whole thing.  I've just got my summary.

3  I don't know.

4  Q    The event itself occurred on June 4th?

5  A    I don't know.  I don't have it in what I've got here.

6  Q    So you don't have any dates in that?

7  A    I have my summary and my knowledge that I do recall.

8  Q    Okay.  But you don't recall specifically that the

9  complaint was made 24 days after the arrest?

10  A    No, I don't.

11  Q    Correct me if I'm wrong, but I thought I understood you

12  to say that the -- of the complaints you had with regard to

13  Investigator Worsham, that they were all very similar and they

14  involved using a punch or a knee because someone was reaching

15  for a gun?

16  A    Basically, that's correct, yes.

17  Q    And yet in the Brandon summary, you say, "At no time did

18  Deputy Worsham state that he felt he was in fear for his

19  safety or that he thought Brandon was trying to go for a

20  weapon when he had his arm under him.  Worsham simply states

21  he was worried Brandon would try to destroy evidence."

22        And I believe that -- I don't know the number of the

23  exhibit, but you should have it in front of you there.  If you

24  look at the third paragraph.

25  A    I do have that one.  Okay.  And the question is again?

1  Q    Well, didn't you write in the summary, in the next to the

2  last sentence, at paragraph 3, "At no time did Deputy Worsham

3  say he felt he was in fear for his safety or he thought

4  Brandon was trying to go for a weapon when he had his arm

5  under him"?

6  A    At no time did Deputy Worsham tell me that he feared for

7  his safety or that he thought he was going for a weapon.

8  Q    Right.

9  A    Right.

10 Q    But you just said that the pattern was that's what he

11 would say?

12 A    That is correct.

13 Q    So this is not one of those?

14 A    No, not one of those exactly, no.  I said --

15 Q    In fact, in the three that you've been directed to,

16 that's the only one where he uses a knee strike, isn't it,

17 Reynolds or Cook?

18 A    Yes, that is the only one he used a knee strike of those

19 three.

20 Q    In the -- I think in the Brandon one -- no, I take it

21 back.  You indicated that you had told Sheriff Taylor that you

22 were concerned that the deputies had gone hands-on with

23 Mr. Cook sooner than they needed to?

24 A    Yes.

25 Q    And it looks like in Sheriff Taylor's memo that he says

1  they both should have tasers and an ASP.  An ASP being a

2  baton.  And apparently they didn't have those?

3  A    They did not have those that night during this incident.

4  Q    And were you suggesting that the taser or the ASP would

5  have been more appropriate than what they did?

6  A    No, I'm not.  I'm not sure what this meant by Sheriff

7  Taylor.  "Make sure that both have tasers and ASPs, along with

8  the training for both," which led me to believe that tasers

9  and ASPs all times on duty?  Or are you telling me to have it

10 at the training?

11 Q    Would you agree with me that a knee strike should be used

12 before a taser in the continuum of force that you talk about?

13 A    I'm not familiar with a knee strike as a defensive tactic

14 for police officers.  I'm not saying it's not.  I've never

15 heard of it in 36 years.  I don't know.  So I'm thinking a

16 taser is a nonlethal form of compliance most of the time.

17 Q    Yeah, I was going ask you about that.  It's not every

18 time, is it?

19 A    No.  And I think a knee strike could also crush something

20 and kill you also.  So I don't know which one you would go to

21 first.

22 Q    Okay.  Well, let me ask this:  When did you go to the

23 academy?  When were you certified as an officer?

24 A    Last recertified or first certified?

25 Q    First certified.

1   A    1976.

2   Q    And I take it the knee strike was not taught in 1976 in

3   the academy?

4   A    No, sir, not in mine.

5   Q    In the Brandon case, the complaint came in several months

6   after the arrest, didn't it?

7   A    It came sometime after it.  It was a significant time.  I

8   don't remember how long.

9   Q    Something like February to July?  Does that sound about

10  right?

11  A    It was a long time.  I know it wasn't quickly, but the

12  sheriff brought it to me to investigate.

13  Q    And there was a date on the complaint, so you knew there

14  was a difference between the complaint and the date of the

15  arrest?

16  A    Yes, I knew there was differences.  Yeah.

17  Q    And you contacted Danville Police Officer Stone to ask

18  him about video?

19  A    No, I didn't -- well, I didn't know there was a video

20  until I happened to find out that there was an Officer Stone

21  there, and in his interview, he told me there was a video.

22  Q    Right.  And that would have been after the July report of

23  a complaint?

24  A    Yes, sir.

25  Q    And then you found out that they basically taped over the

 1  video in Danville?

 2  A    Correct, they had.

 3  Q    Which didn't surprise you given the length of time, did

 4  it?

 5  A    No, it did not.

 6  Q    When you reported to Sheriff Taylor, did you copy anybody

 7  on your report?

 8  A    No.  I reported only to him.

 9  Q    You don't know what was transmitted from him to the

10  officers, do you?

11  A    No.

12  Q    And you're not aware of whether or not what you sent to

13  the sheriff was sent to the officers?

14  A    I'm sorry, I couldn't hear you with the cough.

15  Q    You're not aware that what you sent to the sheriff was

16  sent to the officers, whether it was or not?

17  A    That is correct.

18  Q    You know you didn't?

19  A    Right.

20  Q    These three incidents, Brandon, Reynolds, and Cook, none

21  of them suffered any serious injury, did they?

22  A    No, sir.

23  Q    Do you have a recollection of the day of the week that

24  the Reynolds incident occurred?

25  A    No, I don't have any idea what day of the week it was.

1  Q    And to clarify, when you were referring to the use of

2  force reports that you reviewed earlier, you're not talking

3  about complaints, you're talking about reports?

4  A    Correct.

5  Q    And those would have been prepared by the officer?

6  A    Yes, sir.

7  Q    And you reviewed the use of force reports, or at least

8  stored the use of force reports, for every officer in

9  Pittsylvania County, didn't you?

10  A    Yes, sir.

11  Q    Whatever use of force report was filed or submitted, you

12  kept in a file?

13  A    Yes, sir.

14  Q    And then you're responsible for reporting use of force

15  figures, statistics, or the like to the Commonwealth?

16  A    Sometimes that was a request, yes.  Some years it was,

17  some years it was not.

18  Q    And sometimes it was a matter of keeping the statistics

19  for the department?  Or did you even do that if it wasn't part

20  of the Commonwealth's submission?

21  A    I didn't keep the statistics unless there were times the

22  sheriff asked me how many complaints someone had, or give me

23  the top ten complaints on officers and how many they've had.

24  But otherwise, I didn't keep the statistics unless they were

25  requested by the State of Virginia or the Department of

1  Criminal Justice or the sheriff.

2  Q    Are use of force reports broadly used in police

3  departments and sheriff's offices, to your knowledge?

4  A    Yes, sir.

5  Q    Were they used in Norfolk?

6  A    Yes, sir.

7         MR. GUYNN:  That's all I have, Your Honor.

8         THE COURT:  All right.  Is that all?

9         MR. BEATON:  Nothing further, Your Honor.  Thank you.

10        THE COURT:  Thank you.

11        All right.  Members of the jury, we're going to

12  recess now until 9:30 tomorrow morning.  And as I've told you,

13  do not discuss the case with anyone, do not allow anyone to

14  discuss it with you.  Do not remain within hearing of anyone

15  discussing the case.  Do not read, listen, look at anything

16  about the case.  Don't do any research about the case.

17        So we'll see you back in the morning at 9:30.  And go

18  to the jury room when you get here.  Thank you all.

19        The jury may file out.

20     (Jury out at 4:56 p.m.)

21        THE COURT:  Is there anything before we leave?  Are

22  you all okay with the exhibits?

23        THE CLERK:  I believe so.

24        THE COURT:  Okay.  See y'all in the morning.

25        THE WITNESS:  Sir, am I dismissed?

1          THE COURT:  You don't have to stay outside.

2          THE WITNESS:  Do I have to come back in the morning?

3          THE COURT:  Do you all need him back tomorrow?

4          MR. BEATON:  No.

5          MR. TODD:  No.  Yeah, but leave the paper there.

6      (Court recessed at 4:57 p.m.)

7

8                         CERTIFICATE

9  I,  Judy K. Webb, certify that the foregoing is a

10 correct transcript from the record of proceedings in

11 the above-entitled matter.

12

13 /s/  Judy K. Webb          Date: 5/12/2017

14

15

16

17

18

19

20

21

22

23

24

25