UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


```
* * * * * * * * * * * * * *
MICHAEL E. WYATT,            * CIVIL ACTION 7:14-CV-00492
                             * APRIL 19, 2017  9:31 A.M.
              Plaintiff,     * JURY TRIAL
                             * VOLUME II OF III
vs.                          *
                             * Before:
JOHNNY OWENS, ET AL.,        * HONORABLE NORMAN K. MOON
                             * UNITED STATES DISTRICT JUDGE
              Defendant.     * WESTERN DISTRICT OF VIRGINIA
* * * * * * * * * * * * * * * AND A JURY
```

APPEARANCES:

For the Plaintiff:      BENJAMIN JOEL BEATON, ESQUIRE
                        CARLA MORGAN BRANCH, ESQUIRE
                        GORDON DWYER TODD, ESQUIRE
                        Sidley Austin, LLP
                        1501 K Street, N.W.
                        Washington, D.C. 20005




For the Defendant:      JIM H. GUYNN, JR., ESQUIRE
                        Guynn & Waddell, PC
                        415 S. College Avenue
                        Salem, VA 24153




Court Reporter:         Judy K. Webb, RPR
                        210 Franklin Road, S.W., Room 540
                        Roanoke, Virginia 24006
                        (540)857-5100 Ext. 5333


          Proceedings recorded by mechanical stenography,
transcript produced by computer.

1    **PLAINTIFF'S EXAMINATION INDEX**

2                                                    **PAGE NO.**

3    SCOTT WYATT:

4    Direct by Mr. Todd                            227

5    Cross by Mr. Guynn                            248

6    Redirect by Mr. Todd                          260

7    Recross by Mr. Guynn                          267

8

9    JOHNNY OWENS:

10   Direct by Mr. Todd                            268

11   Cross by Mr. Guynn                            282

12   Redirect by Mr. Todd                          288

13   Recross by Mr. Guynn                          293

14

15   MICHAEL WYATT:

16   Direct by Ms. Branch                          294

17   Cross by Mr. Guynn                            318

18

19   DENNIS WALLER:

20   Direct by Mr. Beaton                          340

21   Cross by Mr. Guynn                            383

22   Redirect by Mr. Beaton                        399

23

24

25

1

**PLAINTIFF'S EXAMINATION INDEX**

2

                                                    **PAGE NO.**

3   JEFFREY SMITH, M.D.:

4   Direct by Ms. Branch                             403

5   Cross by Mr. Guynn                               440

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | EXHIBIT INDEX | | |
|---|---|---|---|
| PLAINTIFF'S EXHIBITS: | | MARKED | RECEIVED |
| 14 | | 261 | |
| 15 | | 263 | |
| 16 | | 278 | 279 |
| 17 | | 316 | 316 |
| 18 | | 376 | 376 |
| 19 | | 416 | 416 |
| | | | |
| DEFENSE EXHIBITS: | | MARKED | RECEIVED |
| 1 | | 453 | 453 |

1    (Court convened at 9:31 a.m.)

2        THE COURT:  Good morning.  I see the plaintiff is not

3    here yet.  Is he in the building?  Okay.  We won't start with

4    the jury until he is here.

5        I received the memo from the plaintiff's counsel

6    regarding those reports.  Is there anything else to be said

7    about it?

8        MR. GUYNN:  Perhaps I could ask what memo, Your

9    Honor?  I haven't seen it.

10       THE COURT:  A memo in support of the admissibility of

11   the reports we've been talking about all yesterday.

12       MR. GUYNN:  Okay.

13       MR. TODD:  Should we take a few minutes to let

14   Mr. Guynn review the papers, Your Honor?

15       THE COURT:  Sure.

16     (Pause in the proceedings.)

17       MR. BEATON:  I don't know if Your Honor has a copy of

18   the *Beech* case that we cite.  I'm happy to give one to the

19   Bench and my opposing counsel.

20       THE COURT:  We have a copy.

21       Are you ready?  Anything else to be said?

22       MR. GUYNN:  I assume that's me, Your Honor, as far as

23   anything else to be said.

24       THE COURT:  Well, the ball is in your court.  You've

25   pretty well expressed yourself for some time now on the issue.

1      MR. GUYNN:  Well, I would like to clarify a couple of

2 things and make sure that I'm clear on the record.

3      THE COURT:  Okay.

4      MR. GUYNN:  First, just because the sheriff has an

5 internal investigation doesn't make it the type of government

6 investigation that is covered by this rule.

7      THE COURT:  Well, on that matter, I think the word

8 is, is it an official investigation.  I do find that the

9 investigation that the internal affairs person conducted fits

10 the rule.  I don't see any limitation.  I mean, I'm sure there

11 are limitations, but I think that's clearly within the meaning

12 of the rule.

13      MR. GUYNN:  I'm not going to belabor the point.

14      THE COURT:  Right.  Go ahead.

15      MR. GUYNN:  The second is the brief says that my

16 principal objection is the hearsay part of it.  That's not the

17 principal objection.  The principal objection is that it is

18 irrelevant to this case, that is, previous investigations are

19 irrelevant to this case, Your Honor.

20      And, you know, when we had the hearing on this last

21 week, I suggested at one point we should at least bifurcate

22 the liability and damages, and that way this evidence would

23 only come in on damages if the jury found that there was

24 liability for this particular instance.  Instead, we're now

25 running the risk that the jury is going to base its decision

1  in this case, on this particular allegation, on the fact that
2  there were three instances over a total of six or eight years
3  in which there were complaints of excessive force, all of
4  which were unsustained and all of which -- not all of which
5  were even similar.  And I would just submit to the Court that
6  it's a relevance issue here that is the problem.

7            Obviously when Mr. Young is testifying about his own
8  findings, that's a different situation.  But the fact that
9  he's already testified -- and the second thing I would add to
10 that is, the fact that he has already testified sort of
11 obviates the need to put the exhibits in.  And I think it
12 overemphasizes them to the detriment and to the prejudice of
13 my client based upon the case that is being tried, the
14 liability case that is being tried today regarding Mr. Michael
15 Wyatt.  It doesn't have anything to do with Mr. Michael
16 Wyatt's case, Your Honor.

17           THE COURT:  Okay.  Thank you.  All right.  Anything
18 else?

19           MR. BEATON:  Thank you, Your Honor.  Just briefly.
20 The incidents in question all occurred within less than a
21 three-year period just before the incident in this case.  This
22 was not a six- or eight-year period.

23           Second, I believe I heard my friend take a couple of
24 issues off the table, which is relevance as to damages, I
25 believe he has conceded; there's no hearsay issue.  And the

1  only question would be relevance to liability, which is

2  precisely what we briefed and argued a week ago before Your

3  Honor's order, which, as you're familiar, we offered the three

4  bases for admissibility, which we attempted to establish

5  yesterday.

6       As to testimony versus documents, I think we're all

7  familiar with the difference between a juror sort of hearing

8  snippets of a finding versus seeing it in its best and

9  original context on the page, which is important.

10      And then the last thing I would like to address,

11 which I don't believe my opposing counsel did, was the *Rainey*

12 case, which I believe clearly sets forth that the rules

13 committee considered this question:  There is no

14 distinction -- there is no parsing between facts and opinion

15 under this hearsay exception.  The question is whether the

16 report is trustworthy.  And I haven't heard any question that

17 these reports are not trustworthy.

18      Unless you have any questions, that's all I had to

19 add.

20      THE COURT:  All right.

21      MR. GUYNN:  With all due respect, no, I haven't

22 suggested to you that the reports are appropriate for damages

23 either.  All I've suggested in bifurcation is that if the

24 Court is going to do this, that the only way to do it without

25 unfairly prejudicing the defendant is to bifurcate.  That

 1   doesn't means that it is admissible.  It simply means, from

 2   our standpoint, that's the only way that we could see that

 3   would even --

 4         THE COURT:  Well, all the evidence -- I mean, I've

 5   allowed the reports to be read.  I don't think there's

 6   anything in the reports that hasn't come in, correct?  I mean,

 7   the jury has already heard all that.

 8         MR. GUYNN:  There is the last sentence on the third

 9   page of one of them.  I think it was admitted at first as a

10   two-page -- or it was initially looked at as a two-page

11   document and was added to it.  I'll find it here in a second,

12   Your Honor.

13         Yeah, the part about Worsham, the recommendation of

14   the investigator that Worsham receive a five-day suspension

15   for his conduct, that shouldn't be admissible.

16         THE COURT:  Did that come in?

17         MR. GUYNN:  He did not testify to it.

18         MR. BEATON:  Your Honor, Sergeant Young did not

19   testify to that, we avoided that, but Investigator Worsham

20   did.

21         THE COURT:  Yeah.  Well, that would tend to indicate

22   that that was a founded complaint.  I mean, that the

23   officer -- the internal affair's officer's investigation, he

24   found it was a founded complaint and made that recommendation.

25         Well, I'm ready to rule on it, on the motion.

 1          I allowed this evidence in for limited purposes.  And

 2   yesterday we spent almost the whole day on this type of

 3   evidence.  And this evidence, when it's submitted under 403,

 4   the Court has to consider not only the probative value but

 5   also whether there could be undue prejudice.

 6          Now, I made the ruling earlier that I did not think

 7   that the prejudice -- I thought the probative value outweighed

 8   the prejudice.  And I think, in general, the probative value

 9   of the evidence is important in this case, more for the

10   reasons given the particular credibility issue and whether

11   this was intentional, or whether there was a mistake made, or

12   whether he accidently injured the plaintiff.

13          And I think it is still admissible for that reason.

14          But I am concerned that in the *Beech* case, the report

15   in that case concerned the cause of action before the Court at

16   that time.  Now, here we've got these prior instances, and I'm

17   afraid that if you put all of these reports in, I mean, and

18   the time we've already spent on this, that we get to the point

19   where the prejudice tends to maybe outweigh some of the

20   probative value.

21          I will allow you -- the opinions and that sort of

22   thing doesn't bother me, but I do think when we put all this

23   report in -- and I think in this thing it's more all the

24   evidence that was gathered by the officer.  It just happens to

25   be his investigation file.

Wyatt v. Owens, et al. — 4/19/2017

1    And I don't think necessarily -- it may be admissible

2    under that case, and other parts of the report, if they be in

3    the report.  But I think the opinions are admissible.  And I

4    think any particular facts found are admissible.  And I think

5    you questioned Officer Worsham about it extensively and the

6    internal affairs officer.

7    And I think to go and to admit these reports in whole

8    would tend to risk the prejudice and outweigh the probative

9    value of what's already in.  I don't in any way suggest that

10   there is not probative value.  But I think we're getting to

11   the point in the case, if the case goes on with this heavy

12   concentration on those reports, we get away from what actually

13   happened in this particular instance.  And the jury, I'm

14   afraid, could be swayed just by the fact of these complaints,

15   that what happened in this case happened again -- I mean, what

16   happened was what had happened possibly before.

17   And so for that reason, I'm not going to allow the

18   reports themselves in.  I will allow any witness to testify.

19   Or if there is specific -- if there are specific findings of

20   fact or conclusions in the report -- I mean, I think they've

21   already been on the screen to some extent possibly, I'm not

22   sure, but I'm not going to allow the entire report in.  If

23   there's anything specifically in the reports that you think

24   you haven't brought up that you want to, I will allow -- might

25   allow that.  I will hear argument on that.

1          MR. BEATON:  Just to clarify, Your Honor, I believe

2     what you're saying is the information that came out on the

3     stand yesterday is in, and you would prefer not -- we're not

4     going to publish anything further?

5          THE COURT:  Right.

6          MR. BEATON:  If there's additional information in a

7     report, a finding in a report, then we would take it up at the

8     time when we sought to introduce that additional conclusion;

9     is that correct?

10          THE COURT:  Right.  Yes.

11          MR. BEATON:  Thank you, Your Honor.

12          THE COURT:  Okay.  Where is the plaintiff?

13          THE CLERK:  My understanding was he was --

14     plaintiff's counsel had requested he not be brought in.  He

15     needed another shirt.  So as soon as that came, they were

16     going to get him.

17          MS. BRANCH:  He is ready.

18        (Plaintiff enters the courtroom.)

19          THE COURT:  All right.  Let's call the jury.

20        (Jury in at 9:53 a.m.)

21          THE COURT:  Call the next witness.

22          MR. TODD:  Your Honor, the plaintiff calls Scott

23     Wyatt to the stand.

24              SCOTT WYATT, PLAINTIFF'S WITNESS, SWORN

25                    DIRECT EXAMINATION

1  BY MR. TODD:

2  Q    Good morning, sir.

3  A    Good morning, sir.

4        MR. TODD:  Good morning, ladies and gentlemen of the

5  jury.  We'll go a lot faster today, I hope.  Make everyone

6  happy.

7  BY MR. TODD:

8  Q    Introduce yourself to the jury.

9  A    Investigator Scott Wyatt, Pittsylvania County Sheriff's

10  Office.

11  Q    And, sir, you were among the officers who arrested the

12  plaintiff, Michael Wyatt, on July 3rd, 2012; were you not?

13  A    That's correct, sir.

14  Q    And in the course of the arrest, am I correct you grabbed

15  Mr. Wyatt from behind, took him to the ground, and punched him

16  in the face four to eight times?

17  A    I took him to the ground, yes.  And it was not four to

18  eight times.  It was four to five times.

19  Q    Sir, do you recall earlier in the case answering some

20  written questions posed to you by the plaintiff?

21  A    I do, sir.

22  Q    Those are called interrogatories?

23  A    Yes.

24  Q    And you filled those out at your leisure, right?  You

25  weren't in court?

1  A     I'm sorry, sir?

2  Q     You filled those out on your own?  You weren't in court?

3  A     That's correct, sir.

4  Q     And those were sworn answers, right?  You signed them and

5  swore?

6  A     Yes, sir.

7  Q     Let me hand you a copy of the document, sir.  If you

8  would just confirm for me that that's your response to written

9  questions.  And in particular, I will direct you to page 5.

10         MR. TODD:  Your Honor, if you're on page 5, it's

11  question 6.

12  BY MR. TODD:

13  Q     My first question to you is just confirming this is your

14  response, sir.

15  A     I didn't type this, sir, but that appears to be my

16  response, yes, sir.

17  Q     If you look at page 7, is that your signature?

18  A     Yes.

19  Q     And it's notarized, right?

20  A     That's correct, sir.

21  Q     Let me direct you to page 5 --

22  A     Sure.

23  Q     -- question 6.

24         MR. TODD:  Your Honor, this is a sworn statement so

25  it comes in as substantive evidence.  I will read it with the

1  Court's permission.

2          THE COURT:  Yes.

3  BY MR. TODD:

4  Q    The question posed to you, sir, was, "Describe your

5  involvement in the seizure and arrest of plaintiff, describing

6  with particularity any use of force you engaged in, the reason

7  for that use of force, and when and why you discontinued that

8  use of force."

9          Did I read that correctly?

10 A    Yes, sir.

11 Q    I'm not going to read your whole answer, but if you look

12 at the fourth line up from the bottom, the sentence starting,

13 "I struck," do you see that?

14 A    I do, sir.

15 Q    Your answer is, "I struck him as hard as I could four to

16 eight times while continuing to order him to give up his right

17 arm, and he continued to resist."

18 A    That's correct.

19 Q    I read that correctly?

20 A    That's correct.

21 Q    I will take that back.  Thank you.

22          Investigator Wyatt, you are a member of the Special

23 Investigations Division, the same as Worsham and Owens,

24 correct?

25 A    That's correct.

S. Wyatt – Direct

1  Q    And in July of 2012, did you report directly to Sergeant

2  Ford?

3  A    Did I report?

4  Q    Did you at the time?

5  A    He was my supervisor, yes.

6  Q    Did Sergeant Ford report to then Captain Nicholson?

7  A    That's correct.

8  Q    And Tommy Nicholson, now Major Nicholson --

9  A    That's correct.

10 Q    -- was the ranking officer on the scene on July 3rd,

11 2012?

12 A    Yes.

13 Q    Now, you were in court yesterday when I reviewed the

14 sheriff's use of force policy with Investigator Worsham,

15 correct?

16 A    That's correct.

17 Q    So you also understand that a deputy, an officer such as

18 yourself, should use the minimum amount of force necessary to

19 accomplish a lawful objective?

20 A    That's correct.

21 Q    And that's consistent with your training at the police

22 academy, correct?

23 A    That is correct.

24 Q    That's training that you actually refresh every two years

25 or so; is that right?

1  A    That's correct.  Not necessarily a defense tactics

2  refresher, no.  It's just an update about law enforcement.

3  Whatever they tell us hours we need, that's what we go to.

4  Q    And that's also consistent with your training on the

5  Danville Police Department?

6  A    That's correct.

7  Q    Because like Investigator Worsham, you were also

8  previously a Danville City police officer?

9  A    Yes, sir, for eight years.

10 Q    And you understand that a deputy's use of force should be

11 appropriate to respond to a suspect's behavior at that

12 specific point in time?

13 A    That's correct.

14 Q    So as a subject's risk of force diminishes, an officer's

15 permissible use of force also diminishes, right?

16 A    As it did in this case, yes, sir.

17 Q    Now, Mr. Worsham mentioned yesterday a use of force

18 refresher course, a day-long refresher course that he was

19 required to attend in 2010.  Do you recall that?

20 A    Yes, sir.

21 Q    And you were also required to attend that course, right?

22 A    That is correct.

23 Q    That is not something that you went to voluntarily?

24 A    That's correct.

25 Q    What subjects did it cover?

S. Wyatt – Direct

1  A    Anything from controlled takedowns, controlled holds, and

2  knee strikes.

3  Q    It is a wide range of subjects that you covered over the

4  course of the day?

5  A    It was, sir.

6  Q    And what Investigator Worsham recalled was the knee

7  strike training you just referenced?

8  A    Yeah.  Yes, sir.

9  Q    And do you recall being specifically trained at some

10  point to target the thigh, where there's a nerve?

11  A    There is a nerve in the leg, yes.

12  Q    And if you knee someone in the thigh, in that nerve, it

13  creates dysfunction and pain in the leg?

14  A    It does.

15  Q    And that's a very effective way of taking someone down to

16  the ground?

17  A    Yes.

18  Q    But if you don't hit them hard enough, it might not have

19  the desired effect on the leg?

20  A    It might not.

21  Q    You might not be able to get them to the ground?

22  A    That's correct.

23  Q    In this case, you didn't throw a knee, you threw punches?

24  A    That's correct.

25  Q    Now, you've received training on the use of force various

1  times throughout your career from the academy?

2  A    That's correct, sir.

3  Q    You don't recall ever being taught specifically where to

4  target with punches; is that right?

5  A    There is no specific training where to target punches,

6  no, sir.

7  Q    Am I correct, sir, that, in fact, the only place you

8  remember ever being taught not to punch someone is in the

9  neck?

10  A    That's correct.

11  Q    Last question on training, sir.  Are you familiar with

12  the term "distraction strikes" or "distraction blows"?

13  A    Yes, sir.

14  Q    Can you describe for us what that is?

15  A    It can be something that if someone wouldn't give you

16  their hands, maybe you could do something such as a knee

17  strike to the leg to make their hands come free, so it's not

18  tucked up underneath them.

19  Q    What is the distinction between a distraction strike or a

20  distraction blow and a regular strike or regular blow?

21  A    Sometimes distraction strikes do not work.  And sometimes

22  regular blows are meant to actually cause pain, to make

23  someone comply.

24  Q    A regular strike is harder?

25  A    Yes, sir.

1  Q    Full power?

2  A    That's correct.

3  Q    Let's talk about July 3rd, 2012.  You were among the

4  officers tasked to go search for Mr. Wyatt?

5  A    That's correct, sir.

6  Q    And Sergeant Ford contacted you about Mr. Wyatt about mid

7  day; is that right?

8  A    That's correct, sir.

9  Q    And I believe you picked up Captain Nicholson?

10 A    I did.

11 Q    Where did you pick him up?

12 A    Out the Brosville area.  It's the west side of Danville.

13 Q    And you spent some time looking for Mr. Wyatt?

14 A    I did, sir.

15 Q    You went to his wife's house, I believe?

16 A    We did.

17 Q    You searched a storage facility?

18 A    We did.

19 Q    Did you also search some hotels or motels?

20 A    We started checking hotels in the City of Danville area.

21 Q    Some point in the afternoon, maybe the middle of

22 afternoon, you heard that Investigator Owens had spotted

23 Mr. Wyatt; is that right?

24 A    That's correct.

25 Q    And they were pursuing him?

1    A     That's correct, sir.

2    Q     Did you get that by radio or a cell phone?

3    A     By radio.

4    Q     And you joined in the pursuit?

5    A     I did.

6    Q     When it was already in progress?

7    A     Yes, sir.

8    Q     And you, in fact, took over the lead in your car, right?

9    A     That's correct.

10   Q     Were you driving a blue Nissan Maxima?

11   A     Yes, sir.

12   Q     And Captain Nicholson was sitting in your passenger seat?

13   A     That's correct.

14   Q     Now, when Mr. Wyatt turned onto Cahill Court, you were

15   the car immediately behind him?

16   A     That's correct.

17   Q     And based on what we saw on the video yesterday, you

18   pulled up behind Mr. Wyatt's car?

19   A     I did.  I actually pulled up behind it, but I was off to

20   the driver's side of it.

21   Q     So if this is -- if my right hand is his car and this is

22   your car, you were slightly offset?

23   A     I was, sir.

24   Q     And putting your passenger's side more or less behind his

25   driver's side?

S. Wyatt - Direct

1  A    That's correct, sir.

2  Q    And your car was about one to one and a half car lengths

3  behind his?

4  A    That's correct, sir.

5  Q    So from that vantage point, you're looking right down the

6  side of his car, the driver's side of his car?

7  A    Yes, sir.

8  Q    You're staring at his driver's door?

9  A    Pretty much, yes, sir.

10  Q    As Mr. Wyatt stepped out of the car --

11  A    He didn't step out of the car, sir.

12  Q    Jumped out of the car?  Better?

13  A    Mr. Wyatt, as we were pursuing him, opened his driver's

14  side door as we were still moving.  He come out of the car

15  with his right leg, steps on the rocker panel, which is where

16  your door closes, the bottom of the car, and with his left

17  leg, steps on the door.  The door is open, vehicle is moving,

18  and he is about to jump from his moving vehicle.

19  Q    So back to my actual question.  As he steps out of his

20  car, you can see him, right?

21  A    He jumps from his car, and yes, I could see him.

22  Q    Okay.  You know what, sir?  When I'm done with you,

23  Mr. Guynn is going to get up and he's going to be -- he'll ask

24  you lots of questions -- maybe not lots, but he will give you

25  a chance to say whatever you want to say.

S. Wyatt – Direct

```
 1  A    I just want to make it correct, sir.

 2  Q    We'll move much faster if you answer my --

 3           THE COURT:  Okay.  Let's just question and answer.

 4           MR. TODD:  Thank you, Your Honor.

 5  BY MR. TODD:

 6  Q    As he came out of his car --

 7  A    Yes, sir.

 8  Q    -- you could see both of his hands, correct?

 9  A    I could see both of his hands while he was on the car.

10  Q    You could see his -- let me make sure I get this right.

11  You could see his right hand on the steering wheel and his

12  left hand on the A pillar, which is --

13  A    That's correct.

14  Q    -- the frame that holds the windshield, right?

15  A    That's correct, sir.

16  Q    His left hand was closer to you?

17  A    (No response.)

18  Q    It doesn't really matter.  The point is, you could see

19  both of his hands, and you didn't see a gun in his hands, did

20  you?

21  A    Not at that time, no, sir.

22  Q    You didn't actually see a gun in his hand at any time,

23  right?

24  A    No.

25  Q    So he jumps out of his car, gets out of his car, however
```

1  you want to phrase it, and he starts running.  That's your

2  testimony?

3  A    Yes.  And then I could no longer see his right hand.

4  Q    And you chased him, right?

5  A    I did, sir.

6  Q    Now, it's not a very big parking lot, is it?

7  A    I'm sorry, sir?

8  Q    It's not a very big parking lot?

9  A    No, sir, it's not.

10 Q    And Mr. Wyatt only ran a short distance, right?

11 A    That's correct, sir.

12 Q    A few mere parking spaces?

13 A    That may be -- that may be a correct statement.

14 Q    That may be a correct statement?

15 A    He ran -- I couldn't say if it was a couple parking

16 spaces or six parking spaces.

17 Q    I'm happy to play your deposition testimony.

18 A    You can, sir.  I'm just sitting here saying I don't

19 remember exactly the exact parking spaces at this time.

20 Q    Let's put it this way:  Are you disagreeing with my

21 characterization that it was mere parking spaces?

22 A    I think that would be a fair assumption.

23 Q    Thank you, sir.  Now, as he's running, you saw him look

24 back over his right shoulder?

25 A    That's correct, sir.

1  Q    And he slows down, right?

2  A    He does, sir.

3  Q    And at this point, you grabbed him from behind?

4  A    I did, sir.

5  Q    Okay.  As Mr. Guynn described in opening, in a bear hug?

6  A    That's correct, sir.

7  Q    Pinning his arms to his side?

8  A    That's correct, sir.

9  Q    And about the same time you got to him, Investigator

10  Shelton grabbed him by the legs?

11  A    He did, sir.

12  Q    With Mr. Wyatt's legs immobilized and you wrapped him up

13  from behind, you and he fell to the ground?

14  A    That's correct.

15  Q    I want to make sure I'm describing this correctly.  When

16  you came down, your upper body was on his torso and your legs

17  were off to the side?

18  A    That's correct, sir.

19  Q    Now, it was once you were on the ground that you punched

20  Mr. Wyatt in the face?

21  A    That is correct, sir.

22  Q    And I want to describe this accurately, so tell me if I

23  get it wrong.  You put your right hand over his right

24  shoulder, coming back this way, and under his neck, correct?

25  A    Yes, sir.  Under his chin, yes, sir.

1  Q    And with that right hand, you peeled his head back?

2  A    That's correct, sir.

3  Q    And with your left hand, you then delivered punches,

4  strikes to his face and neck area, right?

5  A    Yes, sir.

6  Q    How were you oriented to Mr. Wyatt when you delivered

7  these punches?

8  A    My head is -- my head is right beside his head.

9  Q    Sir --

10 A    My chest is on his back but kind of to his left side,

11 enough for me to take my arm, go over his neck.  I had pretty

12 much his entire neck and side of his face covered with my

13 right arm.  And as you described it, my hand comes under his

14 chin and brings his head up.

15 Q    So it sounds like your testimony is you were basically

16 laying beside him; is that right?

17 A    I was on his left side, sir.  I was actually on him and

18 the pavement.  I can't give you in perfect detail.

19 Q    I'm sorry to interrupt you, sir.  If your head is down

20 near his head, it sounds like you're basically lying beside

21 him; is that right?

22 A    I'm kind of on his left side, but my head is kind of over

23 his shoulder.

24 Q    I guess I'm just trying to understand how low to the

25 ground you are.  Because you said --

S. Wyatt - Direct

1  A    We're flat --

2  Q    -- your head was right next to his head.

3  A    We're flat on the ground, sir.

4  Q    Okay.  Thank you.

5       Now, in addition -- well, after you punched Mr. Wyatt,

6  his right hand was still underneath him; is that right?

7  A    Yes.  That was the reason for me punching him.

8  Q    And when you stopped punching him, his right hand was

9  still underneath him; is that right?

10  A    I don't remember exactly when the last punch was thrown.

11  The last strike was thrown, and I'm not sure who it was by,

12  but then his arm finally came out.

13  Q    You were -- I think you testified a second ago that you

14  were using the force because his right hand was underneath

15  him?

16  A    That's correct, sir.

17  Q    But you're not sure whether, when you stopped punching

18  him, whether his right hand was out or not?

19  A    No punches were thrown after his hand came out; I can

20  assure of that.

21  Q    So when you stopped punching him, his right hand was

22  still underneath him?

23  A    Yes.  I never threw a punch when his arm came out.  As

24  soon as his arm comes out, I stopped punching him.

25  Q    Now, in addition to the punches, I believe you also tried

S. Wyatt – Direct

1  to secure Mr. Wyatt's left arm?

2  A    At first yes, sir.

3  Q    At first?

4  A    Yes.  Someone else ended up grabbing his arm and getting

5  it completely out.

6  Q    And would I be correct in saying that you took your left

7  arm and put it underneath his left arm and pulled it up that

8  way?

9  A    That's correct, sir.

10  Q    You kind of pivoted it up?

11  A    Yes, sir.

12  Q    His left arm would have been back like this?

13  A    It was coming up out like this.  And then I don't

14  remember who grabbed it, but they grabbed it and straightened

15  it out.

16  Q    It would be unseemly for me to lay on the floor in court.

17  But you're pulling his arm up, and so his body is rotating

18  this way as that arm comes up?

19  A    I'm not sure how his body was rotating.  I couldn't

20  answer that.

21  Q    While you were doing this, other officers were trying to

22  pull Mr. Wyatt's right arm out?

23  A    They were pulling his right arm so hard, his body was

24  actually moving.

25  Q    They were moving his body?

S. Wyatt – Direct

1  A     They were actually pulling his body to the right as

2  they're trying to pull his arm out from underneath him.

3  Q     And they were moving your body too, they were pulling so

4  vigorously?

5  A     That's correct.

6  Q     Now, your vehicle, your undercover Maxima, didn't have

7  any kind of recording device in it?

8  A     That's correct, sir.

9  Q     You weren't wearing a body mic or anything like that?

10 A     We don't have body cameras and body mics.  No, sir.

11 Q     Not so helpful for undercover work, right?

12 A     I'm sorry, sir?

13 Q     Not so helpful for undercover work?

14 A     That's correct, sir.

15 Q     And so the only recordings we have of the scene are the

16 Danville police cruiser tapes we saw yesterday?

17 A     That's correct.

18 Q     Now, you've probably seen those videos quite a few times

19 at this point, haven't you?

20 A     I have, sir.

21 Q     Let me pull up Exhibit 1, which is the one that shows the

22 altercation.  And let's play it from around the 16 to 18

23 second mark, which is, I believe, when you first come into

24 view.

25         MR. TODD:  Play those three seconds.

 1          (Video is played.)

 2          MR. TODD:  Stop.  And back up and take Tommy

 3  Nicholson out of the scene.

 4          Your Honor, with your permission, may I approach the

 5  screen over here?

 6          THE COURT:  Yes.

 7          MR. TODD:  Thank you.

 8  BY MR. TODD:

 9  Q    This is you here, sir, right?  Come on down.  That's you

10  on the left, correct?

11          THE COURT:  Can the jury see?

12          JURY MEMBER:  (Shakes heads side to side.)

13  A    You would have to play it so I can tell you.

14          MR. TODD:  Go ahead and play it forward and backwards

15  a few times and let the investigator see it.

16          (Video is played.)

17  BY MR. TODD:

18  Q    Go ahead and retake the stand, sir.

19          MR. TODD:  Stop there.

20  BY MR. TODD:

21  Q    You and investigator Shelton were the first two officers

22  to reach Mr. Wyatt?

23  A    That's correct, sir.

24  Q    And there are only two officers present at the scene,

25  right?

S. Wyatt – Direct

1   A    That's correct.

2   Q    And one officer is on Mr. Wyatt's legs, towards the rear;

3   and the other officer, the gentleman to the left, is the only

4   other person there.  That must be you, right?

5   A    That's correct, sir.

6   Q    So of the two bodies we can see clearly, you're on the

7   left and Shelton's on the right?

8   A    That's correct.

9   Q    As we look at this picture, sir, that's your left arm

10  pulled back like this, right?

11  A    I believe so, yes, sir.

12  Q    Your left arm at this point is not underneath Michael

13  Wyatt's left arm, is it, sir?

14  A    Not at that point, no, sir.

15  Q    And you, sir, at this point are not laying on the ground,

16  are you, sir?

17  A    Not at this immediate point.

18  Q    You are kneeling up and delivering downward punches?

19  A    In this picture, yes, sir.  If you could play it through,

20  it would show me go on top of his body.

21  Q    I'm happy to play it through for you, sir, but, actually,

22  Captain Nicholson gets in the way and we can't see what you're

23  doing.

24  A    Oh, okay.

25  Q    I think that's about all I have for you, sir.  Actually,

S. Wyatt – Direct

1  let me take that back.  Let's do one more thing.

2  A    Yes, sir.

3  Q    We've actually never played the video all the way to the

4  end, this video, so I would like to go ahead and do that and

5  ask you a question about the end.

6        MR. TODD:  Go ahead and play it.

7        (Video is played.)

8  A    You actually can see me in this video --

9        MR. TODD:  Stop it.

10 BY MR. TODD

11 Q    Go ahead, sir.

12 A    You can actually see me in this video that my body goes

13 to the side.

14 Q    So perhaps after you punched him, you then lay down next

15 to him?

16 A    No.  It was all simultaneously, sir.

17 Q    You were still punching while you were laying down?

18 A    Yes, sir.

19 Q    Okay.

20        MR. TODD:  Go ahead and play.

21     (Video is played.)

22        MR. TODD:  Go ahead and stop.

23 BY MR. TODD:

24 Q    Now, you testified earlier, sir, that no one, you or

25 anyone else, punched, kicked, struck Mr. Wyatt after the

1  handcuffs are on?

2  A    That's exactly right, sir.

3  Q    And that's what just we saw, right?  Everyone stood up

4  and stepped away?

5  A    That's correct.

6        MR. TODD:  I'm going to approach the screen again,

7  Your Honor, for just a second.  This is hard to see because

8  it's in the corner of the screen.

9  BY MR. TODD:

10  Q    But this is Mr. Wyatt here, sir, right?

11  A    That is correct.

12  Q    That's his head?  Can everyone see?  That's his head,

13  right?

14  A    I can't tell that it's his head or not.

15  Q    You recall --

16  A    He was laying there, but I can't say that's his head.

17  Q    But just how he was oriented, his head was closer to this

18  vehicle?  His head was that way?

19  A    Yes, sir.

20  Q    Okay.  Go ahead and retake the stand.

21        When you stepped up, you stepped away from him, none of

22  you touched him further?

23  A    I didn't, sir.  I walked away.

24  Q    You didn't move him around?

25  A    I'm sorry, sir?

S. Wyatt – Cross

1  Q    You didn't move him around?

2  A    I did not, no, sir.

3  Q    Do you know if any of the other defendants?

4  A    I know that he was picked up and set in the grass off the

5  pavement.

6  Q    You saw that on the second video?

7  A    Yes, sir.

8  Q    And that was a little later in time?

9  A    Yes, sir.

10 Q    But at the time that you stepped away, after he was in

11 handcuffs, you didn't touch him further, right?

12 A    No, sir.

13 Q    You didn't roll him over?

14 A    No, sir.

15 Q    You didn't check to see if there was a gun under him, did

16 you?

17 A    I did not, no, sir.

18       MR. TODD:  No further questions.

19       MR. GUYNN:  Your Honor, may I approach the witness?

20       THE COURT:  Yes.

21       MR. GUYNN:  I just want to hand him back the

22 interrogatory answers.

23       THE COURT:  All right.

24                      CROSS–EXAMINATION

25 BY MR. GUYNN:

1  Q    Mr. Wyatt, you were asked in your direct examination

2  there about your answer to Interrogatory Number 6, and you

3  read part of it.

4       Would you read the entire answer, please, for the jury?

5  A    Yes, sir.  "I saw the plaintiff pull up his shirt, his

6  right hand reach under" --

7            THE REPORTER:  I'm sorry.  Slower.

8  BY MR. GUYNN:

9  Q    Whoa, whoa, whoa.  Way too fast.

10  A    Sorry.  "I saw the plaintiff" --

11            MR. TODD:  Your Honor, objection.  The interrogatory

12  was read in specifically to impeach the officer's testimony as

13  to how many times he struck Mr. Wyatt.  There is no other

14  basis for putting an out-of-court statement, sworn or not,

15  into evidence.

16            Shall I approach?  I used the interrogatory to

17  impeach Investigator Wyatt as to how many times he struck

18  Mr. Wyatt.  There is no other basis for reading an

19  out-of-court statement into the record when the investigator

20  is here and can testify directly to whatever it is Mr. Guynn

21  wants to elicit from him.

22            THE COURT:  All right.

23            MR. GUYNN:  Your Honor, I would submit that it's no

24  different than a deposition.  He is entitled to read his

25  entire answer.

S. Wyatt - Cross

 1           THE COURT:  But the answer -- he was asked today how

 2  many times he struck him, and this was a finite question and

 3  he testified to it at the deposition.  You'll be able to call

 4  him and use him as your witness.  He can testify.  But it

 5  doesn't enlighten anything about how many times he struck him,

 6  the rest of the answer.

 7           MR. GUYNN:  Your Honor, that --

 8           THE COURT:  I sustain the objection.

 9           MR. GUYNN:  I understand, but that raises the

10  question of whether we can go ahead and do that now as far as

11  making him my witness.

12           THE COURT:  Well, you can make him your witness and

13  ask him.

14           MR. GUYNN:  Exactly.  But I was under -- I didn't

15  want to then draw the objection that I'm beyond the scope of

16  the direct examination.

17           MR. TODD:  I do not object to Mr. Guynn doing

18  whatever he wants to do as a direct at this point so we don't

19  have to recall.

20           THE COURT:  Go ahead.

21           MR. GUYNN:  Thank you.

22  BY MR. GUYNN:

23  Q    Let me call your attention, then, Mr. Wyatt to the

24  morning of July 3rd, 2012.  What were you told that morning

25  about searching for Mike Wyatt?

1           MR. TODD:  Objection, Your Honor, hearsay.  May we

2    approach?

3           THE COURT:  Well, you can, but -- can you be more

4    specific, I mean, in the question?  I think he is allowed to

5    say why he was -- what his state of mind was as he approached.

6           MR. TODD:  He is, Your Honor, but there's some nuance

7    to this point.  May we approach?

8           THE COURT:  Okay.  Come up.

9        (Sidebar on the record.)

10           MR. TODD:  There's an e-mail that was sent, and I

11   forget who it was sent to or from, involving Captain

12   Nicholson, which describes what the officers were told, and

13   they were told that Mr. Wyatt was wanted in connection with

14   this robbery and he was armed and dangerous.  If that's the

15   extent of his testimony, that's fine.

16           The problem is that in his deposition, this witness

17   went on to claim that he was specifically told that Mr. Wyatt

18   had shot at the clerk in the store.  There is zero evidence

19   for that.  It is objectively false.  That's rank hearsay and

20   there's nothing to substantiate it.

21           I want to make sure what that is.  Absolutely he is

22   allowed to testify to what we've all agreed the officers were

23   told.  That is permissible.  If we're going to get into

24   shooting the clerk at the PAK store, that is going to open a

25   can of worms I don't think anyone is going to want to get

1   into.

2           MR. GUYNN:  That is what he was told.

3           THE COURT:  It affects his state of mind, even though

4   it may be false, unless he said he knew it was false and

5   didn't believe it.  He can testify to anything that affects

6   his state of mind.

7           MR. TODD:  There is no evidence.  He couldn't

8   identify who told him.  It's hearsay, Your Honor.

9           THE COURT:  No, I mean for him to -- of course it's

10  hearsay, but it affects his state of mind, so I think it comes

11  in.

12          MR. GUYNN:  The standard is the jury has to be --

13          THE COURT:  Well, I'm overruling the objection.

14          MR. TODD:  Thank you, Your Honor.

15      (End of sidebar.)

16  BY MR. GUYNN:

17  Q    All right.  So on the morning of July 3rd, 2012, were you

18  assigned to search for Michael Wyatt?

19  A    That's correct, sir.

20  Q    And what were you told as far as executing the search?

21  Why were you searching for him?

22  A    Michael Wyatt pulled off an armed robbery at the PAK's

23  Supermarket, PAK Supermarket on Westover Drive inside the

24  city, and actually fired a shot at the store clerk.

25  Q    When you joined the pursuit, where was it?

1  A    We were southbound on Piney Forest Road, passing the

2  Taylor Middle School.

3  Q    How fast were you going?

4  A    In excess of 80 miles an hour.

5  Q    How fast -- were you gaining on Mr. Wyatt?

6  A    Yes, I was right behind him.

7  Q    Could you estimate his speed?

8  A    It was approximately 80-plus miles an hour.

9  Q    Tell the jury how the route continued to get into the

10  parking lot there at Cahill Court.

11  A    I don't remember some of the residential street names,

12  but we were southbound on Piney Forest Road, we were turning

13  to Central Boulevard.  We were still southbound.  We made a

14  left.  I believe Boxwood is the street address -- street name,

15  and it takes you to a residential neighborhood.

16  Q    How fast were you going then?

17  A    Approximately 50.

18  Q    Through the residential neighborhood?

19  A    Yes.  These are narrow roads.  At one point, a woman was

20  actually exiting her car, was missed within inches, actually

21  had to pull herself between her car and her door and close the

22  door on herself so that she wasn't struck by Mr. Wyatt.

23       We continued -- we came back up on the residential roads

24  where it comes up on Coleman Marketplace, which crosses back

25  over Central Boulevard.  Never touched the brake going through

1  lights.  The light was red.

2      Went down through the shopping center and we exited

3  through the south end of the shopping center parking lot,

4  where we then continued back on Central Boulevard southbound,

5  speeds 80-plus miles an hour.

6      He crosses just before we get to the Memorial Drive

7  overpass.  There's a concrete barrier dividing the northbound

8  and southbound lanes, he goes over that.  So now is he

9  traveling southbound in northbound lanes at approximately

10 80 miles an hour, hits the off-ramp, going up the off-ramp in

11 the wrong direction onto Memorial Drive.

12 Q    When you say the off-ramp, was that the off-ramp from

13 Memorial onto Central?

14 A    It is.  It's the off-ramp that would come off Memorial

15 and send you northbound onto Central Boulevard.

16 Q    So he was going against traffic on Memorial?

17 A    He was.  He was traveling southbound in the northbound

18 exit, onto Memorial Drive.  I couldn't follow him through

19 there.  I had to catch the exit, catch back up to him.  And as

20 I was on Memorial Drive, he made a left onto Cahill Court.

21 And that's when he opened the door and started to jump from

22 the moving vehicle.

23 Q    Did you have lights and siren on your vehicle?

24 A    Yes.  My vehicle was equipped with a lot of blue lights

25 and siren.

1  Q    Were they in operation?

2  A    Yes, sir.

3  Q    Through the whole pursuit?

4  A    Entire pursuit.

5  Q    So he jumped out of the moving car.  What happened to the

6  car after he jumped out of it?

7  A    It actually rolled back into Memorial Drive, striking a

8  vehicle.

9  Q    Did he get all the way to Memorial Drive, or do you know?

10 A    I don't know.  And I didn't even see the car roll back

11 until we were done.

12 Q    So when -- as the video shows, when everybody got up, you

13 then noticed that the car had rolled back?

14 A    Not at first, no, sir, I didn't.

15 Q    But that's the first time that you had saw that it rolled

16 back, was after the incident?

17 A    That's correct.

18 Q    So you indicated that Mr. Wyatt had slowed down when you

19 tackled him?

20 A    I did, sir.

21 Q    Had he stopped?

22 A    Did not stop.

23 Q    Were you yelling to stop?

24 A    Yes.  I was yelling "stop" as soon as I exited my

25 vehicle.

S. Wyatt - Cross

1  Q    Did you say "stop"?  What else did you say when you said

2  "stop"?  Did you identify yourself?

3  A    I yelled "stop" numerous times.  I don't recall

4  identifying myself.

5  Q    Did you say "police"?

6  A    I don't remember.

7  Q    And then you tackled him and he went down?

8  A    That's correct, sir.

9  Q    Where were his arms when he went down?

10  A    His arms were trapped -- my arms had come around his, and

11  his right hand was in his waistband.  His --

12  Q    When -- I'm sorry.  Go ahead.

13  A    As we were running -- as if someone is running, you know

14  how your arms are moving? -- his left arm was moving like

15  that, but his right hand stayed in front of him.  And as I

16  closed the distance on him, he then literally digs into his

17  waistband, and that's when he was tackled.

18  Q    When his hand was in front of him and he was running,

19  what did that indicate to you?

20  A    I was definitely in fear that he had a firearm,

21  especially given the circumstances in which we were pursuing

22  him for.  There was not a doubt in my mind.

23  Q    Now, once you fell to the ground, were you talking to

24  Mr. Wyatt?

25  A    I was telling him -- I was yelling, "Stop resisting.

1  Give me your hands."  And not only was I yelling it, everyone

2  there was yelling it.

3  Q    Did he voluntarily give up his hands?

4  A    Absolutely not.  He did not comply whatsoever.  They were

5  trying to pull his arms out from underneath him so hard, even

6  with me on top of him, our bodies were moving.  He just would

7  not give his arm up.

8  Q    Why did you want his hands?

9  A    To make sure there wasn't a gun in it.

10  Q    Were you going to handcuff him?

11  A    Absolutely.

12  Q    And is there a protocol for where you handcuff him, front

13  or behind?

14  A    Behind.

15  Q    You indicated that you hit -- that -- I can't do it, but

16  you had your arm around him and you were hitting him with your

17  left hand?

18  A    That's correct, sir.

19  Q    And this is while you were laying on the ground with him?

20  A    That's correct, sir.  It's from the time we actually hit

21  the ground to the time he brought his arm out.

22  Q    Well, you got your -- when you say "his arm," are you

23  talking about his left arm?

24  A    His right arm.

25  Q    Well, you got his left arm out by, what, levering it, I

1  guess?

2  A     Yes, sir.  At some point, yes, sir.

3  Q     So when you were doing that, you obviously weren't

4  punching him?

5  A     That's correct.

6  Q     Because you were hitting him with your left hand?

7  A     That's correct.

8  Q     What is your dominant hand?

9  A     My right hand.

10  Q     So when you say you were hitting him as hard as you

11  could, was that as hard as you could hit him with your left

12  hand?

13  A     That was with my left.

14  Q     Laying down?

15  A     Laying down, no leverage.

16  Q     And from a very short distance?

17  A     That's correct.

18  Q     So how hard were you hitting him?

19  A     I was hitting him as hard as I could with my left hand,

20  but it wasn't like I was coming back here hitting him.  It

21  was -- you're talking -- I guess they call them rabbit

22  punches, where you're coming in and doing it like that.

23  (Demonstrating.)

24  Q     When were you first aware that Michael Wyatt didn't have

25  a gun?

1  A    When he was handcuffed.  Nobody said anything about it.

2  I got up and walked away, but no comments was made about him

3  having a firearm.

4  Q    After he was handcuffed?

5  A    After he was handcuffed.

6  Q    I think you said earlier you didn't hit him after his

7  arms were free?

8  A    No one did.  That's correct, sir.

9  Q    Were you or -- well, let me back up and ask it this way:

10  Who searched him?  Do you know?

11  A    I don't know, sir.

12  Q    Was it you?

13  A    No, sir.

14  Q    Who took him over into the grass?

15  A    I can only tell you that by looking at the video, but I

16  didn't see them take him to the grass.

17  Q    Did you take him over to the grass?

18  A    No, sir.

19  Q    You were asked about the policy about not hitting people

20  in the head or face.

21  A    That's correct, sir.

22  Q    Does that policy apply all the time?

23  A    No, sir.

24  Q    And if -- did you believe you were in a life or death

25  situation?

S. Wyatt – Redirect

```
 1  A     I did, sir, absolutely.
 2  Q     Was there anything in that policy that prevented you in a
 3  life or death situation from hitting him anywhere you could?
 4  A     No, sir, absolutely not.
 5            MR. GUYNN:  That's all I have, Your Honor.
 6            THE COURT:  All right.
 7                      REDIRECT EXAMINATION
 8  BY MR. TODD:
 9  Q     Investigator Wyatt, you testified just now that someone
10  told you that Michael Wyatt fired a shot during this robbery,
11  at the clerk?
12  A     That's correct, sir.
13  Q     That seems like a really important detail.
14  A     That's a huge detail.
15  Q     Did that factor into your use of force analysis?
16  A     Absolutely.
17  Q     That a suspect actually fired a shot at someone?
18  A     Yes, sir.
19  Q     That's different from just firing a shot not at someone?
20  A     I think firing a shot, period, during an armed robbery is
21  pretty serious, but at someone is very significant.
22  Q     You have submitted a number of written accounts of this,
23  right?
24  A     That's correct.
25  Q     And I'm sure that in compliance with the sheriff's policy
```

S. Wyatt – Redirect

1  that we heard about yesterday about use of force reports, you,

2  as a good officer, would have filled out a use of force report

3  that very evening, right?

4  A    I'm pretty sure we did fill them out that evening.

5  Q    And isn't it a fact, sir, that nowhere in that use of

6  force report did you note that someone told you that Michael

7  Wyatt fired a shot at the clerk?

8  A    I don't know that I would put that in my use of force

9  report.  And I don't have my incident report in front of me.

10  But I felt like that would have been in there, as it is in

11  here.

12  Q    If I supplied you with a copy of that, could you tell me

13  whether or not you wrote that someone told you that he shot at

14  the clerk?

15  A    I would be happy to.

16        (Plaintiff's Exhibit Number 14 was marked for

17  identification.)

18  BY MR. TODD:

19  Q    Sir, I'm handing you what's been marked as Exhibit 14 for

20  identification purposes only.  It's not an exhibit.

21  A    Yes, sir.  Is that yours?

22  Q    We might need that in a minute too.  Do you recognize the

23  document I've handed you?

24  A    I do, sir.

25  Q    Is that a use of force report that you filled out after

S. Wyatt – Redirect

1  this incident?

2  A    It is.

3  Q    Let me direct you to page 2, sir.  Do you see there's a

4  brief description of the event?  And this is not evidence, so

5  I don't want you to read it into evidence, sir.

6       Can you tell me whether you wrote anywhere in here that

7  you were told that Michael Wyatt fired a shot at the clerk?

8  A    Not on this, no, sir.

9  Q    Okay.  Maybe put that in that basket right up there.

10      Now, you later filed a supplemental report about this

11  case.  Do you recall that?

12  A    I would have to see it, sir.  There was so much paperwork

13  that come out of this, I couldn't specifically say.

14 Q    Well, if you filed a supplemental report in this case --

15 A    Yes, sir.

16 Q    -- which is a longer report, right?

17 A    I'm sorry, sir?

18 Q    Supplemental reports are longer than just use of force

19 reports?  There's more --

20 A    That's correct.

21 Q    -- narrative?

22 A    Yes.

23 Q    Do you think you would have included this important

24 detail in that report?

25 A    I'm not sure if I did or I didn't.

1  Q    I could show it to you.

2  A    I would like to read it.  I would like to read my answer

3  to that.

4  Q    Okay.

5       (Plaintiff's Exhibit Number 15 was marked for

6  identification.)

7  BY MR. TODD:

8  Q    Sir, I'm handing you what's been marked as Exhibit 15 for

9  identification purposes.  Again, not an exhibit so we're not

10 reading it into evidence.

11      But can you tell me whether anywhere in here -- and it's

12 longer so take a minute to read it -- whether you wrote

13 anywhere in here that Mr. Wyatt fired a shot at the clerk?

14 A    No, sir, it's not in my report.

15 Q    Stick that in that basket as well, sir.  And I think you

16 can put the other one in there too.

17      Now, we heard testimony yesterday about body armor,

18 tactical gear.  Do you recall that?

19 A    I do, sir.

20 Q    I assume you own a bulletproof vest --

21 A    I do.

22 Q    -- and tactical gear?

23 A    I do.

24 Q    Taser, mace, ASP baton?

25 A    Yes, sir.

1  Q    Like Mr. Worsham, do you keep those on your vest?

2  A    Yes.

3  Q    So you have it all together?

4  A    I have my taser inside my vest.

5  Q    I assume that when you're looking for an armed and

6  dangerous felon, you would wear your tactical gear; is that

7  right?

8  A    Had it on all day.

9  Q    And you did wear it the morning of -- when you first went

10  out on July 3rd, right?

11  A    I did, sir.

12  Q    But at some point you all took off your tactical gear,

13  right?

14  A    I did, sir.

15  Q    After you took it off, you continued to look for

16  Mr. Wyatt, right?

17  A    Yes.  It wasn't long, but yes.

18  Q    Now, you testified at some length about the car chase.

19  A    Yes, sir.

20  Q    And how fast you were going.

21  A    (Nods head up and down.)

22  Q    Do you know how far it is from the motel on Piney Forest

23  down to Cahill Court?

24  A    I believe it ended up -- I'm pretty sure it ended up

25  being something to the effect of 3.9 miles.

1  Q    That's exactly right.  The whole chase wasn't 80 miles an

2  hour, was it?

3  A    No, sir.

4  Q    The chase lasted about ten minutes?

5  A    If that.

6  Q    That doesn't even get you into a 50-mile an hour average,

7  does it?

8  A    That's correct.

9  Q    And you're not suggesting to the jury, are you, that the

10  mere fact that someone has run from the police or driven

11  quickly, that that justifies the use of potentially deadly

12  force, right?

13  A    Not merely running.

14  Q    Let me bring you back to the parking lot.  You testified

15  to Mr. Guynn that, like the other defendants, you claimed you

16  were afraid that Mr. Wyatt had a gun underneath him.

17  A    Absolutely.

18  Q    And you were concerned for your safety?

19  A    Absolutely.

20  Q    And the safety of your fellow officers?

21  A    That's correct, sir.

22  Q    Who are you more concerned for?

23  A    I'm sorry?

24  Q    Who were you more concerned for, yourself or them?

25  A    Myself or them?

1  Q    Yourself or the other officers.

2  A    I would say -- I don't know that I could answer that.

3  Q    Now, as we discussed earlier when Mr. Wyatt stepped out

4  of the car, you saw his hands and there was no gun, correct?

5  A    That is correct, sir.

6  Q    And from the point that you stepped out of your car, at

7  no point did you take a position of cover?

8  A    No, sir.

9  Q    You ran right after him?

10 A    That's correct, sir.

11 Q    You never drew your weapon, did you?

12 A    It happened very quick, but no, sir, I did not.

13 Q    You didn't have any other use of force options, your

14 taser, because you had taken that off?

15 A    Yes, sir, I had just taken it off prior to the pursuit.

16 Q    You never saw a gun?

17 A    I'm sorry, sir?

18 Q    You never saw a gun?

19 A    No, sir.

20 Q    And you testified about how you were yelling at

21 Mr. Wyatt?

22 A    That's correct.

23 Q    Everyone was yelling at Mr. Wyatt?

24 A    That's correct.

25 Q    Yelling, "Stop resisting"?

```
 1   A     That's correct.

 2   Q     Right?  "Stop moving"?

 3   A     I don't recall anybody saying "stop moving."

 4   Q     "Give me your hands"?

 5   A     That's correct.

 6   Q     But no one ever yelled "gun," right?

 7   A     I apologize, sir.

 8   Q     No one ever yelled "gun"?

 9   A     That's correct, sir.

10         MR. TODD:  No further questions, Your Honor.

11         THE COURT:  All right.

12                      RECROSS-EXAMINATION

13   BY MR. GUYNN:

14   Q     Investigator Wyatt, the two reports that you looked at,

15   was there any reference in those reports to Michael Wyatt's

16   status?

17   A     To be considered armed and dangerous.

18   Q     Was that in both reports?

19   A     It was, sir.

20         MR. GUYNN:  That's all I have, Your Honor.

21         THE COURT:  Thank you.  You may step down.

22         MR. TODD:  Continue on, Your Honor, or take a break?

23         THE COURT:  Well, we've been in here, I guess, a long

24   time.  The jury hasn't been so long.  It's a good time.  We'll

25   take about a 15-minute recess.
```

1      (Recess taken from 10:39 a.m. until 10:55 a.m.)

2          THE COURT:  All right.  Next.

3          MR. TODD:  Your Honor, we call Johnny Owens.

4          THE CLERK:  Raise your right hand.

5          JOHNNY OWENS, PLAINTIFF'S WITNESS, SWORN

6                   DIRECT EXAMINATION

7  BY MR. TODD:

8  Q    You can put the stand-alone mic down while you're sitting

9  there.  The ones next to you will pick you up just fine.

10  A    I'm sorry?

11  Q    The mics next to you will pick you up just fine while

12  you're sitting there.

13  A    Okay.

14  Q    Good morning, sir.

15  A    Good morning.

16  Q    Would you please introduce yourself to the jury.

17  A    I'm Johnny Owens.  I'm an investigator with the

18  Pittsylvania County Sheriff's Office.

19  Q    And you were also among the officers who arrested

20  Mr. Wyatt on July 3rd, 2012?

21  A    I was.

22  Q    At the time that you reached Mr. Wyatt, he was already

23  laying on the ground, correct?

24  A    Correct.

25  Q    And Allen Shelton was on his legs?

1  A    Yes.

2  Q    And Scott Wyatt was on his torso, in the upper body area?

3  A    Yes.

4  Q    And Captain Nicholson was coming in from the other side

5  and grabbing Mr. Wyatt's right arm?

6  A    Yes, sir.

7  Q    And at this point, you punched Mr. Wyatt in the back five

8  to six times?

9  A    Yes.

10 Q    Now, we've been through this a few times already, so

11 we'll move quickly.

12      You are also familiar with the department's use of force

13 policies?

14 A    I am.

15 Q    And you know that an officer should use the minimum force

16 possible to achieve a lawful purpose?

17 A    Yes.

18 Q    And that an officer should decrease his use of force in

19 response to a suspect's decrease in risk imposed?

20 A    Yes.

21 Q    And these principles are consistent with what you learned

22 in the academy?

23 A    Yes.

24 Q    You were never a Danville City police officer, were you?

25 A    No.

1  Q    You, yourself, were actually a police weapons instructor?

2  A    Yes, sir.  I'm an ASP baton instructor.

3  Q    As part of your training, you know there are parts of the

4  body that an officer should aim at or, conversely, avoid?

5  A    Yes, sir, mainly the soft tissue areas.

6  Q    You aim for --

7  A    Yes.

8  Q    -- the soft tissue areas?

9  A    Yes.

10 Q    And that means muscle or fat, right?

11 A    Yes.

12 Q    And you try to avoid the sternum?

13 A    The sternum, the groin.

14 Q    Avoid the head?

15 A    Yes.

16 Q    The neck?

17 A    In certain situations, yes.

18 Q    Certain situations.  And you say that because attempting

19 to target these areas could be considered deadly force?

20 A    Depending on the situation, yes, sir, they could be.

21 Q    Based on your training and experience, Investigator

22 Owens, you would never purposely try to strike someone in one

23 of these areas unless you were in a deadly force, fighting for

24 your life kind of situation, right?

25 A    Yes.  Unless I felt my life was in danger, yes.

```
 1  Q    And these same rules apply to punches and knee strikes?
 2  A    Yes.
 3  Q    Let's talk about July 3rd.
 4  A    Okay.
 5  Q    You and Investigator Allen Shelton were riding together
 6  that day?
 7  A    Yes, sir.  I was driving and Mr. Shelton was the
 8  passenger.
 9  Q    You were driving your unmarked white Ford Explorer?
10  A    Yes.
11  Q    You were driving and he was the passenger?
12  A    Yes.
13  Q    And the Explorer that you were driving was a sheriff's
14  vehicle?
15  A    It was.
16  Q    But an unmarked one?
17  A    Correct.
18  Q    It had police lights?
19  A    It did.
20  Q    But they were hidden?
21  A    Yes.
22  Q    You can see them when they're on, but when they're off,
23  they're out of sight, out of mind?
24  A    Yes, most of them.  There was a couple in the grille that
25  you could see if you looked.  But if you didn't know, if you
```

1  weren't looking, no, you wouldn't see them.

2  Q    The vehicle is designed potentially for undercover work?

3  A    Yes.

4  Q    And you also have a siren, right?

5  A    I'm sorry?

6  Q    You have a siren as well?

7  A    Yes.

8  Q    But, again, it's not -- there is nothing visible on the

9  outside of the car that says, "Hey, I'm a police siren"?

10 A    No.  It's only operational once you initiate it.

11 Q    Special Investigation Division, SID division vehicles are

12 purposely not supposed to look like police cars?

13 A    Typically, that's correct.

14 Q    You don't use Crown Vics, for example?

15 A    No, we don't have any Crown Vics.  We got a couple of

16 Chargers.

17 Q    You don't use Chevrolet Impalas, the kind of vehicles

18 that are most often seen as police cars?

19 A    Yeah, we try to avoid those vehicles if possible.

20 Q    So on July 3rd, various different SID officers, yourself

21 included, were sent out to look for Mr. Wyatt?

22 A    Yes.

23 Q    Were you out searching in the morning?

24 A    Yes, sir.

25 Q    You didn't find him in the morning?

1  A    No, sir.

2  Q    In the afternoon, though, you were checking some motels,

3  right?

4  A    Yes.  As a last-ditch effort, we were going to search the

5  motels in the Danville area.

6  Q    Before you got there, before your last-ditch effort, you

7  met up with the other defendants and with Nicholson and

8  Shelton, right?

9  A    Yes.

10 Q    Was Worsham there or not?

11 A    I don't recall if he was there or not.

12 Q    But everyone was there?

13 A    Yes.

14 Q    And that's when you all, all four of you, took off your

15 protective gear and you stuck yours in the back of your car?

16 A    I did.

17 Q    And Shelton did the same?

18 A    Yes.

19 Q    And you then continued to look for Mr. Wyatt at motels,

20 as you just said?

21 A    Yes.

22 Q    And one of those motels was a Budget Inn motel up Piney

23 Forest Road?

24 A    Correct.

25 Q    If I told you the address was 1228 Piney Forest Road, do

1 you know that?

2 A    I know it's beside Taco Bell on Piney Forest, yes.

3 Q    I love Taco Bell.

4      You spotted the brown Lumina that you had been told

5 Mr. Wyatt was driving?

6 A    It was actually burgundy, but yes.

7 Q    I apologize.  A burgundy Lumina.

8 A    Yes.

9 Q    And you learned that was the car he might be driving?

10 A   Yes.  And I looked at the tag, and the tag information

11 matched up as well.

12 Q   After you spotted his car -- well, let me describe this

13 and you tell me if I'm right.  As you look at the motel from

14 Piney Forest Road, you see the top level.  Am I right there's

15 a ramp on the right-hand side that goes down to a lower back

16 parking lot?

17 A   Yes, correct.

18 Q   After you spotted him, you pulled down that ramp, around

19 to the back, and turned around?

20 A   I did.

21 Q   And you pulled back up the ramp?

22 A   Yeah, I pulled on the side so I could still maintain a

23 visual on his vehicle.

24 Q   You're sitting at an angle on the ramp, you can see him,

25 you hope he won't see you -- or you can see his car?

1  A    Yes.

2  Q    Do you recall, there's a railing along the ramp, right?

3  A    It's like a concrete divider of some sort, yes.

4  Q    And while you were sitting there waiting, hoping

5  Mr. Wyatt would come out, you made some phone calls?

6  A    I did.

7  Q    You called the K-9 officer?

8  A    I did.

9  Q    You tried to get ahold of Sergeant Ford?

10  A    Yes.

11  Q    And ultimately you reached him, I think?

12  A    I did.

13  Q    Do you recall if it was by -- I think you tried your

14  radio?

15  A    Yeah.  I think the call was going through, and about the

16  time that he answered is when Mr. Wyatt came out and started

17  towards his vehicle.

18  Q    What you didn't do while you were sitting there was put

19  your protective gear back on?

20  A    No.  It was all the way in the trunk, in the back of the

21  vehicle.

22  Q    So if I -- do you recall the time that Mr. Wyatt came

23  out?  If I said it was around 3:30, does that sound about

24  right?

25  A    3:30 sounds accurate.

Owens – Direct

1  Q    So Mr. Wyatt comes out from the motel office area; is

2  that right?

3  A    Yes.  From the front of the building, yes.

4  Q    And walks to his car?

5  A    Correct.

6  Q    Gets into his car?

7  A    Yes.

8  Q    You at this point pull up the ramp and around behind him?

9  A    I did.  I attempted to block him from moving his vehicle,

10 yes, sir.

11 Q    Was his car parked face in or face out?

12 A    It was facing the building.

13 Q    Facing the building.  And you pull up behind him?

14 A    Yes.

15 Q    You didn't turn on your lights as you came up the ramp,

16 did you?

17 A    Not at that time.  As soon as I pulled behind him is when

18 he took off.

19 Q    As you started up the ramp, you didn't turn your lights

20 on?

21 A    Not at that time, no.

22 Q    You didn't turn your siren on?

23 A    Not at that time, no.

24 Q    You were wearing plain clothes.  We saw in the video, I

25 think you had a white shirt and khaki slacks on?

Owens - Direct

1   A    That sounds accurate.

2   Q    And Allen Shelton was also wearing plain clothes?

3   A    Yes.

4   Q    And you weren't wearing your vests?

5   A    Not at that moment, no.

6   Q    You didn't have badges displayed?

7   A    I believe I did have my badge either on my neck or on my

8   belt, but yeah.

9   Q    Okay.  Other than that, nothing that would announce you

10  as a police officer?

11  A    Not at that precise moment, no.

12  Q    And Mr. Wyatt at this point drives out of the parking

13  lot, takes off over the curb and down Piney Forest Road?

14  A    Yes.

15  Q    You had to -- you were going the opposite direction from

16  where he drove out, right?

17  A    Actually, I was behind him.  And when he backed up and

18  started making the U-turn, or the turn to go out, I did the

19  same.  So I actually was, like, pretty much right behind him

20  at that time.

21  Q    You had to turn your vehicle around to pursue him?

22  A    I did.  I backed up and, yeah, made the turn, correct.

23  Q    And once you start pursuing him down Piney Forest, then

24  you get your lights and sirens on?

25  A    I did.

 1  Q    You followed Mr. Wyatt until he turned in to Cahill

 2  Court.  We've heard about the car chase before.  He turned in

 3  to Cahill Court, Scott Wyatt comes behind him, and you're

 4  behind Scott Wyatt, right?

 5  A    Yeah.  Initially, when Mr. Wyatt jumped the divider, the

 6  concrete divider, I was the only one in an SUV at the time, so

 7  I followed him up the ramp, with my emergency equipment on.

 8  But before we got on Cahill Court, Investigator Wyatt had

 9  caught back up to us and took over lead again onto Cahill.

10  Q    Fair point.  Fair point.

11       Sir, let me hand you what I'm marking as Exhibit 16 for

12  identification purposes.

13       (Plaintiff's Exhibit Number 16 was marked for

14  identification.)

15  BY MR. TODD:

16  Q    Do you recognize what is shown in this picture?

17  A    That appears to be the parking lot, Cahill Court.

18  Q    Is that a fair and accurate top down representation of

19  the parking lot as it existed on July 12th, 2013?

20  A    It appears to be, yes, sir.

21  Q    2012.  Sorry.

22       MR. TODD:  Your Honor, move to admit Exhibit 16 so we

23  can put it up on the screen.

24       THE COURT:  It will be admitted.

25       (Plaintiff's Exhibit Number 16 was received.)

1    MR. TODD:  Jason, can you zoom it in a little bit on

2  the parking lot?

3  BY MR. TODD

4  Q    Now, I'm told I can draw on this thing.

5  A    I'm sorry?

6  Q    I'm told I can draw on this thing.  If you look at your

7  monitor or the screen, I will try to get this.

8  A    Okay, I will.

9    MR. TODD:  How do I turn on the drawing, Jason?

10 BY MR. TODD:

11 Q    The vehicles we were just talking about, Mr. Wyatt's car,

12 Scott Wyatt's car, and your car, entered this way, right?

13 From this end of the parking lot?

14 A    Yes, sir.  By the lower end, yes, sir.

15 Q    Now, Mr. Wyatt's car slowed -- I'm not claiming that I'm

16 doing this exactly -- but slowed more or less around there; is

17 that right?

18 A    It was somewhere around the midpoint, or a little shy of

19 the midpoint, yes.

20 Q    Okay.  And Scott Wyatt was more or less here, slightly

21 outside, Scott Wyatt's car?

22 A    That looks about correct, yes.

23 Q    And you, sir, drove past Mr. Wyatt's car this way, right?

24 A    Yes, sir.  I tried to get in front of him in an attempt

25 to block him in so he couldn't get back out on the highway.

1 Q    So your car ended up across the parking lot with his car

2 T-ing into you?

3 A    Yes.

4 Q    Now, as you turned in front of Mr. Wyatt's car and you

5 slowed, Investigator Shelton jumped out of your car while it

6 was still moving, right?

7 A    Yeah.  Before I could get it in park, yeah.  Because as I

8 was pulling to block him in is when he exited the vehicle,

9 jumped out, and ran by my vehicle.

10 Q    And Mr. Wyatt ran by you, Scott Wyatt ran by you and

11 Investigator Shelton joined those two, correct?

12 A    Yes.

13 Q    You didn't actually see Investigator Wyatt and

14 Investigator Shelton take Michael Wyatt to the ground, right?

15 A    No.  Because the way my vehicle was facing, they would

16 have been to my right.  Once I put my vehicle in park and got

17 out is when I encountered it.

18 Q    They're over here somewhere, right?

19 A    Yeah.  Somewhere in that vicinity, yes, sir.

20 Q    I'm going to do that again with a color that actually

21 shows up.  I don't think the blue showed up on the screen.

22       About there?

23 A    That looks pretty accurate.

24 Q    Thank you.  So then you got your car stopped, you had to

25 run around the front of your car -- do you come around the

1  front or back?

2  A    I don't recall whether it was the front or the back.

3  Q    One way or the other --

4  A    Yes.

5  Q    -- you came around and you ran over to where Scott Wyatt,

6  Michael Wyatt, and Allen Shelton were laying on the ground?

7  A    Correct.

8  Q    And as we established earlier, when you reached that

9  pile, Michael Wyatt was laying down, chest on the ground,

10  prone on the ground?

11  A    Yes.

12  Q    Held down by two other officers already?

13  A    They were -- they were on top, trying to gain control of

14  him at that time, yes.

15  Q    And the very first thing that you did when you reached

16  the pile was to reach down and punch Mr. Wyatt in the lower

17  back?

18  A    Yeah.  They were yelling for him to "Give us your arm.

19  Give us your arm.  Give us your hands."  And he was not

20  complying, so, yes, I --

21  Q    The answer to my question is "yes"?  Yes, that's the

22  first thing you did?

23  A    Yes.

24  Q    After you punched him, you then, as we've seen in the

25  video, you then shifted to your left to try to execute a

1  wristlock on Mr. Wyatt's left hand?

2  A    Yes.  After that, yes, I did.

3  Q    When you stopped punching Michael Wyatt, his right hand

4  was still underneath him, right?

5  A    It was.

6         MR. TODD:  No further questions, Your Honor.  Thank

7  you.

8         THE COURT:  Okay.

9                     CROSS-EXAMINATION

10 BY MR. GUYNN:

11 Q    Investigator Owens, how long have you been with the

12 Pittsylvania County Sheriff's Office?

13 A    Since 2002.

14 Q    And on the morning of July 3rd, 2012, what were you told

15 about looking for Michael Wyatt?

16 A    I was told that Mr. Wyatt had warrants on him out of

17 Danville for robbery, commission -- using a firearm during the

18 commission of a robbery, and discharge of a firearm during

19 that robbery.

20 Q    What were you asked to do?

21 A    We were asked to locate him and find him and arrest him.

22 Q    And when you say "we," who was involved?

23 A    Members of the Special Investigations Division.

24 Q    All of them?  Some of them?

25 A    All of us ended up being a part of it, yes.

1   Q    And so what was your assignment beginning that morning?

2   A    We had checked several locations that we had information

3   he possibly could have been, and then towards the afternoon is

4   when we were asked to check the local hotels.

5   Q    Now, you described earlier going up to the hotel as the

6   last-ditch effort?

7   A    Yeah.  Because we had checked all the other locations,

8   previous addresses and things of that nature, his mother's

9   address, I believe.  And, you know, we were like, "Well, you

10  know, we haven't located him as of yet.  Let's check the

11  hotels to see if he possibly could be there."

12  Q    And you were also asked about having your lights on in

13  the parking lot.  Were you ever able to get behind the car in

14  the parking lot and come to a complete stop and turn your

15  lights on?

16  A    No.  As soon as I got behind his bumper, before I could

17  announce who I was, initiate lights, or anything, he had

18  already thrown it in reverse and started maneuvering to get

19  out of the parking lot.

20  Q    You indicated that you followed him?

21  A    I did follow him, yes.

22  Q    When did you turn your lights and siren on?

23  A    Prior to turning onto Piney Forest Road.  I was still in

24  the Budget Inn parking lot.  I wanted to initiate my emergency

25  equipment before turning in to traffic on Piney Forest.

1  Q    How far were you behind Mr. Wyatt at that point?

2  A    He probably had at least a half a football field, I would

3  say 50 yards, maybe, ahead of me.

4  Q    Was there anything about your lights and siren that would

5  make them difficult to hear or see 50 yards away?

6  A    No.  It's multiple lights, and the siren worked very well

7  as well.

8  Q    And you indicated that when he jumped the curb, you

9  followed with the SUV?

10  A    I did.

11  Q    And the pursuit stopped, I think you said, at Cahill

12  Court.

13       Now, when you ran up to where Mr. Wyatt was on the ground

14  with Scott Wyatt and Allen Shelton, could you hear what was

15  being said as you got there?

16  A    Yes, sir.

17  Q    And what was being said?

18  A    They were yelling for him to, you know, give us your

19  hands, you know, get your arm out.

20  Q    Was he cooperating?

21  A    No, sir.

22  Q    And could you tell whether or not he was resisting?

23  A    Yes, he definitely was resisting.

24  Q    So you stepped over and used distraction blows?

25  A    Yes, sir.  I threw approximately six quick jabs to his

1  lower side area.

2  Q    Now, when you say "quick jabs," were they as hard as you

3  could throw them?

4  A    I was actually bent over, so they were -- I mean I was

5  basically just coming back like that (demonstrating), as you

6  can see in the video.

7  Q    What is the point of the distraction blow?

8  A    To distract them, to get their mind off what it is

9  they're trying to do, and maybe he'll think about that and

10 release the arm.

11 Q    Did he release the arm?

12 A    No, sir, he didn't.

13 Q    How did you finally get the left arm out from under him?

14 A    Once I did that and I saw that the jabs weren't working,

15 I looked over and noticed that this left arm was out in front

16 of him like this; at which point I tried to gain control of

17 the left arm to try to get it at least behind his back.  By

18 the time I got it back there, the other arm by that time had

19 been loosened and we got him in handcuffs at that time.

20 Q    I'm sorry, I -- I may have confused things.  When you

21 used the distraction blow, was that to get his right arm or

22 his left arm out?

23 A    No, he actually -- I don't recall where his left arm was

24 initially.  But like I say, I done the distraction blows and I

25 just happened to stand up and try to see, you know, evaluate

1  the situation.  And I looked and this arm was up here at that

2  time, the left one was, and at which point I grabbed it.

3  Q    Do you know when it came out?

4  A    I'm not sure.

5  Q    Was it out when you used the distraction blows?

6  A    I'm not sure at that time whether it was up there or not.

7  Q    Were you using the distraction blows for the right arm?

8  A    At the time -- I had observed him run past my vehicle

9  with the right arm in his waistband.  That was the arm that I

10  was initially concerned about, yes, sir.  And he definitely

11  would not release it, so in an attempt to get him to do so is

12  why I delivered the distraction blows.

13  Q    Describe how he ran by your vehicle.

14  A    I had a pretty good view of him when he ran by, because

15  my vehicle was actually in front of his, and he ran directly

16  in front, him and then Investigator Wyatt.  When he ran by me,

17  it was an abnormal way.  I mean, if I was running, I would

18  have probably ran like that (demonstrating).  He was running

19  with this hand like this (demonstrating).  It just -- you

20  know, in my mind, he had a firearm.

21  Q    Now, is that based on what you, saw or were there other

22  factors that you took into account?

23  A    It was based on what I saw and the whole reason we were

24  trying to find him, you know, in the first place, because of

25  the robbery and the discharge of the firearm the night before

1  with the clerk, all that information that we had received.

2  Q    Do you know who put the handcuffs on Michael Wyatt?

3  A    It was either me or Investigator Wyatt.

4  Q    And once you got both sets of -- I'm sorry, both arms

5  handcuffed, did anyone else strike him?

6  A    No, sir.

7  Q    Did anyone strike him after the right arm was out and

8  before you got him handcuffed?

9  A    Not that I recall, no, sir.

10  Q    Were you yelling any instructions to Michael Wyatt?

11  A    I was.

12  Q    What were you yelling?

13  A    "Give us your hands.  Stop resisting."

14  Q    Did he comply?

15  A    Not initially, no, sir.

16  Q    Were you able to see whether Scott Wyatt struck Michael

17  Wyatt?

18  A    I could see him doing something out of the corner of my

19  eye.  It did appear he was delivering blows.  I couldn't tell

20  you where.

21  Q    And did any of the blows from Scott Wyatt occur after he

22  was handcuffed?

23  A    I'm sorry?

24  Q    Did any of the blows from Scott Wyatt occur after he was

25  handcuffed?

```
1   A    No, sir.  We all stood up at that point.

2   Q    Did you see any of Robert Worsham's actions?

3   A    I did in my peripheral, yes, sir.

4   Q    What did you see Officer Worsham do?

5   A    I could see him go down and I could see him deliver knee

6   strikes.  Again, I couldn't tell you where.  Like I said, I

7   was focused on what I was doing at the time so I don't know

8   exactly where.

9   Q    Was that before or after the right arm came out?

10  A    That was right before.

11  Q    Did Michael Wyatt ever appear unconscious to you?

12  A    No, sir.

13  Q    Was he unconscious after he was handcuffed?

14  A    No, sir.

15  Q    Do you know who searched him?

16  A    I believe that was Investigator Harris.

17  Q    And who moved him to the grass?

18  A    I believe that was Investigator Harris and Sergeant Ford.

19  Q    Thank you.

20  A    Yes, sir.

21                    REDIRECT EXAMINATION

22  BY MR. TODD:

23  Q    Investigator Owens, when Mr. Wyatt got out of his car and

24  you testified you were turning left to cut him off, he gets

25  out of his car and he runs in front of your car, right?
```

1  A     He runs by the front, yes, sir.

2  Q     Runs by the front.  And you're looking at him out, I

3  guess, your side window, and then tracking him across the

4  front?

5  A     Yeah.  He was just going around, and I could look -- he

6  was to the left side of me, yes.  And then I pulled around in

7  front.

8  Q     He was within 10, 15 feet of you?

9  A     Yes.

10 Q     Closer than I am to you right now?

11 A     Yes.

12 Q     And as he passed in front of you, his right leg was

13 closer to you?  That was the closest part to you?

14 A     Yes.  His right side was related to me, yes.

15 Q     You didn't see a gun, did you?

16 A     I didn't see a gun, no.

17 Q     Was it your testimony that his hand was shoved all the

18 way down in his waistband or near his waistband?

19 A     It was at his waistband, like this, like he was trying to

20 maintain control of something.

21 Q     Was it in his waistband or out of his waistband?

22 A     It was right here (indicating).  I couldn't tell you if

23 it was in it.  All I know is when he got out running, it

24 looked peculiar to me, because he was running with it like

25 right here.  (Indicating.)

1  Q    You're not sure whether it was in or out?

2  A    No.

3  Q    But you didn't see a gun, in any event?

4  A    I did not see a gun.

5  Q    He wasn't brandishing a firearm?

6  A    I'm sorry?

7  Q    He wasn't brandishing a firearm?

8  A    No, sir.

9  Q    You didn't see a holster?

10 A    I didn't.

11 Q    So your belief that he had a gun is based entirely on his

12 body placement?

13 A    That, and the information we had.

14 Q    And you know today, as you testified, that he in fact did

15 not have a gun, right?  There was no gun?

16 A    No.  Not on his person, no.

17 Q    And when Mr. Wyatt crossed in front of you, you had a few

18 other things going on, didn't you?

19 A    I'm sorry?

20 Q    Well, you were still pulling your car to a stop, getting

21 it in gear, right?

22 A    Yes.

23 Q    And we've heard before that Mr. Wyatt jumped out of his

24 car while his car was still moving, right?

25 A    Yes.

1  Q    In fact, that car was approaching your car?

2  A    Yeah.  It actually struck my car.

3  Q    It actually struck your car?

4  A    Yes.

5  Q    On the driver's side?

6  A    Yes.

7  Q    Now, after you got out of your car, sir, you never drew

8  your own weapon?

9  A    No, sir.

10  Q    You didn't make any attempt to provide lethal cover for

11  the officers who were already physically engaged with

12  Mr. Wyatt?

13  A    No.  We were more concerned about getting the gun if he

14  had one.

15  Q    You didn't stand back with your gun to provide cover in

16  case he produced a gun?  You went ahead and got physically

17  involved yourself, correct?

18  A    I didn't want to point my gun in the direction of

19  everyone, because it was several officers and him.

20  Q    And you testified on what you heard being yelled?

21  A    I'm sorry?

22  Q    "Stop resisting.  Give us your arm"?

23  A    Yes, we were all doing that.

24  Q    Did you yell yourself?

25  A    I did.

1  Q    Same things?

2  A    Yes, sir.

3  Q    And despite what you heard and what you testified today

4  that you saw, you yourself never yelled "gun," right?

5  A    No, I did not yell "gun."  No, sir.

6  Q    Now, you testified with Mr. Guynn that the punches you

7  threw were merely distraction blows?

8  A    Yes.

9  Q    And you demonstrated for the jury, and I'm not sure the

10 jury could actually see when you did it because of the

11 microphone, you basically went like this, right, jab?

12 (Demonstrating.)

13 A    I was bent over.  So yeah, I was just like cocking my arm

14 back, like jabs.

15 Q    Jabs from the front of your body, not pulling your elbow

16 back like this?

17 A    It was back -- yeah, I mean, it was back.  But I was -- I

18 can't go so far, but it was from here, yeah.

19 Q    Did you pull your elbow back as far as you could go?

20 A    Yes.

21 Q    And you delivered blows from there downwards into his

22 back?

23 A    Yes.  I mean, they weren't roundhouses but they were

24 jabs.

25 Q    It's hard to throw a roundhouse when you're leaning down

1  on somebody, right?

2  A    Exactly.

3  Q    That's about the most powerful punch you can throw?

4  A    Yes.

5        MR. TODD:  Let's see Exhibit 1, the video, at about

6  from 22 to 29 seconds.

7        (Video is played.)

8  BY MR. TODD:

9  Q    That's you who enters that scene from the left, right,

10  sir?

11  A    Yes.

12  Q    And those are the punches you're throwing?

13  A    Yes.

14        MR. TODD:  Rewind it and run it again.

15        (Video is played.)

16        MR. TODD:  Stop.

17  BY MR. TODD:

18  Q    That was your use of force, correct, sir?

19  A    Yes, that was me.

20        MR. TODD:  Thank you.  No further questions, Your

21  Honor.

22                      RECROSS-EXAMINATION

23  BY MR. GUYNN:

24  Q    You indicated that you didn't want to point the gun --

25  you didn't want to pull your gun and point it because there

1  were officers engaged with him.

2  A    That's correct.

3  Q    I don't want to -- I'll just ask it this way:  Don't they

4  do that on TV all the time?

5  A    TV and the real world is a big difference.

6  Q    Were you concerned that you wouldn't be able to hit him

7  and you would hit one of your compatriots?

8  A    I didn't want to hit anybody that was undeserving.  I

9  mean, you know, I just didn't -- I felt like we needed to

10 control that arm, and if there was a weapon, take control of

11 it so that he could not fire at us.  That was my main

12 objective.

13 Q    You didn't set out or you weren't thinking at any time of

14 shooting him or killing him?

15 A    No, sir.

16         MR. GUYNN:  That's all I have, Your Honor.

17         THE COURT:  All right.  Thank you.  You may stand

18 down.

19         Next witness.

20         MR. TODD:  Your Honor, the next witness will be

21 Mr. Michael Wyatt.  We can start him now, before lunch, if you

22 would like.

23         THE CLERK:  Please raise your right hand.

24         MICHAEL E. WYATT, PLAINTIFF'S WITNESS, SWORN

25         MS. BRANCH:  Good afternoon, ladies and gentlemen.

 1  This is the first time you're seeing me.  Morgan Branch for

 2  Michael Wyatt.

 3          May I proceed, Your Honor?

 4          THE COURT:  You may.

 5                      DIRECT EXAMINATION

 6  BY MS. BRANCH:

 7  Q    Would you introduce yourself to the jury.

 8  A    My name is Michael E. Wyatt.

 9  Q    How old are you, Mr. Wyatt?

10  A    I'm 51.

11  Q    Where were you born and raised?

12  A    Right here in Danville, Virginia.

13  Q    How long have you lived in Danville?

14  A    All my life.

15  Q    What schools did you attend?

16  A    Cedarbrook and Langston.

17  Q    Did you graduate from high school?

18  A    No, ma'am.

19  Q    Why not?

20  A    I ended up quitting because I had a reading disability,

21  and spelling.  And my mom and dad divorced, so I tried to go

22  to work to help my mom with some bills.

23  Q    What jobs have you had to support yourself over the

24  years?

25  A    I've worked at a few junkyards around here, done a lot of

1  paint and bodywork all my life.

2  Q    Michael, are you married?

3  A    Yes, I am.

4  Q    How long have you been married?

5  A    I've been married approximately about 31 years.  Been

6  with her for about three or four years before we got married,

7  and I have two children and three granddaughters, one grandson

8  that I love a whole lot and that I miss.

9  Q    You said that you miss your wife and your kids and your

10 grandkids.  Why is that?

11 A    Because I'm incarcerated.

12 Q    Why are you incarcerated?

13 A    I broke the law and I done some things I shouldn't have

14 done.  But I pled guilty to it, take the responsibilities for

15 my actions, and I'm paying for it a whole lot.

16 Q    And when you said you pled guilty, did you plead guilty

17 to robbery as we've heard in court today?

18 A    Yes, ma'am.

19 Q    Did you plead guilty to alluding police?

20 A    Yes, ma'am.

21 Q    And why did you plead guilty?

22 A    Because I done it.

23 Q    So we've heard a little bit about the robbery.  When did

24 this robbery occur?

25 A    July the 2nd, 2012.

1  Q    So we'll come back to that.  For now, let's turn our

2  attention to why we're here today.  Michael, what happened to

3  you that brings us here today?

4  A    I was brutally attacked by some police officers.  I was

5  beaten, knocked unconscious, and still suffer from certain

6  stuff.  It don't look like it, but I do.

7            MS. BRANCH:  I'm now showing opposing counsel -- it's

8  just a still shot from the video, Exhibit 1.

9  BY MS. BRANCH:

10 Q    Here you go, Mr. Wyatt.  Is that the parking lot where

11 you were beaten?

12 A    Yes, ma'am.

13 Q    And can you identify yourself there in the still shot?

14 A    You can't see me, but I'm under all them guys right

15 there.

16 Q    Why can't you see you?

17 A    Because I've got like four or five people on top of me.

18 Q    Have you seen the video of when you were beaten on

19 July 3rd?

20 A    Yes, ma'am.

21 Q    Are you familiar with the events shown in that video?

22 A    Yes, ma'am.

23 Q    And do you remember everything that happened that's

24 depicted in that video?

25 A    No, ma'am.

1  Q    Why not?

2  A    Because when I was hit on the right side of my face, I

3  think I lost -- I mean, I think I was knocked out completely.

4  Q    Had you ever been knocked out before?

5  A    No, ma'am.

6  Q    Are you sure whether you were knocked out?

7  A    I don't know.  I -- I don't know if I was -- I mean, I

8  don't know if it was knocked out or not.

9  Q    Are there parts you don't remember from that day?

10  A    Yes, ma'am.

11        MS. BRANCH:  Now playing Exhibit 1 for the record.

12      (Video is played.)

13        MS. BRANCH:  If you will back up and go to 44:41.

14      (Video is played.)

15  BY MS. BRANCH:

16  Q    Do you know where you are in this shot, Mr. Wyatt?  If

17  you need to get down and point to the screen.

18        MS. BRANCH:  With the Court's permission?

19        THE COURT:  You may.

20  A    As you can see, this is me right here, getting out of my

21  car.

22        THE REPORTER:  I'm sorry, I wasn't able to hear.

23  BY MS. BRANCH:

24  Q    Can you say it again, Michael?

25  A    I said this is me exiting my car.

M. Wyatt - Direct

1  Q    And after you exited your vehicle, what did you do then?

2  A    I started to run towards the road, towards Memorial

3  Drive.

4  Q    Did you stop at any point?

5  A    Yes, ma'am.

6  Q    Why did you stop?

7  A    I seen the gray Charger on the front, with the lights and

8  the -- up over the top of the sun visor, and I immediately

9  knew that was the police.  And I had other cars beside me, and

10 I -- I assumed sometime or another that they was the police,

11 so I give up.  I was surrounded, there was no way I could have

12 got away.

13        MS. BRANCH:  So if you will play the video to

14 14:44:43.

15        (Video is played.)

16 BY MS. BRANCH:

17 Q    Do you see a car towards the left side of the screen?

18 A    Yes, ma'am.

19 Q    Is that the gray Charger you just mentioned?

20 A    Yes, ma'am, the Charger.

21 Q    And you say you saw police lights?

22 A    Yes, ma'am, over the top of the dash, the sun visor.  As

23 you can see right there, they're blinking.  Well, it's on.

24 Q    Sorry.  Just to clarify, are those the police lights that

25 caused you to stop?

1  A    Yes, ma'am.

2  Q    And what did you do when you stopped?

3  A    As I was stopping, I started putting my arms up, and I

4  was hit from the back and slammed to the ground face first.

5  Q    And, Mr. Wyatt, earlier you've heard testimony from the

6  officers in court today about where your right hand was --

7  A    Yes, ma'am.

8  Q    -- on July 3rd?

9      When you were running for your vehicle, did you have your

10  right hand in your waistband?

11  A    No, ma'am.

12  Q    Was your right hand near your waistband?

13  A    No, ma'am.

14  Q    Did you have anything around your waistband?

15  A    No, ma'am.  There's no need for me to run with my right

16  hand in my -- I wear right-sized clothes, so I don't need to

17  hold my britches up.

18  Q    How about your pants, were you holding your pants up?

19  A    No, ma'am.

20        MS. BRANCH:  We'll play the video again.  Stop at

21  44:50.

22      (Video is played.)

23  BY MS. BRANCH:

24  Q    And do you see the vehicles on the left side of the

25  screen, Mr. Wyatt?

M. Wyatt - Direct

1    A    Yes, ma'am.

2    Q    Are those the vehicles that you just mentioned that were

3    surrounding you?

4    A    Yes, ma'am.

5    Q    Can you identify the vehicle that is closest to the

6    camera in this shot, that's behind your car?

7    A    Yes, ma'am.  It's a -- it's a blue Maxima.

8    Q    And what about your -- you mentioned your car.  Can you

9    identify your car in this shot?

10   A    Yes, ma'am.  It's a burgundy Lumina to the right side

11   that's sticking -- the taillights are sticking out a whole

12   lot.

13   Q    Who owned the Lumina that you were driving?

14   A    It belongs to my daughter.

15   Q    And how frequently did you drive that car?

16   A    Probably one, two times, maybe, a month.

17   Q    And when you exited the car, can you describe where the

18   various cars were positioned relative to you?

19   A    I didn't mean.  It was a blue Maxima to the right -- I

20   mean to the left of me, and there was a Ford SUV in front of

21   me, to the -- parked like that, basically in front of my car,

22   or my daughter's car.

23   Q    Is it fair to say that you were surrounded?

24   A    Yes, ma'am, I was definitely surrounded.

25   Q    You mentioned earlier that you were taken to the ground.

1  Can you describe what happened next after you started to put

2  your hands up?

3  A    I was slammed to the ground, and as I hit the pavement,

4  this arm was under my leg.  But I had so many people on top of

5  me you can't -- five guys, 260 pounds, and I'm 155,

6  '60 pounds, and they all on top of my back, there's no way I

7  could have pulled my arm out.

8  Q    Mr. Wyatt, let's talk about your arms.  Could you stand

9  up and demonstrate again where your right arm was positioned

10  when you went to the ground?

11  A    I was something like that right there, when I hit the

12  pavement.  (Demonstrating.)

13  Q    So your right hand was under your right leg?

14  A    Yes, ma'am.

15  Q    And your left arm was up above your head?

16  A    Yes, ma'am.

17  Q    Was your right arm ever tucked in your waistband once you

18  were on the ground?

19  A    No, ma'am.

20  Q    How many officers tackled you?

21  A    It was one that tackled me from the left, back side right

22  here, and took me to the ground.  And I landed on this side of

23  my face.

24  Q    Were you able to break your fall?

25  A    No, ma'am, I was not.

M. Wyatt - Direct

1    Q    What hit the ground first?

2    A    My face.

3    Q    The left side of your face?

4    A    Yes, ma'am, my left side.  This side of my face.

5    Q    Could you see anything once you're on the ground?

6    A    No, ma'am.  As I hit the ground, I turned my head over

7    and I felt somebody hitting me, so when they was hitting me, I

8    won't trying to pay no attention.  I mean, you know, I'm

9    trying to protect myself.  So I turned my head this way, and

10   as soon as I turned to the right, I feel somebody kick me or

11   hit me in the eye, and it was like . . . (crying.)  It was

12   like a train in my head and it hurt.

13   Q    Mr. Wyatt, just to clarify, you said you first felt

14   punches or force being applied.  Was that on the left side or

15   the right side initially?

16   A    I was being hit on the right side, but when I turned my

17   head to keep from getting punched in the right side of my

18   face, I got hit on this side.  So I turned my head this way

19   and I got hit.  And, I mean, yes, I was moving because every

20   time I was hit, I had to move.  I mean --

21   Q    Mr. Wyatt, do you remember everything clearly when you

22   were being punched?

23   A    No, ma'am.  I don't remember a lot of it.  I just felt

24   the pain.  That's all I remember, is the pain going through my

25   head.  I mean like I said, it's like I got hit by a car or

1  something.  I mean it was excruciating.

2        MS. BRANCH:  If you will play the video again.

3      (Video is played.)

4        MS. BRANCH:  If you will pause it.

5  BY MS. BRANCH:

6  Q    Mr. Wyatt, did you see the strikes being applied on the

7  left side just now?

8  A    Yes, ma'am.

9  Q    And do you remember ever feeling punches in your back

10 area?

11 A    I really can't say, because I was hit everywhere.  You

12 know, I was feeling punches from every side so, I mean, I was

13 beat up all around.  I don't know -- yes, I felt it.

14       MS. BRANCH:  If you would play it again.

15     (Video is played.)

16 BY MS. BRANCH:

17 Q    Mr. Wyatt, did you just see the knee strikes being

18 applied?

19 A    Yes, ma'am.

20 Q    You mentioned earlier that the last thing you remember is

21 a knee strike to the head?

22 A    Yes, ma'am.

23 Q    Were those the knee strikes?

24 A    Yes, ma'am.

25 Q    Did you know what was happening on July 3rd before you

1  seen the video?

2  A    No, ma'am.

3  Q    Do you remember being struck five times in the face?

4  A    No, ma'am.

5  Q    Why not?

6  A    Because I -- I must have -- I was knocked out, I would

7  imagine.  I don't know if I was completely knocked out or all

8  the way; I don't know.  I've never been knocked out before, so

9  I can't say.  But I know the one hit in my eye, I don't

10 remember nothing else.  I just remember a lot of pain and that

11 was it.

12 Q    And, Mr. Wyatt, when you were laying on the ground, were

13 you trying to get up?

14 A    No, ma'am.  I couldn't get up.

15 Q    And were you resisting?

16 A    No, ma'am.

17 Q    When you were laying on the ground, were you moving

18 yourself at all?

19 A    No, ma'am.  The police officers was moving me by hitting

20 me; that's how I was moving.  I was trying -- they were

21 beating me in my ribs.  I mean, it hurt.  I had to move, I had

22 no choice.

23 Q    Do you know how long this went on?

24 A    No, ma'am.  I haven't the slightest idea.

25 Q    Mr. Wyatt, were you ever charged with resisting arrest?

```
 1  A     No, ma'am.

 2           MR. GUYNN:  Objection.

 3           THE COURT:  Go ahead.

 4  BY MS. BRANCH:

 5  Q    Mr. Wyatt, were you ever charged with resisting arrest?

 6           MR. GUYNN:  Objection.

 7           THE COURT:  Overruled.

 8  BY MS. BRANCH:

 9  Q    To clarify, were you ever resisting arrest?

10  A     No, ma'am, I never resisted.

11  Q    Let's talk a little bit about how you ended up in the

12  parking lot.  We've heard a lot about a robbery that occurred

13  on July 2nd today --

14  A     Yes, ma'am.

15  Q    -- in court.  And as you said earlier, Mr. Wyatt, did you

16  plead guilty to armed robbery?

17  A     Yes, ma'am.

18  Q    When you were in the store on July 2nd, did you have a

19  firearm?

20  A     No.

21  Q    And did you show that firearm?

22  A     No, ma'am.

23  Q    What did you have?

24  A     I had a cap pistol that belonged to my grandson.

25  Q    What is a cap pistol?
```

1  A    It's a little toy, looked like a little plastic cap

2  pistol that shoots caps.

3  Q    And why did you bring that cap pistol in the store and

4  rob the store?

5  A    I haven't the slightest idea.

6  Q    Do you regret doing that?

7  A    Yes, ma'am, I regret it dearly.  I mean, I'm stuck here.

8  I'm doing my time because I done something wrong.  I admitted

9  it, and I was wrong, and I'm paying for that.

10 Q    Michael, did you ever point the cap pistol at the store

11 clerk?

12 A    No.  I never pointed nothing at nobody.

13 Q    And did you discharge the cap pistol at any point?

14 A    It went off.  I pulled the trigger and --

15 Q    Where were you pointing it?

16 A    I pointed it at the floor.

17 Q    Did there come a time on July 3rd that you checked into a

18 motel?

19 A    Yes, ma'am.

20 Q    What happened when you first arrived at the hotel?

21 A    I went in and got a room.  And as I was exiting, I got

22 almost to my car and somebody come flying towards me.  And I

23 didn't know who it was, I didn't know what they were doing.  I

24 jumped in my car and I spun out, I left.  I headed towards

25 Danville, to the city.

M. Wyatt - Direct

1   Q    Let's back up a little bit.  When you were in the parking

2   lot and exiting the office, where did you go immediately after

3   exiting the office?

4   A    I was leaving the office, going to my car.

5   Q    And what happened when you were standing at your car?

6   A    I started to reach for the door and I heard someone

7   coming from around back.  But as they were coming around the

8   curve, they floorboarded it like they were coming straight at

9   me.  They never hollered, nothing.  I heard a "woooom," like

10  they were going to run over me.  So, yes, I jumped in my car.

11  I did run.

12  Q    Would it be fair to say that you heard an engine rev?  Is

13  that what it sounded like?

14  A    Yes, ma'am.

15  Q    Were you aware at that time that there was a warrant for

16  your arrest?

17  A    No, ma'am.  I never thought nothing about it.

18  Q    When you were at your car and you heard the car rev its

19  engine, were you able to see that car clearly?

20  A    I seen most of the front of the car as it come towards

21  me, and at first I thought it was like a white Durango.

22  That's what it looked like.  But I found out it was a white

23  Ford SUV.

24  Q    And could you see that there were people in that Ford?

25  A    Yes, ma'am.  I could see two people in the front, but --

M. Wyatt - Direct

1  Q    Could you tell if there were more people?

2  A    I couldn't tell who was in the back.  I didn't know who

3  they was.

4  Q    And did that car have its emergency lights on when you

5  saw it in the parking lot?

6  A    No, ma'am.

7  Q    What about its sirens?

8  A    No, ma'am.

9  Q    Were the occupants wearing police uniforms?

10  A    No, ma'am.

11  Q    Were they displaying badges?

12  A    No, ma'am.

13  Q    Did they get out and say, "We're the police"?

14  A    No, ma'am.

15  Q    Did you -- did it ever occur to you it was the police

16  while you were in the parking lot?

17  A    No, ma'am.  I've never seen the vehicles that they was

18  driving.  I've never seen a police officer's car like that, to

19  my knowledge.  I've never even seen it on TV like that.  I

20  didn't know it was police.

21  Q    And when you heard the engine, what did you do next?

22  A    I jumped in my car and left.

23  Q    Why did you leave in such a hurry?

24  A    Because I didn't know what they was doing.  I had a lot

25  of money the night before.  I didn't know if somebody was

1  coming to rob me, because I had been robbed before, and when I

2  was robbed, I was beat.  And, I mean, I didn't know what was

3  going on.  I didn't know if somebody was planning on hurting

4  me, and I -- I was right, because I did get hurt.

5  Q    Well, is it fair to say that you were scared when you

6  were driving away?

7  A    Yes, ma'am, I was definitely scared.

8  Q    Where did you head in your vehicle?  In what direction?

9  A    Downtown Danville.  I was headed to -- straight down

10 Memorial Drive, to go towards the police department.

11 Q    Why were you going towards the police department

12 downtown?

13 A    Because I felt like if somebody was planning on to rob me

14 or anything was going to happen, as long as I was right there

15 in that area where the police department was, I knew I was

16 safe, and I knew whoever was chasing me would stop.  That's

17 why I was headed towards downtown Danville.

18 Q    Did anything happen to your car during this?

19 A    Yes, ma'am.

20 Q    What happened?

21 A    It run hot and cut off.  And as it cut off, I rode down

22 the hill and turned in to the parking lot where the car is

23 now.  I kept cranking it, cutting it off, cranking it.

24 Q    Mr. Wyatt, did you hear in court earlier when one of the

25 officers said that there was a woman who was getting into her

1 car that you almost, you know, hit with your vehicle?

2 A    Yes, ma'am, I heard it.

3 Q    Do you remember that happening?

4 A    No, ma'am, I sure don't.

5 Q    Do you think that did happen?

6 A    I haven't the slightest idea.  I don't know, because

7 myself, I never seen nobody trying to get in their car.  I

8 never tried -- I mean, I wasn't trying to hurt nobody.  I

9 mean, if it did happen, you know, I don't know.  I can't

10 really say because I haven't the slightest idea.

11 Q    So after you got to Cahill Court, what did you do then?

12 A    I slowed down almost to a complete stop and I opened my

13 door and exited.  I jumped out of my car.  It was running --

14 it was going so slow, there's no way it was going nowhere.  It

15 had to stop, because from the parking lot, you can see it's a

16 hill there and a curb.  I knew it would stop right there, so I

17 exited my vehicle and run, and run towards the street.

18 Q    About how fast was your vehicle going when you exited, if

19 you can recall?

20 A    Probably two, three miles an hour tops, walking speed.

21 Q    And it was at this point that the officers tackled and

22 beat you?

23 A    Yes, ma'am.

24 Q    Ands just to clarify, when you were tackled, did you lose

25 consciousness?

M. Wyatt - Direct

1  A    Say that again.

2  Q    I know you said earlier you weren't sure whether you lost

3  consciousness.  Can you just clarify why you don't know

4  whether you lost consciousness?

5  A    Because I -- I've never been knocked out.  I've never

6  lost consciousness before, so I don't know.  I wouldn't know

7  the symptoms.  All I know is a lot of the stuff that happened,

8  I don't remember.  And I look at the video and I see things

9  that I don't remember.  I mean, if you look, you can see I

10  wasn't moving.  I was knocked out.

11  Q    And at the time, could you identify who had hit and

12  kicked you?

13  A    Over the time of watching the video.  I didn't know none

14  of these police officers before this incident.  I didn't know

15  nobody.

16  Q    So on the scene that day, you didn't know who actually

17  beat you?

18  A    No, ma'am.  I didn't know none of them.

19  Q    Mr. Wyatt, were you armed when you exited your vehicle?

20  A    No, ma'am, I was not armed.

21  Q    Did you have a gun on your person?

22  A    No, ma'am.

23  Q    And after you were handcuffed, did you know what happened

24  after that?

25  A    From -- I don't remember.  From the video, they showed

M. Wyatt - Direct

1  them picking me up, dragging me across the street, and

2  throwing me in the grass.  I mean, I don't remember that.

3  That's what the video showed.

4         MS. BRANCH:  For the record, we're playing Exhibit 2

5  that's been admitted into evidence.

6      (Video is played.)

7  BY MS. BRANCH:

8  Q    Have you seen this video before?

9  A    Ma'am?

10 Q    Have you seen this video before?

11 A    Yes, ma'am.

12 Q    Can you identify yourself in this shot?

13 A    Yes, ma'am.  I'm the -- the lifeless person laying on the

14 ground right there, that's not moving.  Right there, one shoe

15 off.

16 Q    Mr. Wyatt, do you want to step off the stand and point

17 out where you appear on this video?

18         MS. BRANCH:  With the Court's permission.

19 A    This is me right here.  That's my feet, and my body is

20 heading that way.

21         MS. BRANCH:  You can play it again.

22      (Video is played.)

23 A    You can see the only way I'm moving is the police officer

24 is moving -- jerking me and throwing me.  I don't remember

25 none of that.

M. Wyatt - Direct

1  BY MS. BRANCH:

2  Q    Do you remember this happening?

3  A    No, ma'am.  I don't remember nobody talking to me right

4  there.

5  Q    Do you remember being pulled over to the grass?

6  A    No, ma'am.

7  Q    Do you know how long you were lying on the grass?

8  A    No, ma'am.  I haven't the slightest idea.

9        MS. BRANCH:  You want to skip forward three or four

10  minutes.

11      (Video is playing.)

12      MS. BRANCH:  If you want to skip ahead to 54:30.

13  Okay, you can play it from there.

14  BY MS. BRANCH:

15  Q    Could you describe what just happened in the video?

16      MS. BRANCH:  If you want to back up to 54:30 again.

17  A    I'm laying on the ground, and it's a police officer, you

18  can't see him, but on the other side of this vehicle, he is

19  smacking me in my face, telling me to wake up.  He is saying,

20  "Wake up."  And I'm -- I'm trying to wake up, figure out

21  what's going on, I mean what happened, or what just happened.

22      MS. BRANCH:  You can play it from there.

23  BY MS. BRANCH:

24  Q    And at about 36, can you describe what happened?

25  A    I just bent over.

M. Wyatt - Direct

1  Q    Is that you sitting up?

2  A    Yes, ma'am, that's me, like this, trying to figure out

3  what's going on.

4  Q    So it looks like it's about ten minutes after the beating

5  stopped.  Do you recall being in the grass for ten minutes

6  before sitting up?

7  A    No, ma'am.  I never knew it.

8  Q    Can you describe how you felt at this point, whenever you

9  woke up and sat up in the grass?

10 A    When I woke up, my side was hurting real, real bad, I

11 couldn't breathe, and my head was -- this side of my face was

12 just a real bad sharp pain in my eyes.  I kept trying to bend

13 over, as you can see there, because I couldn't breathe.  It

14 felt like I didn't have no wind, somebody knocked all the wind

15 out of me.  And I kept telling them, you know, that I was

16 hurt.  And I kept saying, you know, I need the paramedics, I

17 was hurt.  I need some help.

18 Q    What happened after that?  Were you taken to the

19 hospital?

20 A    Yes, ma'am.  They called the ambulance or the rescue

21 squad, and the rescue squad come and got me.  And they loaded

22 me in the back of a police -- I mean, an ambulance, took me to

23 the Regional and admitted me in there.

24 Q    Do you remember photos being taken once you arrived at

25 the hospital?

1  A    Yes, ma'am.  I remember some photos tooken.

2        MS. BRANCH:  I think three of these photographs have

3  already been admitted into evidence.  I will be adding a few

4  more.  I think there are just three.

5        MR. GUYNN:  Collectively three?

6        MS. BRANCH:  Uh-huh.

7     (Plaintiff's Exhibit Number 17 was marked for

8  identification.)

9        MS. BRANCH:  You can pull them up on the screen.

10 BY MS. BRANCH:

11 Q    Mr. Wyatt, is this you in these pictures?

12 A    Yes, ma'am, that's me.

13 Q    And are these the photos that were taken of you at the

14 hospital?

15 A    Yes, ma'am, it is.

16 Q    And do these accurately reflect how you looked in the

17 hospital?

18 A    Yes, ma'am.

19        MS. BRANCH:  At this time, Your Honor, I would like

20 to publish to the jury the remaining photos as Exhibit 7.

21        THE COURT:  You may.

22     (Plaintiff's Exhibit Number 17 was received.)

23 BY MS. BRANCH:

24 Q    Do you know what you were treated for while you were at

25 the hospital?

M. Wyatt - Direct

1   A     No, ma'am.  I haven't the slightest idea.

2   Q     Did they put you on any medication?

3   A     I'm pretty sure they did.  I don't know.

4   Q     Do you know if you were on pain medication after you left

5   the hospital?

6   A     No, ma'am.  All I remember is waking up in pain.

7   Q     Do you ever remember anyone handing you any kind of pills

8   after you left the hospital?

9   A     Yes, eventually, when I was in the Danville city jail.

10  Q     Have you had any medical care for your injuries from

11  July 3rd since you've left the hospital?

12  A     Yes, ma'am, I have.  I've been treated for severe

13  migraine headaches, and they give me some kind of pill for

14  being nervous and anxious.  My heart, seems like I get real,

15  real paranoid and scared at times when I'm confined in a small

16  area.

17  Q     You mentioned migraines.  Had you had migraines before

18  the beating on July 3rd?

19  A     Yes, ma'am, I have.

20  Q     When did you have them?

21  A     I had them when I was a youngin, when I was growing up.

22  Q     How often were you having them prior to July 3rd?

23  A     I had them probably one, maybe two a month.  I mean

24  everybody gets headaches, but over the years they kind of

25  slowed off and I maybe got one a year.

M. Wyatt - Cross

```
 1  Q    And this was prior to July 3rd?

 2  A    Yes, ma'am.

 3  Q    And how often do you have migraine headaches since

 4  July 3rd?

 5  A    I have one every day, every day.

 6  Q    You have migraines every day?

 7  A    Yes, ma'am.

 8  Q    Are you treated for these migraines?

 9  A    Yes, ma'am.

10  Q    How often do you take medication for your headaches?

11  A    Twice a day.

12  Q    You also mentioned that you have anxiety and you get

13  scared when you're confined.  Are you treated for this

14  anxiety?

15  A    Yes, ma'am.

16  Q    Do you take medication for this anxiety?

17  A    Yes, ma'am.

18       MS. BRANCH:  I have no further questions at this

19  time, Your Honor.

20       THE COURT:  All right.  Go ahead.

21                    CROSS-EXAMINATION

22  BY MR. GUYNN:

23  Q    Mr. Wyatt, I want to make sure that I understand.  Are

24  you now telling us that on July 2nd, 2012, that you committed

25  an armed robbery at the PAK store?
```

1  A     Yes, sir.

2  Q     Do you recall when we met previously?

3  A     Sir?

4  Q     Do you recall when you and I met previously?

5  A     Yes, sir.

6  Q     And I was asking you questions at that time?

7  A     Yes, sir.

8  Q     And at that time, under oath, you told me you were forced

9  to plead guilty to a robbery, that you didn't commit it,

10 didn't you?

11 A     Say that again.

12 Q     Didn't you tell me under oath back on August 17th, 2016,

13 that you were forced to plead guilty to the robbery, that you

14 didn't commit it?

15 A     No, sir.

16        MR. TODD:  Give us a minute to look at it.  What's

17 the line cite?

18        MR. GUYNN:  Lines 5 through 8.

19        MS. BRANCH:  Your Honor, we object to the use of this

20 for impeachment purposes.  The pages that Mr. Guynn cites does

21 not contradict what Mr. Wyatt has said.  It doesn't say that

22 "I didn't commit the armed robbery."

23        MR. GUYNN:  He says that on the next page, Your

24 Honor.

25        MS. BRANCH:  I'm sorry, where are you referring to?

1          MR. GUYNN:  Page 11, line 2.

2          MS. BRANCH:  Your Honor, may we approach?

3          THE COURT:  Yes.

4       (Sidebar on the record.)

5          MS. BRANCH:  The testimony that he -- the testimony

6   that Mr. Guynn is pointing to is Mr. Wyatt saying that he

7   never shot a real firearm, not that he never committed a

8   robbery.  And I think he is misrepresenting the testimony by

9   attempting to impeach.

10          THE COURT:  What is it?

11          MR. GUYNN:  I think I just asked him, Your Honor, if

12   he was forced to plead guilty to a robbery.

13          THE COURT:  No.  You asked him did he say that he did

14   not commit a robbery.

15          MR. GUYNN:  Right.  And over here he says, "So I

16   understand, you pled guilty to a crime you didn't commit?"

17          "Yes, sir."

18          MS. BRANCH:  Your Honor his testimony is that there

19   were lots of charges against him, and he pled guilty to a

20   group of them by his lawyer's advice.  He never testified that

21   he did not commit a robbery.

22          THE COURT:  Okay.  Well, he hasn't testify that he

23   didn't commit a robbery.  I mean, is it in there that he said

24   he didn't -- I mean, he says --

25          MS. BRANCH:  I think he is misconstruing his

1  testimony, because what he testified is that he never shot a

2  real firearm.

3        THE COURT:  Read the question you asked him.

4        MR. GUYNN:  The question I asked was:  "Did you tell

5  me that you were forced to plead guilty to an armed robbery?"

6  And he said:  "Yes, I was forced to plead guilty to an armed

7  robbery."  Today he is saying he voluntarily did it.

8        THE COURT:  Well, he didn't say that he didn't commit

9  it.

10       MR. GUYNN:  And then I asked:  "Do I understand that

11 you pled guilty to a crime you didn't commit?"

12       "Yes, sir."

13       MS. BRANCH:  Jim, when you first stand up, you said,

14 "You are now telling us that you committed robbery."  He never

15 said that he didn't commit armed robbery in his deposition or

16 today.

17       THE COURT:  Well, you have to put it all in.

18       MR. GUYNN:  I will clarify it.  If that's what I

19 said, I apologize.

20       THE COURT:  That's the way I understood the question.

21       MS. BRANCH:  I just want to make sure he is not

22 attempting to use this testimony to say that --

23       MR. GUYNN:  I'm going to ask him if he was forced to

24 plead guilty to armed robbery.

25       THE COURT:  Well, ask him -- you prefaced it by, "You

1  said before you didn't commit armed robbery and you were

2  forced to plead guilty."

3          MS. BRANCH:  Yeah, that's --

4          MR. GUYNN:  That isn't what I meant.

5          THE COURT:  Go ahead and question him, but you can't

6  impeach him if he didn't testify contrary to his deposition.

7          MR. GUYNN:  I will ask him if he was forced to plead

8  guilty.

9          THE COURT:  Well, if he was forced to plead guilty --

10         MR. GUYNN:  He is going to say, I assume, "no."  If

11 he says "yes," then that's going to be different than what he

12 said --

13         THE COURT:  Well, its not going to be that he denies

14 the armed robbery.  That's different.  He didn't say that he

15 did not commit the armed robbery.

16         MS. BRANCH:  And I feel like that's the way this is

17 being presented.

18         MR. GUYNN:  I don't understand, then -- okay, he

19 says:

20         "So I didn't shoot a firearm in the PAK's store, no,

21 sir."

22         "So do I understand that you pled guilty to a crime

23 you didn't commit?"

24         "Yes, sir."

25         MS. BRANCH:  He was probably referring -- if I'm not

1  mistaken, he was referring to the possession of firearm

2  charge.

3         MR. GUYNN:  He can explain that.

4         THE COURT:  Go ahead.  It's taking too much time.

5  You will just have to follow up.

6      (End of sidebar.)

7  BY MR. GUYNN:

8  Q    Mr. Wyatt, were you forced to plead guilty to an armed

9  robbery?

10 A    I pled guilty to some charges.  I don't know what all

11 they was.  Yes, I pled guilty to them, a bunch.  Like I said,

12 I don't know exactly what they was.

13 Q    Did you plead guilty to a crime you didn't commit?

14 A    I really don't know how to answer that, because they put

15 a whole lot of charge -- a bunch of charges together, and I

16 just pled guilty to all of them.  So, I mean, I don't know if

17 any of them I didn't do or did do.  I just pled guilty to all

18 of them for one sentence.  It was a plea bargain; that's what

19 I done for a lighter sentence.

20 Q    Do you recall me asking you if you were forced -- if you

21 pled guilty to an armed robbery?  And your answer --

22        MR. GUYNN:  May I show him his answer, Your Honor?

23        THE COURT:  Just ask him what his answer was.

24 BY MR. GUYNN:

25 Q    And your answer at that time was, "Yes, I was forced to

1 plead guilty to a robbery"?

2        MS. BRANCH:  Objection, Your Honor.

3        THE COURT:  Did you read that correctly?

4        MR. GUYNN:  Yes.

5        THE COURT:  Okay.  What's the objection?

6        MS. BRANCH:  My objection is that is not what the

7 testimony says.

8        MR. GUYNN:  I'll be happy --

9        THE COURT:  Bring it up here.

10     (Sidebar on the record.)

11        MR. GUYNN:  Start with line 5 and read through line 8

12 on page 10, Your Honor.

13        MS. BRANCH:  The question is not -- he did not ask

14 the question, "Were you forced to plead guilty to armed

15 robbery?"  That's what he just said.

16        MR. GUYNN:  I didn't ask that question.

17        MS. BRANCH:  That's what you just said.

18        MR. GUYNN:  No, it's not.

19        THE COURT:  Wait.  Where is the --

20        MR. GUYNN:  It's on page 10, line 5 through 8.

21        THE COURT:  Where is it?  How is yours different?  I

22 don't understand.

23        MS. BRANCH:  So it says, "Any other crimes that you

24 pled guilty to that you didn't" -- so it says, "You understand

25 that you plead" --

 1          THE COURT:  I'm reading up here.  This is what he is

 2   asking up here:  "Did you plead guilty to an armed robbery

 3   that occurred on July 2nd?"

 4          "Answer:  Yes, I was forced to plead guilty to a

 5   robbery."

 6          "Question:  Was that the robbery that occurred at the

 7   PAK store in Danville?"

 8          "Yes, sir."

 9          MS. BRANCH:  I think he admitted that he plead guilty

10   to armed robbery.

11          THE COURT:  Listen, we're not going to quibble over

12   this.  Ask the question and then you can clear it up.  Go

13   ahead.

14          MR. GUYNN:  May I show this, Your Honor, to the

15   witness?

16          THE COURT:  Yes.

17      (End of sidebar.)

18          THE COURT:  Wait.  I thought you wanted to show it to

19   him.

20          We'll instruct the jury that the question -- read the

21   question and answer.

22          And I will instruct you that that is what the record

23   shows at the deposition.  Read the question and answer.

24          MR. GUYNN:  From August 17th, 2016, Your Honor, on

25   page 10, I asked the question at line 5:  "Did you plead

1  guilty to an armed robbery that occurred on July 2nd?"

2        The answer he gave then was:  "Yes, I was forced to

3  plead guilty to a robbery."

4        The next question:  "And was that the robbery that

5  occurred at the PAK store in Danville?"

6        "Yes, sir."

7  BY MR. GUYNN:

8  Q    Do you recall telling me that at that time?

9  A    Yes, sir.

10 Q    Now today you're telling us that you weren't forced to

11 plead, correct?

12 A    It depends on how you're talking "forced."  They told

13 me -- there my lawyer tells me, "If you don't take this plea

14 bargain, they're going to give you a lot of time."  I would

15 call that forced to plead guilty.  If you don't take the plea

16 bargain, they're going to try to give me a life sentence.  So

17 I would say, yes, that was a force of pleading guilty, because

18 I took a plea bargain to get a lesser sentence.  So I pled

19 guilty to it, yes, I did.

20 Q    In the -- you said that you had a cap gun?

21 A    Yes, sir.

22 Q    And when you discharged the cap gun, it made a noise,

23 didn't it?

24 A    Yes, sir.

25 Q    And it was your intent to make the owners of the store

M. Wyatt - Cross

1  believe that you had the gun so they would give you the money?

2  A    No, I think they was laughing at me when I went in there.

3  They thought it was a joke, because the people knew me.

4  Q    Did they give the money?  You said earlier you had a lot

5  of money with you on the 3rd and you were afraid somebody was

6  going to rob you.  Where did that come from?

7  A    The PAK store where I robbed.

8  Q    So even though it was a cap gun and even though they were

9  laughing, they gave you a lot of money?

10 A    No, sir, they didn't give it to me.  I run around the

11 counter and got it and took off running out the door.  They

12 didn't give me nothing.  They was as far as from here to that

13 man away from me.  And I run -- it took about six seconds to

14 run around and grab the money and run.  That's what I done.

15 They didn't hand me nothing.  I mean, I run around there and

16 grabbed it and took off running.

17 Q    You indicated that you've been married for over 30 years.

18 A    Yes, sir.

19 Q    Where do you and your wife live?  Where did you all live?

20 A    Kingwood Court, about a block from the store where I

21 robbed.

22 Q    And why were you staying in a hotel?

23 A    To get some rest.

24 Q    I didn't hear you.  I'm sorry?

25 A    To get some rest, because I had been up all night.

1  Q    I still didn't hear you.

2  A    I said to get some rest.

3  Q    When you said that you didn't realize they were police,

4  you heard the siren and you saw the lights, didn't you?

5  A    Some point of view -- I never heard a siren, never heard

6  no siren.  Somewhere along the line, I did see a light blink

7  on and off, but I was paying more attention to what was in

8  front of me than what was behind me, because I was going down

9  Memorial -- I mean Piney Forest Road.  So my eyes wasn't on

10 the rearview mirror or the mirrors.  I was looking straight

11 ahead of me.

12 Q    And after running around the counter and taking the money

13 out of the cash register at the PAK store, it didn't occur to

14 you the next day that the police would be looking for you?

15 A    No, sir.

16 Q    Even though, as you said, the PAK store owners knew it

17 was you?

18 A    Yes, sir.  I didn't think they would call the police.

19 Q    You thought that you could go in, steal all the money out

20 of the cash register that these guys had and they wouldn't

21 call the police?

22 A    No, sir, I didn't.  I mean it didn't never cross my mind,

23 because I knew eventually I would pay them back.  I've done

24 work for them more than one time on their cars, and they paid

25 me more than what I got out of the cash register, or off the

1  counter, more or less.  It wasn't in the cash register, it was

2  right there --

3  Q    Mr. Wyatt, you understand that when you go in with a cap

4  gun and discharge it, that they don't realize that you're

5  going to do car work for them for the money that you run

6  around and steal out of the cash register, don't you?

7  A    I don't know what they assume.  I just knowed that it was

8  a stupid mistake, and I made a mistake and I pled guilty to

9  it, and I'm doing my time for it, and I'm paying for my

10  mistakes.  But it doesn't justify for them beating me.  It

11  does not justify that, particularly in my face.

12  Q    Mr. Wyatt, as I understand you're telling the jury,

13  though, that you didn't think that they were the police?

14  A    Sir?

15  Q    You didn't think they were the police?

16  A    No, sir, I did not.  At the time, I did not.  At the

17  motel when I run, I did not know.  If they would have got out

18  of the car like normal police officers do and walked up and

19  said, "I'm a police officer.  You're under arrest," I would

20  have give up right then.

21  Q    But do you have a lot of experience with normal police

22  officers?

23          MS. BRANCH:  Objection, Your Honor.

24          THE COURT:  Overruled.

25  A    Normal police officers?  Most police officers wear

1  uniforms, like some of the guys in here.

2  BY MR. GUYNN:

3  Q    So if they had had a uniform on, you would have stopped?

4  A    If they would have identified theirself as a police

5  officer, yes, I would have stopped.

6  Q    Did you give them a chance to?

7  A    I don't think I -- I'm glad I didn't give them a chance.

8  I'm glad -- I wish I would have got a little closer to

9  Danville, because there won't no video cameras there to catch

10  them beating me.

11  Q    So you were headed -- let me -- I want to make sure that

12  I understand the full picture.  You had the night before run

13  around the counter, stolen the money with a cap gun.  This SUV

14  comes up, you don't realize it's the police, and you decide

15  you're going to go to the Danville Police Department?

16  A    Yes, sir.  Around it.

17  Q    Around it?

18  A    Yes, sir.  I was going to ride around a circle, around --

19  it's a block.  I was going to ride around the police office

20  because someone was chasing me.  Who, I don't know.

21  Q    And when these guys kept chasing you towards the police

22  --

23  A    I've never seen these people in my life, in my whole

24  life.  So if somebody is chasing you down the road, what are

25  you supposed to do?  You think you're just going to pull over

1  on the side of the road and get beat up?  No, you're trying to
2  go somewhere, to a safe location, like they tell you to do if
3  you don't know who they are.  You pull into a safe location;
4  that way, this does not happen.  And I didn't make it.  I
5  wished I could have made it to DMV or somewhere, because it
6  would have been a lot better for me.
7       But I was in an empty parking lot and I had nowhere to
8  go.  So I run towards the street, I did.  And as soon as I
9  seen and recognized and realized that they was police
10 officers, I gave up.  I did that, yes.  But does that justify
11 being slammed on the ground and beaten because I run from
12 them?
13 Q   Mr. Wyatt, where were your hands when you were tackled?
14 A   My hands was slightly going up as I -- I come to a
15 complete stop and was moving, starting my hands up, and I was
16 hit and slammed to the ground.
17 Q   Did you say anything?
18 A   Yeah.  I hollered when I fell and hit the ground face
19 first.
20 Q   Did you land on your ribs too?
21 A   No, sir.  I landed on my face.
22 Q   Did you say before you stopped, "Oh, wait a minute.
23 Y'all are police.  I give up"?
24 A   If I'd have turned around, I would have landed on the
25 back of my face, because he would have tackled me forward and

M. Wyatt - Cross

1    I would have went backwards.

2    Q    Let me ask you this then:  Your concern was that they

3    weren't police, right?

4    A    Yes, sir.

5    Q    And there was one car in the parking lot that you were

6    sure was police.  You just said it was the Charger, right?  It

7    had the lights on?

8    A    Yes, sir.

9    Q    But you didn't run toward that car?

10   A    I didn't.  I was headed towards -- straight towards

11   Memorial Drive.  That's where the police car was sitting.

12   Q    You were headed towards Cahill Court, weren't you, over

13   at the other end of the parking lot?

14   A    No, sir.  I was running directly straight towards --

15   straight across the highway.  And when I recognized that it

16   was a police car coming up, at that point I realized that

17   everybody was police, so I put my hands up.  I started, and I

18   was hit and slammed to the ground.

19        I was surrounded.  I had -- what was I supposed to do?  I

20   stopped.  That's what I was supposed to do.  And what I was

21   doing at the right time by starting to put my hands up, and I

22   was never -- I was never given a chance to put them all the

23   way up.  I was tooken to the ground.  They never said "stop,"

24   "freeze," nothing.  They just slammed me.

25   Q    You ran past the SUV, right?

1  A    No, I didn't run past it, I run to the side.  When I

2  jumped out of my car, I went towards Memorial Drive.

3           MR. GUYNN:  Which of the exhibits, I'm sorry, is the

4  overhead view?

5           THE CLERK:  16.

6           MR. GUYNN:  Can we display that?

7  BY MR. GUYNN:

8  Q    Do you recognize this?

9  A    Yes, sir.

10 Q    And as I understand, you were going on Memorial, what,

11 south in a northbound lane, right?

12 A    I would assume.  I don't really know.

13 Q    Well, you were going in the wrong way?

14 A    Yes.

15 Q    You turned left into the parking lot?

16 A    Yes, sir.

17 Q    And then you stopped, right?

18 A    Yes, sir.

19 Q    Jumped out of the car?

20 A    Yes, sir.

21 Q    The car rolled back?

22 A    Yes, sir.

23 Q    Which, because it's on a hill, you knew would happen?

24 A    Yes, sir.

25 Q    But that didn't bother you?  I mean, you weren't

1 concerned about putting the brake on?

2 A    At the time, I didn't know really what was going on.

3 Q    My question was, were you concerned enough to put the

4 brake on, knowing the car was going to roll back in Memorial

5 Avenue -- Memorial Drive?

6 A    No, sir.

7 Q    You see the parking lot runs towards Cahill.  Which

8 direction were you running?

9 A    It depends on where you were --

10         MR. GUYNN:  Your Honor, if he may, can he stand up

11 and show us?

12         THE COURT:  Yes.

13 A    I was running this way.  He hit me this way.

14 BY MR. GUYNN:

15 Q    Okay.  Where were the cars?

16 A    The cars were parked -- my car was like right here, there

17 was a car here, and one here.

18 Q    Okay.  So you ran past the one that was there, or didn't?

19 A    Yeah.  But you've got to remember, my car was rolling

20 back.  So if I'm laying here and running this way, my car

21 rolled back.  That's what they testified, it rolled back.

22 Q    I understand.

23 A    Right.  So I had to be in front of my car.  When I exited

24 my car, I took off towards the road this way.  What good would

25 it do me running this way?  There's nothing over here,

1  nothing.

2  Q    Well, what is there?

3  A    It's nothing.  It's a parking lot.  Here, if I would --

4  Q    There are buildings there, aren't there?

5  A    These people could see me.  I didn't know what was going

6  on.  I mean, to my knowledge, I didn't know what was

7  happening.

8  Q    So you ran past the cars that you said surrounded you?

9  A    No, I didn't run past them.  I run away from them.

10  Q    Okay.  So you weren't really surrounded because you were

11  able to run away from them?

12  A    Yes, I was surrounded.

13  Q    Weren't all the cars in the parking lot?

14  A    Yes, sir.  There was cars behind me and there was a car

15  in front of me, yes, sir.

16  Q    So you ran to the side?

17  A    I run straight towards the police car.

18  Q    Straight towards which police car?

19  A    The gray Charger that was sitting on the side of the

20  road.  Yes, sir, I sure did.  And I was slammed -- I was hit

21  from the back and slammed to the ground.  And I was laying,

22  and they -- and I was beaten.

23  Q    You ran towards the gray Charger that was in Memorial

24  Drive?

25  A    Yes, sir.  It was almost completely stopped, sitting on

1  Memorial Drive, sitting somewhere right through here.  Yes,

2  sir, I was running this way, towards the car.  What was I

3  supposed to do?  I didn't know what was going on.

4         THE COURT:  Okay.  You've answered the question.

5  Next question.  I'll tell you what, why don't we stop here for

6  lunch.  And I have -- it's about 12:20 -- nearly 12:25.  We'll

7  try to be back by 1:30.

8         Of course, do not discuss the case with anyone or

9  allow anyone to discuss it around you.

10        We'll recess.

11     (Recess taken from 12:22 p.m. until 1:33 p.m.)

12        THE COURT:  All right.  Proceed.  All right,

13 Mr. Guynn, you may proceed.

14        MR. GUYNN:  Thank you, Your Honor.

15 BY MR. GUYNN:

16 Q   Mr. Wyatt, you testified that you were taken to the

17 Danville Hospital on July 3rd; is that correct?

18 A   Yes, sir.

19 Q   And when you arrived at the hospital, they treated you in

20 the emergency room, didn't they?

21 A   Yes, sir.

22 Q   And there were, I guess, a number of nurses and doctors

23 around?

24 A   Yes, sir.

25 Q   Did they ask you questions?

1  A    I really don't know.

2  Q    You don't recall them asking you questions?

3  A    No, sir.  I remember people talking to me, but I can't

4  remember what they was asking me.

5  Q    Let me ask it to you this way then:  If they asked you

6  questions, did you give them truthful answers?

7  A    To as far as my knowledge.

8        MR. GUYNN:  Your Honor, may I approach the witness?

9  BY MR. GUYNN:

10  Q    Mr. Wyatt, I've handed you a couple of documents.  Do you

11  need your glasses to see?

12  A    I mean, I can see some.  I didn't bring my glasses with

13  me.  I'm sorry.  I didn't know I was going to be reading

14  nothing.

15  Q    Do you know what I've handed you?

16  A    It looks like a photo of me.

17  Q    Can you see the date under there?

18  A    Huh-uh.  No, sir.

19  Q    On one, there's a date that says July 10th of 2012.

20  A    Where?

21        THE COURT:  Well, can you just do it?  There's no

22  question it's there, right?

23        MR. GUYNN:  No, there's no question.

24  BY MR. GUYNN:

25  Q    And the other says 8/22/2012.  Do you recall having your

1  picture taken?

2  A    No, sir.

3  Q    Do you recall having your picture taken at the Danville

4  jail?

5  A    No, sir.  I'm pretty sure I did.  I mean, I don't

6  remember it.

7  Q    Do those pictures accurately reflect you as of July 10th

8  and August 22nd?

9  A    I don't know.  I can't -- can't really see them.  I

10  can't -- I can't make it out.

11  Q    Would it help if they were on the television screen?

12  A    No, sir.  I can't see it.  I didn't bring -- I didn't

13  bring my glasses.  Like I said, I didn't know I was going to

14  be reading.  I'm sorry.

15  Q    In the openings, your attorney indicated that you were

16  under the influence of drugs on July 2nd; is that correct?

17          MS. BRANCH:  Objection, Your Honor.

18          THE COURT:  Well, overruled.

19  A    Sir?

20  BY MR. GUYNN:

21  Q    Do I need to repeat the question for you?

22  A    Yes, sir.

23  Q    In the opening statements, your attorney indicated that

24  you were under the influence of drugs on July 2nd, 2012; is

25  that correct?

1  A    I can't recall.  I don't remember.

2        THE COURT:  Well, can you ask -- he may be confused

3  about what the attorney said and his condition.  I mean, what

4  are you asking him to remember --

5        MR. GUYNN:  I was asking him to remember if --

6        THE COURT:  -- July 2nd or what the attorney said?

7  BY MR. GUYNN:

8  Q    Were you involved in, I guess the term would be,

9  "partying" on July 2nd?

10 A    Yes, sir.

11 Q    I'm sorry?  Yes?

12 A    Yes, sir.

13 Q    And what did that involve?

14 A    Some beer and some pills and some cocaine.

15 Q    And on July 2nd -- well, when was the last time that you

16 used those substances before 3:30 on July 3rd, 2012, 3:30

17 p.m.?

18       MS. BRANCH:  Objection, Your Honor, relevance.

19       THE COURT:  Overruled.

20 A    I did them sometime July the 2nd, I would imagine.  I

21 don't know exactly what time.  It was in the daytime.

22 BY MR. GUYNN:

23 Q    I'm sorry, did you say it was in the evening?

24 A    The day -- the day before July the 3rd, July the 2nd.

25 Q    Did it carry past midnight?

```
 1  A     It was in the evening.

 2  Q     And did you use any drugs on July 3rd?

 3  A     No, sir.

 4        MR. GUYNN:  Those are my questions, Your Honor.

 5        THE COURT:  All right.  Any redirect?

 6        MS. BRANCH:  No redirect, Your Honor.

 7        THE COURT:  All right.  Mr. Wyatt, you may step down.

 8        THE WITNESS:  What do you --

 9        THE COURT:  Put those in the bin.

10        MR. TODD:  Your Honor, we call Dennis Waller.

11        THE COURT:  All right.  Come around.

12        THE CLERK:  Raise your right hand.

13         DENNIS WALLER, PLAINTIFF'S WITNESS, SWORN

14        MR. GUYNN:  Could we approach the bench for half a

15  second, Your Honor?

16        THE COURT:  Yes.

17        MR. GUYNN:  Nothing of a legal matter, Your Honor.

18  It's just that I want to let a witness know that he can go,

19  that I'm not going to need him today.  Could I have half a

20  second to go do that?

21        THE COURT:  Yes.

22        MR. GUYNN:  Should I get the bailiff?

23        THE COURT:  Is he outside?  Where is he?

24        MR. GUYNN:  He's outside.

25        THE COURT:  I mean, do you need to speak to him?
```

1      MR. GUYNN:  I was as a courtesy.

2      THE COURT:  Just run out and come right back.  Just

3  be a second.

4     (Pause in the proceedings.)

5      THE COURT:  All right.  You may proceed.

6                   DIRECT EXAMINATION

7  BY MR. BEATON:

8  Q    Good afternoon, Mr. Waller.

9  A    Good afternoon.

10  Q    Could you please introduce yourself to the jury?

11  A    My name is Dennis Waller, usually go by Denny Waller.

12  Q    And what is your profession, Mr. Waller?

13  A    Police practices consultant.

14  Q    And have you done police-related work throughout your

15  career?

16  A    I have, either police work or police related as far as

17  training police officers or involved in criminal justice or

18  police science at the college and university level.

19  Q    Did you attend college, Mr. Waller?

20  A    Pardon me?

21  Q    Did you attend and graduate from college?

22  A    Yes.  I have a bachelor's of science degree in police

23  administration from Michigan State University.

24  Q    Any education beyond that bachelor's degree?

25  A    I have a master's of science in public administration

Waller – Direct

1  from Florida International University, and some postgraduate

2  credits.

3  Q    And after college did you go straight into law

4  enforcement?

5  A    Yes, I was involved in law enforcement.

6  Q    And what was that?  In what capacity?

7  A    Well, I was a deputy sheriff with the Washington County

8  Sheriff's Department, and that is Ann Arbor, Michigan; and

9  also a program manager for crime control, basic police

10 planning in the Detroit area.

11 Q    And what is the highest rank you ever obtained in law

12 enforcement?

13 A    Chief of police.

14 Q    Could you just explain for the jury sort of the nature of

15 your career in law enforcement between that first job you

16 mentioned and when you became chief?

17 A    I served in a variety of law enforcement positions,

18 including police officer, field training officer, detective,

19 SWAT team, sergeant, lieutenant, chief of police, department

20 training officer.  For about four years or so I was a director

21 of a regional police training academy in Raleigh, North

22 Carolina.

23     I also taught full-time or part-time for probably 18 or

24 19 years at the college and university level on such things as

25 police function, criminal investigation, police

1  administration, that sort of thing.

2  Q    And when you were chief, could you describe your duties?

3  A    As chief of police, my primary responsibility was to

4  develop policy and make sure the officers were trained, and

5  then to make sure the officers were supervised so that they

6  would follow the policy in their training. And if they failed

7  to do that, then we had a disciplinary process. And then the

8  day-to-day management of the police agency, I mean budgets,

9  hiring and firing, that sort of thing.

10 Q    Do those policies include use of force policies?

11 A    Absolutely. That's one of the most critical.

12 Q    And so could you describe your duties with respect to use

13 of force policies as chief?

14 A    Well, you want a policy that the officers are going to

15 understand. The policy should provide guidance, and their

16 training should conform to the policy. So when you have an

17 officer out on the street and he or she needs to use force,

18 they should have some kind of guidance as to what is expected

19 from them, both limitations and when they can escalate to a

20 higher degree of force.

21 Q    And so how would you determine whether that level of

22 force chosen was appropriate?

23 A    Well, every time an officer uses force -- an officer's

24 privileged to use force only to accomplish a law enforcement

25 objective. They can't arbitrarily use force to hurt somebody

1  or punish somebody, so they're required to justify every bit

2  of force they use whenever they use it.

3      And sound administrative policy calls for an

4  investigation or at least an examination of what force was

5  used and was it appropriate.

6  Q    And would that sort of assessment address whether a given

7  technique was trained or not to the officer?

8  A    Well, you want to encourage officers to use trained

9  techniques whenever possible.  Trained techniques enable the

10  officer to gain control, but they reduce the likelihood of

11  serious or lasting injury.  So occasionally you may not be

12  able to use a trained technique, you have to improvise.  But

13  for the most part, whenever you can you should, because then

14  you're least likely to create lasting or serious injury.

15  Q    So after you were chief, then what did you go do?

16  A    I had an opportunity to go into the private sector with

17  one of the preeminent use of force experts in the country at

18  the time, a Dr. Kevin Parsons.  He is the one who also

19  developed the ASP baton.  That is the expandable baton that

20  you see many of the police officers carrying on their belt.

21      I worked with him for about a year.  And then as he was

22  getting out of the expert witness practice, he served as my

23  mentor and referred cases to me.  So initially on a part-time

24  basis, and then more and more until today, it's the primary

25  focus of my business.

1  Q    And you already touched on this a little bit, but could

2  you describe sort of the nature of your work today?

3  A    Well, as a police practice consultant, and usually it's

4  related to litigation.  Somebody is either -- either the

5  police or individual officers, the attorneys for them will

6  call me because somebody is suing them, or lawyers for --

7  representing people who are suing the police will call me to

8  give them an opinion.

9       And my job is to make an objective assessment of the

10  facts, compare it with standards -- accepted standards of

11  training and practice, and then advise them whether or not

12  they have a case or not in my opinion.  And sometimes they

13  decide to use me and other times they don't like my opinion

14  and they don't use me.

15  Q    So I think you touched on this, but am I right that you

16  will sometimes be engaged by the complained on officer, other

17  times you're engaged by the party who is complaining about the

18  conduct?

19  A    Correct.  And people suing the department, or I've been

20  hired by attorneys representing officers who are suing the

21  department.  I've been hired by lawyers representing police

22  agencies and individual officers.

23  Q    And is there a particular type of case or types of cases

24  that you work on more often, that you specialize in?

25  A    The three primary areas I work with -- and we always

1  generally get involved in training policy issues –– but use of

2  force, vehicle pursuits, and then investigative issues.

3  Q    And when you're conducting that assessment, what do you

4  rely on in approaching a case and reaching an assessment about

5  what happened?

6  A    Well, I use a methodology; it's somewhat borrowed from

7  the scientific approach.  But I attempt to understand or gain

8  an understanding of all the facts possible from the various

9  sources.  I then analyze the actions of the officers.  I

10 compare their actions with the standards of training, best

11 practices, situations that I'm aware of.

12     Now, I've been retained in 36 states and the District

13 Columbia.  So over a lot of years, I've examined the training

14 programs provided in various areas of the country and the

15 policies provided by all different sized agencies.

16     There's generally –– when compared to best practices,

17 there's not a significant difference in the policies or the

18 training programs.  There might be different terminology or

19 whatever, but primarily they're very similar.

20     So after I analyze the facts or analyze the actions of

21 the officers, I look to see if their actions are consistent or

22 inconsistent with the standards and policies and training.

23 And then my function is to help the triers of fact understand

24 what sometimes is confusing, sometimes is presented

25 deliberately in a confusing manner or misrepresented.  And

1  that's what I basically do.

2      Now, as I said before, sometimes after I go through that

3  process and I give my opinions, they may not be used because

4  they're not helpful for the party, whether it's defense or

5  plaintiff.

6  Q    And that process that you just described, I appreciate

7  it, what sort of training or experience from your background

8  does it draw on that enables you to conduct that sort of

9  analysis?

10  A    Well, familiarity with the scientific approach.  And,

11  also, I had a mentor when I first started that kind of gave

12  me -- guided me along as how to go through the process.  It's

13  similar to what all respected police practices experts use and

14  some variation or form of that.

15  Q    Does it also draw on your experience as a police chief

16  and earlier in your law enforcement career?

17  A    Yes.  I apply my experience in law enforcement, my

18  experience as a police trainer, my experience as an educator,

19  criminal justice police science educator, and also the

20  cumulative experience I have from consulting, because every

21  time I'm involved in a job in a different jurisdiction, I'm

22  looking at what are the state standards, how did they -- how

23  were the officers trained, what were the policies that were

24  important to the situation.  So those types of things.

25  Q    So when you get into this line of work, how are you

1  compensated for it?  How do you make a living?

2  A    I'm paid for what I do mostly is consulting work.  And

3  then, on occasion, I will testify either at deposition or a

4  trial or an administrative hearing, so I'm compensated for

5  that.

6  Q    Do you have a standard rate that you charge to one side

7  or the other?

8  A    Well, it's the same rate whether it's defense or

9  plaintiff, and that's $200 an hour.

10  Q    Is that what you're charging in this case?

11  A    Yes.

12  Q    And does that change at all depending on the outcome of

13  the case, who prevails?

14  A    Not at all.  I think to be objective you can't have your

15  opinions based on whether you win or lose.  It calls that into

16  question.

17  Q    So how do you stay current on police practices and use of

18  force training while you're in this job?

19  A    I attend probably 30 to 40 hours of law enforcement

20  training annually, firearms, defensive tactics, that sort of

21  thing, an occasional seminar, so I keep focused on that.  I

22  read a number of journals and periodicals, both paper copies

23  and online.  I think I said I attend seminars when I have the

24  opportunity.  And also my involvement in different cases.  So

25  I'm constantly being aware of what's done and where.

Waller - Direct

1      I belong to a number of professional organizations, and

2  usually, if there's some important development in the field,

3  will get a heads up.  I'll obtain that, whether it's the

4  latest research or whatever development, and review that.  So

5  it's an ongoing process.

6  Q    I think you mentioned at the outset that you had taught

7  some at the college level.  Could you tell the jury if I'm

8  right and, you know, where and what you taught?

9  A    I taught or was employed full-time at Craven Community

10  College in New Bern, North Carolina, and Wake Technical

11  College in Raleigh, and the University of Wisconsin at

12  Platteville.  I also taught on an adjunct basis part-time at

13  Shaw University, North Carolina State University, University

14  of North Florida, Marian University in Wisconsin, and Mount

15  Senario College.

16      In addition, I have worked as a trainer, police trainer,

17  for a number of agencies, including Milwaukee Area Technical

18  College, Southwest Wisconsin Technical College, Lakeshore

19  Technical College, Fox Valley Technical College.  I think

20  there was probably two or three others, and individual police

21  departments either as defensive tactics instructor or firearms

22  instructor.

23  Q    Now, without getting into the facts of this case, can you

24  tell us whether you reviewed the facts surrounding this

25  incident?

Waller - Direct

1  A    I did.

2  Q    And did you apply those principles and methods that you

3  described to the jury a moment ago?

4  A    I did.

5  Q    And is it the same methodology or did this case somehow

6  differ?

7  A    No, it's the same methodology.  It's based on a

8  particular fact situation.  You can't give legitimate opinions

9  unless you know the facts.

10  Q    Don't tell me the answer, but did you reach a conclusion

11  about what happened in this case, after performing an

12  assessment?

13  A    I did.

14  Q    And what part of your background did you rely on in

15  reaching that conclusion about this case?

16  A    Well, the totality of my training, education, and

17  experience; in law enforcement, training, education; and as a

18  consultant, so that totality, and particularly the expertise I

19  have developed in use of force policies and training police

20  officers in the appropriate use of force and determining

21  proper force options in certain situations.

22  Q    What materials did you review in the course of this

23  analysis?

24  A    I reviewed the relevant police reports, the statements

25  from the officers, a number of videos, the depositions of the

1  various officers and other involved parties.  I did make a

2  site visit.  Let me clarify.  I didn't make the site visit

3  before I drafted my opinion.  I made it before I came to court

4  today.  So those are primarily the things which I typically

5  review.

6  Q    What was the question that you were trying to answer when

7  you sat down with these materials and methods in trying to

8  reach a conclusion?

9  A    I don't think there was a particular question.  I think

10 it was were the actions of the officers consistent with

11 accepted standards of practice, department policy, and their

12 training.

13         MR. BEATON:  Your Honor, at this time I would offer

14 Mr. Waller as an expert in police practices and the use of

15 force.

16         THE COURT:  All right.  He may express his opinion in

17 that field.

18         MR. BEATON:  Thank you, Your Honor.

19 BY MR. BEATON:

20 Q    Mr. Waller, the video you mentioned just a moment ago,

21 are those the same videos that have been used in this

22 courtroom in this case?

23 A    Correct.

24 Q    And the documents that you reviewed are documents,

25 statements that we have been discussing in this case so far?

Waller - Direct

1   A    Yes.  I mean, in addition to having reviewed the sworn

2   testimony in the depositions, I was also present to hear the

3   testimony in court.

4   Q    Has anything you've heard since this trial started

5   changed the opinion that you reached before you came to this

6   case -- before you came to this courtroom, about the case?

7   A    No, it has not.

8   Q    And what was the opinion that -- or opinions you reached

9   regarding the appropriateness of the use of force in this

10  case?

11  A    That obviously the force used was more than the minimum

12  necessary.  It was excessive to the need to control Mr. Wyatt,

13  or to effectively control Mr. Wyatt at the time.  And it

14  appeared rather gratuitous, more toward hurting and punishing

15  him rather than accomplishing a legitimate law enforcement

16  purpose.

17  Q    Now, let's break that down for a minute.  What about

18  Investigator Wyatt's punches?  Did you reach an opinion with

19  respect to that force specifically?

20  A    Yes.  Once Mr. Wyatt was taken to the ground and in a

21  prone position, he is face down, what officers typically do to

22  facilitate or help them control an individual is prone them

23  out face down on the ground and that eliminates 180 degrees of

24  movement.

25       It also limits their ability to impact or harm the

 1  officer.  Because if you're flat on the ground, you can only

 2  limit -- lift up like that, and it's ineffective to try to

 3  kick.  So that helps an officer.

 4      So you have two officers who made the initial contact,

 5  Officer Wyatt and Officer Shelton.  Wyatt went high, Shelton

 6  went low, and they took him to the ground.  He is where a

 7  professional officer would want somebody in this arrest

 8  scenario to be.

 9      It also limits the amount of force that is necessary to

10  use to control him.

11  Q    And so just to put a bow on that, what was the opinion

12  you reached with respect to Investigator Wyatt's use of force

13  with the punches?

14  A    Well, once he got him down and there are two officers

15  holding him down, then he punched him as hard as he could,

16  according to information provided by Investigator Wyatt, four

17  to eight times.  And at least three of those strikes I believe

18  are readily visible on the videotape.  Those weren't

19  distracting blows, those were full-out punches.  There was no

20  call for that, and particularly to the head and face area.

21  Those weren't distracting blows, those were full-out punches.

22      And one of the other factors that you utilize when

23  evaluating use of force are the officers' subject factors.

24  Okay, how many officers versus how many subjects.  We had one

25  subject and we had two officers.  Those two officers took him

1  to the ground, he is in a relatively good position for

2  controlling him, and then officer -- or Investigator Wyatt

3  started punching him.  To me, that was unnecessary,

4  particularly at the time.

5  Q    What about Investigator Owens, did you come to an opinion

6  about the punches that he used?

7  A    I did.

8  Q    That he threw against Mr. Michael Wyatt?

9  A    I did.

10  Q    And what was that opinion?

11  A    Well, by the time that Investigator Owens entered the

12  scene, you had Captain Nicholson already there, and you had

13  Investigator Owens run up and then, like a piston, just

14  punching him in the lower back, and then he said up towards

15  the head area.  It's very hard to see what he is targeting.

16      But he acknowledged directly and indirectly that his

17  initial punches were directed at the kidneys.  That's an

18  internal organ, it can cause lasting and significant injury,

19  and you would not do that unless you were also authorized to

20  use deadly force, which would be to shoot him.  And obviously

21  that wasn't appropriate in this case.

22  Q    And what about Investigator Worsham, did you reach an

23  opinion or opinions about Investigator Worsham's use of force

24  in this case?

25  A    I did.

1  Q    And what were they?

2  A    Again, excessive gratuitous and unnecessary force used to

3  accomplish a lawful objective.  When officer or Investigator

4  Worsham arrived, Mr. Wyatt was on the ground, in a prone

5  position, with four officers on top of him.

6      And after Investigator Owens used the punches, the hard

7  punches to the back and upper back -- or the kidney area and

8  the upper back of Mr. Wyatt, he placed Mr. Wyatt in a

9  wristlock.  A wristlock is a control technique.  It's designed

10 to help control individuals.  It's a trained technique, so

11 it's not likely to cause lasting or significant damage.  It's

12 one of the things they could have or should have done

13 initially.

14     But as Investigator Worsham arrived, Captain Nicholson

15 stood up.  And then you had Investigator Worsham deliver

16 five -- I believe five or six knee strikes to the neck and

17 head -- neck, head, face area of Mr. Wyatt.  Not a trained

18 technique for that target, total inappropriate use of that

19 technique, and it's very likely to cause significant damage,

20 which could include death, because you don't have that control

21 when you're striking this area.  You can strike the head, the

22 neck and kill somebody or create, really, some significant

23 injuries.

24         MR. BEATON:  Jason, could you pull up the first

25 video, video Exhibit 1 admitted in this case.

1  BY MR. BEATON:

2  Q    I know it hasn't started yet, Mr. Waller, but do you

3  recognize this video as one you that considered in reaching

4  your opinions in this case?

5  A    Yes.

6         MR. BEATON:  Could you please play the first 18

7  seconds of the video.

8         (Video is played.)

9  BY MR. BEATON:

10  Q    All right.  Mr. Waller --

11         MR. BEATON:  Back it up just a couple of seconds.

12  Thanks.

13  BY MR. BEATON:

14  Q    What about this first portion of the video was important

15  to the opinions that you just told the jury about this case?

16  A    Well, consider the officer subject factors.  You had two

17  officers already on top of Mr. Wyatt.  They had pinned him to

18  the ground, face down, which facilitates control.  You have a

19  third officer, Captain Nicholson, who is running up to provide

20  assistance.  So now you're going to have, in a second, three

21  officers, one subject, and the subject is already in a prone

22  position.

23  Q    What about the location where you see the parties there

24  on the pavement?  Was that significant in terms of formulating

25  your opinion?

 1  A     Well, yes, it was -- it indicates that when Mr. Wyatt

 2  fled on foot, it wasn't very far, it was a very short

 3  distance, and that's when they went hands on with him.

 4  Q     And what, if anything, can you see Michael Wyatt doing in

 5  this section of the video?  Or what about him in this video is

 6  important to your opinion?

 7  A     Well, Mr. Wyatt is in a prone position with two officers

 8  on top of him.  That's about all you can see.

 9  Q     And is anything significant about -- well, do you

10  recognize Officer Shelton in this video?

11  A     I don't recognize him.  I understand that the one down --

12  the officer down by the legs is Investigator Shelton.  The one

13  higher up, on the left side of Mr. Wyatt's body, is

14  Investigator Wyatt.

15  Q     And what do you see Investigator Shelton doing in this

16  section of the video?

17  A     Holding him down.

18  Q     Did you see him hit Mr. Wyatt?

19  A     I did not.

20  Q     Kick?

21  A     No.

22  Q     What about Scott Wyatt, who is up further towards the

23  head?  What did you see him do in this section of the video?

24  If you want, we can roll it back a little bit and you can then

25  answer my question.

1 A    Okay.  I see Investigator Wyatt punching two or three

2 times, I think it was three times, in a downward, pretty much

3 of a full cocked punch, hard strike down towards Mr. Wyatt's

4 head and face.

5 Q    Can Michael Wyatt get away at this point?

6 A    I'm sorry?

7 Q    Can Michael Wyatt get away at this point, based on what

8 you see in the video?

9 A    No.  I mean, officer subject factors:  You have multiple

10 officers; the officers are quite a bit bigger, that's another

11 factor; and they have him in a controlled position.

12 Q    Now, the defendants say they were scared that Michael

13 Wyatt had a gun at this point.  Is that consistent with what

14 you see in the video?

15 A    Well, if they felt he had the gun and they got him

16 secured on the ground, it would be more appropriate to make

17 sure they controlled both arms.  And they know other officers

18 are moving up immediately, they know other officers are in the

19 area, so there's really no need to use hard punches or

20 strikes, particularly to sensitive areas.

21 Q    What about before they even got right there on top of

22 Michael Wyatt?  Are those earlier actions consistent with a

23 fear that he had a gun?

24 A    No.  I mean, if you thought somebody had a gun and -- may

25 I stand up, Your Honor?

1          THE COURT:  Yes.

2  A     -- and the individual is running away and could turn

3  around and shoot, you would want your gun out or you would

4  want to be behind cover.  But if you're running after an

5  individual who you think -- I mean, do you really think he has

6  a gun and is likely to shoot you.

7  BY MR. BEATON:

8  Q     And did either of these officers have a gun out?

9  A     To my knowledge, you couldn't see the initial, when they

10  made contact, but my understanding was neither one drew their

11  weapon.  The only one that drew a weapon, a firearm, was

12  Captain Nicholson, and as soon as he approached, you will see

13  him holster it in the video.

14  Q     Now, we heard a little bit yesterday about this concept

15  of lethal cover.  I believe you may have mentioned it a moment

16  ago.  Could you just explain to the jury in plain terms what

17  you mean by lethal cover?

18  A     Lethal cover is a concept like if an officer is, you have

19  two officers and somebody may have an edged weapon, a knife or

20  an ice pick or something, and one officer is going to use a

21  less lethal option, such as a taser, you would always want

22  another officer with his or her firearm out, being ready to

23  use deadly force if the taser didn't work.  That's the idea of

24  lethal cover.

25          Lethal cover in this case would be if you really think

1  this subject has a gun and that if he somehow breaks loose, he

2  could shoot you -- remember, action is faster than reaction --

3  you would want somebody standing there being able to take

4  action on the officer's behalf.  That didn't happen here.

5  Q    Thanks.

6        MR. BEATON:  Could you play the next five seconds to

7  the 23-second mark, please.

8        (Video is played.)

9        MR. BEATON:  Stop there.

10 BY MR. BEATON:

11 Q    Now, Mr. Waller, did you recognize -- or do you know who

12 that third officer who ran into the screen is?

13 A    Well, the one in the pink --

14 Q    Right.

15 A    -- was Captain Nicholson.  The one to the left was

16 Investigator Owens.

17 Q    Okay.  And just focusing on Nicholson, I mean, what's his

18 role in this?  Is it different from the other officers on the

19 scene?

20 A    Yes.

21 Q    In what way?

22 A    Well, he is the captain, he's the commander.

23        MR. GUYNN:  I object to this line of questioning.

24 His opinion with regard to somebody who is not a party to the

25 case is irrelevant.

1          THE COURT:  Overruled.

2    BY MR. BEATON:

3    Q    You can go ahead.

4    A    You would expect him to take charge, to, if he sees an

5    officer using an inappropriate level of force, to stop it.

6    You would expect him to give commands.  You would -- if you

7    have multiple officers giving commands, "Get your hand out."

8    "Don't move."  "Stop resisting," okay, what is the guy

9    supposed to do, assuming he was resisting?  If he can't -- one

10   person wants him to show his hand, the other person is saying

11   "don't move."  You're kind of darned if you do and darned if

12   you don't.

13        So you want, in a case like this, as best as possible so

14   you're not creating confusion, you're creating clear, concise

15   commands, would be one of the people present taking control

16   and giving commands, not everybody.

17   Q    So does Nicholson strike Mr. Wyatt?

18   A    No, he does not.

19   Q    Does he kick him or knee him?

20   A    No, he does not.

21   Q    What does he do in this portion of the video?

22   A    He basically holds his right arm so he can't bring it

23   out.

24          MR. BEATON:  Well, back up just a minute, if you

25   don't mind, Jason.

1  BY MR. BEATON:

2  Q    Just focus on the third officer.  And, Mr. Waller, if you

3  could just describe for the jury what it is that he does when

4  he gets to the scene.

5  A    Well, what he does is holster his firearm, and then he

6  leans over and grabs the right arm.

7  Q    And why is it significant to you for him to holster that

8  weapon?

9  A    He was the only one that had a firearm out that I

10  observed.  So he is no longer lethal cover, he is asserting

11  control.  And now you have four officers on one subject who is

12  in the, basically, ideal control situation.

13  Q    And is that consistent with the officers being afraid of

14  a gun?

15  A    To me, it is not.  My opinion, that's contrary to a

16  belief that Mr. Wyatt posed a danger with a firearm.

17  Q    And so after the holstering, then what does Nicholson do?

18  A    What did Nicholson do?  He held the arm down.

19  Q    Which arm?

20  A    His right arm.

21  Q    And does he do anything with it or just hold it?

22  A    From --

23  Q    As far as you can tell.

24  A    As far as I can, he just controlled it and kept it from

25  moving.

1  Q    Let's watch the next couple of seconds.

2         MR. BEATON:  If you could take it from 22 to 29,

3  please.

4        (Video is played.)

5         MR. BEATON:  Okay.  Thank you.

6  BY MR. BEATON:

7  Q    Now, do you know who that fourth officer who came on the

8  scene was?

9  A    Investigator Owens.

10  Q    And at this point, once Owens arrives, what is the

11  officer subject factor that you've been -- that you've

12  mentioned a couple of times already?

13  A    You now have four officers on one subject, who is in a

14  controlled position, and all those officers are bigger or

15  heavier than the subject.

16  Q    And so what does Owens do?

17  A    What did what?

18  Q    What does Investigator Owens do when he gets to

19  Mr. Wyatt?

20  A    He delivered, I think, five or six strikes to the kidney

21  area and back.  Those were not distraction blows, those were

22  full power strikes.  And if you see his arm moving, it's like

23  a piston, just bringing it back, cocking it, and hitting it

24  down as hard and fast as he could.

25  Q    And that sort of a punch to the area that you described a

Waller – Direct

1  moment ago, is that consistent with a distraction blow or a

2  controlled technique that an officer would be trained in?

3  A    No.  Officers are trained to avoid that area because it

4  could cause lasting injury or significant injury.  You avoid

5  anywhere where direct -- causing direct trauma to internal

6  organs.

7  Q    Is there a term that those viewing the law enforcement

8  field would use for that sort of scenario?

9  A    There is different terminology by different schools of

10 thought, but it's generally like a restricted area or a

11 no-strike zone or what have you.  If you had a full colored

12 picture, those areas would be in red, indicating no striking

13 there.

14      I mean, don't get me wrong, if you thought deadly force

15 was appropriate, if you would have been justified in shooting

16 him, then everything is out the window.  You could strike

17 wherever, you could take a brick to his head, but it's got to

18 be a deadly force situation.

19 Q    And was this a deadly force situation?

20 A    No, not by any means.

21 Q    Why not?

22 A    Before the officer would be allowed to use deadly force,

23 he has to -- he or she has to justify that they are in

24 imminent fear, a rational imminent fear of death or great

25 bodily harm.

1    Now, you have four officers on top of one guy, he is

2  pinned to the ground, face down, really can't move, and you

3  have a fifth officer approaching.  That's about as good as it

4  gets; certainly not a basis for justifying the use of deadly

5  force.

6  Q    Now, I think we've heard earlier in the case and you may

7  have used already once this notion of a distraction blow, but

8  I want to -- I'm going to just ask if you can describe to us

9  in layman's terms what is a distraction blow?  Or show us, if

10  that's easier.

11  A    I can try to explain it.  I can demonstrate it a lot

12  better -- or a lot easier.  But, basically, a distraction blow

13  is if you're trying to apply a trained technique, for example

14  I want to use a wristlock and the person tightens up, so if

15  you go like a slap toward their face or their groin, or you

16  can give them a slight knee strike to the common peroneal

17  nerve.  That is the beefy part of your thigh.  It's a broad

18  target, it hurts, but it's not likely to cause damage.

19    So what you're doing, the purpose of a distracting blow

20  is to get their mind off where they are resisting so you can

21  apply a training technique.  Could I demonstrate?

22  Q    Fine with me.  Perhaps against my better judgment.

23  A    Okay.  If I want to put him in a wristlock -- a wristlock

24  is not designed to cause lasting or significant injury.  But

25  if you grab somebody's wrist, arm, they're very likely to

Waller – Direct

1  tighten up.  So a distracting blow would be (demonstrating).
2  You saw his reaction, he was hoping I would stop.  The same
3  way, you could pop them in the face.  Okay, but a distracting
4  blow and you go to the technique.
5      Now, a wristlock, I've got him in the wristlock.  Now
6  tell me when you want me to stop.  (Demonstrating.)
7  Q    Now.
8  A    Okay.  Now, sir, I'm going to do that again unless you do
9  what I tell you.  Look to the right, put your hand on top of
10 your head, cluck like a chicken.
11 Q    Cluck, cluck.
12 A    Okay.  Now, the distracting blow is to get his attention
13 away so you can apply a trained technique, which although
14 might not feel good at the time, it's not going to leave a
15 lasting or significant injury.  That's why you use trained
16 techniques.
17 Q    Thanks.
18      Did you see anything in the video that resembled a
19 distraction blow?
20 A    No, sir.
21 Q    Why was Scott Wyatt's punches not distraction blows?
22 A    Because for one, they weren't designed to move into a
23 trained technique, and they were in a prohibited area.  Hard
24 strikes to the face or head can cause significant and lasting
25 injury.  So unless it was a deadly force situation, officers

1  are generally prohibited from doing it.

2       Now, there is a distracting blow, somebody is running at

3  you, you can pop them with a quick jab, like, to the chin or

4  chest area just so the officer can get a little room and move

5  around and go to some other technique.  That's a distracting

6  blow.

7       But beating somebody or hitting somebody as hard as you

8  can in the circumstances, that's not the definition -- that's

9  not a distracting blow.

10  Q    What about the injuries that you saw in the photographs

11  that you viewed?  Were those consistent with distraction

12  blows?

13  A    No, sir.

14  Q    Now, we just talked about Investigator Owens' punches.

15  What techniques were available to a trained officer, fourth

16  officer to approach in that situation, what techniques would

17  be available to him right then?

18  A    The one he ultimately used after he did the six strikes,

19  and that's he put Mr. Wyatt's left arm -- he is face down, he

20  put his left arm in a wristlock.  That's referred to as pain

21  compliance, and very effective.

22  Q    Was it effective in this case, eventually?

23  A    Well, they controlled him.  I mean, they didn't use

24  trained techniques.  They literally beat up Mr. Wyatt.

25  Q    Was a wristlock ultimately used when Mr. Wyatt was

1  handcuffed?  Is that your understanding?

2  A    It was used to bring his wrist around to a position where

3  he could be handcuffed behind his back, correct.

4  Q    But the issue is it was after the punches, not before,

5  right?

6  A    After the punches and after the knee strikes.

7  Q    Any reason you're aware of why that couldn't have been

8  used right when he arrived on the scene?

9  A    None whatsoever.

10       MR. BEATON:  Jason, could you take us to 55 seconds.

11       (Video is played.)

12       MR. BEATON:  Thanks.

13  BY MR. BEATON:

14  Q    So during that section of the video, could you describe

15  to us what Nicholson was doing and why that was significant to

16  your opinions in this case?

17  A    Well, Captain Nicholson was holding down the right arm

18  and securing it, assuming that there was some kind of fear

19  that Mr. Wyatt had a firearm.  As soon as Investigator Worsham

20  arrived and started administering knee strikes to the face,

21  head, upper body area, the right side of Mr. Wyatt's face and

22  head, Captain Nicholson just stood up and walked away -- you

23  saw him walk around the pile of bodies -- apparently not

24  concerned about control issues and leaving it to Investigator

25  Worsham.

Waller - Direct

1 Q    So did Nicholson make any blows on Michael Wyatt at any

2 point before he was handcuffed?

3 A    None that I'm aware of.

4 Q    Did he hold on the whole time to try to secure him?

5 A    No.  He released the right arm, which was the supposed

6 threat, as soon as Investigator Worsham engaged with the knee

7 strikes.

8 Q    You mean he released it before that right arm was

9 handcuffed?

10 A    Yes.

11 Q    Now, when Nicholson stands back up, does he go back for

12 his weapon?

13 A    No.

14 Q    And what's important about that to you?

15 A    Again, it's, you know, if you're concerned that somebody

16 could pop up out of that with a gun, you would probably want

17 to be ready for it, or you would want to be advising the

18 officers, you know, make sure you've got both his arms, do

19 whatever.

20 Q    So who is the fifth officer who comes on the scene during

21 this last segment we watched?

22 A    That's Investigator Worsham.

23 Q    And what does Worsham do?

24 A    He runs up and then he starts administering knee strikes

25 to -- it's not use of a trained technique because it's not the

1  appropriate target area.  And you could cause significant and

2  lasting injuries.

3  Q    What did he do after the knee strikes?  Can you tell in

4  the video or from your review of the case?

5  A    My understanding, reached down and grabbed the arm and

6  brought it up and handcuffed Mr. Wyatt.

7  Q    Was that the trained technique that you would have

8  expected them to use right off the bat?

9  A    Well, I guess I would have expected him to use a trained

10 technique to secure the arm, and then start giving verbal

11 commands to do that in a controlled manner.

12 Q    But first he used the knee strikes and then he controlled

13 the arm?

14 A    Yes.  The knee strikes were totally gratuitous.

15 Q    And so like Investigator Owens, there was at some point a

16 trained technique involved, but it was after the strikes we're

17 here all about, right?

18 A    Correct.

19 Q    At this point, how would you describe the officer subject

20 factor that you've been tracking as the video goes along?

21 A    Well, you now have five officers, four of them who are

22 actively involved, one who's Captain Nicholson standing around

23 observing, and then you have the arrival of two additional.

24     Now, you also have to remember this video is from a

25 marked Danville Police Department unit, and that officer

 1  indicated he didn't go to help the officers because he felt

 2  there was enough to take care of business.

 3  Q    So there are five officers we can see here on the screen,

 4  but then I believe you're saying there was another two coming

 5  in that car, heading towards us, and there was one in the car

 6  whose windshield we're looking out of?

 7  A    That's from the squad video, correct.

 8  Q    So at this point, with eight law enforcement personnel

 9  identified, how is the situation different from when the video

10  first started?  How have things changed for Mr. Wyatt at this

11  point?

12  A    Well, you still have Mr. Wyatt on the ground, you have

13  additional officers present, but he hasn't moved in any manner

14  that I could see.  He is still in a prone position on the

15  ground and either was handcuffed by this time or is about to

16  be handcuffed.

17  Q    And what sort of resistance could Michael Wyatt offer

18  when he is on the ground and there are five officers around

19  him?

20  A    Very little and nothing very effective.  You know, that's

21  the reason officers take people to the ground, so it helps

22  them control them.

23  Q    And what sort of a threat does he pose to the officers at

24  this point?

25  A    If they can control both arms, he doesn't pose a threat

1  at all.

2  Q    Now, the officers say they couldn't get his right arm out

3  from underneath him.  What should they have done at that

4  point?

5  A    You mean instead of -- what would be appropriate instead

6  of beating him up?

7  Q    Right.

8  A    I can demonstrate some possibilities.

9  Q    All right.

10  A    I get paid to do this too.

11      Okay.  First let me demonstrate a knee strike.  Again,

12  the target area is the thigh, the beefy part of the thigh.

13  One reason, you have the common peroneal nerve that runs

14  through there.  If you strike that hard, it causes a great

15  deal of pain and creates dysfunctional movement.  And the

16  technique is used either to deal with somebody who is

17  attacking the officer or to help the officer take the subject

18  to the ground.

19  Q    Am I standing or am I laying in this?

20  A    You're standing right now.  But the appropriate technique

21  would be -- and you should do it hard.  I mean, this isn't --

22  this might get his attention, a distracting blow.  This

23  (demonstrating) is the proper way to do it.  And you saw how

24  far my knee went.  I'm trying to go right through, carry all

25  that force.  And I want to hurt him, but it's a controlled

1  hurt.  It causes him pain, causes dysfunction, and it allows
2  me to effect control over him.
3  Q    And what is your aim, with me standing up, when you throw
4  that hard knee strike?
5  A    Well, the thigh area, which is where the common peroneal
6  nerve is.  If you were attacking me, it would be the lower
7  abdomen.
8  Q    Is the point for me to remain standing or to get me to
9  the ground?
10  A    You're attacking me, it's to stop the attack, be able to
11  push you away.  That's kind of a stun or distraction.  If I'm
12  using this technique on you while you're standing, it's to
13  facilitate taking him to the ground.  If you're already on the
14  ground, there's no need to use it.
15  Q    Have you ever taught anybody a knee strike against a
16  subject already on the ground?
17  A    No, never.  I mean, again, if it was a deadly force
18  situation, if you were going to shoot them, you could probably
19  knee them in the head or do whatever.
20  Q    In a deadly force situation?
21  A    Only in a deadly force situation.
22  Q    Aside from that, would you ever teach or expect a knee
23  strike to go to the head area?
24  A    No.  It's probably one of the strongest strikes that an
25  officer can do.  Your leg is much stronger than your arm.  A

kick or a knee strike is much stronger than a punch or an
elbow.  So, again, you're looking at appropriate target areas
and you're attempting to accomplish a legitimate law
enforcement objective.

Now, if you would, lay down this way, face down.
(Demonstrating.)  Okay.  Put your right arm under -- a little
farther.  Put your left arm back, because by this time
Investigator Owens, he doesn't have it behind his back, but he
has it in a wristlock.

Now when Investigator Worsham came up, his testimony was
he tried to punch him, but there was some movement by the
other officers and he missed and he punched the ground.  So
then he delivered knee strikes, multiple knee strikes, about
five.

Why don't you want this target area?  Because you've got
the throat, you've got the head, you've got the face.  You
don't try to do this.  (Demonstrating.)  This is an imprecise
technique.  You want the thigh because it's a broad target.

Now, if Investigator Worsham tried to punch him, which is
the more controlled technique, and missed, why would he want
to use a less accurate technique unless he was literally
trying to hurt him?  And it's not an appropriate target.  This
is not an appropriate target.

What he could have done was come over here and pinned his
right arm underneath, placed his knee over the top.  I mean he

1  has to kneel down.  Now, remember, I've got three other beefy
2  boys holding him down.  So now I can control him.  He can't
3  take his right arm out, his left arm is in a wristlock.  What
4  do we do?  We deescalate.
5      What's the least amount we can do at this point?  Verbal
6  commands.  "Okay, boys, I've got it from here."
7      "Sir, we don't want to hurt you.  Sir, we want you to
8  cooperate.  Can you get your right arm out from underneath
9  you?  Are you willing to cooperate?"
10     And so we get no response, or he said he's not helpful.
11 You can use pressure points.  I won't do it, but you can push
12 in this area (indicating).  And that's a process.  You can
13 push under the mandibular angle this way, or the interorbital,
14 under the nose.  It causes intense pain.  And then if he is
15 conscious, he is likely to cooperate.  Those aren't going to
16 cause lasting injury.
17     Now if he is cooperative, sir, and you've got everything
18 calmed down, I can bring his wrist out, which is something I
19 want to do, and apply it to a wristlock and bring it over for
20 handcuffing.
21     But now -- you can get up -- I don't want him bringing
22 his right arm out real fast.  I want him to bring it out in a
23 controlled manner in case he does have something.
24 Q    Am I done?
25          THE COURT:  If you're going to another topic, we'll

1    take a recess now.

2             MR. BEATON:  Perfect time for me, Your Honor.

3             THE COURT:  15 minute recess.

4        (Recess taken from 2:40 p.m. until 2:56 p.m.)

5             THE COURT:  All right.  Go ahead.

6             MR. BEATON:  Your Honor, I forgot to offer for

7    admission Mr. Waller's CV earlier.  With your permission, I

8    would like to offer that.

9             THE COURT:  All right.  Without objection, it will be

10   admitted.

11            MR. GUYNN:  What number is it?

12            MR. BEATON:  18.

13        (Plaintiff's Exhibit Number 18 was marked and received.)

14   BY MR. BEATON:

15   Q    Mr. Waller, you've heard the defendants say that they had

16   a fear, they were afraid that Mr. Wyatt had a gun in the

17   parking lot, correct?

18   A    Yes.

19   Q    Is that, in your expert opinion, a reasonable -- was that

20   a reasonable fear?

21   A    Well, I mean you should always be wary of anybody you

22   interact with, whether they possibly have a weapon.  But they

23   didn't act in a manner consistent with a reasonable fear that

24   Mr. Wyatt was armed.

25   Q    And so why isn't that a reasonable fear?

1  A    They ran after him after a pursuit.  They didn't consider

2  taking cover.  Neither of the officers that were closest to

3  him, pursuing him, had their firearm out.  You would expect

4  that, if there was a rational fear that he had a gun.

5       In addition, immediately before Mr. Wyatt was running

6  away, they observed him hanging onto the car, and he did not

7  have his -- anything in his hands, and he was running away.

8       Now, whether or not he had a gun, as soon as he was taken

9  to the ground and two officers had effective control over him

10 in a prone position, that takes that pretty much out of the

11 equation, if they act according to their training.

12 Q    What about what the officers said?  Is that relevant to

13 your opinion about whether there was actually a reasonable

14 fear of a gun?

15 A    My job is not to determine credibility.  But saying that

16 you --

17 Q    Just to be clear, I'm referring to at the moment, not in

18 the courtroom.  At the moment in the parking lot, was there

19 anything about what was said or not that was relevant to your

20 opinion?

21 A    Yeah, just their actions, nothing that was said.

22 Q    Was anything said about a gun?

23 A    No.  I mean, the fact that there was no, "Watch his

24 hands, he might have a gun," you know, "I'm concerned he was

25 reaching for his waistband," not hearing that or not hearing

Waller – Direct

1  them testify that that occurred while the confrontation was

2  occurring, you know, that's something you would expect to

3  hear.

4  Q    What about the officers' equipment that they had on at

5  the time or had available at the time, is that relevant to

6  your opinion?

7  A    They had bullet resistant vests available to all of them.

8  They wore them earlier in the day.  Now, not only would that

9  have protected them to a certain extent from a gunshot, but

10 that's also where they carried their less lethal weapons.  So

11 none of the less lethal weapons were available to them, as

12 well as a vest that could save their life in a situation.  If

13 they really believed that this guy was armed and dangerous, a

14 little discomfort would have been worthwhile.

15 Q    So when everyone first got to the parking lot, what

16 should have happened as a matter of police practices?

17 A    The protocol is to do a felony vehicle stop.  Mr. Wyatt

18 ran from the scene, but -- and you could see how quickly all

19 the other officers were there.  You know, there was no place

20 for him to really run to, so they could have dealt with him in

21 a much more controlled manner, running over to the side of the

22 car, taking a position of cover, giving commands to Mr. Wyatt.

23      There was no way for him to run along that length of the

24 building, to the rear of where the Danville Police Department

25 squad was, where you're seeing the video from that

 1  perspective.  There was a big fenced-in area, there was no way

 2  to go there, and there was additional officers arriving every

 3  minute.  So you had multiple officers, you had no place for

 4  him to run, and, you know, control it, reduce your risk, take

 5  care of business.

 6  Q    Well, does your opinion change because -- would your

 7  opinion change based on whether or not there was a hand near a

 8  waistband?  Is that aspect of the case something you accounted

 9  for in your opinion?

10  A    Again, if he -- you have conflicting testimony.  Whether

11  there was a hand on the waistband or not, it's a furtive

12  moment.  If there was a furtive movement, I'll tell you how I

13  would have done it when I was on the street.  I would have had

14  my gun out if that was legit.  They didn't.  So I can only go

15  by the training that I have and what I've observed other

16  officers do in similar situations.  So their actions were

17  inconsistent with an actual belief that he may be armed.

18  Q    Now, let's just assume for a second that he's on the

19  pavement and he actually did have a gun in his right arm.  In

20  that situation, hypothetically, would throwing knee strikes

21  make the situation better or worse from the officers'

22  perspective?  More or less dangerous?

23  A    Throwing knee strikes didn't do anything to control the

24  right arm, if that's where they believed that he had a

25  firearm.  The kidney punches to the small of his back or to

1  his back didn't do anything to control the right arm.  The

2  punches to his face by Investigator Wyatt didn't do anything

3  to control his right arm.  The weight of the officers

4  controlled his right arm, and simply force could have

5  controlled his right arm.  But those -- the knee strikes, the

6  punches, they didn't do anything to control the right arm.

7  Q    Now, could you explain to the jury the difference between

8  active and passive resistance?  Are those terms that you

9  understand and you can explain to us?

10 A    Active resistance is fighting with an officer, actively

11 resisting arrest.  Passive resistance is just not cooperating.

12 "Put your hands behind your back," you don't do it, that's

13 kind of passive resistance.  Or, you know, squirming around a

14 little bit, that's passive, that's not active resistance.

15 Active resistance, you know, that would raise the level of

16 force that may be appropriate for the officer to use.

17 Q    Now, assume there was some level of resistance in the

18 actions we saw in the video.  Would that have been active or

19 passive?

20 A    If there was resistance, it was passive.  You also have

21 to consider, if you have the weight of four officers on top of

22 a relatively slightly built man, is he going to be able to get

23 his -- move his right arm out from underneath him even if he

24 wants to.

25 Q    Are you familiar with the use of force continuum we've

1  discussed a time or two in the case?

2  A    I'm very familiar with use of force continuums.  The one

3  in the sheriff's department here is a bit unusual, but I'm

4  used to the concept of force continuum.

5  Q    So the passive resistance you've described, in the

6  situation you've described, how would the use of force

7  continuum apply to that sort of behavior by a suspect?

8  A    It would only justify lower levels of force, perhaps a

9  wristlock or joint manipulation, arm bar, that sort of thing.

10  Q    And I think there's a concept that we've discussed also

11  about escalation and deescalation of force.  Is that familiar

12  to you?

13  A    Correct.  In any use of force situation, an officer has

14  to be able to escalate, go to a higher level, and if the

15  situation warranted, up to and including deadly force.  Or

16  deescalate.  If the need for force is reduced, the officer

17  would only be justified in using a lesser or lower form of --

18  a lower force option.

19  Q    So can those terms be used to describe both the suspect's

20  conduct and the officer's conduct?  Use of force would

21  escalate and deescalate, and the level of resistance could

22  escalate and deescalate?

23  A    Correct.  I mean, the officer's justification for force

24  is based on the actions of the subject.  If the subject is in

25  a position of relative control, and that control is increased

1  as each officer approaches, then the need for higher levels of

2  force goes away.

3  Q    So think about this case.  From the first frames we see

4  in the video until the end, the level of resistance, if any,

5  for Mr. Wyatt, is it escalating or is it deescalating relative

6  to the officer subject factors around them?

7  A    From the first point at which you have two officers on

8  the top of him and he's in a prone position, I can't see from

9  the videos any movement, any resistance.  There was testimony

10 that he was knocked unconscious.  You're not going to have any

11 movement or cooperation if somebody is unconscious, but you

12 have the position of relative control.  Then it's time to stop

13 the frantic activity and for one officer to start giving

14 meaningful commands to take the situation under control.

15 Q    So as the threat level changes in this video, from the

16 suspect's side, what happens in terms of escalation or

17 deescalation and the use of force that we've talked about

18 today?

19 A    The force that would be justified would be reduced.

20 Q    And is that what happens in the video, or does the force

21 move in the other direction?

22 A    No, it continued on with Investigator Worsham,

23 Investigator Owens, and -- Investigator Wyatt, Investigator

24 Owens, and Investigator Worsham.  And less force would have

25 been appropriate right at the beginning, as soon as they had

```
 1  him down on the ground.  There wouldn't be a justification for
 2  punches or knee strikes.
 3  Q    What was the most forceful, the most significant use of
 4  force against Michael Wyatt in this case, of the different
 5  strikes we've talked about?
 6  A    The highest level?
 7  Q    Yeah.
 8  A    Probably the most powerful was at the very end by
 9  Investigator Worsham, because the knee strikes are potentially
10  the most dangerous, the most difficult to deliver in an
11  accurate manner and a totally inappropriate or unacceptable
12  target area.
13  Q    So that happened at the end when there were five
14  officers, not at the beginning when there were two?
15  A    Correct.
16  Q    Is there anything else about the video or about the use
17  of force that you've examined that was significant in leading
18  to your conclusions today?
19  A    I can't think of anything offhand.
20         MR. BEATON:  Thank you very much.  Nothing further
21  from me.
22         THE CLERK:  One of the jurors needs some water.
23         THE COURT:  Okay.
24                       CROSS-EXAMINATION
25  BY MR. GUYNN:
```

1  Q     Good afternoon, Mr. Waller.

2  A     Good afternoon.

3  Q     As I understand it, it's been almost 30 years since

4  you've been employed by a law enforcement agency; isn't that

5  correct?

6  A     Close, about 28.

7  Q     And it's been even longer than that since you actually

8  served as a law enforcement officer, taking people into

9  custody and making arrests?

10  A     I did that occasionally as police chief, but not on a

11  regular basis.

12  Q     Okay.  On a day-to-day basis?

13  A     Correct.

14  Q     It's been like 30 years since you were in the position,

15  essentially, that these officers occupy?

16  A     Correct.

17  Q     And as I understand it, you're not a certified law

18  enforcement officer in Virginia?

19  A     No, sir.

20  Q     Nor are you certified by the Department of Criminal

21  Justice Services to train in Virginia?

22  A     No, I'm not.

23  Q     And I want to make sure we're using the same terms.  You

24  used the concept that -- if I understood it correctly, that

25  Mr. Wyatt was under control when the officers had him on the

1    ground?

2    A    I said a position of relative control.  He was in a prone

3    position, there was two officers on top of him.  He was in a

4    position where officers are trained to take people, to

5    facilitate or maximize their ability to control that person's

6    actions.

7    Q    And in Virginia, you're aware that suspects are

8    considered under control when they're handcuffed?

9    A    Well, technically --

10   Q    Aren't you?

11   A    Handcuffs are temporary retraining devices.  And is a

12   person really under control?  A person handcuffed could still

13   kick you or headbutt you.  So I use the term a relative

14   position of control.  That's a little bit different than what

15   you're arguing.

16   Q    I'm just asking.

17   A    That was -- I was just replying.

18   Q    Okay.  I'm not arguing.

19        I guess what I'm trying to figure out, then, are we under

20   agreement that you're under control when you're handcuffed?

21   A    I think it facilitates control in a similar manner as it

22   does if you have a person on the ground.  I mean, are you more

23   secure if the person is handcuffed behind their back as a

24   police officer?  Sure.  Can they still hurt you?  Sure.  So to

25   say absolute control, that's a misnomer.  Relative control,

```
 1  yeah, that's a greater degree of control.
 2  Q    So I take it from that that officers are safer than
 3  having him on the ground, if they've got him handcuffed?
 4  A    Correct.
 5  Q    And then I guess if you put leg shackles on, that would
 6  make you even more safe?
 7  A    You can go -- go on up.
 8  Q    And it is appropriate, isn't it, for officers to place
 9  suspects under control when they are arresting them?
10  A    It is.
11  Q    You were talking about the continuum and level of force
12  and the like.  Isn't it true that officers determine that
13  level of force to use based on the actions of the suspect?
14  A    By and large.
15  Q    And they should use one level of force above what the
16  suspect is using?
17  A    That's a general rule of thumb.  I mean, it's not
18  supposed to be a fair fight; officers are expected to win.
19  But that's why you have guidelines, that's why you have
20  training, and training techniques, and policy.
21  Q    And protecting the safety of the officers is an
22  appropriate basis for the use of force, isn't it?
23  A    If it's rational, I would agree, yes.
24  Q    And the same is true with regard to the public?  We want
25  officers to use force that is necessary to protect the public?
```

1  A    Sure.

2  Q    In your site visit that you took, when was that?

3  A    Yesterday morning.

4  Q    Okay.  And it appears in the video that there are some

5  doors there to the buildings.  What do those doors go to?

6  A    What do what?

7  Q    The doors that you see on the building in the video?

8  A    Yes.

9  Q    There are offices there?

10  A    That building looked for sale, so I don't know what the

11  status was at the time of the incident.

12  Q    But it could have been that there were people in that

13  building, couldn't it?

14  A    Possibly.

15  Q    And that was something that you would want officers to at

16  least take into account, wouldn't you, in how they deal with a

17  suspect?

18  A    Sure.  You want them to take into account as many

19  circumstances as possible.  I mean, their job is to protect

20  the public.

21  Q    There was nothing -- isn't it true that there was nothing

22  that you saw in the video or that you've seen or heard in the

23  testimony that indicates that shooting Mr. Wyatt would have

24  been appropriate?

25  A    Correct.  It was not a deadly force situation and,

1  therefore, extreme measures which could cause significant or

2  lasting injury would have been inappropriate.

3  Q    So in the felony stop concept, if I understand correctly,

4  they're supposed to pull their cars up, take cover behind, and

5  pull their guns out?

6  A    And ideally bring the subject back to them.  Now, if the

7  subject is running away, that changes the scenario.

8  Q    In what way?

9  A    Then you have to come up with some other technique.

10  Q    So is that to yell at him, "Hey, stop"?

11  A    Certainly it would be.  That would an appropriate

12  command.  "Police officer.  Stop."  Moving your position to

13  control or cut him off.

14      I mean, it's not like this was an isolated situation and

15  you had one or two officers dealing with one person.  You had

16  a whole parade of police cars on their way.  And you had,

17  within seconds, a matter of seconds at least eight officers.

18  Q    How did the Pittsylvania officers know the Danville

19  officers were coming?

20  A    I read testimony in one of the depositions that indicated

21  whenever there's a pursuit, everybody comes in this area.

22  Now, that's their understanding and expectation.

23  Q    Did you read that from any of the Pittsylvania officers?

24  A    The deputies?  Yes, I believe so.  And it may have been

25  Investigator Wyatt.  I would have to look at the deposition to

1  find out.

2  Q    So let's assume this felony stop and they get out and

3  they pull their guns out and say "stop" and he doesn't stop,

4  and then he runs into one of those buildings.  And we don't

5  know whether it was occupied or not, but let's assume it was

6  occupied and the public.  Is that a worse problem than what

7  happened here?

8  A    You know, I don't have a problem with them taking him

9  down and controlling him in the parking lot using appropriate

10  levels of force.  I'm not arguing that.  And creating a

11  potential hostage situation would be a bad thing.

12      I'm only talking about using the excessive and gratuitous

13  force that they used against Mr. Wyatt when they -- after they

14  had him under relative control.

15  Q    And that relative control being with one arm under him?

16  A    Correct, with two officers on top of him.

17  Q    Which they thought could be reaching for a pistol?

18  A    That's the rationale they used.

19  Q    But if he had a pistol, that wouldn't be relative

20  control, would it?

21  A    It would be as long as he couldn't access it.

22  Q    Well, if it's in his belt, and his hand is underneath his

23  body, what is to keep him from accessing it?

24  A    Control of his arms, which you don't get from punching

25  him in the kidneys, punching him in the face, or giving him

1  knee strikes to the head and face.

2  Q    So assuming, as I'm showing, his arm is down to his side

3  and his hand is on the pistol, what control of his arm would

4  keep him from doing that?

5  A    I mean, you've all seen the size of the officers.  So you

6  initially had two officers, then you had three, then you had

7  four, and then you had five, and then you had eight that were

8  present.  Certainly there were sufficient officers to

9  physically control him if you're using proper techniques and

10  you're using your body weight to help the officers, who should

11  have no problem holding down somebody Mr. Wyatt's size, on the

12  ground, to keep him from accessing a firearm underneath him if

13  he's in a prone position.

14  Q    Don't you have to get his hand out eventually?

15  A    Sure.  But that's instead of using wild, disjointed

16  efforts and conflicting commands, somebody takes charge.

17  Q    So that --

18  A    I would have expected that if Captain Nicholson failed to

19  do so, which he should have, then at least one of the officers

20  would have said, "Okay, everybody calm down.  I've got this."

21  And, "Make sure you've got control of his right arm.  We don't

22  know what's under there."

23      "Sir, you know, we don't want to have to hurt you.  We're

24  going to do this by the numbers, and we're going to do it slow

25  and under control."

1      That would be a professional response.

2  Q    Isn't protection of the suspect also important in the use

3  of force?

4  A    Protection?

5  Q    Yes.

6  A    Yes.

7  Q    You're not --

8  A    I mean, that's definitely a consideration.

9  Q    So if he does have the pistol under there, you don't want

10  him shooting himself either, do you?

11  A    So let me -- if I understand your concept, you are to

12  beat this guy senseless to prevent him from shooting himself?

13  That doesn't really make a lot of sense to me, sir.

14  Q    So you don't think that getting his arm out from under

15  him, pulling it out as soon as possible and quickly as

16  possible and getting it handcuffed because he may have a gun

17  in his belt makes sense to you?

18  A    That's not what they did.  They took the opportunity --

19  Q    My question, sir, is does that make sense to you?

20  A    Yes.  And I would have expected them to do that in an

21  expeditious --

22  Q    And they were attempting to do that, weren't they?

23  A    No, sir, they were beating on him.

24  Q    You've got the testimony of people saying they were

25  pulling his arm, and you're just discounting that testimony?

1  A    Why would you pull out somebody's arm if you thought he

2  had a gun --

3  Q    Are you discounting the testimony, sir?

4  A    No, sir.  That's the jury's prerogative.  I don't

5  determine credibility.

6  Q    So if the officers who say they were trying to pull his

7  arm out are to be believed, then they were acting

8  appropriately, weren't they?

9  A    If they're trying to pull his arm out just randomly, or

10 trying to keep it controlled underneath until they had control

11 of the situation?  Which is it?

12 Q    I think they said they were trying to pull his arm out.

13 A    Well, without any other controls, I think that's a very

14 foolish move if you really believed that he had a gun.

15 Q    In the use of knee strikes, is the thigh the only place

16 you can use them?

17 A    No.  I demonstrated if somebody is attacking you, the

18 lower abdomen is another acceptable area.

19 Q    How about on the deltoid?

20 A    Again, you're getting close to the head; it's not a

21 precise technique.  If you're talking about upper body, it's

22 not an appropriate technique.

23 Q    You indicated that -- well, did I understand you to say

24 that you are currently involved in training police officers?

25 A    No, not currently.

1  Q    Okay.  In fact, you've been an expert witness now over

2  650 times, haven't you?

3  A    Actually closer to 700, but, yes, sir, since 1988.  And

4  let me clarify that.  I haven't testified as an expert witness

5  in all those cases.  Those are cases in which I've reviewed

6  and acted as a consultant.

7  Q    In apprehending -- I'm sorry.  In using force on a

8  suspect, would you agree that the officer is to consider the

9  severity of the crime committed by the suspect in determining

10 the level of force?

11 A    That's one consideration, yes.

12 Q    And would you agree in this case that armed robbery is at

13 the high end of that, that is, that is a severe crime for the

14 officer to consider?

15 A    Yes.

16 Q    Would you also agree that the threat to the officers or

17 others that the suspect poses is an appropriate consideration

18 for officers to take into account in deciding how much force

19 to use?

20 A    Correct.  But that's constantly changing as the

21 circumstances change.

22 Q    Okay.  And would you also agree that the use of force

23 determination by an officer should take into account whether

24 or not the suspect is attempting to escape or evade arrest?

25 A    Yes.  That's the *Graham v. Connor* considerations, which

1  provide guidance to law enforcement agencies in determining

2  the appropriate use of force.

3  Q    And that *Graham v. Connor* that you mentioned is the

4  constitutional standard, isn't it?

5  A    Well, my job is not to determine constitutional

6  violations; mine is to look at police practices.  And you have

7  policies and you have training which --

8  Q    My question was, isn't *Graham v. Connor* the

9  constitutional standard?

10 A    It's the constitutional standard, but it's used by law

11 enforcement agencies to determine appropriate levels of force

12 by the officers.

13 Q    And wouldn't you agree that leading the police on the

14 chase and pursuit that Mr. Wyatt led them on is indicative

15 that he is attempting to escape?

16 A    Yes.

17 Q    And if he had had a pistol, that would have been a threat

18 to the officers and others, wouldn't it?

19 A    Could have been.

20 Q    And when we're doing this constitutional analysis, we're

21 doing it from a reasonable belief standpoint, aren't we?

22        MR. BEATON:  Your Honor, I object.  I don't think he

23 has a basis for asking this witness a constitutional question.

24        THE COURT:  Sustained.  He is not the instructor on

25 the law.  You can ask him if it was reasonable, and I will

 1  instruct.

 2  BY MR. GUYNN:

 3  Q    I think I understood you to say that the officers can

 4  use, I guess, pain compliance techniques?  I think the

 5  gooseneck is one, isn't it?  The wristlock, gooseneck?

 6  A    Gooseneck, wristlock, arm bar, those are compliance

 7  techniques, correct.  Those are relatively low level and,

 8  applied consistent with training, are not likely to cause

 9  lasting or severe injury.  That's why you use trained

10  techniques.

11  Q    And I guess the concept there is that the suspect is

12  going to comply, to make the pain stop?

13  A    That's the theory.  That's why they call it pain

14  compliance.

15  Q    In your review of the materials in this case, did you

16  review Mr. Wyatt's medical records?

17  A    Some of them, yes, sir.

18  Q    Did you find any indication that he suffered any kidney

19  damage?

20  A    I don't recall that.  I don't believe so.

21  Q    He wasn't treated for anything that you could see in the

22  medicals?

23  A    I don't believe in the records that I looked at he was.

24  Q    I'm curious.  You mentioned several times four officers,

25  five officers, that sort of thing being on the suspect.

1  You're not suggesting to the jury that they were all laying on

2  him, are you?

3  A    Well, no.  But there were two or three that were on top

4  of him or holding him down using their body weight.  And one

5  of the significant factors in determining how much force is

6  appropriate is the number of officers versus the subject, the

7  size of the officers versus the subject.

8       In this case, you had multiple officers, all

9  significantly bigger than the one subject.  So that is

10 certainly a factor that should be considered in how much force

11 is appropriate.  And generally, the rule of thumb, the more

12 officers you have, particularly if they're working in concert,

13 the lower level of force is needed.

14 Q    Well, Mr. Waller, you know from your experience some 30

15 years ago that taking somebody into custody just because you

16 have a weight advantage doesn't necessarily mean you're going

17 to win that battle?

18 A    That's true.

19 Q    Because it's not TV, is it?  I mean --

20 A    No, sir.  But once you get the guy proned out and your

21 officers are in a position of advantage, it's pretty much all

22 downhill from there.

23 Q    At least if you can get his arms behind him and get him

24 handcuffed?

25 A    We know he had one arm behind him and secured.  We know

1  that he was in a position where he really couldn't move and

2  that was under control, and so it's a matter of using

3  appropriate techniques rather than random acts of violence.

4  Q    What you're telling the jury is that, as far as you're

5  concerned, in the Commonwealth -- well, I'm sorry, you

6  wouldn't know in the Commonwealth of Virginia -- that what you

7  know is knee strikes to the deltoid are not appropriate?

8  A    I know nationally accepted standards of practice.  And I

9  know that there isn't one credible use of force or law

10  enforcement defensive tactics training system that trains to

11  use knee strikes to anywhere near the head.

12  Q    I'm curious in your view of the video, because you

13  indicate that apparently you could see that Worsham's knee hit

14  Mr. Wyatt's head?

15  A    No.  I saw knee strikes.  I also saw damage to the right

16  side of his face and head.

17  Q    And you also indicated that you saw, I think, Captain

18  Nicholson with Wyatt's arm completely out.  Did I understand

19  that correctly?

20  A    No.

21  Q    Because that never happened either, did it?

22  A    I never said anything like that.  You didn't understand

23  correctly, apparently.

24  Q    Sir.

25  A    You said "Did I understand?"

1  Q    Yes.

2  A    And I said you didn't understand correctly, apparently.

3  Q    And that wouldn't be the first time.

4       So you're not suggesting that Captain Nicholson had

5  Mr. Wyatt's arm out from under him when Investigator Worsham

6  used knee strikes?

7  A    No.  My understanding is he had control of the arm as

8  Investigator Worsham approached, and then released control as

9  Investigator Worsham was using the knee strikes to that area

10 of the head.

11 Q    And you're defining control as being underneath him?

12 A    Yes, sir.

13 Q    In the use of any distraction technique, it's always

14 possible that the suspect moves as you're executing it, isn't

15 it?

16 A    Sure.  It's a dynamic situation.

17 Q    So you may not always hit exactly what you're aiming for?

18 A    That's not the purpose.  The purpose is to distract them

19 from tightening up an arm or whatever and to focus on some

20 other area, to allow the officer to implement a trained

21 technique.

22 Q    But that other area that you're focusing on, you could

23 miss benignly because they're moving.  It's not necessarily a

24 malicious intent, is it?

25 A    Sure.  And do people miss with distracting blows?  Yes.

1  Do people use five or six distracting blows or punches and

2  call them distracting blows?  Yes.  Are they distracting

3  blows?  No.

4  Q    In this case, wouldn't you agree that Mr. Wyatt's arm

5  came out from under him after Investigator Worsham used the

6  knee strikes?

7  A    Chronologically, it did.

8         MR. GUYNN:  Those are my questions, Your Honor.

9         THE COURT:  All right, sir.

10                   REDIRECT EXAMINATION

11 BY MR. BEATON:

12 Q    Just very briefly, please.

13        Mr. Waller, if there was a distraction blow or knee

14 strike that missed its intended target and hit the head area,

15 would you expect that knee to be thrown in the same way again,

16 a second time?

17 A    No.

18 Q    If there was a mistake, would you expect it to be thrown

19 in that way a third time?

20 A    No.

21 Q    And not a fourth and not a fifth?

22 A    Correct.

23 Q    Now, a moment ago you were asked about the basis for your

24 opinion that other officers were on the way to the scene or

25 had arrived at the scene.  Do you recall that question?

1  A     Yes.

2  Q     And you referred to the deposition testimony of one of

3  the defendants, correct?

4  A     Yes.

5          MR. BEATON:  Your Honor, there was a discussion

6  earlier about a portion of a defendant's deposition testimony.

7          MR. GUYNN:  We should approach the bench, Your Honor.

8          THE COURT:  Okay.

9      (Sidebar on the record.)

10         MR. BEATON:  On cross-examination he was asked

11 whether and how he knew that other officers were on their way.

12 He said, "I think it was from the deposition testimony of one

13 of the defendants."  Scott Wyatt's deposition testimony, page

14 44, there is the question and answer in which Wyatt says, "I

15 didn't have to call for backup because in 18 years, every time

16 you call in a pursuit, the officers are coming."

17         I would like to show this to the witness.

18         THE COURT:  What's the problem with that?

19         MR. GUYNN:  They didn't identify the deposition

20 testimony was going to be read.

21         THE COURT:  It's offered in rebuttal.

22         MR. GUYNN:  He is offering rebuttal to his own

23 witness.

24         THE COURT:  No.  I mean, you have implied something

25 that's not true.  You should want it clear.  Did you know it

1  was in there?

2          MR. GUYNN:  No.

3          THE COURT:  Well, you shouldn't have asked the

4  question.

5          MR. GUYNN:  I read it, but it's 100-and-some pages.

6          THE COURT:  Okay.  But he remembered it.

7          MR. GUYNN:  And that's it.  I left it alone.

8          THE COURT:  Okay.  I think you can go ahead.

9          MR. TODD:  We're going to show it to him and then

10 ask.

11     (End of sidebar.)

12         MR. BEATON:  Your Honor, may I approach the witness

13 and show him the deposition transcript?

14         THE COURT:  You may.

15 BY MR. BEATON:

16 Q   Mr. Waller, when you were asked earlier about how you

17 knew or why you thought other officers were coming to the

18 scene, you referenced the deposition testimony of one of the

19 defendants.

20     I've handed you the transcript from Investigator Wyatt's

21 deposition, and I've marked a section at the bottom.  Is that

22 what you had in mind when you answered Mr. Guynn's question?

23 A   Yes.

24 Q   And so having seen that, do you remember now specifically

25 the basis for your opinion that other officers were on their

1  way?

2  A    Yes.  It was the testimony of -- or the sworn testimony

3  of Investigator Wyatt.

4  Q    And what did Mr. Wyatt say?

5  A    "Question:  So do you actually specifically call for

6  backup then, call for marked backup?"

7      "Answer:  No, it -- I can safely say this:  In 18 years

8  I've been doing this -- almost 18 years, every time you call

9  in a pursuit, the cavalry is coming.  You don't have to say,

10  'Hey, guys, come help me'; they know."

11      "Okay.  So is the cavalry the sheriff's office?"

12      "Answer:  I say your law enforcement buddies when I say

13  that."

14  Q    Thank you.

15      Mr. Waller, the reasonableness or appropriateness of the

16  use of force by law enforcement is measured at the time it's

17  delivered, right, not earlier, not later?

18  A    Correct.

19  Q    And so at the time when Mr. Wyatt was punched by

20  Investigators Owens and Wyatt, and when he was kneed by

21  Investigator Worsham, at that point in time was he trying to

22  escape?

23  A    Apparently not.  I mean, there was no indication from the

24  video that he was.

25  Q    Was he able to escape?

1  A    No, I do not think so.

2         MR. BEATON:  Nothing further.

3         THE COURT:  Okay.  Thank you.  You may step down.

4         MR. TODD:  Your Honor, the plaintiff's next witness

5  will be Dr. Jeffrey Smith.  We're just bringing him in from

6  the hallway.

7         THE CLERK:  Please raise your right hand.

8      JEFFREY SMITH, M.D., PLAINTIFF'S WITNESS, SWORN

9         MR. TODD:  Your Honor, I apologize for the shuffle;

10 we misplaced something.  Could we have, perhaps, five minutes?

11        THE COURT:  Yes.  Members of the jury, if you would

12 like to go back, we will probably go to about 5:00 o'clock.

13 You may take a brief break and go back to the jury room.  As

14 soon as all of you are ready to come back, come back.  And I

15 say everybody in court be back in ten minutes.

16     (Recess taken from 3:41 p.m. until 3:54 p.m.)

17        THE COURT:  All right.  You may be seated, and we'll

18 proceed.

19        MS. BRANCH:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

21 BY MS. BRANCH:

22 Q   Could you please introduce yourself to the jury.

23 A   Yeah.  My name is Jeffrey Smith.

24 Q   Mr. Smith, can you lean in a little bit to the mic.  I

25 just want to make sure everyone can hear you.

1  A    Yeah.  Hi, my name is Jeffrey Smith.

2  Q    Mr. Smith, could you describe your education for the

3  jury?

4  A    Sure.  I went to -- it's working?  Yeah.

5      I went to college at Villanova University.  I went to

6  medical school at the University of Maryland in Baltimore.  I

7  did a residency training program in both emergency medicine

8  and internal medicine.

9  Q    Did you graduate with honors?

10 A    I did, yes.

11 Q    From medical school and from undergraduate?

12 A    Correct.

13 Q    And could you describe your medical training for the

14 jury?

15 A    Sure.  So I did a three-year program in emergency

16 medicine.  It was a combined program at Georgetown University

17 and George Washington University.  And then I continued on in

18 internal medicine at Georgetown at the VA Hospital.  And I

19 completed both of them in, I think it was '85 or -- '85, I

20 think.  And then I took my boards in both of them in '85 and

21 '86.

22 Q    Where did you do your residency?

23 A    Did my residency -- so emergency medicine was a combined

24 program between George Washington University and Georgetown

25 University, and internal medicine was essentially Georgetown

1  University.

2  Q    What other jobs have you had after your residency?

3  A    So I became faculty at George Washington University upon

4  graduation, and I have been at GW essentially since then.  We

5  do provide emergency service coverage for several hospitals.

6      So during the time I've been a faculty member at GW --

7  and it's a medical school, so we have residents.  We have 40

8  residents training with us at any one time in emergency

9  medicine, and then we have medical students and physician

10 assistants and nurse practitioners training.

11     And then in addition to that, in addition to the

12 educational part, I have worked clinically, either working

13 clinically seeing patients in the emergency room, which I do

14 every week, as well as I have a number of different

15 administrative functions.

16 Q    And did you at some point get a master's degree as well?

17 A    I did.  I got a master's at GW in international public

18 health.  We have -- or I have started a number of different

19 training programs in emergency medicine in a number of

20 developing countries, and so my focus was on working with

21 ministries of health and other leadership to sort of develop

22 sound policies in emergency health care, access to emergency

23 care for people, and training physicians in emergency care.

24 Q    You mentioned training.  Do you train other residents and

25 physicians yourself?

Smith - Direct

1  A    I did.  So we trained -- we train physicians from all

2  specialties in their first year of training, but we have an

3  emergency medicine training program that runs for four years.

4  So it's a four-year program, and we have 40 residents in total

5  at any given time.

6  Q    And just so the jury can understand you, could you talk

7  just a little bit slower.  I know the acoustics are a little

8  strange in here and sometimes you can't always hear every

9  word.

10  A    Will do.

11  Q    Where do you work now?

12  A    I work at George Washington University.

13  Q    What is your title there?

14  A    I am associate professor of emergency medicine.  I am the

15  associate director of the trauma program at GW, and I am the

16  director of the international emergency medicine program.

17  Q    And how long total have you worked at GW?

18  A    Over 25 years.

19  Q    And in addition to your title, could you describe your

20  current role as director?

21  A    Sure.  So, again, I work clinically in the emergency room

22  several days a week.  We run a variety of international

23  emergency medicine training programs.

24       And then as the associate director of the trauma program,

25  we're involved with developing educational curriculum for both

1  the surgeons and the emergency physicians and the nurses in

2  trauma.  We are involved with training both the emergency

3  physicians and trauma surgeons in trauma.

4      And then we are a Level I trauma center, so very much

5  involved with making sure that we keep our Level I

6  accreditation in trauma, so making sure we do the appropriate

7  quality improvement, quality assurance, peer review, all the

8  things necessary so that we can really deliver excellence in

9  trauma care.

10 Q    When you say "Level I," what does that mean?

11 A    So Level I trauma facilities are facilities that

12 essentially can manage all aspects of trauma.  They virtually

13 have all specialists on call.  Some specialists, like the

14 surgeon and others, are in the hospital, and others have to be

15 to the hospital within 20 minutes.  We can do a wide range of

16 trauma surgeries and interventional procedures and radiology

17 and other things, so that we really sort of meet the standard.

18     And in addition to that, we have to have a strong

19 post-surgical program.  So we have a very active community

20 outreach program to the citizens of the District of Columbia

21 on trauma.  We do a lot of training for paramedics.  We follow

22 all of our trauma patients and their families.  We have a

23 traumatic brain injury clinic where patients with brain

24 injuries are referred to for ongoing assessment and follow-up.

25 Q    So when you say "ongoing assessment and follow-up," does

1 that mean you see patients that you've seen in the emergency

2 room after they leave the emergency room?

3 A    I will see them as part of the trauma clinic just because

4 of my role in the trauma services.

5 Q    And I think you've already explained this, but what is

6 your primary field of practice?  What would you call that?

7 A    Emergency medicine.

8 Q    Can you describe to the jury what you mean by emergency

9 medicine?

10 A    Emergency medicine really deals with the assessment and

11 stabilization of anyone, really, coming to the emergency room.

12 So if you kind of go from head to foot, you know, whether it's

13 a brain injury or stroke, whether it's an asthma attack or

14 acute allergic reaction, whether it's someone with a

15 complication of a pregnancy or having a ruptured aneurysm,

16 whether it's trauma to the extremities, so it's anything that

17 would lead you to go to an emergency room, something acute,

18 sudden, requiring immediate intervention.

19 Q    Would this include physical trauma?

20 A    Absolutely.  I would say probably 15 percent of our

21 emergency department visits are related to trauma.

22 Q    What types of trauma do you see specifically?

23 A    So the majority, even though we're an inner city

24 hospital, the majority is blunt trauma, about 85 percent.  So

25 that would be anything.  That would be, most common, falls

1  from height, fall from downstairs, fall off a building

2  structure in construction, motor vehicle accidents, violence,

3  assaults, interpersonal violence, sporting injuries, et

4  cetera.

5      And then about 15 percent is penetrating: stab wounds and

6  gunshot wounds.

7  Q   When you say "blunt trauma," specifically can you

8  describe what you mean by blunt trauma?

9  A    Yes.  Blunt trauma is one where there is a defined force

10 hitting a part of the body.  It doesn't penetrate into the

11 body, it all hits it on the external.  So, you know, and it

12 can happen, again, from falling and hitting your head to

13 breaking your knee, breaking your hip, to breaking your spine,

14 et cetera.  It is all just relating to your body hitting

15 another object or a person with a significant force to cause

16 injury.

17 Q   Do you have any specialized training or experience in

18 emergency medicine outside of what you've already described?

19 A    No.

20 Q   Have you published any scholarly writings in your field?

21 A    I have.

22 Q   Are you a member of any professional societies or other

23 organizations related to emergency care?

24 A    Sure.  I'm a member of the American College of Emergency

25 Physicians.  I'm a member of the Academic Society of Emergency

1  Physicians.  I'm a member of the American Trauma Committee.

2  Q    And what's your role in these professional societies?

3  A    It has varied over the years.  Certainly an active

4  member, sometimes have run certain interest groups in certain

5  areas because I tend to do a lot with international

6  development.  I tend to sort of play more leadership roles in

7  getting both clinical international emergency care as well as

8  research in emergency care in a number of developing

9  countries.

10  Q    Can you describe the skills that are essential to

11  practicing emergency medicine, specifically related to things

12  like blunt force trauma, head injuries, and things caused by,

13  like you said earlier, force, whether it's falling or a motor

14  vehicle accident?

15  A    Yes.  I think the key thing for emergency medicine is

16  that (A) they do a rapid assessment, and the assessment

17  includes both as much history as you can get, which sometimes

18  you may get none; doing a rapid assessment in trying to

19  determine if there is substantial life-threating or

20  limb-threatening or brain-threatening injuries; providing

21  initial stabilization for them, so whether it's giving them

22  blood or, you know, whatever it would require to get them

23  stable.

24      And then depending, you know, for relatively minor

25  trauma, we discharge them home.  We'll set a fracture, we'll

1  relocate a dislocated shoulder, or whatever.  And for others,

2  they are admitted or they're referred to other specialty care.

3  Q    Have you ever diagnosed blunt force trauma?

4  A    Oh, sure.  Daily.

5  Q    And are you trained in the principles and methods used in

6  diagnosing and treating blunt force trauma?

7  A    I am.

8  Q    Could you briefly explain those principles and methods

9  and what kind of tests you would do and whatnot?

10 A    It would again, based on sort of the history that you

11 get, doing your physical exam, doing an assessment and

12 laboratory evaluation, managing the patient's active problems,

13 whether it be giving them fluid if their blood pressure is

14 low, controlling their pain, because most of these are very

15 painful events, and then deciding on what the appropriate

16 disposition is.  So defining what the injuries are, deciding

17 what requires specialty care, what doesn't require specialty

18 care, what requires admission, and then arranging for

19 appropriate follow-up.

20 Q    And same question but for potential head injuries.  Are

21 you trained in the principles and methods used to diagnose and

22 treat potential head injuries?

23 A    We are.  So it would be the same sort of history and

24 exam.  Again, depending on the extent of the history and exam

25 we get, we determine whether we need to get additional

1   imagining, such as CT scans or MRIs.

2       And then I think it is a –- you know, it's really

3   incumbent, as it is with most patients in the emergency room,

4   that they get really good follow-up, because not only is there

5   issues related to the initial injury, but many times patients

6   have a lot of problems after their initial stabilization and

7   injury that may take weeks or months to show up.  So it's

8   really important that they're plugged into a system where

9   they're getting good ongoing medical care.

10  Q    And do you have experience with patients who have

11  suffered from some kind of blunt force trauma where they lost

12  consciousness?

13  A    Yeah.  It's very common.  I would say that of our entire

14  trauma population, of our what we would consider more major

15  trauma, probably about 70 percent is involving –- involves

16  head injury, if not head injury and something else.  It's

17  becoming more and more increasingly a problem in the U.S.

18  Q    And what are some of the things that an expert in your

19  field would look for in terms of diagnosing a potential head

20  injury?

21  A    So I think it's important that you –- obviously you need

22  to get a good history or the history that's available.  You

23  need to do a very detailed neurologic exam to see whether they

24  have any neurologic issues relating to it.  Do they have any

25  weakness, any numbness, any difficulty speaking, any

1  difficulty walking, et cetera.

2      And then if we think it is significant, say an injury

3  where someone either has severe pain after an injury, severe

4  headache or any neurologic finding, slurred speech, seizure,

5  whatever, or if they had loss of consciousness, in general

6  that at least kicks off a CAT scan, a CT scan of the brain to

7  make sure that there is no obvious bleeding that's occurred.

8  And bleeding can occur in multiple places related to trauma.

9  We have to make sure that bleeding has not occurred, and then

10 we decide on appropriate follow-up.

11 Q    I think you already covered this, but are you trained in

12 the principles and methods used to diagnose and treat a head

13 injury?

14 A    I am.

15 Q    In addition to physical trauma, do you see patients with

16 any kind of psychological trauma?

17 A    Sure.  So -- and, again, I'm going to tie this more --

18 so, obviously, we see a lot of people come to the emergency

19 room with distress of one sort or another.  I'm going to

20 really kind of define this more in the setting of a trauma

21 setting.

22      So obviously there's an impact to the individual who has

23 had trauma, so it's something disability of some sort.  And

24 there's a huge impact to the family that's had trauma, because

25 someone who has either lost their ability to work or isn't

1  functioning properly for weeks to months on end.  So there is

2  a number of things that we see and that we try and address

3  acutely, and then, again, to make sure they have appropriate

4  follow-up.

5  Q    And are you trained in these principles and methods used

6  to, you know, deal with patients who are potentially suffering

7  from psychological effects from trauma?

8  A    We are.

9  Q    Have you ever served as an expert in a civil trial

10 before?

11 A    I have.

12 Q    Are you typically paid for the work that you do related

13 to litigation?

14 A    I would say typically.  I would say maybe 20, 25 percent

15 is pro bono, no charge.

16 Q    Were you charged in this case?

17 A    I mean I haven't submitted a bill, but, yes, I would

18 charge in this case.

19 Q    And we'll get to what happened in the specific case in a

20 minute.  But as an initial matter, all the principles and

21 methods that you've described so far, did you apply those in

22 assessing Michael Wyatt's injuries?

23 A    I did.

24 Q    And did you also apply your training and education and

25 experience in assessing Michael Wyatt's injuries?

1  A    Yeah, of course I did.

2  Q    And without getting into the specific facts, did you

3  review materials in your assessment?

4  A    I did.

5  Q    What did you review?

6  A    So I reviewed the Danville Regional Medical Center

7  emergency department records, which included the initial

8  assessments, the observations in the overnight admission, the

9  laboratory and the CT scans that were done.  I reviewed

10  photographs that were taken at some point during the time that

11  Mr. Wyatt was in the emergency room.

12      I reviewed his clinic records both from when he was in

13  jail as well as at the corrections center.  I reviewed

14  independently his ophthalmology evaluation records.

15      I reviewed two videos related to sort of the arrest and

16  restraining of Mr. Wyatt and the -- sort of the video

17  immediately after the arrest was done.  And I did the review

18  some excerpts of depositions from different people, so from

19  both Michael Wyatt as well as some of the arresting officers

20  in the case.

21  Q    Have you ever spoken to Mr. Wyatt about his injuries?

22  A    I did.  I spoke to him once.  I think it was October 15th

23  of last year, so in 2016, which was actually four years after

24  the incident, roughly, to just sort of get a sense of how his

25  recovery had been going, what his current active issues were,

1  along those lines.

2          MS. BRANCH:  Your Honor, at this time I would like to

3  tender Dr. Smith as an expert in trauma medicine for the

4  purpose of this case.

5          THE COURT:  He may express his opinion in the field

6  of trauma medicine.

7          MS. BRANCH:  At this time, may I produce his CV to

8  the jury?

9          THE COURT:  Yes.

10         MS. BRANCH:  Sorry, just to clarify, I would liked to

11 tender him as both an emergency medical physician as well as a

12 trauma physician.  Thank you, Your Honor.

13         THE COURT:  Understood.

14 BY MS. BRANCH:

15         MR. GUYNN:  19?  20?

16         THE COURT:  Excuse me?

17         MR. GUYNN:  What number is that?

18         THE CLERK:  19.

19     (Plaintiff's Exhibit Number 19 was marked and received.)

20 BY MS. BRANCH:

21 Q    Now, Dr. Smith, I want to turn to Michael Wyatt's

22 diagnosis, treatment, and the extent of his injuries in this

23 case.  You mentioned that you had seen photographs before?

24 A    I did.

25 Q    Could you just generally describe those photographs that

Smith - Direct

1  you saw?  And then we'll put them up for you.

2  A    There were photographs taken while Mr. Wyatt was in the

3  emergency room, so again, taken at a point in time, but kind

4  of -- photographs were taken of the areas where injuries had

5  been identified.

6        MS. BRANCH:  If you will put up -- I think it's

7  Exhibit 3 and Exhibit 17.

8  BY MS. BRANCH:

9  Q    Are these some of the pictures that you reviewed?

10 A    That's correct.

11 Q    And did you consider these photographs when forming your

12 expert opinion in this case?

13 A    I did.

14 Q    Now, you mentioned earlier that you also reviewed medical

15 records.

16 A    Right.

17 Q    This included hospital records?

18 A    That's correct.

19 Q    What types of medical doctors treated Michael Wyatt on

20 July 3rd and 4th at Danville Regional Medical Center?

21 A    So he was evaluated by three physicians during his

22 overnight stay in the hospital.  He was evaluated by the

23 emergency physician initially, who did the initial assessment

24 or the laboratory studies and the imagining studies that were

25 done.

1    He was admitted to the hospital, so he was admitted under

2  a hospitalist service, which is, generally, the physicians

3  now, they sort of take care of the inpatients in most

4  hospitals.

5    And the specifically because of his eye injury, he was

6  evaluated by the ophthalmologist.

7  Q    I will say one more time if you can speak up a little

8  bit.  I'm having a hard time hearing you.  They might be able

9  to hear you great.  Maybe the other mic would work better if

10  you lean in?

11         THE CLERK:  Doctor, if you will tell me what number

12  is on that mic?

13         THE WITNESS:  Three.

14         THE CLERK:  Okay.

15         MS. BRANCH:  Can you guys hear him okay?

16      (Jurors nod affirmatively.)

17  BY MS. BRANCH:

18  Q    You mentioned an emergency physician, ophthalmologist,

19  and hospitalist.  What did the doctors do specifically to

20  evaluate Michael Wyatt's injuries, in terms of tests?

21  A    Specifically, the emergency physician initially did an

22  assessment, took a history, did an exam, and then ordered

23  laboratory studies and x-ray imaging.

24  Q    You mentioned a laboratory evaluation.  Could you

25  describe what they did in terms of lab tests?

1   A    Right.  So they did, basically, a basic electrolyte

2   panels, point of care testing that they can do in the

3   emergency room that just checks basic things like sodium,

4   potassium, glucose.

5        They did a troponin, given the history that there may

6   have been some chest trauma, to make sure there wasn't

7   evidence of heart muscle injury.

8        They did a urinalysis, and they did -- they at least

9   ordered a urine drug screen and did an alcohol level.

10  Q    You said that they ordered a drug screen.  Was there

11  anything in the medical records to suggest Michael Wyatt was

12  on any drugs?

13  A    Yeah, I didn't -- there was -- I didn't see a report of

14  the urine drug screen; I just see that it was ordered.  I

15  didn't see a report with it.  We do know that his alcohol

16  level was nondetectable.  He had no alcohol in his system.

17  Q    Can you generally describe some of the injuries that

18  Michael Wyatt suffered from on July 3rd?

19  A    Sure.  So if I could just --

20       (Microphone feedback.)

21          THE CLERK:  Sorry.  Let's try a different mic.  I

22  think one of our problems is -- we're going to move this one

23  because we're getting feedback.

24          THE WITNESS:  Is this working?  Much better.

25  BY MS. BRANCH:

1   Q    So, again, could you just generally describe some of the

2   injuries, not in detail, but just generally some of the

3   injuries he suffered?

4   A    Yeah.  So the injuries that basically Mr. Wyatt had is he

5   had injuries to his head, he had injuries to his face, he had

6   injuries to his chest, and he had some injuries to his

7   extremities.

8   Q    Now, you mentioned that he suffered from some facial

9   injuries, which I think we can all see.  Let's start with the

10  left side.  What facial injuries did Michael suffer from on

11  the left side of his face?

12  A    So I guess they had one where they could zoom.  There you

13  go.  I think that's a great picture.

14       So, basically, if you see all of his injuries are sort of

15  localized in one area there.  So he has -- and it's all around

16  the left eye and then involving the left ear.  So you may not

17  be able to see it fully here, but he has a laceration above

18  his eyebrow on the left; he had small tissue evulsions, so

19  small tearing of issue above the left upper and lower lid; he

20  had this abrasion on his cheek, covering the entire sort of

21  upper cheek area; and then he has an injury to his ear there.

22  You can see a little bit of bruising and swelling of his ear.

23  And that's primarily what you see on the left side.

24  Q    And in your opinion -- I know you've reviewed a lot of

25  material.  In your opinion, what specifically caused the

1  injuries to the left side of his face?

2  A    So I think these injuries are sort of most consistent

3  with falling and landing on the asphalt, not only just the

4  mere impact of a fall, but probably some element of sliding,

5  where you get road rash and sort of tearing of the skin.  So

6  it's all very localized to a single area.

7       I mean of note, there's no injury to the nose.  So it

8  wasn't a face-forward injury or it would have broken his nose,

9  which is the first thing that would have happened.  So it was

10 really falling onto the left side and sustaining the injuries

11 both around the eye, to the eyelids, the laceration, and the

12 injury to the ear.

13 Q    And what about the right side of his face?  Could you

14 describe the injuries to the right side?

15 A    So on the right side of his face, I will tell you what

16 you see and then we'll do a little bit more of the imaging.

17      So you actually sort of see three areas here.  So at the

18 sort of very top of his forehead, there's an abrasion.  As you

19 see, sort of on the lateral aspect of his -- near the eye,

20 sort of on the cheek area, the zygomatic area over here by

21 where the jaw attaches, there's an abrasion; there's a little

22 abrasion lower on his cheek; and then probably the most

23 dramatic thing is his eye is swollen shut here.  And he

24 actually had sort of a direct blow injury or injury to the

25 orbital area, which is apparent externally there.

1    Now, the eye is not open, so I can tell you what the eye

2  exam showed by the ophthalmologist.  But then they also did a

3  CT scan of his head and his face.  And on the CT scan of his

4  face, behind that right eye there was a lot of inflammation

5  and stranding suggesting that there was direct impact directly

6  to the eye.

7  Q    Would this have been localized or spread across various

8  areas?

9  A    So this was a localized injury to the eye.  There is a

10 localized injury to the forehead.  And really sort of distinct

11 from that eye is sort of this zygomatic area, which is another

12 injury.  And he has got a small one on his cheek.

13 Q    I know you said earlier that the left side injuries were

14 consistent with potentially falling.  What about the right

15 side?  Could that have been caused by falling to the ground?

16 A    So he is only going to fall and land on one side, right?

17 If you fall face forward, you're going to smash your nose.  So

18 you're going to land on one side, and you really wouldn't

19 sustain injuries to the other side if that's where you landed.

20    In addition, the type of injuries specifically that he

21 has on the right side, most importantly sort of the eye, the

22 globe itself, but then the separate areas.  So where you saw

23 on the left side, it is all sort of one continuous area.

24 These are three separate areas, so this was not related to the

25 fall at all.  This is related more to other forceful impact to

1  the face.

2  Q    Now, you also mentioned earlier that there were injuries

3  to his chest.  Could you just describe those injuries?

4  A    So one of his -- yeah.  So specifically to the chest, he

5  had both a rib fracture on the right fifth rib, sort of

6  anterolaterally, so a little bit over to the side here on the

7  right.  And on the CT scan, he had small collapse of the lung

8  on the right-hand side.

9  Q    And when you say a small collapsed lung, could you

10  describe what you mean by that?

11  A    Yeah.  So, again, it would be sort of very consistent

12  with sort of a localized blunt fall.  So there was an injury

13  to the rib, the rib would puncture the lung, and it would

14  collapse.  And we don't really -- the type of collapse he had

15  with the lung was minor.  I mean, it's not life-threatening.

16  As physicians, we're going to observe them, but we're not

17  worried about that.  We're not going to do an intervention to

18  that.

19       More specifically with Mr. Wyatt, though, is he had a lot

20  of pain with breathing because he broke a rib.  So he had a

21  lot of pain with breathing and so he wasn't taking deep

22  breaths.  So he complained of shortness of breath in the

23  hospital.  When they tried to suture him and they laid him

24  down, he felt like he couldn't breathe, so he didn't want them

25  to suture the eyebrow and he wanted to sit up.

1        And then when he got to the nursing floor, they did a

2   pulse oximetry, which we measure the patient's oxygen by

3   putting a little probe on their earlobe or their finger.  A

4   normal adult, even with a smoking history -- his was pretty

5   mild, a pack a day or less -- would run oxygen sat -- 100

6   would be perfect.  He would run it 92 to 93.  On oxygen, he

7   was 88 percent.  So he was splinting.

8        I doubt it was related to the collapsed lung; probably it

9   contributed, but to a smaller extent.  Probably more related

10  to the pain in the rib.  He didn't want to take deep breaths,

11  so he was not fully expanding his lungs and getting

12  oxygenation there.

13       And I think it was noted both by the emergency physician

14  and the hospitalist, the doctor that saw him on the floor,

15  that he was having a lot of splinting of the chest, i.e., he

16  was not taking deep breathes because of the rib fracture,

17  which is very painful.

18  Q    In your opinion, could the rib fracture have been caused

19  by the fall or caused by something else?

20  A    No, it would be caused by a local impact.  If someone

21  fell and had rib fractures, and we see this all the time, they

22  fracture three or four ribs.  They hit a solid surface, they

23  break -- unless they fall on the corner of this desk, maybe

24  they will break a rib.  But usually they have more significant

25  trauma.  Whereas, if he had another strike or blow, whether

1  it's a fist or a knee or anything, that could just isolate,

2  break a rib and not cause a lot of other injury.

3      Of note, the emergency physician noted some bruising on

4  the chest.  On his pictures, we don't actually really see it,

5  and sometimes these things take a little while to show up.

6  Q   Now, you said earlier that you spoke with Michael.  Did

7  he ever describe pain that he was experiencing on the left

8  side of his body, specifically in his abdomen area?

9  A   He didn't -- well, so, from the phone call I actually

10 don't really remember us focusing on his abdomen.

11     In the emergency room, though, at least during the

12 evaluation and during the examination, he had chest pain on

13 the right chest and the right abdomen.  And I make that point

14 because when we talk about sort of the x-ray evaluation of

15 Mr. Wyatt, he had a scan of his head, his brain; he had a CT

16 scan of his face; he had a CT scan of his chest; and he had a

17 CT scan of his abdomen and lower abdomen, the pelvis.

18     We don't do that for minor trauma.  You may not even get

19 an x-ray, or you just get a chest x-ray.  If he has tenderness

20 in the chest and abdomen, and with a face looking like this,

21 you want to see if there are broken bones, you want to see if

22 there's a broken rib, you want to see if there's a collapse

23 lung.  The tenderness in his abdomen, you want to make sure he

24 didn't rupture his liver or his spleen.  So all of those are

25 completely indicated in him because of the impact he had had,

1  the injuries he had had, and his complaints.

2  Q    You mentioned the spleen and liver and other organs.

3  Have you ever had experience with patients who come in with

4  blunt force trauma to specific organs?

5  A    Sure.  We see a lot of it both typically -- the ones that

6  cause the most problem are the liver and spleen because they

7  tend to bleed a lot.  These patients can have blunt force

8  trauma and they come in pretty sick.

9       But both of them have a capsule that surrounds them, so

10 sort of this crystalline type of thing that surrounds the

11 liver and spleen.  So you can certainly have an injury where

12 you get bleeding under the capsule.  And if it doesn't break

13 loose in the abdomen, you don't lose a lot of blood, so there

14 you may just have pain.

15 Q    And what about the kidneys?  Is that another organ where

16 you have seen, you know, people come in with trauma, bruising,

17 other types of injuries?

18 A    Again, yes.  But that should be picked up, as a general

19 rule, on the CAT scan.  So the CAT scan should be very

20 sensitive in picking up injuries relating to blunt trauma,

21 particularly the scans he had.

22 Q    You mentioned also trauma to Michael Wyatt's head.  Could

23 you describe some of the -- some of your bases for your

24 opinion about his head trauma?

25 A    Yeah.  So he had some -- so you could see what he had on

1  his face.  In addition to that, he had sort of a

2  laceration/abrasion on the left side of his scalp.  We know

3  that there were sort of reports, I think by one of the

4  officers, that he was certainly very dazed, if not briefly

5  unresponsive at the scene where he had the injuries.

6      We know that when he came to the emergency room he knew

7  he was in Danville, but he couldn't tell you the year, the

8  date, et cetera.  He was oriented only to location.  We know

9  that at times nursing notes also notes that there's again a

10 mild -- this was a mild degree of sort of disorientation or

11 inability to recall events.

12     And so, you know, with all those things suggesting -- not

13 suggesting -- or diagnostic, that he had at least some level

14 of a traumatic brain injury.  I think it was a mild traumatic

15 brain injury.  But nonetheless, in addition to the external

16 injuries you see here, he had internal injuries to the brain,

17 which would not necessarily be picked up from a CT scan, which

18 is not that sensitive.  We do it to look for gross bleeding,

19 but we look at it to see if someone has a small bruise of the

20 brain.  And certainly based on his history and his

21 presentation, he absolutely had mild traumatic brain injury.

22 Q   You mentioned earlier that you relied on video evidence

23 also in your medical opinion.

24         MS. BRANCH:  If you could please play Exhibit 2.

25         (Video is played.)

1  BY MS. BRANCH:

2  Q    And to clarify, this is the video that you were

3  discussing earlier that you relied upon?

4  A    Correct.

5  Q    What about Michael's condition in this video led to you

6  believe that he suffered from a traumatic brain injury?

7  A    So you can see, so this was after the arrest and after he

8  was succumbed.  And we know that initially after he fell,

9  there was discussion by, I think, all the police officers that

10 he was struggling and they were trying to work with his arm.

11 So the impact of the fall to the head still allowed him to do

12 everything, and no one describes a period where he is not

13 lucid or conscious.

14      It's clear from this video -- this is after all the

15 officers are off him -- he is sort of laying like a dead

16 person on the street.  I mean, you don't really see any

17 movement of him whatsoever.  And we watched 30 seconds of this

18 where there is no movement, it looks like someone is trying to

19 arouse him, and then they sort of grab him by extremities and

20 drag him off the hot asphalt onto the grass.

21      So it's clear he had a major change in mental status.

22 Whether he had loss of consciousness, which really makes no

23 difference in making a diagnosis of brain injury, but he

24 clearly was very stunned and not moving.

25      And so I think there's no question -- and there's no

1    other injuries to describe it.  It's not like he's in shock
2    from bleeding in his abdomen, it's not like he's in shock from
3    having a small pneumothorax.  There's only one thing that can
4    account for that, and that's the head injury that he had.
5    Q    Are there any other things that led you to believe that
6    he had suffered from a brain injury, for instance, symptoms he
7    was experiencing after?
8    A    Sure.  So when you sort of talk about -- and I'm really
9    going to confine this more to mild traumatic brain injury,
10   because I think that's what Mr. Wyatt had, and I'll make the
11   distinction.  Mild is someone who either is dazed or has a
12   short period of loss of consciousness.  The definition varies,
13   but less than 30 minutes.  Some people will say less than five
14   to ten minutes.
15        Typically, after the event they have a period where they
16   don't have good recall of what happened.  And obviously
17   everyone is going to have a headache if they hit their head,
18   so that is normal and that's not necessarily a sign of a
19   traumatic brain injury.
20        It's the persistence of symptoms that make the diagnosis.
21   The persistence of symptoms such as headache, difficulty
22   concentrating, sensitive to loud noises or bright lights,
23   difficulty performing normal functions; so interpersonal
24   relationships, being able to write a check, you name, it
25   whatever it takes.

1    So there's both functional things -- and we know that he

2    wasn't paralyzed, and we know that he didn't lose his ability

3    to talk, and we don't have any evidence he was numb or weak in

4    the leg.  But what we do know is he has had sort of these

5    constant headaches, difficulty sleeping, anxiety, feeling

6    depressed, a number of events that would all be the perfect

7    definition -- he defines the definition of mild traumatic

8    brain injury.

9    And it's really a symptom that can persist for weeks to

10   months to years.  Some people do very well, and after three or

11   four months these symptoms completely resolve.  Others require

12   many, many months of treatment and monitoring with it.  And

13   some of them are still bothered by difficulty concentrating,

14   inability to really return to the higher level of functioning

15   and work that they were doing before.

16   Q    Thank you, Dr. Smith.

17   So what treatment did Michael receive for his injuries

18   while he was in the hospital?

19   A    So he obviously had the imaging.  He was seen by the eye

20   specialist, who recommended that he had bilateral eye trauma

21   but much worse on the right, that we can even tell from the

22   pictures.  And he had the evidence on the CT scan of a lot of

23   inflammation and stranding.  So he was -- initially he had a

24   full eye exam.  He was treated initially with antibiotic drops

25   and later transitioned to steroid drops to cut down on

1 inflammation in the eye.

2      In addition to that, he had a very painful condition, so

3 whether it was his headache or his rib pain or his facial

4 pain.  So he was given narcotics and anti-inflammatories in

5 the emergency room.  So he received some I.V. morphine; he

6 received the equivalent of Lortab, which is Percocet, Vicodin,

7 one of those; and he received Toradol, which is sort of like a

8 super strength ibuprofen.  He received all of those sort of

9 initially to control the pain, and then was eventually

10 transitioned to sort of anti-inflammatory medicine, like

11 ibuprofen or aspirin or such.

12 Q    Was this after he left the hospital?

13 A    That's correct.

14 Q    You mentioned he was in a lot of pain.  Is there any

15 measure within the medical records that suggest he was in

16 pain?

17 A    Yes.  So there were several observations that were done.

18 Normally when we grade pain -- so pain is traditionally graded

19 on a zero to ten scale, and when we ask the patient to grade

20 their pain, 1 is very mild, like a little ache; 10 is the

21 worst imaginable pain you can think of.  Not the worst pain

22 you've had, just the worst imaginable, and then we rate them.

23 So typically, like, zero to 3 or zero to 4 is mild; 4 to 6,

24 maybe 4 to 7 is moderate; and 7 to 10 is considered severe.

25 And there is current guidelines and recommendations about how

1  you should treat those.

2      So during his short stay in the hospital, he had several

3  observations.  I think he rated his pain either at an 8 or 9,

4  and he was referring either to his head or face pain.  And

5  then at one point, I think specifically related to the eye, he

6  may have had like a 4 or 5.  He sort of had mild to severe

7  pain.

8      And then he had this chest pain, but I think the

9  shortness of breath was bothering him more than the pain;

10  although, it was a very painful thing for him to tolerate.

11  Q    When the pain scale went down to 4, 6, whatever it was,

12  was that after he took pain medication?

13  A    Correct.  So later that evening or the next morning, his

14  pain level had dropped, but then he had received several doses

15  of the narcotics, as well as that very strong

16  anti-inflammatory medicine, Toradol.

17  Q    So I want to go back to some of the facial injuries

18  again.  You mentioned several times that his facial injuries,

19  particularly on the right side, are suggestive of localized

20  pain -- or, sorry -- localized blunt force trauma.  I want to

21  talk a little about that.  And you also mentioned you viewed

22  more than one video during your assessment.

23  A    Correct.

24  Q    Do you recall the other video that you reviewed?

25  A    The other video was sort of the arresting and restraining

1   of Mr. Wyatt.

2           MS. BRANCH:  If you will play admitted Exhibit 1.

3       (Video is played.)

4           MS. BRANCH:  Pause at 45:02.

5   BY MS. BRANCH:

6   Q    So did you see on the left side of the video the strikes

7   that were being administered by one of the officers?

8   A    Correct.

9   Q    And, in your opinion, would these strikes have caused

10  some of Michael's injuries?

11  A    That's right.

12  Q    And this is to the left side?

13  A    Could you repeat that one more time?

14  Q    Sorry.  In your opinion, would the strikes that you were

15  seeing, and this is to the left side of Michael Wyatt's body,

16  would these have caused certain injuries to Michael's side, to

17  his face.  And some of the pain he was experiencing?

18  A    Right.  So it certainly would have caused pain and some

19  bruising.  And when I actually said earlier on, just so that

20  we're clear, on the left side, which is the huge area that we

21  see, I said it could be attributed to the fall.  It certainly

22  could be attributed to both a fall and a hit.  So it doesn't

23  have to be just one.

24      It's just that I think since he fell on that side, it

25  looks that way, and there's several authors that had stated

1    that.  I think I'm just giving him the benefit of the doubt

2    that was probably related to the fall; although, it could have

3    been related to fall and strikes.

4    Q    Can lacerations be caused by blunt force trauma as well?

5    A    They can.  So they could be caused by either a fall or a

6    punch.

7    Q    So if the punch is hard enough, it could cut his eye?

8    A    Absolutely, sure.

9    Q    And to the left side -- you also saw the strikes being

10   administered to the left side of Michael's body.  Were there

11   ever pictures taken of Michael's left back area?

12   A    Yeah, so there's no pictures of the back or that side.

13   It's just a front view of the chest.  I will say that we also

14   have the ear injury, which has a significant amount of

15   bruising and swelling with it.  So although that could have

16   been from falling, my sense is he fell like this and this was

17   probably related to an impact from either a punch or a kick.

18   Q    Since there are no pictures of his back and he was

19   experiencing pain in his back, what is your opinion about, you

20   know, potential other injuries to his body, such as bruising?

21   A    Well, I think most of it was probably sort of bruising.

22   We see that he fell -- his arms were restrained, so he fell

23   sort of chest first, so he didn't really hit his back.  But I

24   think it's pretty obvious from the videos you see people

25   repeatedly sort of punching his back.  So he clearly had

1    bruising there.  He fortunately, other than maybe that was a

2    contributing factor to the rib, whether it was punching or

3    kneeing him, it didn't cause broken bones.  It just caused

4    pain and bruising.

5    Q    Now, if you will play the video through.

6         (Video is played.)

7    BY MS. BRANCH:

8    Q    So as you saw on the left side of the screen the knee

9    strikes?

10   A    Yeah.

11   Q    In your opinion, did those knee strikes cause Michael

12   Wyatt's injuries to his face?

13   A    So it certainly could have.  It certainly could have

14   contributed to his injuries to his face, it could have

15   contributed to his injuries to the eye, and could have

16   contributed to the injuries to the ear.

17   Q    Was the right eye injuries consistent with things such

18   as, you know, knees to the face?

19   A    Sure.  So if you look at, you know -- again, sort of as

20   we saw on the left side, he fell and he had all these

21   abrasions here, but he doesn't really -- other than some mild

22   eye injury, his eye looks pretty good there; although later

23   described as swollen shut.  But the whites of the eye are

24   white, his anterior chamber and stuff looks clear.  That's

25   because he fell on sort of the pavement or whatever, sort of

1    hit that side of the face.

2       On the other side, he didn't really have much there.  He

3    had a significant blow to the eye, causing a lot of swelling

4    in the tissues behind that.  That's not from falling.  The

5    bones around your eye protect your eye.  Your eye is recessed

6    back a little bit, so that only happens from someone poking

7    your eye or hitting it or kneeing it.

8    Q    And, Dr. Smith, although some of Michael's facial

9    injuries have clearly healed today, does that mean that all of

10   his injuries are gone?

11   A    Well, we know that he sort of has -- no.  Obviously he

12   has issues related to pain, and then he has issues related to

13   his right eye.  And I would say that -- so we know after the

14   injury, his vision was much more decreased on the right eye

15   than the left eye.  And there's been persistent complaints of

16   occasionally blurring or floaters.  And floaters are sort of

17   like this debris between sort of the cornea, where the lens

18   is, and the back of the eye.  And it can be cellular debris or

19   whatever.

20      And sometimes you can see it with a slit-lamp exam and

21   dilating by an ophthalmologist, and sometimes you can't,

22   because it sort of follows gravity.  It will settle down to

23   the base, and then with movement and stuff, it can spur up a

24   little bit, and so you can these sort of little images

25   floating around in the eye.

Smith – Direct

1    So he has complained of it.  On the eye exam, when they

2  looked at his eye, it looks pretty quiet, they don't really

3  see much there.  But it's been a persistent complaint that

4  doesn't seem to have ever appeared prior to this incident.

5  Q    When you say "persistent complaint," is this based off of

6  medical records you reviewed after his hospitalization?

7  A    That's correct, based off the clinic and based off the

8  eye exam.  So these symptoms certainly persist.  He was seen

9  immediately; I think before discharge; at day seven; and,

10  essentially, at three months, and these complaints persisted

11  throughout that.  And there were other complaints in the

12  either jail or correction facility that mentioned persistence

13  of intermittent eye discomfort or blurring, et cetera.

14  Q    And you also mentioned "persistent pain."  What are you

15  referring to?

16  A    I'm sorry, one more time.

17  Q    You also mentioned that he has persistent pain.

18  A    He has persistent headaches, and I did actually discuss

19  this with Mr. Wyatt on October 13, to try to get a good

20  history of prior history of headaches and his current state.

21    And although he sort of carries a diagnosis or had a

22  diagnosis of migraines, it sounds like it was just not as

23  common.  He had it during an earlier period in his life, they

24  sort of went away.  And then after this incident -- and I

25  think it's really part of this sort of traumatic brain injury;

1  headaches are a really common complaint -- he has been really

2  bothered by persistent headaches, and essentially almost

3  daily, five, six times a week.  It gets better with things

4  like Excedrin and stuff; although, sometimes goes away,

5  sometimes doesn't.  But it's been a recurring issue.

6      And there's multiple visits of him in the clinics at the

7  various facilities that he has been at where he has come

8  complaining of this persistent headache.  And I think the

9  headache is contributed also -- well, I'll leave it there.

10 Q    You mentioned certain anxiety driven symptoms that he's

11 complained about.  Can you describe some of those and, in your

12 opinion, what caused those symptoms?

13 A    Right.  So for sure part of a traumatic brain injury is

14 alteration in people's mood and their -- and anxiety,

15 persistent anxiety can persist after that, or intermittent

16 anxiety; depression can persist; as I said, sensitivity to

17 bright light and sounds.  So that's a component of it.

18     And then he does sort of also describe a sleep

19 disturbance pattern, which is totally consistent with

20 traumatic brain injury.  But he also describes periods of

21 higher levels of anxiety, sort of night terror.  And, you

22 know, whether that's a part of a traumatic brain injury or

23 whether that's part of sort of approached trauma stress

24 problem, a little hard to define.

25     These are really defined, especially on sort of his level

1   of the spectrum.  They're really defined by history and what

2   the patient really tells you.  It's sort of like anyone else.

3   People may have an underlying history of mild anxiety or mild

4   depression or mild headaches, but then they can have an

5   incident like this and all of a sudden these symptoms

6   significantly accelerate.

7       So it's really going to be kind of based on the history

8   and response to treatment that the diagnosis -- it is a

9   clinical diagnosis.  And this diagnosis, whether it be

10  traumatic brain injury or posttraumatic stress, is made by

11  virtually many healthcare providers, physicians in primary

12  care and family medicine.

13      I mean, about 8 percent of people at some point in their

14  life have sort of posttraumatic stress.  They have a really

15  terrible event in their life.  Usually it lasts for several

16  months where, you know, they don't want to walk into a

17  relative's room or they don't want to get in a car because of

18  a bad car accident or whatever, but some people's persist a

19  lot longer than that.

20  Q    In your opinion, is that something that Michael Wyatt

21  suffered from as a result of this incident?

22  A    That's correct.

23  Q    And just to clarify, in your opinion, is this anxiety

24  attributable to the beating itself?

25  A    Well, the anxiety is attributable to the sequela of the

 1  beating, attributable to the brain trauma he had, and it is

 2  attributable to the stress, both during immediate post-injury

 3  period and what has resulted since that point.

 4      These were new changes based on -- if you look at any

 5  prior history with it, there doesn't seem to be any evidence

 6  that I've seen where this has been a problem before.  He has

 7  been in jail before, and he has had these incidents before,

 8  but these are new symptoms, and these symptoms really

 9  developed after this incident on July 3rd.

10      MS. BRANCH:  I have no further questions at this

11  time.

12                    CROSS-EXAMINATION

13  BY MR. GUYNN:

14  Q    Good afternoon, Doctor.

15  A    Good afternoon.

16  Q    To make sure I understand, you've never examined Michael

17  Wyatt, have you?

18  A    That's correct.

19  Q    And you haven't treated him?

20  A    That's correct.

21  Q    And your opinion is based solely on the review of the

22  records, that is, medical records from the hospital and jail

23  that were created by the doctors who examined and treated him?

24  A    And speaking with, obviously, Mr. Wyatt.  But that's

25  correct, there is plenty of information in the medical records

1  and the clinic records.

2  Q    Well, let me make sure I understand.  You said that your

3  opinion in this case is based upon your conversation with

4  Mr. Wyatt, and that occurred on October 15th, 2016?

5  A    No.  No.  I'm just saying that there is -- no.  My

6  opinion in this case is based on the initial medical records,

7  the photographs, the video review.  That's really what my

8  opinion is based on with it.  And then with the clinic records

9  which then go on to detail sort of the persistence of

10 headaches, et cetera.

11 Q    Okay.  So this conversation you had with him is not part

12 of it?

13 A    This conversation was not the basis for my opinion, no.

14 Q    Okay.  I think you testified there were three doctors at

15 Danville Hospital that saw Mr. Wyatt.

16 A    That's correct.

17 Q    And none of those doctors diagnosed a traumatic brain

18 injury, did they?

19 A    No, but they wouldn't.  So traumatic brain injury would

20 not necessarily -- I mean, you might be able to diagnose it

21 right from the very get-go.  So you're going to diagnose it if

22 someone comes in and they've got bleeding in their brain or

23 they come in with persistent seizures, or they've got acute

24 weakness and they've had a stroke, or they have acute

25 numbness.

1    In short of that, all you're going to be able to say with

2  him is that he has had a traumatic brain insult.  He has a

3  closed head injury is what we would call it.  It's not

4  penetrating, it's from blunt force trauma.

5    And then I think it's really going to be that incident

6  which describes change in alter consciousness, et cetera, that

7  defines closed head injury.  So I think they could him a

8  diagnosis of closed head injury if they want.  They may or may

9  not.  It's sort of immaterial to me.  But the record sort of

10  speaks for itself.  But to actually say he has got sort of

11  traumatic brain injury is going to require that incident plus

12  some observational time, observation over time.

13  Q    And as I read the medical records, there was no diagnosis

14  of a concussion?

15    (Coughing.)

16  A    I'm sorry, he was coughing.

17  Q    As I read the medical records, there was no diagnosis of

18  a concussion?

19  A    There wasn't.  But I'm going to tell you, so as a

20  director of an emergency department and someone who has worked

21  with this a lot, people may -- they may just describe what the

22  injuries are.  Like, I'm sure if you look at it -- I would

23  have to look at the diagnosis again -- it's not going to list

24  every injury.  It's going to say, "Facial trauma, rib

25  fracture, admit to hospital."

1  Q    They read the CT scan of the head and said it was normal?

2  A    Which it would be.

3  Q    And, in fact, the history showed there was no loss of

4  consciousness?

5  A    Yeah, and there doesn't have to be loss of consciousness.

6  I think clearly he was dazed, and clearly there was some

7  degree of disorientation.  Loss of consciousness is not

8  critical to be able to diagnose either a closed head injury or

9  a traumatic brain injury.

10  Q    And that would have been based upon, as you know,

11  histories that are taken from the patient on the day he was in

12  the hospital?

13  A    Not only from the patient.  From the patient, from

14  observers, et cetera.  We get our source of information from

15  multiple people.

16  Q    And it's important that doctors get that history correct?

17  A    Well, again, yeah, I think you try and get the history

18  that is deliverable to you there.  So you're going to get some

19  from the patient; if they're confused, et cetera, you may not.

20  You're going to get some from the family, you're going to get

21  some from people at the scene.  I mean, that sort of is the

22  basis of the beginning of it.  This may obviously evolve as

23  the patient is in the hospital or observed and you get more

24  information.

25  Q    Based on his report, he had no loss of consciousness?

Smith – Cross

1  A    That's correct.

2  Q    And he said he remembers the injury and coming to the

3  hospital?  Do you recall that?

4  A    Yeah.  So I think he remembers components of the injury,

5  so he remembers whatever, falling, hitting, et cetera.  I

6  don't think he remembers the ambulance ride to the hospital.

7  And, again, his report is that he doesn't think he lost

8  consciousness, which might very well be true.  He certainly

9  looked pretty unresponsive to me in that video.

10 Q    Well, I understand what you're saying.  But by the same

11 token, we have the hospital record and it does say that he had

12 no loss of consciousness.

13 A    Which is fine; it's totally consistent with the picture

14 he has.

15 Q    I'm sorry, did you say he didn't remember coming to the

16 hospital?

17 A    I think in his -- in his statement, I think it's in his

18 deposition, he made a comment that he sort of remembered

19 getting in the ambulance but didn't remember much thereafter.

20 He remembers some things about being in the hospital with the

21 tetanus and shortness of breath, but then other periods where

22 he didn't recall.

23 Q    What did the history at the hospital note?

24 A    There are two different histories in the hospital, which

25 is not sort of an uncommon event that occurs.  There is the

1  initial triage history that comes in, which, to me, looking at

2  records, and I've looked at thousands of them, looks like it

3  probably came from people transporting him.  So whether it was

4  EMS providers or police told EMS providers, this is version

5  three or secondhand or whatever you want to call it.

6      And then there's another note by the nurse that says,

7  "Hey, I jumped out of the car, I hit my feet running, I was

8  tackled, I was punched, I was whatever," and that was reported

9  by Mr. Wyatt.  So there's, like, two histories in this span of

10 probably an hour or so.

11 Q    There's also one that says, "Patient remembers: injury,

12 coming to hospital"?

13 A    Yeah, there's no question he remembered some of it,

14 obviously.

15 Q    The records that you reviewed showed that he had suffered

16 migraine headaches from age 12.

17 A    That's correct.

18 Q    And this -- they call it a pneumothorax in the records,

19 but that's the small collapsed lung, I think you said?

20 A    I think it's a small apical pneumothorax.  So at the very

21 top of the lung there is some retraction, correct.

22 Q    And that was actually pretty small, wasn't it?

23 A    It was small.

24 Q    It didn't show up on the x-rays?  It showed up on the CT

25 scan?

Smith - Cross

1  A    Right.  CTs can be far more sensitive.  And it's really

2  not -- again, I certainly don't overplay the pneumothorax.

3  It's a small pneumothorax.  You might even take a pneumothorax

4  like that and discharge them home and have them come back the

5  next day for an x-ray.

6      I think the issue was the low oxygen saturation.  And so

7  that was the reason for keeping him in the hospital: he had

8  good pain control, and to make sure he was well oxygenated.

9  So it's the sequelae of the trauma.  I don't think it was

10 really related to that small pneumothorax.  It shouldn't

11 really cause hypoxia, low oxygen.

12 Q    The rib fracture, it says it was the Number 5, what,

13 anterolateral?

14 A    Correct.

15 Q    Is that the one in the back?

16 A    It's anterolateral, so it's sort of, like, under your

17 armpit, maybe a little anterior to that.  It's on the side.

18 Q    It would be on the right side?

19 A    That's correct.

20 Q    It was odd to me that the rib fracture didn't show up on

21 x-ray either and they found it on a CT scan.

22 A    No, x-ray is a terrible study for getting rib fractures.

23 We do this all the time.  We have tons of people that fall, a

24 lot of elderly people, you get an x-ray, you see one fracture;

25 you get a CT scan, they have seven.  X-ray is not a sensitive

1  study, even with rib films, to be able to pick up a fracture.

2  Q    Notwithstanding your diagnosis of a traumatic brain

3  injury, is there anything else that you picked up as a

4  diagnosis, in your opinion, that hasn't cleared up?  I'm

5  sorry, you said his eye?

6  A    Yeah.  So I think the persistent complaints have been the

7  eye, the headaches -- I mean, the headaches, the difficulty

8  sleeping, the increased anxiety, those are the complaints.

9  Q    We know that the migraines occurred before this incident.

10  A    But there's a change in pattern, so we know that there

11  was a significant change.

12  Q    How do you know that?

13  A    Well, I think there's one intake note from the nurse at

14  the correction facility that kind of describes his history of

15  headaches.  But then the other part of it would have been from

16  what Mr. Wyatt said.

17          MR. GUYNN:  May I approach the witness, Your Honor?

18          THE COURT:  Yes.

19  BY MR. GUYNN:

20  Q    Doctor, is that a document that you've seen before?

21  A    It is, correct.

22  Q    And is that the document you're referring to when you say

23  that there was a notation that he had suffered from migraines

24  since age 12?

25  A    That's correct.  I mean, there's no mention in this about

1  frequency, duration, how often he had it at 12, how often he

2  had it at 22, how often he had it at 44, and then how often he

3  has it now.

4  Q    Right.  So we don't know.

5  A    I mean, again, I think, you know, for a number of these

6  issues -- and I don't want to sort of downplay or minimize it,

7  but I do think a lot of it is related to history and symptoms.

8  I mean, that's what you have to go by.  You're not going to be

9  able to find -- a scan is not going to show anything different

10  than it showed back from July 3rd, 2012.

11  Q    But if we're relying on history, this is the best we can

12  do, isn't it?

13  A    Well, we have -- I mean, we certainly know that there

14  were multiple clinic visits for it.  So if you're asking me

15  historically, I think you're going to have to try to confirm

16  that information.  The report is that there's been a change, a

17  significant increase in the frequency of headaches.

18  Q    That's based on what he says?

19  A    That's correct.

20  Q    And that's taking into account the fact that he had also

21  said he had them before the incident?

22  A    Yeah.  So, you know, I actually do want to make a

23  distinction, because part of the thing that is true with

24  medical records a lot is -- or even doctors, is that he has a

25  history of migraines since 12.  Whether these are true

 1  migraines as diagnosed by a neurologist or whether it's just

 2  headaches since 12, there could be a significant difference.

 3      And now he has an increased frequency of headaches.  So

 4  are these more of the same or are these posttraumatic from the

 5  trauma he had?  So everyone sort of generically says

 6  "migraines" in this process.  My bet is maybe none of them

 7  were ever migraines, they're just a headache.

 8      And from a common vernacular point of view, people will

 9  say, "Oh, I have migraines" when it's really a headache.  It

10  could be stress, it could be tension, it could be muscular.

11  It could be any number of things.  It probably doesn't truly

12  meet the definition diagnosis of migraines.  It's a headache,

13  that's the best we can say.

14  Q    I was curious about your discussion of floaters in the

15  eye, because my eye doctor told me my floaters were the result

16  of getting old.

17  A    It could be.

18  Q    Does it happen because of age?

19  A    It certainly could be.  There was a change, though.  I

20  mean, I think part of it is, again, you're going to have to

21  kind of go by change before versus after.  I mean, that's

22  really --

23  Q    Well, he's also turned 50 since then, right?

24  A    He has.

25  Q    Seems like that's when they start occurring?

```
1   A    I mean, I think they occur at different times.  I don't
2   have floaters.  I don't know.  What can I tell you?
3   Q    Thank goodness.
4        As far as the pictures are concerned with the road rash
5   and the black eye, how long does it take for those to go away?
6   A    I mean, it could be -- they will all progressively get
7   better if it is just soft tissue contusions.  Over a period of
8   weeks to months, I would imagine most of it is completely
9   gone.
10  Q    In fact, they would likely be gone in about a month and a
11  half, wouldn't they?
12  A    Certainly could be, sure.
13           MR. GUYNN:  Those are my questions, Your Honor.
14           THE COURT:  All right.  Is that all?
15           MS. BRANCH:  Nothing further, Your Honor.
16           THE COURT:  Okay.  Doctor, you may step down.
17           Members of the jury, we will resume tomorrow morning
18  at 9:30.  Of course, I'll repeat again, do not discuss the
19  case with anyone or allow anyone to discuss it with you.  I'm
20  going to allow you to file out.  Go ahead, let
21  them . . . (pause.)
22       (Jury out at 5:01 p.m.)
23           THE COURT:  All right.  Where do we stand with regard
24  to the plaintiff's case?
25           MR. TODD:  Your Honor, we are done with our
```

```
 1  witnesses, except for I have a couple of questions -- or we
 2  have a couple of questions for Investigator Shelton.  I
 3  understand Mr. Guynn is calling him tomorrow anyway.  I'm
 4  happy to either call him first thing for a few questions and
 5  then rest, or I'm also happy to take those questions up when
 6  he is on the stand, just like we did with the defendants.
 7             MR. GUYNN:  I'll bring him in first thing, Your
 8  Honor, and I'll do my cross-examination right after their
 9  questions.
10             THE COURT:  Okay.  Well, that will be okay.
11             MR. TODD:  And that will be your direct?
12             MR. GUYNN:  Yeah.
13             MR. TODD:  We'll rest, and then you can call him
14  again.
15             THE COURT:  Okay.  I'm going to have -- we have a
16  draft of the instructions.  You might want to take a look and
17  see if there are any principles of law you would like, that
18  you think we've missed.  And we've tried to work all the
19  instructions in that you've given us.  I don't think we've
20  denied anything in particular.  But you might look them over,
21  and if there's anything you think is really bad, let us know,
22  and you can send an e-mail, or let us know.
23             MR. TODD:  Will do, Your Honor.
24             THE COURT:  I don't like to take a long time after
25  the case to talk about the instructions.  I like to have them
```

Smith — Cross

```
 1  ready to go, if at all possible.
 2          MR. TODD:  Your Honor, procedurally, do you instruct
 3  before closing or after closing?
 4          THE COURT:  Before.
 5          MR. TODD:  Thank you.
 6          MR. GUYNN:  Your Honor, may I move the admission of
 7  the medical record that the doctor had?  I forgot to.
 8          THE COURT:  I would think so.  No problem with that,
 9  is there?
10          MS. BRANCH:  No.  I do have an objection to
11  publishing to the jury this page.
12          MR. TODD:  What are you talking about, "this page"?
13          MR. GUYNN:  Right.
14          MS. BRANCH:  So I don't necessarily have a problem
15  with the page coming in as long as there's a piece of it that
16  is redacted per your order.  The last paragraph, it should be
17  redacted before it goes to the jury.
18          THE COURT:  I'm not looking at it, so I don't know
19  what's in it.  Any problem with that?
20          THE CLERK:  The deputy clerk doesn't have a copy of
21  that either.
22          MR. GUYNN:  I don't have any problem with that, Your
23  Honor, if it's just that last section.
24          THE COURT:  Okay.  We'll let it in subject to the
25  redaction.
```

1       (Defense Exhibit Number 1 was marked and received.)

2           THE COURT:  We'll recess until tomorrow at 9:30.

3       (Court recessed at 5:04 p.m.)

4

5                           CERTIFICATE

6   I,  Judy K. Webb, certify that the foregoing is a

7   correct transcript from the record of proceedings in

8   the above-entitled matter.

9

10  /s/  Judy K. Webb              Date:  5/12/2017

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25