UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF VIRGINIA

ROANOKE DIVISION


```
* * * * * * * * * * * * * *
MICHAEL E. WYATT,            * CIVIL ACTION 7:14-CV-00492
                             * APRIL 20, 2017   9:28 A.M.
            Plaintiff,       * JURY TRIAL
                             * VOLUME III OF III
vs.                          *
                             * Before:
JOHNNY OWENS, ET AL.,        * HONORABLE NORMAN K. MOON
                             * UNITED STATES DISTRICT JUDGE
            Defendant.       * WESTERN DISTRICT OF VIRGINIA
* * * * * * * * * * * * * * * AND A JURY
```

APPEARANCES:

For the Plaintiff:        BENJAMIN JOEL BEATON, ESQUIRE
                          CARLA MORGAN BRANCH, ESQUIRE
                          GORDON DWYER TODD, ESQUIRE
                          Sidley Austin, LLP
                          1501 K Street, N.W.
                          Washington, D.C. 20005




For the Defendant:        JIM H. GUYNN, JR., ESQUIRE
                          Guynn & Waddell, PC
                          415 S. College Avenue
                          Salem, VA 24153




Court Reporter:           Judy K. Webb, RPR
                          210 Franklin Road, S.W., Room 540
                          Roanoke, Virginia 24006
                          (540)857-5100 Ext. 5333

          Proceedings recorded by mechanical stenography,
transcript produced by computer.

1            **I N D E X**

2                                                    **PAGE NO.**

3    PLAINTIFF RESTS:                                463

4

5              **DEFENSE EXAMINATION INDEX**

6    ALLEN SHELTON:

7    Direct by Mr. Guynn                             463

8    Cross by Ms. Branch                             470

9    Redirect by Mr. Guynn                           476

10

11   TOMMY NICHOLSON:

12   Direct by Mr. Guynn                             477

13   Cross by Mr. Beaton                             485

14   Redirect by Mr. Guynn                           495

15

16   SCOTT WYATT:

17   Direct by Mr. Guynn                             496

18

19   ROBERT WORSHAM:

20   Direct by Mr. Guynn                             497

21   Cross by Mr. Todd                               498

22

23

24

25

Wyatt v. Owens, et al. – 4/20/2017

| | |
|---|---|
| 1 | **DEFENSE EXAMINATION INDEX** |
| 2 | **PAGE NO.** |
| 3 | ROBERT WERSHBALE: |
| 4 | Direct by Mr. Guynn                                     500 |
| 5 | Cross by Mr. Beaton                                     525 |
| 6 | Redirect by Mr. Guynn                                   585 |
| 7 | |
| 8 | DEFENSE RESTS:                                          586 |
| 9 | |
| 10 | JURY INSTRUCTIONS:                                     586 |
| 11 | |
| 12 | CLOSING ARGUMENTS: |
| 13 | By Mr. Todd                                            603 |
| 14 | By Mr. Guynn                                           626 |
| 15 | By Mr. Todd                                            638 |
| 16 | |
| 17 | VERDICT:                                               653 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

1   (Court convened at 9:28 a.m. outside the presence of the

2   jury.)

3   THE COURT:  I don't want to particularly argue

4   instructions, but anything you want to bring up right now

5   while we're waiting, we can do it.  If you have any comments

6   or anything you'd like us to look over so that the clerks can

7   be thinking about it, what issues we can raise.

8   MR. GUYNN:  I do, Your Honor.  Your Honor, the

9   defendants submitted three instructions that were not

10   included.  And we didn't submit them necessarily as numbered,

11   but they were on separate page numbers, so I'll use the page

12   numbers, if I may, through the ECF record.

13   Page 17 includes the definition of a calculus of

14   reasonableness, which talks about making split-second

15   judgments in circumstances that are rapidly evolving.  And I

16   think it includes the language -- that is the language from

17   *Graham v. Connor*.  It also includes, I believe -- yeah, the

18   language about 20/20 vision hindsight.

19   I do not find that in the Court's instructions and I

20   would request that be given, because not only is it

21   consistent, but it's an accurate statement of the law from

22   *Graham v. Connor*.

23   Second, on page 18, the second paragraph -- the Court

24   gave the first paragraph regarding intention, but the second

25   paragraph shows that it has to be objectively reasonable from

1  the perspective of a reasonable officer facing the same

2  circumstances.  And I didn't see that in the Court's

3  instructions either, and I think that's an accurate statement

4  of the law, that whole second paragraph on 18.

5          THE LAW CLERK:  Look at Number 15, "Perspective of a

6  reasonable officer based on the same circumstances of the

7  defendant's . . ."

8          THE COURT:  Okay.  We know your point.  What else?

9          MR. GUYNN:  The last one, Your Honor, is our

10 definition of an unreasonable force is Number 19, our page

11 Number 19, and it was the three criteria set forth in *Graham*

12 *v. Connor*.  And the criteria used by the Court are many more.

13 And our submission is that the *Graham v. Connor* criteria would

14 be sufficient and that we are going to risk jury confusion, or

15 the jury is going to seize upon one of the others that hasn't

16 been approved by the Supreme Court.

17         THE COURT:  All right.  I know what to consider.

18         Does the defendant have anything you want us to be

19 looking at while -- I want to get the jury back quick, but --

20         MR. BEATON:  Yes, Your Honor.  Would you like me to

21 respond to Mr. Guynn or just make our own comments?

22         THE COURT:  Well, if you don't object to anything

23 that he has raised, it's okay.

24         MR. BEATON:  So we prefer the -- on the two, 17 and

25 19, when he cited *Graham*, we believe that the Fourth Circuit

 1  has recognized that what is included in *Graham* is not the

 2  limit of the factors that may be considered by the jury; there

 3  are additional ones that the Fourth Circuit has recognized.

 4  So we would oppose an ability to restrict those tighter than

 5  what the Fourth Circuit has allowed.  Certainly Mr. Guynn is

 6  free to argue some of these more specific points, but the

 7  factors are legally justified.  That is my only response to

 8  what was just raised.

 9       And the one issue that we had, we submitted by e-mail

10  last night, and we received an e-mail from James this morning.

11  And I just had one point in response to that.  The response we

12  received by e-mail referred to whether credibility was a

13  proper instruction for prior acts under Rule 608(b), and I

14  wanted to clarify for the Court that the prior act evidence,

15  the specific instances, that would not be covered by 608, my

16  understanding, that would be 404(b).  And 404 requires

17  specific instances, which is why we put on the evidence.

18       THE COURT:  I'll have to work on that instruction.

19  We already have some alternatives that maybe will cover the

20  point.

21       The evidence I admitted concerned the explanation by

22  the defendant as to why he applied force, and it was relevant

23  for the jury to decide whether to believe his version of why

24  he needed to apply force.  And I think that covers the mistake

25  and accident and his credibility on that issue too.

1    MR. BEATON:  I certainly agree with you with respect

2 to mistake and accident.  What I had in mind was the testimony

3 from Mr. Young regarding the repetition of the explanation in

4 those prior instances, which was similar to the explanation in

5 this case.

6    THE COURT:  Well, that's sort of why I let it in.

7 But, okay, let's call --

8    MR. TODD:  Your Honor, I'm sorry, quickly two brief

9 points at the risk of trying the Court's patience.  First, I

10 wanted to let you know we're going to rest as soon as the jury

11 comes in, so we'll move to the defendant's case.

12    Secondly, one issue that arose yesterday that I

13 wanted to flag for the Court.  Before trial, Your Honor

14 excluded evidence of the gun that was allegedly found on July

15 10th, the crack pipe, and you not only excluded them, but you

16 instructed defense counsel to instruct his witnesses that they

17 shouldn't testify in any way that insinuated the existence of

18 such evidence.

19    Yesterday we came awfully close to that line, if we

20 didn't actually step across it.  I asked Investigator Owens

21 the question whether Mr. Wyatt had a gun in his hand, and I

22 framed the question that way purposely to allow an answer that

23 wouldn't allow any insinuation.  The answer was, "Well, he

24 didn't have a gun on his person."  It was very close to the

25 line Your Honor drew.  I want to make sure that instruction --

1  Your Honor's instruction has been given to the two officers

2  who are going to testify today, Shelton and Nicholson, to make

3  sure they don't come anywhere near that evidence.

4          THE COURT:  Are you clear on that, Mr. Guynn?

5          MR. GUYNN:  I will go and reiterate.

6          THE COURT:  Sir?

7          MR. GUYNN:  I told them, but I will reiterate it now.

8          THE COURT:  Okay.

9          MR. GUYNN:  The other question I have, from a

10  procedural standpoint, I have a Rule 50 motion I would like to

11  make after they rest, but I'd hate to have the jury come in

12  and go back out.

13          THE COURT:  If you're going to rest immediately, let

14  him make his Rule 50 motion now and then the jury won't have

15  to go back out.

16          Go ahead, sir.

17          MR. GUYNN:  Your Honor, we would move under Rule 50

18  on two bases.  One is that qualified immunity is always a

19  decision of the Court.  And now the Court has heard all of the

20  plaintiff's evidence, it would be an appropriate time to

21  consider whether or not they acted as reasonable officers

22  would have acted under the same or similar circumstances.  And

23  given all the evidence that has been put into place so far,

24  including the testimony of the defendants, I would submit to

25  the Court that qualified immunity does apply in these

1  circumstances and would shield them from liability.

2       The second is that the evidence that has been

3  submitted does not support a claim for punitive damages.

4  Basically, what we've got is three incidents from Officer

5  Worsham that are submitted I think for credibility, but

6  they're not submitted for prior acts is, I guess, what I'm

7  saying.  And under those circumstances, there's no support for

8  a claim of punitive damages.

9       I mean, you're talking about a guy who had three

10 complaints of excessive force which weren't substantiated.

11 They were all unsubstantiated.  And under the circumstances,

12 there's nothing in what has been said and what evidence is

13 before the Court that would support a claim that there was any

14 malice or any sort of -- that the hallmarks of conduct that

15 would allow a jury to place punitive damages or to consider

16 punitive damages.

17       THE COURT:  Okay.  Thank you.  With regard to the

18 qualified immunity, I will stand by the opinion already

19 written, my earlier decision, and deny the motion in that

20 regard.  And I will deny the motion in whole.  I think it's a

21 jury issue, so the motion is denied.

22       Ready to call the jury?

23       MR. GUYNN:  Your Honor, given that, I'm going to call

24 these two witnesses first.  I will be right back.

25       THE COURT:  All right.

1          (Jury in at 9:39 p.m.)

2          THE COURT:  All right.  Good morning, ladies and

3  gentlemen.  Good to see you back.

4          We're ready to resume.  All right.

5          MR. TODD:  Your Honor, the plaintiff rests.

6                        PLAINTIFF RESTS

7          THE COURT:  All right.  Mr. Guynn, you may call your

8  first witness.

9          MR. GUYNN:  The defendants call Allen Shelton, Your

10  Honor.

11          THE COURT:  All right.

12          THE CLERK:  Mr. Shelton, if you would come here and

13  be sworn, please.

14          Would you raise your right hand.

15          ALLEN SHELTON, DEFENDANTS' WITNESS, SWORN

16                      DIRECT EXAMINATION

17  BY MR. GUYNN:

18  Q    Good morning.

19  A    Good morning.

20  Q    You're Allen Shelton?

21  A    Yes, sir.

22  Q    And how are you employed, Mr. Shelton?

23  A    I'm employed as an investigator with Pittsylvania County

24  Sheriff's Department.

25  Q    What are your duties?

1   A     Pardon?

2   Q     What are your duties?

3   A     We're in special division, so we work with narcotics

4   cases; seizures, which leads to asset forfeitures; serve

5   criminal warrants; and also do extraditions.

6   Q     Were you employed by the Pittsylvania County Sheriff on

7   July 3, 2012?

8   A     Yes, sir, I was.

9   Q     Let me call your attention to that date.  Were you

10  assigned that date to look for Michael Wyatt?

11  A     Yes, sir.

12  Q     What were you told about why you were looking for

13  Mr. Wyatt?

14  A     We were told that Mr. Wyatt was armed and –– possibly

15  armed and dangerous.  There had been a robbery at a

16  convenience store in Danville, and the –– my bosses told us to

17  go out and start checking areas to see if we could spot a

18  vehicle which he was supposedly driving.

19  Q     And so what did you do?

20  A     Myself and Investigator Owens were checking motels on

21  Piney Forest Road in Danville, and we eventually came to the

22  Budget Inn Motel and checked the parking lot, and came back up

23  to the upper level of the parking lot, and we spotted the

24  vehicle and verified the tag number that belonged –– that

25  Mr. Wyatt was supposed to be driving.

1  Q    What happened next?

2  A    We sat there just a minute and Investigator Owens called

3  Sergeant Ford, Captain Nicholson, advised them what we had

4  found, and they were going to head that direction where we

5  were located.

6       And in the meantime, Mr. Wyatt got into the maroon,

7  burgundy Chevrolet and cranked it up.  And we were going to

8  pull up beside of it and see if we could, you know, make an

9  arrest.

10      And Mr. Wyatt looked around left and right, and then he

11 just put the vehicle in reverse and backed up real sharply and

12 drove through the parking lot of the Budget Inn, across the

13 grass, onto the parking lot of Taco Bell, which is next door,

14 and then pulled out into Piney Forest Road.

15 Q    What did you do?

16 A    Investigator Owens went ahead and turned on his lights,

17 siren, and pursued right behind Mr. Wyatt kind of down Piney

18 Forest Road.

19 Q    Did Mr. Wyatt stop?

20 A    No, sir.

21 Q    So what happened after that?

22 A    We pursued behind Mr. Wyatt on down Piney Forest Road.

23 At a point in time, Investigator Owens spoke to Investigator

24 Scott Wyatt, for him to take the lead in front of us, behind

25 Mr. Wyatt, which he did.

1    And we came on down Piney Forest Road, coming down into
2  Central Boulevard.  At which time we got to the crossover,
3  which would be Memorial Drive.  Mr. Wyatt's vehicle jumped the
4  median strip and went up the road a few feet, went onto the
5  ramp backwards, that comes off of Memorial Drive, and followed
6  that up.  Come onto Memorial Drive, and then went down, turned
7  left, which put him over on -- I think it's Cahill Court.  And
8  that's -- a lot of that property there was owned by Dan River
9  Mills at some time.

10    And as he pulled into the parking lot, Investigator Wyatt
11  was already behind him, and Investigator Wyatt was in a foot
12  pursuit.

13    We stopped.  Mr. Wyatt jumped from the doorway of the
14  vehicle, let it roll, which it rolled back and hit, bumped
15  into Investigator Owens' vehicle.  Then I jumped out and ran
16  to assist Investigator Wyatt in foot pursuit.  At which time
17  we tackled and brought Mr. Wyatt down to the pavement.  And --
18  Q    Let me ask you a couple of questions to make sure I've
19  got the sequence correctly.

20    You said Scott Wyatt was in a foot pursuit.  Was that
21  after or before Michael Wyatt got out of his car?
22  A    That was after Michael Wyatt got out of the car.
23  Q    And you said that you and Scott Wyatt tackled him.  Was
24  he still running away from you at that time?
25  A    He was still running away.  He was across the parking

1 lot.

2 Q    What direction was Michael Wyatt running?  Was he running

3 towards Memorial Avenue?

4 A    He was running towards the building there that I think

5 Dan River used to own.

6          MR. GUYNN:  If I may, Your Honor, we have the exhibit

7 from yesterday.

8          THE COURT:  Yes.

9 BY MR. GUYNN:

10 Q    Do you recognize that photograph, Mr. Shelton?

11 A    Yes, sir.

12 Q    If you would --

13          MR. GUYNN:  Your Honor, can he touch that screen?

14          THE COURT:  You'll have to ask the people that do it.

15          THE CLERK:  He can touch it.  Do you need him to draw

16 on it?

17          MR. GUYNN:  Yes.  Can he?

18          THE CLERK:  May I show him how?

19      (Discussion off the record between the clerk and

20 witness.)

21 BY MR. GUYNN:

22 Q    So you just drew a circle on the exhibit.  That's where

23 you were?

24 A    This is the -- that was the general area where the

25 vehicles had stopped.  And Mr. Wyatt was running that

1  direction.

2  Q   Once you and Scott Wyatt tackled Michael Wyatt, did you

3  say anything?

4  A   We told him in the pursuit to "Stop.  Sheriff's office.

5  You're under arrest."  And then we were just shouting, but we

6  were all running also.

7  Q   Once you tackled him, what was being said?

8  A   Nothing.  He never said anything.

9  Q   I'm sorry, what did you say?

10 A   We were -- got him down, we were telling him to comply,

11 "Give us your hands.  Show us your hand.  Give me your arm."

12 Gosh, over and over, "Give me your hand.  Give me your arm.

13 Give me your hand.  Give me your arm."

14 Q   Did he?

15 A   No.

16 Q   Was there anything about the way Michael Wyatt was

17 running that struck you as unusual?

18 A   Mr. Wyatt was running with his right hand down his

19 waistband of his pants.

20 Q   And why was that unusual to you?

21 A   That's the first time I've ever had anybody do that, run

22 away.  And I thought, according to the information given out

23 prior that, you know, he could possibly still be armed.

24 Q   Now, once you tackled Mr. Wyatt, did you end up on top of

25 him?

1  A    I was on his buttocks and the right thigh.

2  Q    And was he resisting when you were on his buttocks and

3  right thigh?

4  A    Yes, sir, he was resisting.

5  Q    What was he doing?

6  A    He was trying to raise up, trying to move the right leg

7  to, I guess, get up.  He would not give the right arm, let us

8  have the right arm, the right hand.  And we just kept

9  shouting, "Give me your hand.  Give me your arm."

10 Q    Now, from your vantage point, what else did you see?  Who

11 else showed up?

12 A    Let's see.  Investigator Owens and Investigator Robert

13 Worsham and Captain Nicholson.

14 Q    And did you see any of the officers use strikes on

15 Michael Wyatt?

16 A    That would have been Investigator Owens and --

17 Q    Were you able to see those from where you were?

18 A    Pardon?

19 Q    Were you able to say those from where you were?

20 A    A couple, because he was to my left, and we were still

21 shouting, "Give me your arm.  Give me your hand."  And

22 Mr. Wyatt would not give his arm or give his hand to us.

23 Q    Did you see any other strikes by any other officers?

24 A    Investigator Worsham was over to the front.  And I think

25 he -- I remember his knee trying to strike up at the upper

1  part of Mr. Wyatt.  But, you know, I could not see the contact

2  other than I seen his leg, you know, make a movement.

3  Q    Did you strike Mr. Wyatt?

4  A    No, sir.

5  Q    Were you holding on?

6  A    Trying to hold on.

7  Q    After Mr. Wyatt was eventually handcuffed, was he

8  unconscious?

9  A    No, sir, he was not unconscious.

10 Q    Do you know who searched him after he was handcuffed?

11 A    Pardon?

12 Q    Do you know who searched Michael Wyatt after he was

13 handcuffed?

14 A    I do not.  I do not know.

15 Q    Do you know who moved him to the grass?

16 A    I do not.

17       MR. GUYNN:  Thank you.  Those are my questions, Your

18 Honor.

19                    CROSS-EXAMINATION

20 BY MS. BRANCH:

21 Q    Good morning, Mr. Shelton.

22      So earlier, during your direct examination, you testified

23 that Michael Wyatt, after exiting his vehicle, ran towards the

24 building.  Is that your testimony?

25 A    Michael Wyatt exited the vehicle?

1  Q    And ran towards the building.  Am I correct that that's

2  your testimony?

3  A    He run across the parking lot towards the building, yes.

4  Q    But Mr. Wyatt in fact, when he exited his vehicle, ran

5  towards Memorial Drive, didn't he?

6  A    His vehicle was at an angle, and then the vehicle rolled

7  back.

8  Q    Right.  I'm just asking the direction in which Mr. Wyatt

9  ran.  Isn't it true that Mr. Wyatt, after exiting his vehicle,

10 ran towards Memorial Drive, towards the grassy area?

11 A    Oh, he did, that's correct.  He ran up at the top of this

12 parking lot here and turned around and come right back and ran

13 towards the building.

14 Q    So it's your testimony that after exiting his vehicle he

15 actually ran towards Memorial Drive; is that correct?

16 A    Yeah.  Yeah, that's correct.

17 Q    Now, you discussed earlier when you and Johnny Owens were

18 in the parking lot of the motel -- I want to talk about that a

19 little bit.  When you were in the parking lot of the Budget

20 Inn Motel, you never exited your vehicle, correct?

21 A    No.

22 Q    You never announced yourself as a police officer?

23 A    I did not.

24 Q    And Mr. Owens never announced himself as a police

25 officer?

1  A    I do not know.  I was --

2  Q    But to your recollection --

3  A    I had stepped out of my vehicle to the parking lot, just

4  stepped out onto the parking lot --

5  Q    So you did exit your vehicle?

6  A    But I did not -- I still had, like, my left foot still up

7  there.  I could see Mr. Wyatt starting to move to get back in

8  the Chevrolet.  And I don't know if Investigator Owens shouted

9  anything or not.

10  Q    You did not announce yourself as a police officer?

11  A    I did not.

12  Q    And you were wearing plain clothes?

13  A    Plain clothes with my badge on.

14  Q    And did you ever -- but you never showed your badge out,

15  you never announced yourself as a police officer and said,

16  "Here's my badge"?

17  A    No, ma'am.

18  Q    And the Ford Explorer that you were riding in, it was an

19  unmarked police vehicle?

20  A    It was an unmarked vehicle.

21  Q    And you also testified that at some point Mr. Owens

22  activated his police sirens and his light?

23  A    He did.

24  Q    And, in fact, the police siren and the lights were

25  activated after Mr. Wyatt left the parking lot; isn't that

1  true?

2  A    Investigator Owens activated the lights and siren on his

3  Ford Explorer while we were in the Taco Bell parking lot, and

4  Mr. Wyatt is starting to drive -- to drive off onto Piney

5  Forest Road.

6  Q    So just to clarify, the lights and sirens were activated

7  after Mr. Wyatt's vehicle had already started moving?

8  A    Yes.

9  Q    So you testified earlier that when you were in the

10 parking lot on Cahill Court, you assisted Scott Wyatt in

11 tackling Mr. Michael Wyatt, correct?

12 A    Yes, ma'am.

13 Q    And, again, he exited his vehicle, ran towards Memorial

14 Drive?

15 A    That's correct.  Yes, ma'am.

16 Q    And during this tackle, you grabbed Michael Wyatt's legs;

17 isn't that right?

18 A    I grabbed at the waist and just slid down the legs and

19 onto the pavement.

20 Q    And when you had control of Michael Wyatt's legs, you

21 then put a knee on top of his lower back, buttocks area,

22 controlling his lower body?

23 A    I had my knee there, but I was trying to control his --

24 Q    But you were, in fact, on top of his buttocks and legs?

25 A    The buttocks and right thigh, yes, ma'am.

1  Q    And while you were holding Michael Wyatt's legs, Scott

2  Wyatt was holding Michael Wyatt's upper body; isn't that

3  right?

4  A    Scott Wyatt, Investigator Wyatt, was holding the upper

5  part of his body.  He was on the pavement, on the bottom with

6  Michael Wyatt.  I was trying to hold the buttocks --

7  Q    So you were located -- sorry, I didn't mean to interrupt.

8  A    And at that point, my legs are straddled of his right

9  thigh, on the pavement.

10 Q    And you also mentioned earlier that Johnny Owens and

11 Captain Nicholson joined you and Mr. Wyatt and Mr. Michael

12 Wyatt, correct?

13 A    I'm sorry, I didn't --

14 Q    At some point, Investigator Owens and Captain Nicholson

15 came over and also joined you and Investigator Wyatt, correct?

16 A    Yes, ma'am, that's correct.

17 Q    And at this point, you were still holding Michael Wyatt's

18 legs.  You were around the lower part of Mr. Michael Wyatt's

19 body, correct?

20 A    I'm trying to hold his leg, yes, ma'am.

21 Q    And you mentioned earlier that you saw Investigator Owens

22 strike Mr. Wyatt, correct?

23 A    Yes, ma'am.

24 Q    And while Investigator Owens was striking Michael Wyatt,

25 you were still holding Michael Wyatt's legs, correct?

1   A     Yes, ma'am.

2   Q     You also mentioned earlier that Robert Worsham joined you

3   and Scott Wyatt and Captain Nicholson and Johnny Owens at some

4   point, correct?

5   A     Yes, ma'am.

6   Q     And you also mentioned that you saw Investigator Worsham

7   strike Michael Wyatt with his knee, correct?

8   A     I saw his knee in motion.  As far as seeing the strike, I

9   cannot say, but I seen his knee in motion towards his upper

10  body.

11  Q     And while Investigator Worsham was striking Michael

12  Wyatt, you continued just to hold Michael Wyatt's legs to the

13  ground, correct?

14  A     I was just trying to hold his leg, that's it.

15  Q     And you continued to control Michael Wyatt's legs

16  throughout the incident?  At no point did you let go?

17  A     Trying to hold.  I'm not controlling.  I'm trying to go

18  hold.

19  Q     You're over beside his legs, holding them to the

20  pavement?

21  A     Yes, ma'am.

22  Q     You never punched Michael Wyatt?

23  A     No, ma'am.

24  Q     And you never kicked Michael Wyatt?

25  A     No, ma'am.

1  Q    And you never kneed Michael Wyatt?

2  A    No, ma'am.

3  Q    Your only role was to hold Michael Wyatt's legs?

4  A    Yes, ma'am.

5        MS. BRANCH:  No further questions.

6        THE COURT:  Okay.  Thank you.

7                    REDIRECT EXAMINATION

8  BY MR. GUYNN:

9  Q    All right, Allen, you've confused me.  Which direction

10 was Michael Wyatt running when you tackled him?

11 A    When he bailed out -- when Michael bailed out of the car,

12 he ran up just towards the edge of this grass.  He looked back

13 at us, turned in the parking lot, come back down and started

14 running towards the building, that area, which at that point

15 our vehicle was, like, right over here.  So I'm already coming

16 across here to help Scott, assist Scott tackle Mr. Wyatt.  So

17 we actually end up in the parking lot right there.

18 Q    So when you tackled him, which direction was he running?

19 A    That would have been running back towards north.

20 Q    I'm sorry?

21 A    Pardon?

22 Q    I didn't hear you.  When you tackled him, was he running

23 toward the building or was he running towards --

24 A    He was just running towards the building.  He was going

25 across the parking lot.

1          MR. GUYNN:  That's all I have.

2          THE COURT:  All right.  Thank you.  You may step

3  down.

4          MR. GUYNN:  Tommy Nicholson, Your Honor.

5          THE CLERK:  Mr. Guynn, did you want me to leave the

6  annotations here or clear them out?

7          MR. GUYNN:  No, you can clear them.

8          THE CLERK:  If you will come and be sworn, please.

9          TOMMY NICHOLSON, DEFENDANTS' WITNESS, SWORN

10                   DIRECT EXAMINATION

11  BY MR. GUYNN:

12  Q    Please state your name.

13  A    Tommy Nicholson.

14  Q    How are you employed?

15  A    I'm a major with the Pittsylvania County Sheriff's

16  Office.

17  Q    I'm going to get you, when you answer, to make sure

18  you're leaning toward that mic so I can hear you.

19       How long have you been with the Pittsylvania County

20  Sheriff's Office?

21  A    I started in 1982.

22  Q    What are your duties -- what were your duties on July 3,

23  2012?

24  A    I was in charge of the Special Investigations Unit.

25  Q    What does the Special Investigations Unit do?

1  A    Investigate drug crimes and violent crimes.

2  Q    Where is it located with relation to the sheriff's

3  office?

4  A    Just one building over from the sheriff's office.

5  Q    So are you in the same office and see the sheriff on a

6  daily basis when you're in the investigations office?

7  A    No, sir.

8  Q    How about the rest of the command staff?  IA, things like

9  that, do you see them?

10 A    No, sir.

11 Q    Now, calling your attention to July 3, 2012, did you

12 receive an assignment that morning?

13 A    Yes, sir, I did.

14 Q    What assignment did you receive?

15 A    To try to locate a Michael Wyatt.

16 Q    Why?

17 A    He was a suspect in several of our break-ins in the

18 county, and also received information that he was wanted out

19 of the City of Danville for an armed robbery.

20 Q    Did you have any information about the armed robbery?

21 A    Other than that they considered him armed and dangerous,

22 and that a gunshot had gone off when he robbed the store the

23 night before.

24 Q    Now, what significance was that information to you?

25 A    That he was dangerous.

1  Q    So what did you do?

2  A    I called my sergeant and asked him to call the rest of

3  the guys that work in our unit, and we started looking for

4  him.

5  Q    Describe for the jury the process of looking for him.

6  A    We divided up in two-man cars and just started going to

7  all the known locations where we thought he would be at, and

8  started talking to people and just trying to find out where he

9  was last seen at.

10 Q    Did there come a time when somebody found him?

11 A    Yes, sir.

12 Q    Okay.  What do you know about that?  What were you told?

13 Did you hear a call?

14 A    I heard a call from Johnny Owens that they had found his

15 vehicle at the Budget Motel up there on Piney Forest Road.

16 Q    And what did you do next?

17 A    I was with Officer Scott Wyatt, we started heading that

18 way.  And just a few seconds later, they called and said that

19 he had seen them and he jumped in his car and took off.

20 Q    What did you and Scott Wyatt do?

21 A    We cut through and got on Piney Forest Road and got

22 behind him somewhere right there around Kentucky Fried Chicken

23 on Piney Forest Road.

24 Q    And did you turn on your lights and siren?

25 A    Lights and siren was on.  And we were the second car

1 right behind him, pursuing him.

2 Q    Did that change at any time, that you were the second

3 car?

4 A    Well, when we first caught up, Johnny and Allen Shelton

5 was in a white Ford Explorer, and we were in a Nissan Altima.

6 We decided it would be better for us to take the lead and get

7 right behind Michael Wyatt since we were not in a four-wheel

8 drive.  So we got behind him, and Johnny and Allen was behind

9 us.

10 Q    Now, when you were behind Investigators Shelton and

11 Owens, could you tell whether or not the lights were on on the

12 SUV, that is, the emergency lights?

13 A    The lights and siren were on both of the vehicles, yes,

14 sir.

15 Q    So how did the pursuit end?

16 A    We went around -- we went through a lot of different

17 roads.  I don't know the name of them, a lot of residential

18 areas, and finally ended up back on Piney Forest Road.  And he

19 was going -- I can't think of the road, where you cross the

20 bridge at the mall and going like you're going to 86.

21      And then he crosses over the -- there's a metal -- I mean

22 a concrete barrier in between the roads.  His car crossed over

23 that concrete barrier and then went up the ramp that comes

24 down to get back on the road.  He went up the wrong way on the

25 ramp.  Our car was too low to the ground to try to cross it,

1  so Scott and I went on up, come around the ramp like you're

2  supposed to, and then we met him when he was coming off the

3  ramp the wrong way, and he was on the wrong side of the road.

4  We kind of all got there right at the same time.

5  Q    So where did the pursuit end?

6  A    It ended on Cahill Court, was the name of the road.  And

7  that was just a little off road.

8  Q    What did Mr. Michael Wyatt do when he got to Cahill

9  Road -- Cahill Court?

10 A    When we pulled in to Cahill Court, we were kind of right

11 behind him.  His car had slowed down.  All of a sudden, the

12 driver's door comes open to his car and I see Mr. Wyatt; he's

13 got his one arm on the door and his foot in the doorjamb, like

14 he is ready to jump out.  And then all of a sudden the car --

15 I seen it lunge a little bit, and the door come back and it

16 looked like it hit him.  And the car slowed down, and as soon

17 as it slowed down a little bit more, the door flew all the way

18 open and he jumped out of his car while the car was still

19 going forward.

20 Q    And what did you do?

21 A    I was sitting in the front seat of Scott Wyatt's car.  I

22 was the closest one to him, and I had my gun out.

23 Q    Why?

24 A    Because what I knew about Scott being -- I mean Mr. Wyatt

25 being considered armed and dangerous, and what we had just

1  gone through with the high-speed chase, I thought there was

2  going to be a gunfight there.

3  Q   Was there anything unusual about the way that Michael

4  Wyatt was running?

5  A   When he got out of the car, I never could see his right

6  hand.  And when he was running, his right hand stayed in front

7  of him.  I never did see his right hand.  And, you know, the

8  motions when he was running, his right hand was not making the

9  same motion as his left hand.

10 Q   Did you believe he had a gun?

11 A   I did.

12 Q   What happened next?

13 A   He got out of my sight for a few seconds.  And I was

14 getting out of the car and I had run up to where they were at

15 on the ground.

16 Q   When you say "Where they were at on the ground," who was

17 on the ground?

18 A   They were -- Scott Wyatt, Johnny Owens, and Allen

19 Shelton.

20 Q   So you were the fourth there?

21 A   Yes, sir.

22 Q   Was your gun out when you ran up?

23 A   It was out when I got up there to them, and then I

24 holstered my gun before I knelt down beside Mr. Wyatt.

25 Q   Why did you holster your gun?

1  A    Because there were officers all around him, and there

2  wouldn't have been nowhere -- you know, nothing I could have

3  done with my gun.

4  Q    When you knelt down, what did you do?

5  A    I reached down and tried to pull his right hand out from

6  under him, and I couldn't budge his right hand.

7  Q    What was being said as you ran up and as you tried to

8  pull his right arm out?

9  A    Well, everybody, including myself, was hollering, "Quit

10 resisting."  "Show us your hands."  "Give us your hands."

11 "Quit resisting."  We hollered that the whole time we were

12 there.

13 Q    And did Michael Wyatt quit resisting?

14 A    No, he did not.

15 Q    Did you observe Johnny Owens strike Michael Wyatt?

16 A    I seen hand movements; but to say striking him or where

17 he struck him at, I couldn't say.

18 Q    How about Scott Wyatt?

19 A    I couldn't see -- Scott was on the other side, the

20 left-hand side of him.  I couldn't see what Scott was doing.

21 Q    At some point, Robert Worsham gets there?

22 A    Yes, sir.

23 Q    Were you still trying to get the arm out when Officer

24 Worsham got there?

25 A    I was.

1  Q    What happened next?

2  A    When Worsham got there, he got right beside me where I

3  was at, so I got up and moved out of Robert's way so he could

4  try to get his hand out.

5  Q    Now, when you say right where you were at, where were you

6  in relation to Michael Wyatt's body?

7  A    I was on his right-hand side, down on my knees, right

8  about his waistline, or somewhere in there, trying to jerk his

9  hand out.

10 Q    Did you see Robert Worsham use a knee strike?

11 A    I did.

12 Q    What did he hit?

13 A    It looked like he was hitting his arm or somewhere up in

14 there.

15 Q    When you say "up in there," for the record you were --

16 like his underarm area?

17 A    Yes, sir.

18 Q    Or below his -- yeah, below his underarm area?

19 A    Yes, sir.

20 Q    Maybe even in the rib?

21 A    Well, possible.  I mean, I really can't say for sure

22 where his knees were going, just in that area.

23 Q    Did you see him hit his head, hit Michael Wyatt's head?

24 A    I did not.

25 Q    Would you have seen it if it happened?

1  A    I feel like I would have, but I'm not sure.

2  Q    You had a clear view of it?

3  A    Yeah.

4  Q    Now, after Robert Worsham used the knee strikes, did the

5  right arm come out?

6  A    Yes, sir.

7  Q    And after that arm was out, did anybody else strike

8  Michael Wyatt?

9  A    No, sir.  He was handcuffed and that was it.

10  Q    Was he searched?

11  A    At some point in time, he was, yes, sir.

12  Q    Were you there when he was searched?

13  A    I don't recall if I was standing there when he was

14  searched or not.

15  Q    Do you know who searched him?

16  A    I do not.

17  Q    But you didn't?

18  A    I did not.

19  Q    Do you know who moved him to the grass?

20  A    I think it was Gerald Ford and Randy Harris.

21        MR. GUYNN:  Those are my questions, Your Honor.

22        THE COURT:  All right.

23                      CROSS-EXAMINATION

24  BY MR. BEATON:

25  Q    Good morning, sir.

1  A    Good morning.

2  Q    You were the commanding officer on the scene for the

3  Michael Wyatt arrest, correct?

4  A    I was.

5  Q    Senior officer from the county?

6  A    I was.

7  Q    And you were the boss of these three defendants and

8  Mr. Shelton, correct?

9  A    I was.

10  Q    When you entered Cahill Court, you took out your gun,

11  didn't you?

12  A    Yes, sir.

13  Q    Then your car comes to a stop -- or as your car is coming

14  to a stop, you see Mr. Wyatt get out of his car from about

15  20 feet away?

16  A    Something like that.

17  Q    Right?

18  A    Yes, sir.

19  Q    You did not see him with a gun?  You did not see him with

20  a gun, did you?

21  A    I did not.

22  Q    Not in his right hand, not in his left hand?

23  A    I never could see his right hand.  But in his left hand,

24  I didn't see the gun.

25  Q    You said a moment ago you couldn't see his right hand?

 1  A     That's correct.

 2  Q     You couldn't see his left hand either, could you?

 3  A     I could see his hand when he come up and opened the door.

 4  Q     When he exited the vehicle, you could not see his left

 5  hand, could you?

 6  A     I'm pretty sure I could see his left hand when he got

 7  out.  I'm not 100 percent sure.

 8  Q     Excuse me for just one moment.

 9        Mr. Nicholson, do you remember when you had your

10  deposition taken in this case?

11  A     I do.

12  Q     We sat down at the sheriff's office and talked about the

13  case?

14  A     I remember.

15  Q     And you testified under oath that day, just like you did

16  under oath here this morning, correct?

17  A     That's correct.

18  Q     And you told the truth?

19  A     I tried to.

20        MR. BEATON:  May I show the witness his deposition

21  transcript?

22        THE COURT:  Why don't you read the question and

23  answer.

24        MR. BEATON:  Sure.

25  BY MR. BEATON:

1  Q    Mr. Nicholson, tell me if you were asked this question

2  and gave this answer at your deposition.

3       "Question:  Then what did he do with his left arm before

4  he exited the car?"

5       "It looks to me like he -- it looks like to me he used

6  his left arm to open the door and maybe pushed the door open,

7  and he was getting ready to bail out.  And then it looked like

8  the car kind of jumped like that, and that's when the door

9  come back and hit him.  And then it wasn't just a second after

10 that that the door comes all the way back -- all the way open

11 again and he jumped out."

12      "Question:  And you saw him jump out?"

13      "Answer:  Yes, sir."

14      Were you asked this question:  "Okay.  What did he have

15 in his left hand?"

16      Any reason to doubt you were asked that question?

17 A    No.

18 Q    And any reason to doubt that you gave this answer:  "I

19 didn't see anything in his left hand?"

20 A    That's right.

21 Q    Okay.  And the next question -- well, I say -- the

22 questioner says, "Okay."

23      You go on to say:  "I can't even remember seeing his left

24 hand."

25      Was that your testimony at your deposition, that you

1  couldn't see his left hand?

2  A    You have to go back to the first question you ask about

3  his left hand being outside the door.

4  Q    Could you answer my question first, please, sir?

5  A    Yeah.

6  Q    Is that your testimony?

7  A    That's right.

8  Q    That you could not see his left hand when he exited the

9  car?

10  A    That's right.

11  Q    Okay.  Next you testified a moment ago that you didn't

12  see Scott Wyatt and Allen Shelton take Mr. Wyatt down to the

13  pavement, correct?

14  A    That's correct.

15  Q    Because your view was blocked at that point by the SUV,

16  right?

17  A    That's correct.

18  Q    But this only took a couple of seconds, from when Michael

19  Wyatt got out of his car to when he was face down on the

20  pavement, correct?

21  A    That's right.

22  Q    When you got out of your car, you did not say anything

23  about a gun, did you?

24  A    No.

25  Q    You didn't hear any other officer say anything about a

1  gun either, did you?

2  A    No, sir.

3  Q    When you exited the car, is your gun still out?

4  A    My gun is still out.

5  Q    Was it still out when you run up to Michael Wyatt and

6  look down and see him on the pavement?

7  A    My gun was still out until I got ready to kneel down, and

8  then I holstered it.

9  Q    And so when you get there and you look down and you see

10  Mr. Wyatt, what did you do with your gun?

11  A    Put it in its -- put it in my holster.

12  Q    You holstered it, right?

13  A    Yes.

14  Q    And you're the only officer who had drawn a weapon at

15  that point, correct?

16  A    As far as I know.

17  Q    So at this point, Investigator Shelton is holding down

18  Mr. Wyatt -- is on top of Mr. Wyatt's legs and torso area,

19  correct?

20  A    That's correct.

21  Q    Scott Wyatt is holding his upper body from the left side,

22  correct?

23  A    He was on his left side, yes, sir.

24  Q    You go to his right side?

25  A    Yes, sir.

Nicholson – Cross

1  Q    You grab his right arm?

2  A    I do.

3  Q    That's the right arm that if there was a gun, it would

4  have been in that right arm?  That's your testimony, right?

5  A    I feel like it.

6  Q    Right.  So if there's a gun, it's on the right arm,

7  underneath his body.  You've got both hands on the right arm,

8  correct?

9  A    Right.

10  Q    And you're using your body weight to hold him down, to

11  try to control that right arm, correct?

12  A    I was trying to pull his right arm out from under him.

13  Q    You wanted to keep control of that right arm, correct, so

14  he could be safely handcuffed?

15  A    I wanted to get his right arm out so I could see what was

16  in it and get him handcuffed, that's correct.

17  Q    Right.  You were the one who had control of anybody over

18  the right arm?  If anybody had it, you were responsible for

19  it, correct?

20  A    At that point, yes, sir.

21  Q    And at that point, you don't -- you didn't punch

22  Mr. Wyatt, did you?

23  A    No, sir.

24  Q    You didn't kick him?

25  A    No, sir.

1  Q    You didn't knee him?

2  A    No, sir.

3  Q    Did you hit him in any way?

4  A    No, sir.

5  Q    Because you had your hands on his right arm?

6  A    I was trying to get his arm out from under him.

7  Q    Mr. Nicholson, you've never even had a use of force

8  report in your career, have you?

9  A    No, sir.

10 Q    So around the same time you arrive on the right, Johnny

11 Owens arrives on the left, correct?

12 A    It might have been a second or two difference.

13 Q    Within seconds.  So at that point, four officers laying

14 hands on Michael Wyatt, correct?

15 A    Yes, sir.

16 Q    He is face down?

17 A    Yes, sir.

18 Q    The fifth officer who came up is Robert Worsham, correct?

19 A    That's correct.

20 Q    At that point, when there's five officers, one suspect,

21 you released your hands from Michael Wyatt's right arm,

22 correct?

23 A    I did.

24 Q    You stood up?

25 A    I did.

1  Q     Did you take your gun back out?

2  A     No, sir.

3  Q     You didn't, did you?

4  A     (Shakes head side to side.)

5  Q     You walked around, looked down at the officers and

6  Mr. Wyatt?

7  A     I was looking at Mr. Wyatt's hands, trying to see his

8  hands.

9  Q     And you testified a moment ago that you did see

10 Investigator Worsham come to that right side and throw those

11 knee strikes, correct?

12 A     Yes, sir.

13 Q     But you didn't see where they hit, did you?

14 A     I did not see where they hit.  I just know he ended up in

15 the same location where I was at.

16 Q     I thought your testimony was a little unclear earlier

17 when you said, "Well, maybe it was lower, maybe it was

18 higher."

19      But your testimony, sir, is that you do not know where

20 that knee hit the first, second, third, fourth, or fifth time,

21 do you?

22 A     I do not know a hundred percent where it hit on, what

23 spot it hit on his body.

24 Q     You don't know if it hit his side or his shoulder or his

25 head?

1  A    It was lower than his head, because he was -- Worsham

2  pulled up next to where -- when he got down to where I was at,

3  he was down lower than his head.

4  Q    Are you sure of that?

5  A    Well, I mean, we can look at the video.

6  Q    Let's look at your deposition testimony.

7       At your deposition I asked you:

8       "And where did Worsham strike Michael Wyatt with his

9  knee?"

10      You answered, did you not:  "I don't know.  The upper

11 body somewhere.  I'm not sure where the strikes actually hit

12 at"?

13      Was that your answer?

14 A    Yes, sir.

15 Q    And then I asked:  "Would it have been his rib area?"

16      You answered:  "Possibly."

17      I said:  "Shoulder?"

18      You said:  "I'm not sure."

19      "His head?" I asked.

20      "I don't know."

21      Was that your answer?

22 A    It was.

23 Q    You don't know where Mr. Worsham's knee hit Mr. Wyatt, do

24 you?

25 A    Not a hundred percent.

1  Q    Thank you.

2       You never saw Michael Wyatt pull a gun out in that

3  parking lot pavement, did you?

4  A    No, sir.

5  Q    It would not have been okay for an officer to walk up to

6  Mr. Wyatt and shoot him under those circumstances, with five

7  officers, would it have been?

8  A    No, sir.

9       MR. BEATON:  Nothing further.

10                    REDIRECT EXAMINATION

11 BY MR. GUYNN:

12 Q    Major, in your experience, what do your officers do if

13 somebody yells "gun"?

14 A    I'm sorry, I didn't hear the question.

15 Q    If somebody yells "gun," what do your officers do?

16 A    If somebody yells "gun"?

17 Q    Yeah.  If somebody had yelled "gun," what would have

18 happened?

19 A    Then everybody is going to pull their gun out.

20 Q    Start shooting, aren't they?

21 A    Yes, sir.

22 Q    Do you ever yell that unless you absolutely, positively

23 see the gun?

24 A    No, sir.

25       MR. GUYNN:  That's all I have.

S. Wyatt – Direct

1      THE COURT:  All right.  Thank you.  You can step

2  down.

3      MR. GUYNN:  Scott Wyatt.

4      SCOTT WYATT, DEFENDANTS' WITNESS, SWORN

5      DIRECT EXAMINATION

6  BY MR. GUYNN:

7  Q    Investigator, you're still Scott Wyatt from yesterday?

8  A    I hope so, yes, sir.

9  Q    I only have -- I'm not going to repeat the things I asked

10 you yesterday, but I did have a couple more questions.

11      When you had tackled Michael Wyatt, I think your

12 testimony was you were up, I guess, on his left side, towards

13 his head; is that correct?

14 A    That's correct, sir.

15 Q    Where was your head compared to his?

16 A    Once we had gotten -- I got flat on the ground, my head

17 was right beside his.

18 Q    On the left side of his?

19 A    That's correct, sir.

20 Q    Now, in the course of this altercation that you had, did

21 Mr. Wyatt's head ever move and strike yours?

22 A    No, sir.

23 Q    Were you ever aware that anybody hit him in the head

24 other than you?

25 A    No, sir.

1  Q    You were aware that Robert Worsham was using knee

2  strikes?

3  A    I knew something was happening but I couldn't -- I could

4  see his body movement, but I couldn't tell you exactly.

5  Q    But you didn't have any movement in Michael Wyatt's head

6  as you saw that happening?

7  A    That's correct, sir.

8  Q    Thank you.

9  A    Yes, sir.

10          THE COURT:  Any questions?

11          MR. TODD:  No questions.

12          THE COURT:  Thank you.  You may step down.

13          MR. GUYNN:  Call Robert Worsham, Your Honor.

14          THE CLERK:  Mr. Worsham.

15          ROBERT WORSHAM, DEFENDANTS' WITNESS, SWORN

16          MR. TODD:  Do you have a time you want us to play it,

17  or do you have a time reference?

18          MR. GUYNN:  Just before Worsham gets there.

19          MR. TODD:  About 20 seconds.  Start there.

20          MR. GUYNN:  If you can go forward just a little bit.

21  Okay.

22      (Video is played.)

23                      DIRECT EXAMINATION

24  BY MR. GUYNN:

25  Q    Investigator, you recognize that's your car pulling up?

1  A    Yes.

2  Q    Let's run it through the knee strikes.  Tell the jury

3  what is happening.

4  A    As I come up, I see multiple arms pulling at his arm.  It

5  seems that I'm sliding in right beside at the time Captain

6  Nicholson was there.

7  Q    And does he move?

8  A    And he slides out of my way, to his left, which would be

9  lower on him, and I got right exactly where he was and started

10 delivering the knee strikes.

11 Q    Did you deliver the knee strikes to Michael Wyatt's head?

12 A    No.

13        MR. GUYNN:  Those are my questions, Your Honor.

14        MR. TODD:  Give me one minute, Your Honor.

                    CROSS-EXAMINATION

16 BY MR. TODD:

17 Q    Good to see you again, sir.

18      Today you're 100 percent confident that you did not hit

19 him in the head, right?

20 A    Yes.

21 Q    Okay.  You weren't 100 percent on Tuesday.

22 A    I said that it was in his arm, right in that area.

23 Because I was working on his arm, not his head.

24 Q    Tuesday you said maybe, but unlikely, hit his head.

25 Today you're 100 percent?

1  A    I don't believe there's no way.

2  Q    Well, it's in the transcript and the jury heard it.  But

3  in view of your testimony today, we'll just go ahead and read

4  your deposition testimony into the record on this point, sir.

5        MR. TODD:  Page, Jim, 113, line 20 through 114, line

6  2.

7        "Question:  So do you know whether the knee struck

8  him lower in the torso one way or the other?"

9        "Answer:  No."

10        "Question:  Do you know whether it struck him higher

11 up in the shoulder or the neck?"

12        "Answer:  I don't know if it hit him in the shoulder

13 and glanced off and hit him in the head, or if it hit him in

14 the head.  I don't know."

15        That was your sworn testimony back then, wasn't it,

16 sir?

17 A    Yes.

18        MR. TODD:  No further questions, Your Honor.

19        MR. GUYNN:  Yes, no more questions.

20        THE COURT:  Thank you.  You may step down.

21        MR. GUYNN:  Your Honor, I have one more witness.  If

22 this would be a good time for morning recess, I can check and

23 see if our expert is here.

24        THE COURT:  Well, we'll take a recess now.  It will

25 be a good time.  We can take about 15 minutes.

```
 1        (Recess taken from 10:35 a.m. until 10:52 a.m.)

 2           THE COURT:  Call your next witness.

 3           MR. GUYNN:  Call Robert Wershbale.  Wershbale.

 4   Sorry, Your Honor, I didn't know whether to already have him

 5   in or not.

 6           THE CLERK:  Sir, if you will come and be sworn.

 7      ROBERT D. WERSHBALE, DEFENDANTS' WITNESS, SWORN

 8                    DIRECT EXAMINATION

 9   BY MR. GUYNN:

10   Q    Please tell the jury your name.

11   A    My name is Robert Drew Wershbale.

12   Q    And how are you employed?

13   A    I'm employed by the Henrico County Division of Police in

14   Henrico, Virginia, as a patrol lieutenant.

15   Q    It's appropriate for me to call you Lieutenant Wershbale?

16   A    You may.

17   Q    What are your duties with Henrico County?

18   A    My primary duties, I serve as a watch commander of the

19   midnight shift in Henrico County, the west end of our county.

20   My secondary duties include serving as an instructor for our

21   academy.  Specifically, I'm the chief instructor for defensive

22   tactics.  I teach not only our basic recruits, but also our

23   veteran officers, and also do some training and consultations

24   with people internal and external to the police department.

25   Q    How long have you -- let me back up a second.  How did
```

1  you become an instructor at your academy?

2  A    I first became an instructor in 1998.  I became a general

3  instructor, certified by DCJS, which is Department of Criminal

4  Justice Services.

5       After going through the school that you're required to go

6  through to become that, and completing my apprenticeship, I

7  ultimately became the specialty instructor in 1999 for

8  defensive tactics.  What that entailed was going through a

9  completely different school that teaches you not only specific

10  tactics that you're trained to utilize in the performance of

11  your duties as a police officer, but how to break those

12  techniques down so you can instruct them to newer students.

13  Q    And you said that DCJS, the Department of Criminal

14  Justice Services, certified you?

15  A    Yes.

16  Q    Are you certified to teach defensive tactics anywhere in

17  the Commonwealth?

18  A    I am.

19  Q    And what are defensive tactics?

20  A    Defensive tactics are techniques that are utilized in

21  order to take control of a situation or a person.  It ranges,

22  as far as how we teach it, everything from the way we stand,

23  to command presence, to hands-on techniques, which may be very

24  simple as far as basic control all the way to take-down

25  maneuvers, all the way to techniques that might include having

1  to take somebody's life.

2  Q    What is the Department of Criminal Justice Services?

3  A    The Department of Criminal Justice Services is the agency

4  of the state that oversees training as it relates to law

5  enforcement-related activities, correctional, deputies, police

6  departments.  As far as how we are involved as general

7  instructors or defense tactics instructors, they give us the

8  minimum standards that a person is to be taught.

9  Q    Do you continue to teach defensive tactics?  Or have you

10  continued to teach defensive tactics from 1999 to the present?

11  A    Yes, I have.

12  Q    And are you still the lead defensive tactics instructor

13  for Henrico County?

14  A    Yes, I've been the lead instructor for Henrico County

15  since 2002.

16        MR. GUYNN:  Your Honor, based on his certifications,

17  I would offer Mr. Wershbale as an expert in defensive tactics

18  in Virginia.

19        THE COURT:  All right.  Any objection that he testify

20  in that field?

21        MR. BEATON:  No objection.

22  BY MR. GUYNN:

23  Q    How many officers are in the department in Henrico?

24  A    Sworn officers, I believe our current complement is right

25  around the 500 mark.

Wershbale – Direct

1  Q    And how often do you have an academy class?

2  A    We typically teach a basic academy, a full academy twice

3  a year.  However, as far as defense tactics instruction, we

4  recertify every year.  So there is at least one training day

5  every month, three classes a day.

6  Q    You said you're the watch commander for the midnight

7  shift?

8  A    Yes.

9  Q    Does that place you on patrol?

10 A    I am in patrol.

11 Q    And you actually go out and patrol Henrico County?

12 A    I do.

13 Q    Do you have occasion or have you had occasion in the last

14 year to use defensive tactics to arrest somebody?

15 A    I have.

16 Q    Now, in preparing to provide the jury with your testimony

17 in this case, what have you reviewed?

18 A    I was provided several materials, one of them being the

19 video that I was able to view.  I also received some training

20 records, received copies of various Pittsylvania County

21 policies, received some statements from both defendants and

22 plaintiff as far as their recollection of the events that

23 occurred.

24 Q    And what is your understanding of those events?

25 A    My understanding of the events were, on the day in

1  question, that Mr. Wyatt was a wanted felon, that he was

2  considered armed and dangerous, that he was encountered by

3  members of the Pittsylvania County Sheriff's Department, that

4  a high speed pursuit ensued, and during that pursuit, there

5  were times that he demonstrated reckless disregard for others.

6      Ultimately, when the pursuit came to an end, that he

7  exited his vehicle while the vehicle was still moving, and

8  that as he exited that vehicle, members of the Pittsylvania

9  County Sheriff's Department pursued him on foot.  Initially, I

10  believe it was Scott Wyatt.

11      And within a few feet, I would imagine, of the foot

12  pursuit, that it was observed that his hand was moving towards

13  his right side, that he was tackled to the ground, and that,

14  ultimately, there were five members of the department that had

15  to work to try to get him under control and into custody.

16  Q    Now, in analyzing the situation, what standard do you

17  apply?

18  A    When I was looking at everything, the standard that I

19  utilized as far as the reasonableness of their actions comes

20  down to the *Graham v. Connor* case where there are essentially

21  three questions that are asked that they try to fulfill.

22      MR. BEATON:  Objection, Your Honor.  I object to the

23  expert witness speaking to the jury about what the law means

24  under *Graham v. Connor.*

25      THE COURT:  I'm sorry?

 1           MR. BEATON:  I object to the expert witness

 2  testifying to the jury about what the Supreme Court's decision

 3  in *Graham v. Connor* means.

 4           THE COURT:  Sustained.

 5           MR. GUYNN:  Your Honor, may he testify with regard to

 6  the criteria that are set forth?

 7           THE COURT:  Well, he can testify to the criteria that

 8  is generally used and accepted in the community.

 9           MR. GUYNN:  Yes.

10  BY MR. GUYNN:

11  Q    Don't worry about being a lawyer, but tell the jury about

12  what the criteria are to determine whether the force is

13  reasonable.

14           THE COURT:  The criteria accepted by -- within the

15  law enforcement community.

16  BY MR. GUYNN:

17  Q    Right.  What the Judge says.

18  A    The criteria that is accepted within the law enforcement

19  community involves the severity of the crime, whether that

20  person has placed either the officer or others in imminent

21  jeopardy of serious physical injury or death, and also whether

22  the person was actively resisting.

23  Q    You said earlier that you saw that he was an armed felon.

24  Is that a severe crime under the criteria?

25  A    Yes.

1 Q    And is giving the impression that you have a gun, placing

2 the officers or -- does that meet the second criteria?

3 A    That would give you a clue as far as what his body

4 movement was doing, that there is, based off of training and

5 experience that officers receive not only in an academy

6 setting but through practical experience, that quick movements

7 to the waistband, it's a typical area that someone does carry

8 a weapon.  And when someone is running, if they're holding

9 their hand in place, it's usually trying to hold something or

10 retrieve something from that area.

11 Q    Is there any question that he was trying to escape or

12 flee from the police?

13 A    There is no question that he was trying to flee from

14 them.

15 Q    Now, did you undertake an analysis of each of the

16 officers' actions based upon those generally understood

17 criteria?

18 A    I did.

19 Q    And where do you want to start?

20 A    Well, the first interaction that I looked at -- and this

21 is after reading all the statements, then I looked at the

22 video.  I wanted to try to get a better understanding of what

23 they were -- not just what I was going to see on the video,

24 but maybe what they were thinking, hoping that was going to

25 come out through their statements.

1      So when I did finally watch the video, I essentially

2  broke it down into three interactions.  The first interaction

3  would have been with Investigator Wyatt and I believe

4  Investigator Shelton.

5      In watching that video, I saw that they were already down

6  on the ground.  So it kind of takes place after he has already

7  bailed.  You're not sure whether he had that hand under there

8  or not; it is just going off their statements as far as what

9  was going on.  That they were working to try to get to a

10 controlled position; they were not being successful.  Their

11 statements included that he was still flailing, so showing

12 they weren't able to get control of that hand that was going

13 underneath, as well as him in totality.

14     The next interaction that I saw was Investigator Owens

15 and Captain Nicholson.  They entered into the scene.  From

16 what I can see, as well as the statements that I saw, that

17 Investigator Owens was moving into position to try to assist

18 in taking control of this person, seeing that they were having

19 difficulty getting him under the control that they wanted.

20     Captain Nicholson came up on the subject's right side,

21 which would have been the side of the hand that was being

22 reported to be underneath of him.  Investigator Owens was on

23 the left-hand side.  I did not see that they were able to get

24 control of him at that time.

25     The third interaction that I saw involved Investigator

1  Worsham coming up.  And you can see him enter.  It kind of
2  looked as if he was moving up maybe with the expectation that
3  this should be under control, but then soon realized that it
4  wasn't under control, that there was movement.  I saw him come
5  in on the right-hand side.  It was kind of difficult to see
6  exactly his initial contact, but it was clear that he then
7  delivered several hard knee strikes to the right side of the
8  suspect.  This was after Captain Nicholson had stood up.

9       And it was my assessment that Captain Nicholson realized
10  he was not in an advantageous position and that he was moving
11  in to deliver those strikes in order to take control of that
12  right arm.

13  Q    Did you notice whether or not Captain Nicholson had his
14  gun drawn?
15  A    I believe he had his weapon out initially and then put it
16  away when he went to go hands-on, which is a reasonable action
17  if he felt the need he was able to go hands on and get control
18  of that hand.

19       Obviously, the other investigators weren't able to get to
20  that side and able to get control of that hand.  And the last
21  thing that you want to do is try to go hands-on with someone
22  where you still have a weapon in your hand.  So it appeared
23  that he holstered it and then ultimately stood up.
24  Q    There's been some talk about whether or not that is
25  consistent with believing that the suspect has a gun.

1  A    I don't see that it has any relationship to whether they

2  believe that the person has a gun.  If his actions were

3  directed to try to take control of the person, you need both

4  of your hands to take control of that person.

5      If he introduced that firearm to the situation at that

6  given time, I imagine that he would have difficulty, as far as

7  being the movement of the pile, as far as having a clear shot,

8  and realized that was not a safe option.

9  Q    Based on what you saw in the video, was there any reason

10  to take a shot?

11  A    Based on what I saw in the video, there was no reason to

12  take a shot at all.

13  Q    Now, if someone had yelled "gun" in the middle of this,

14  from a defensive tactics standpoint, what is the response to

15  that?

16  A    Well, once somebody yells "gun," that means that there is

17  somebody that is present actually witnessed and saw that gun

18  in that person's possession.  Obviously, that would heighten

19  everybody's actions in knowing that this is a possibility that

20  this firearm may be presented and somebody may be shot.

21      As it relates to tactics, it is really dependent upon any

22  situation as far as what is presented at that time.  If you

23  already have people hands-on, the best course of action at

24  that point is to maintain hands-on.

25      A reaction is always going to be slower than a person's

1   action.  And with the officers reacting to that, if they were

2   to let go and move away in order to draw their weapons to

3   address a firearm, it does not stop the subject from his

4   continued actions.

5       So as they're extracting themselves, he would still have

6   that ability to utilize that weapon and put them at a

7   disadvantage.  So in that situation, it would really just make

8   people aware, if someone was to yell "gun," that there was a

9   firearm in play and that they needed to be cognizant of it.

10  Q    Earlier you used the term "under control."  In the

11  circumstances as you understand them based on the video and

12  the statements, what would placing the suspect under control

13  mean?

14  A    Well, to put -- to put someone under control, it means

15  that you have the power of influence to direct that person's

16  actions to exactly what you want them to do.

17      From what I saw in this video and from the statements, it

18  appeared that they did not have control of this person.  How

19  do we obtain control?  Dependent upon situations, it's always

20  going to be anchored with good verbal direction.

21      From what I understand, there was verbal direction being

22  given, as far as giving -- asking for that person to put their

23  hand out, Mr. Wyatt to put his hand out.  In obtaining

24  control, it may, in addition, require utilizing physical

25  techniques that may include joint manipulation, pain

1    compliance, utilization of other tools that a person may have

2    in their possession.

3    Q    Would he have been under control with his right arm under

4    him?

5    A    Simply having the right hand under him, he was not under

6    control in my opinion, simply because their intent was to have

7    his right hand out so they could have actual hands on it so

8    they can manipulate it into a prone handcuffing position,

9    meaning laying on the ground handcuffing position.  So he was

10   not under control.

11   Q    Is there anything about the fact that they thought he had

12   a gun in his waistband that is inconsistent with pulling his

13   hand out?  Does that make -- never mind, I will ask it this

14   way.

15        Some of the questioning has indicated that pulling

16   somebody's hand out that has a gun in it would not be a good

17   move by the police officers.  Is there a defensive tactic that

18   is used to do that?

19   A    I would say based on the facts of this matter that, with

20   the person laying prone on their stomach, with a hand

21   underneath them, there is an indication they believed he had a

22   gun but they had not seen the gun yet.

23        With that being said, they would -- it would not be a

24   pretty endeavor to try to get that hand out.  In order to get

25   it out, as far as an appropriate defensive tactics technique,

 1   would be to try to cause some kind of motor dysfunction to

 2   that arm, either through hard strikes, to a point where you

 3   can control that arm, loosen it up a little bit, but then you

 4   would still have to be very careful as far as bringing that

 5   out.

 6       If you don't mind me pantomiming, as far as the hand

 7   coming out, you would need to control that arm in a way that

 8   it does not have free reign of motion.  You would need to

 9   control it at least at the elbow area, eventually making its

10   way out, sliding your hand down in order to trap the wrist

11   area.  Only at that point, now that there was a gun in his

12   hand, you would have it trapped.

13       You would still have to be aware of the muzzle, as far as

14   where it could potentially fire.  Once again, they would be

15   giving good verbal direction.  And then ultimately moving that

16   weapon.  And there's techniques that are used where,

17   basically, you oppose the trigger finger in order to bring the

18   barrel back and around in order to strip a handgun from

19   somebody's hand.

20   Q    From a defensive tactics standpoint and officer safety

21   standpoint, if there were a gun under him, was it safe for it

22   to stay under him?

23   A    No, it was not safe to be under him, especially without

24   an arm being in control.  He would still be able to access

25   that.  And just because that gun is not necessarily out and

1  pointed, it could still be fired from a waistband position.

2      Now, of course, that might injure the person that is

3  carrying the weapon, but it also has the potential to injure

4  anyone else around.

5  Q    Well, we don't want the suspect shooting themselves

6  either, do we?

7  A    I don't think we want anybody to get hurt, but it

8  happens.  I've seen that happen.

9  Q    All right.  So let's begin with Scott Wyatt.  Scott

10  testified that when he tackled the suspect and -- that is,

11  Michael Wyatt, he wouldn't give him his hands, and he started

12  striking him about the head.

13      Do you have an opinion as to whether or not the use of

14  force by Scott Wyatt in this case was reasonable?

15  A    I felt that his response to Mr. Wyatt's, Mr. Michael

16  Wyatt's, resistance was appropriate.

17      From what I understand, as far as how everything

18  transpired, it was a very quick event.  It went from the

19  vehicle pursuit to what would be considered just the foot

20  pursuit, seeing Mr. Michael Wyatt coming out of the vehicle,

21  Investigator Wyatt coming out of his vehicle, the quick

22  recognition based off of his training and experience that a

23  hand movement towards the waistband may indicate that there is

24  a weapon there, while the other arm is still running.

25      In the short amount of time, he would make that quick

1   assessment that I need to -- I can't just let this person go
2   based on lack of cover.  Once again, going back to what I
3   mentioned as far as reaction being slower than an action, if
4   he was to react to extract, it may still give that person
5   either time to get away into an occupied area or spin and
6   return fire if there was a weapon present.
7       So I believe it is reasonable to go hands on with that
8   person, tackle him, delivering some kind of distraction area
9   or stunning strikes to that person in an attempt to get
10  control of them, the distraction techniques along that side of
11  the body that Investigator Wyatt was on, hopefully taking
12  Mr. Michael Wyatt's mind off of what he may have been trying
13  to retrieve with his right hand.
14  Q    There is both in policies as well as there has been in
15  testimony an indication that you're not supposed to strike
16  somebody in the head.  Is that an ironclad rule?
17  A    It's not an ironclad rule.  As far as instruction goes
18  through DCJS, when it talks about target areas, they primarily
19  talk about target areas that should be accessed with a baton,
20  usually, in these days, a metal piece of pipe.
21      If you were to hit certain areas -- and the head would be
22  considered a lethal area.  If you were to hit somebody, as you
23  can imagine, with a piece of metal pipe, you're going to cause
24  serious physical injury or possible death.
25      In doing so, it also indicates that, as those targets go,

1  it's a good rule of thumb as far as when teaching a new

2  officer you should avoid striking the head when possible

3  because there is the potential.

4      However, as far as how law enforcement typically works,

5  we're very structured as far as rules.  There's shoulds and

6  there's shalls.  A shall would be you never do this unless you

7  have certain criteria.  A should would be you shouldn't

8  depending on the facts and circumstances of that situation.  A

9  strike using a hand would be reasonable based off the

10  circumstances I saw in this situation.

11  Q    And the circumstances are basically we're in a street

12  fight here, aren't we?

13  A    Well, it's a fight with a person that is a known felon,

14  that is wanted, that you believe to be in possession of a

15  firearm.

16  Q    Do you need a drink of water or whatever?

17  A    No, I'm good.  Thank you.

18  Q    All right.  So as far as Investigator Wyatt is concerned,

19  if he struck Michael Wyatt in the head under these

20  circumstances, in your opinion that was reasonable?

21  A    I would say that's reasonable.

22  Q    Now, let me go forward then to Johnny Owens, Investigator

23  Owens.  You described that he went up -- describe what he did.

24  A    From my recollection, Investigator Owens was the third,

25  third officer interacting with Mr. Michael Wyatt.  It appeared

Wershbale – Direct

1  that he was moving along Mr. Wyatt's left side of his body.

2  It looked like his initial thoughts were to take control.  I

3  don't know if he recognized the fact that there was a hand

4  under -- his right hand under Mr. Wyatt or not.

5      He knew that they had to take control of arms in order to

6  ultimately get this person into custody, into control.  What I

7  saw, he delivered several strikes along the upper back of

8  Mr. Wyatt, from what I can recall from the video.  Ultimately,

9  he was able to get the left arm out and he was able to put

10  that in a wristlock.

11  Q    And did he use distraction strikes?

12  A    That's what I assessed as far as the strikes that he was

13  delivering, trying to take Mr. Wyatt, Mr. Michael Wyatt's mind

14  off of his action of keeping himself balled up.

15  Q    Do you have any way to gauge, based on the video, the

16  force of those strikes?

17  A    I do not.

18  Q    Were they rapid?

19  A    To my recollection, they were one after the other.

20  Q    And is that the way you punch people the hardest?

21  A    I think that would still be subjective to say if it's the

22  hardest.  Typically, a quick succession is a jab.  Usually to

23  generate a lot of power, you try to utilize your entire body,

24  which means, as you can imagine, bringing the arm back and

25  getting rotation into it to generate more power into a strike.

1  Typically, a rapid succession strike is more of a jab, which
2  is not as powerful as a full punch.
3  Q    Now, so the force used by Investigator Owens was the
4  wristlock and the jab distraction blows you just mentioned?
5  A    That's what I saw, yes.
6  Q    And in your opinion, were those reasonable under the
7  circumstances?
8  A    Once again, under these circumstances, I believe that was
9  reasonable.
10 Q    Did they work?
11 A    They were not effective.  Thus --
12 Q    As far as the right arm is concerned.
13 A    As far as the right arm.  It appeared that since he was
14 able to get control of that left arm, that they were at least
15 effective on that side.  But it did still not put Mr. Mike
16 Wyatt in control in this situation, being that there was still
17 a threat of the right hand underneath his body.
18 Q    Next Robert Worsham comes in.  And you mentioned you saw
19 him in the video and he uses knee strikes.
20 A    Yes.
21 Q    Were knee strikes reasonable under the circumstances?
22 A    Under the circumstances in this, I did see it as
23 reasonable.  My recollection from the video, as well as his
24 statements, was as Investigator Worsham was coming up to the
25 scene, he realized this person was still not under control.

1   He moved in to deliver stunning distraction techniques to that

2   shoulder area.  I recall he stated that he threw a punch but

3   missed.  He was fearful of further injury to his hand.

4        I was –– I do not recall whether it was his weapon-side

5   hand or not, but it was one of his hands.  And the reason

6   that's important was if you damage your weapon-side hand, the

7   hand that you typically might fire your weapon with, that if

8   it turned into a situation where he had to draw it, he was

9   going to be at a disadvantage.

10       After that recollection, he made the decision to move

11  towards the knee strikes, once again delivering them along the

12  side of the body, the right side of the body, in the area that

13  appeared in the video to be in that upper shoulder area.

14       Based on my training and experience, that area is a

15  suitable target.  The actual name of the technique –– or the

16  area that you're targeting is referred to as a brachial plexus

17  tie-in, where essentially there's a lot of nerves that come

18  into it.  Training in that shows that if you are able to

19  deliver a hard strike to that specific area, a typical result

20  would be motor dysfunction, meaning the arm is not able to

21  work as well.  It creates a lot of pain, and it also gives the

22  person that is utilizing that technique the opportunity to use

23  that lag time created during that stunning to start moving

24  that arm into a controlled position.

25       And once again, I think at this point it will become

1    dependent upon whether they see a weapon or not as far as how

2    they go.  They will still be cautious, as far as extracting

3    that arm out, to see if there is a weapon in that person's

4    hands.  If not, they would proceed through just a routine

5    prone handcuffing position, where they would ultimately bring

6    that arm out to the side, fold it over, bend it around in

7    order to place cuffs on the person.

8    Q    In your training, do you teach knee strikes?

9    A    We do teach knee strikes.  Where we -- what we

10   specifically try to do is we try to teach targets, because

11   depending on the dynamics of a situation, a hand strike might

12   not be applicable, a knee strike might not be applicable.  But

13   if you know this is a target to strike and this is the desired

14   effect, then you can do it.

15        But to answer your question, yeah, we have taught knee

16   strikes.

17   Q    And are they limited to times when somebody is standing

18   or laying down, or can they be used -- how do you determine if

19   it is appropriate?

20   A    When we do a lot of the instruction that we provide,

21   typically the instruction that someone would receive as far as

22   a knee strike is to the common peroneal area.

23        What that area, it's along -- if you think of the area

24   between your knee and your hip, if you've ever gotten a dead

25   leg, or I think y'all know what I'm talking about there, a

1  hard strike, you bang it, it hurts, it doesn't move as well as

2  it normally does.

3      And really what the intent of that technique is, is to

4  take that person off balance, as well as provide that

5  distraction as far as they may be focusing on their hands, I

6  now have pain in my leg, they think about it, the officers

7  take advantage of the hands.

8      Or, once again, as I mentioned, the disruption of

9  balance.  By taking out that leg, it's going to take that

10 person off balance, being that the body has eight balance

11 points and they're able to oppose those.  They take them into

12 a prone position, meaning laying down, which may reduce the

13 person's ability to run away, in order to take better control

14 of them.

15 Q    And if you are prone, they are using the knee strike to

16 the brachial plexus area?

17 A    As far as once you're prone, it's really dependent upon

18 the dynamics of the situation, where you are and what your

19 intent may be.  If you're delivering stunning distraction

20 techniques, it's going to be dependent on how close you are to

21 a certain area and whether that's one of those targets that

22 you're trying to get as far as trying to achieve motor

23 dysfunction.

24 Q    Did you make a determination -- or reach an opinion, I'm

25 sorry, about whether or not Robert Worsham's knee strikes were

1  reasonable force under the circumstances?

2  A    Under these circumstances, I found that his knee strikes

3  were reasonable and appropriate.  I think when I looked at

4  everything, when everything was said and done, though there

5  was four officers that were trying to control Mr. Wyatt, they

6  weren't successful.  They got one side, but he wasn't

7  completely under control.

8      It wasn't until that fifth person showed up, delivered

9  those hard strikes to the area of the arm in order to extract

10 that arm and get him into a cuffing position.

11 Q    So they were effective?

12 A    They were effective.

13 Q    Did you take note on the video of any strikes or any

14 force used after he was handcuffed?

15 A    I saw nothing after he was handcuffed.

16 Q    What is a felony car stop?

17 A    A felony car stop, we try to refer to it as a high-risk

18 car stop.  And with that, it's usually a more orchestrated

19 traffic stop.  If you think of a low-risk traffic stop, some

20 people call it routine.  We try to say there's nothing routine

21 when you're stopping a car.  Where in a low-risk stop, an

22 officer stops a car, they approach the vehicle, they interact

23 with the person inside the car.

24      When it's a high-risk traffic stop, they have concern

25 that there may be weapons inside, there may be multiple

1  people, they may need to wait for other resources to arrive on

2  the scene.

3      When you're conducting a high-risk traffic stop, as I

4  said, it's a little more orchestrated, you try to get multiple

5  vehicles involved.  You try to position vehicles.  You're

6  giving direction to the person that's inside the car usually

7  via your public address system, your PA system.

8      And when I say "orchestrated," I'm talking "Hands out the

9  window.  With this hand, reach out, pull out the keys.  Drop

10 the keys.  Step out of the vehicle.  Walk towards the sound of

11 my voice.  Keep your hands up."  It's very orchestrated.  It

12 is keeping that person under as much control as you can, given

13 the situation.

14 Q    Now, if the situation is that the person has jumped from

15 the car and is in a foot pursuit, does that work?

16 A    No, it's not applicable, because, once again, you can't

17 stay -- you can't really orchestrate a high-risk traffic stop

18 if that person is running from the vehicle.

19 Q    How do officers determine the level of force that is

20 necessary in a particular situation?

21 A    The easy answer on that is they're responding to whatever

22 type of resistance or lack of resistance they're observing

23 from the suspect at hand.  It's usually outlined, as far as a

24 continuum, that is taught early on in careers in law

25 enforcement.

1    And if you think about how that continuum is set up, when

2  you're dealing with a subject, that person is either going to

3  be compliant or not compliant.  Well, when the person is

4  compliant, your verbal interaction with that person is usually

5  all that is needed to handle whatever type of situation it is.

6    It's when a person is not compliant that you have to

7  start looking at the different types of levels of force that

8  you may utilize.

9    Those levels of force include everything from not just a

10 good verbal direction, it may include hands-on techniques,

11 sometimes referred as soft hands, where it's just basic

12 control holds; to hard hands, which might include strikes.

13 But it's not limited to just hands.  It could be knees, feet.

14    It may involve intermediate weapons, which might include

15 capsicum spray, tasers, batons, other less -- and they're

16 usually referred to as less lethal weapons, less than lethal,

17 because the design is not designed to lead to death or

18 permanent physical injury, all the way up to, I guess, a

19 deadly force response.

20    So it's really based off of what types of resistance

21 you're seeing.

22    In looking at the resistance that a person can have, I

23 mentioned the person is compliant, that's ideal.

24    You have passive resistance.  That is a person that is

25 just using dead weight.  They're not listening to you, but

1    they're not doing anything that is going to hurt you.

2        If anyone ever had a child that was throwing a temper

3    tantrum and they're just laying on the ground, they weren't

4    trying to hurt you, but they weren't making it easy for you as

5    far as trying to take control of them.  That would be passive

6    resistance.

7        Moving up, you have active resistance.  That is when that

8    person is actually making movements in a way to be

9    counterproductive to what the officer's intent, as far as

10   taking control of the person, is.

11       What that might include, pulling your arm in, bracing

12   your arms in a way so they can't work certain maneuvers.

13       Once you go past that active, it's more aggressive,

14   sometimes referred to as assaultive resistance.  That's when

15   they're actually making movements that could hurt you, whether

16   it's flailing with their feet, kicking wildly, throwing

17   punches, spitting, biting, everything included.

18       And then once you move through that, you move to that

19   deadly or lethal resistance, where they are doing actions that

20   would be foreseeable that could lead to death or permanent

21   physical injury to either the officer or someone else as far

22   as their actions.

23       So they take in all this information and that's how they

24   ultimately respond.

25   Q    In this case, would -- you mentioned tasers and OC spray.

1  OC being the pepper spray?

2  A    Yes.

3  Q    Would they have been more appropriate?

4  A    It's my understanding that they weren't even an option in

5  this matter.  From what I understand, all the investigators

6  were plain clothes, so they carry the bare essentials, usually

7  a firearm and handcuffs.  They don't have all the other tools.

8  They don't have the belt to carry all their equipment.

9        Would it have been appropriate?  I don't think so in this

10  situation.  Being that they were as close as they were, I

11  think if they were to use pepper spray, you're risking

12  contaminating everybody else that is there.

13        It's not like a laser, as far as shooting that stream

14  out.  Once it hits, it splatters, and it can get anywhere and

15  everywhere and it usually does, which impacts the officers'

16  safety as well.

17        Even a baton, I would find that a baton would have been

18  difficult to utilize in this situation being it was close

19  quarters as it was.  And by swinging that baton, you're

20  running the risk of hitting those other people that are right

21  there, and maybe not hitting that targeted area that you're

22  hoping to get that desired effect from.

23  Q    Thank you.

24                        CROSS-EXAMINATION

25  BY MR. BEATON:

1  Q    Good morning, Lieutenant.

2  A    Good morning, sir.

3  Q    When you perform your job as an instructor, does the term

4  "trained techniques" mean something to you?

5  A    I'm sorry?

6  Q    When I say "trained techniques," is that a term that

7  means something to you as an instructor?

8  A    Yes.

9  Q    It means the sort of techniques that you want to teach,

10  train, retrain your officers in to safely and effectively

11  control a suspect in a way that's unlikely to cause lasting or

12  serious physical injury, right?

13  A    Trained techniques sometimes provide that result.  It all

14  depends on what the technique is.  Some techniques are

15  designed, as I mentioned early on, that some of the tactics

16  that are taught could lead to death.  So it all depends on

17  what you're looking to try to teach, what specific techniques.

18  Q    So, for example, a wristlock is an example of a technique

19  that can effectively gain control of a suspect, very unlikely

20  to cause lasting or serious physical injury, correct?

21  A    That is correct.

22  Q    And you teach that at the academy in your instruction

23  courses, right?

24  A    Yes.

25  Q    And the knee strike to the common peroneal nerve is

1  another common tactic that you teach, correct?

2  A    Correct.

3  Q    And you teach different sort of distraction strikes,

4  right?  A glance -- a backhand to the face?

5  A    There are several stunning distraction techniques that

6  are taught, yes.

7  Q    Openhanded towards the face?

8  A    They can be openhanded or backhanded, yes.

9  Q    Right.  Downward pressure on the nose?

10  A    Yes.

11  Q    Not closed fist, open?

12  A    Ideally, you would --

13  Q    Talking about the head area.

14  A    Ideally, you would like it to be open, an open hand.  And

15  primarily the reason we try to avoid using a fist is,

16  unfortunately, in a critical situation sometimes that officer

17  might wrap their thumb.  And if anyone has ever punched with a

18  thumb wrap, you're looking at potential injury occurring to

19  yourself.

20      And so we try to teach them that when you're working that

21  area, specifically the head, being the skull is one of the

22  hardest bones in the body, that you try to avoid using closed

23  fist, yes.

24  Q    Knee in someone's back to hold them down while you're

25  handcuffing, that would be a trained control technique too,

1  right?  Do you teach officers to use their knee to hold

2  someone down safely during the handcuff?

3  A    Yeah.  There is a positioning that we utilize where it

4  causes your body to go across them at approximately about a

5  45-degree angle, yes.

6  Q    So that's a yes, you do teach that technique?

7  A    We do teach it as a technique, yes.

8  Q    When you teach handcuffing, you want the subject on the

9  ground, right, or on a flat surface, to take away 180 degrees

10 of their movement, right?  That's the safest way to handcuff

11 them?

12 A    We teach both standing and prone handcuffing.

13 Q    Right.  Prone is better, right, because then they can't

14 do anything in front of themselves?

15 A    Ideally, yes.

16 Q    You do teach that, right?

17 A    Yes, we do teach that, yes.

18 Q    And it's easier to control someone in a trained

19 handcuffing technique, the way you teach it, knee, prone,

20 bringing them around in a trained way, correct?

21 A    Yes.

22 Q    There's no difference in the way you teach these

23 techniques in Henrico County, Virginia, versus Pittsylvania

24 County, versus North Carolina or anywhere else that meets

25 normal police practices instruction, is there?

1    A    There aren't any major differences.  There are minor

2    differences --

3    Q    No differences --

4    A    -- as far as manipulating --

5    Q    I'm sorry.

6    A    Well, there's minor differences in the placement of the

7    hand as far as once that person is in that prone position.

8    But for the most part, it's very similar.

9    Q    No differences that are relevant to this case, are there?

10   A    No.

11   Q    Okay.  Thank you.

12        Now I would like to go to the basis for your opinions in

13   this case.

14   A    Okay.

15   Q    Do you remember when you disclosed your opinion earlier

16   in this litigation and then I deposed you, right?

17   A    Yes.

18   Q    Your opinions today are no different than they were at

19   that point, when you swore and gave your testimony, are they?

20   A    My opinions are the same.

21   Q    There's no other materials you're relying on today beyond

22   what you relied on then, is there?

23   A    No materials.

24   Q    Okay.  I didn't think so.  I just wanted to make that

25   clear.

1          Are you aware today that Investigator Worsham kneed

2    Michael Wyatt five times in the head area?

3    A    It's my understanding that he kneed him several times,

4    and I believe five is a correct number.  But from my

5    understanding, it was in that upper shoulder area.

6    Q    So if he kneed him in the head, that would make your

7    opinion different, right?

8    A    If he kneed him in the head intentionally, yes.

9    Q    What if he kneed him in the head recklessly, would your

10   opinion be different then?

11   A    I would say no, being that he was targeting that area.  I

12   would say -- and I wouldn't use the word recklessly.

13   Q    That is my question.  If he did so recklessly, would that

14   change your opinion?

15   A    If it was recklessly, yes.

16   Q    Okay.  Because when I -- when you gave your initial

17   opinion, when you initially reached your opinion in this case,

18   you didn't know that there was even a chance that Robert

19   Worsham had kneed Michael Wyatt in the head or neck area, did

20   you?

21   A    That -- well, I don't recall if I knew that at that time,

22   I do not.

23   Q    You don't know one way or the other?

24   A    From what I recall, it was his intentions --

25   Q    I'm not asking intention.  I'm asking whether he kneed

1  him in the head area.

2  A    I could not tell --

3  Q    When you reached your opinion in this case, which has not

4  changed, you did not know that he threw a knee around

5  Mr. Wyatt's head, did you?

6  A    I knew that he delivered strikes in that area, not

7  intentionally, though, from my opinion.  And I may need to

8  have recollection if you want to provide that.  I think my

9  statement may have been that it would be understandable if it

10  went off target.

11  Q    Well, do you recall your statement, it may have been

12  understandable if it went off target?

13  A    Yes, based off how that -- obviously you have that, so if

14  you can provide it, that would be great.

15  Q    I'm happy to provide it for you.  This is from your

16  deposition.  You testified under oath then --

17  A    Yes.

18  Q    -- just like you did today, right?

19  A    Yes, sir.

20  Q    And you told the truth then, just like you're doing

21  today?

22  A    Yes.

23  Q    "Question:  Are you aware that Worsham hit Michael Wyatt

24  in the head with his knee strikes?"

25      "Answer:  No."

1          "Question:"  --

2          Well, I will stop there.

3          So that did not factor into your opinion when you

4    initially reached it, because you didn't know there was

5    even -- you didn't account for the fact that he got kneed in

6    the head?

7    A    I was not aware that he was struck in the head, but I

8    believe in my statement I did make mention that even if he

9    did, with his intent to strike that shoulder, that it would be

10   understandable.  I believe that is in my statement as well.

11   Q    What statement are you talking about?  Your report or

12   your deposition testimony?

13   A    My report.

14   Q    If I told you that your report doesn't mention the word

15   "knee," would you disagree with me?

16   A    I would have to look at that report.  I have no reason

17   not to believe you, if you don't see the word "knee."

18   Q    Or "head" at all?

19          THE COURT:  You can let him see it, if you would

20   like.

21          MR. BEATON:  We'll move on.

22   BY MR. BEATON:

23   Q    For a police practices instructor, the distinction

24   between throwing a knee to the side or the shoulder or the

25   head is critical, isn't it?

1  A    It is critical when you're –– as far as picking your

2  target, yes.

3  Q    Right.  Because you would never ever teach an officer to

4  throw a knee strike to the head of someone who's laying face

5  down on the pavement, would you?

6  A    It would be dependent upon the situation.  If they can

7  articulate their use of deadly force.

8  Q    Not the articulation.  Have you ever taught anyone to

9  knee anyone in the head when they're on the pavement?

10  A    Not specifically, but I do teach targeted areas.

11  Q    You teach targeted areas.  My question is, have you ever

12  taught anyone it is okay to knee someone else in the head

13  area?  No.

14  A    I think my answer on that, sir, was I teach targeted

15  areas, and your articulation to hit a specific area will be

16  dependent upon that situation.  Though I might not physically

17  show them in a class, "This is how you deliver a knee strike

18  to the head," I mentioned before that there are targeted areas

19  that you try to hit, and it comes down to articulation as far

20  as why you chose to make that strike.

21  Q    From your deposition transcript, page 84, line 6 to 8:

22       "Question:  Have you ever taught a knee strike to the

23  head when the suspect is prone on the ground?"

24       "Answer:  I have not.  No."

25       Earlier when Mr. Guynn was asking you questions, you

1  mentioned a couple of times that you relied on statements of

2  the officers.  What statements are you talking about?

3  A    When I was referring to statements, it included not only

4  their reports that were generated within Pittsylvania County

5  Sheriff's Department, but also statements that they made as

6  far as their depositions.  Or I'm not quite sure what the

7  terminology is as far as their -- I'm at a loss as far as

8  knowing what the legal term is on what that specific statement

9  is.  I'm sure there is a difference that will be pointed out.

10  Q    Is your testimony today that you reviewed their

11  deposition testimony, their sworn testimony?

12  A    I did not review their sworn deposition, I don't believe

13  so.

14  Q    I think that's right, you didn't.  You didn't review

15  Mr. Wyatt's deposition transcript in this case?

16  A    I did, as well as I guess his initial complaint.

17  Q    You did or did not review Mr. Wyatt's deposition?

18  A    I did, I believe, yes.

19  Q    Page 71, line 23.  "Question:  Did you review any

20  deposition transcripts in this case?"

21      "No."

22      You didn't talk to Mr. Wyatt to hear his side of the

23  story, did you?

24  A    No, I did not.

25  Q    Before you reached your opinion in this case, you hadn't

1  talked to any of the defendants, had you?

2  A    That's correct, I had not.

3  Q    All you had were their own statements that they wrote

4  themselves after the incident, correct?

5  A    That is correct.

6  Q    There came a time, didn't there, when you said, "I want

7  some more information about what was happening on the scene."

8  Do you remember that?

9  A    Yes.

10  Q    And you picked up the phone and you called Mr. Guynn's

11  paralegal at his law firm.  Do you remember that?

12  A    Yes.

13  Q    And she described the incident for you, right?

14  A    She did.

15  Q    And this paralegal, Ms. Reed, was not at the site of the

16  accident, was she?

17  A    No.  She paraphrased most of it, yes.

18  Q    She's not trained in police tactics, is she?

19  A    No, not that I'm aware of.

20  Q    Do you know whether she had reviewed the depositions in

21  this case?

22  A    I am not.

23  Q    So when you reached your opinion in this case, you talked

24  to the paralegal, you had watched the video, you had read the

25  officers' statements, right?

Wershbale - Cross

```
 1   A     That's correct.
 2   Q     You had not ever heard any of the defendants say anything
 3   about a distraction blow, had you?
 4   A     No.
 5   Q     Or a stunning blow?  You never heard that term either
 6   from the defendants, when you reached your opinion?
 7   A     Not from the defendants.  But those are terms that are
 8   utilized in the instruction of defensive tactics.
 9   Q     No question about that.  The defendants had never
10   described what they did to Mr. Wyatt as a distraction blow,
11   had they?
12   A     Not that I recall.
13   Q     That was the term that you used?
14   A     That is a term that I used based off what I saw, yes.
15   Q     And when you reached your opinion, were you aware whether
16   the defendants had any training of any sort in distraction or
17   stunning blows?
18   A     The only training that I can assume that they have is,
19   being that they are certified law enforcement officers, that
20   they at a minimum received their training when they first
21   applied, went through whatever academy that they did, being
22   it's a DCJS mandate, in order to show that they successfully
23   passed that training in order to move on and ultimately obtain
24   their certification.
25   Q     That's your assumption, right?  You don't know that,
```

1  that's your assumption?

2  A    Yes, sir.

3  Q    And you don't know whether whatever training they may

4  have gotten in distraction blows or stunning blows involved

5  punches to the head, knees to the head area, do you?

6  A    Their specific --

7  Q    You don't know the training?

8  A    Their specific training, no, I can't say specifically

9  what they were trained in.

10 Q    Even though you agree with me that an officer's training

11 and experience is relevant to the force they use at a given

12 point in time, right?

13 A    That's correct.

14 Q    At the time you reached your opinion in this case, you

15 thought Mr. Wyatt's injuries came from the car door, didn't

16 you?

17 A    I believe that, if I recall our deposition together, when

18 you asked where I thought that may have come from, I thought

19 that there were several opportunities for those injuries to

20 occur, one of them being the car door.

21      It was described to me -- I'm sorry, I read this in his

22 statement -- in one of the statements, that as the person was

23 jumping or exiting the vehicle, Mr. Wyatt was exiting the

24 vehicle, that it appeared that he was standing on the running

25 board and that the door came back and hit him in the right

1    side of the head.

2        I also said that I would understand that those injuries

3    may -- could have occurred during that initial takedown, when

4    Investigator Wyatt first had took him down to the ground; as

5    well as anything else that may have occurred during that

6    scuffle, that it would -- that would be a reasonable

7    assumption that those were -- where those injuries most likely

8    appeared from.

9    Q    Here's the two things that you mentioned, right, the car

10   door and the tackle.  And you didn't say anything about the

11   punches or the knees, did you?

12   A    Not that I recall specifically if I used "knee" or

13   "punches," no.

14   Q    Is it still your opinion today that his injuries were

15   caused by the car door, or has your opinion changed in that

16   respect?

17   A    Well, I don't think I ever said my opinion strictly was

18   his injuries were caused by the car door.  I said that the car

19   door may have been a contributing factor.

20   Q    And that's your opinion sitting here today?

21   A    I would say it's no different than I gave in my original

22   deposition, that it could have been as a result of the door or

23   from his landing on the ground.

24   Q    Right.

25   A    Or a combination of both.

1  Q    Either the tackle or the car door, those are the two

2  options?

3  A    And it could be both, yes.

4  Q    Nothing else could have caused those injuries?

5  A    Only what may -- that could have been a result of the

6  scuffling and moving around, yes.

7  Q    It could have been as a result of the punches, right?

8  A    It could have been.

9  Q    Or the knee strikes?

10 A    (Shrugs.)

11 Q    But you didn't say that when you reached your opinion in

12 this case?

13 A    That is correct.

14 Q    You said it is the car door or the tackle?

15 A    Yes, that is correct.

16 Q    You also agree with me that an officer's use of force

17 experience is relevant is to their assessment of the

18 appropriate amount of force to use in a situation, don't you?

19 A    I do.

20 Q    You do?

21 A    Yes.

22 Q    But you did not review any officer's use of force history

23 in this case, did you?

24 A    I don't recall having anything on that that I could have

25 reviewed.  There was some training records, but it was very --

1  not very detailed.

2  Q    Right.  I believe you may have –– well, let me ask the

3  question.  Were there some disciplinary letters amongst the

4  materials provided to you?

5  A    I vaguely recall that there was a –– there may have been

6  some disciplinary action.  I don't recall who or specifically

7  which.

8  Q    Because you did not account for any use of force history

9  or discipline in your analysis, did you?

10 A    I did not.

11 Q    Even though you agree that use of force experience may be

12 relevant to the appropriateness of the force used by an

13 officer?

14 A    Yes.

15 Q    For instance, if an officer had been specifically

16 retrained in one technique, you would expect him to use that

17 technique properly going forward, wouldn't you?

18 A    I would.

19 Q    When you reached your opinion in this case, you were not

20 aware that two of the defendants had special remedial use of

21 force training, were you?

22 A    Not that I recall.

23 Q    And you weren't aware that that special remedial training

24 involved knee strikes, were you?

25 A    I was not aware of that.

1  Q    You weren't aware that Investigator Worsham had mockingly

2  cited his special knee force training in justifying use of

3  force?

4        MR. GUYNN:  Objection.

5  BY MR. BEATON:

6  Q    Were you?

7        MR. GUYNN:  Objection.  That's not what the Court

8  allowed the evidence in for, Your Honor.

9        MR. BEATON:  It's in the testimony.

10       THE COURT:  I don't know whether that got into

11 evidence or not.

12       MR. BEATON:  I believe it came in through the

13 defendant's testimony, Your Honor.

14       THE COURT:  Okay.  Overruled.

15 BY MR. BEATON:

16 Q    Now, let's talk for a minute, Lieutenant, about the

17 standard you used to judge the defendants' use of force in

18 this case.

19      The question you tried to answer was whether the force

20 described to you in the defendants' reports was reasonable to

21 use against Michael Wyatt under the circumstances in the

22 parking lot that day, right?

23 A    Yes.

24 Q    And in that situation, the amount of force that was

25 reasonable was the amount of force that was the minimum

Wershbale – Cross

1  required to safely arrest him, wasn't it?

2  A    In looking at the Pittsylvania County policy on that, one

3  part states "minimum," and it also states further on in their

4  policy "reasonable."

5  Q    And you would agree with me, wouldn't you, that in this

6  case there is no difference between what is minimal and what

7  is reasonable?

8  A    I agree that in this situation that they utilized the

9  minimum, which was reasonable.

10 Q    Thank you.  When you reached your opinion in this case,

11 you relied on three different factors, right, to determine

12 whether that force was reasonable?

13 A    Yes.

14 Q    Those three factors, correct me if I'm wrong: prior

15 knowledge and interactions with the suspect, proximity to a

16 weapon, and the ratio of defendants to plaintiff; is that

17 right?

18 A    Those are factors that were pertinent as far as –– as far

19 as my consideration went as far as it meeting the

20 reasonableness, yes.  Those would be the major factors, yes.

21 Q    Well, they weren't the major factors.  Those were the

22 three factors you applied, right?

23 A    Those were the three factors that were utilized, yes.

24 Q    So let's take those one by one.  Prior knowledge and

25 interactions.  The officers here knew only that Mr. Wyatt was

1  suspected as armed and dangerous.  That's the only knowledge

2  that you applied in reaching your conclusion, wasn't it?

3  A    I also included their observations that I read from

4  Investigator Wyatt and his statement, as far as the hand going

5  to the right side.  So that's an observation, and I would

6  consider that kind of prior knowledge as well.

7       In addition to them --

8  Q    But one second.  What was it prior to?  That was his

9  observation while he was hitting Mr. Wyatt.  Is that what you

10  mean by "prior to"?

11  A    Well, if I can take it one step at a time.

12  Q    Just answer my question first and then you can try to

13  explain.  Was that what you were referring to, his

14  observations when he was hitting Mr. Wyatt?  That was the

15  prior knowledge?

16  A    No.

17  Q    Okay.  The second question was proximity to a weapon?

18  A    Would you like me to answer that first part, sir, as far

19  as what I meant by "prior knowledge," or no?

20  Q    Is your testimony that prior knowledge includes what they

21  observed at the moment?

22  A    It would include up until their initial contact with him,

23  meaning physical, hands-on contact.  So the knowledge that

24  they had as far as him being a wanted felon, that he was

25  considered armed and dangerous, and the fact that when he --

1  or the statement that was made that as he was exiting the

2  vehicle, they saw that movement of him, with his right hand

3  going towards his right side, that's knowledge that I took

4  into consideration, and that's all prior to hands-on

5  techniques.

6  Q    And that's information that you got from the officers'

7  reports that they wrote up themselves?

8  A    From those statements, correct.

9  Q    When they were not under oath, right?

10  A    When -- I'm sorry, when who wasn't?

11  Q    They weren't under oath when they wrote those statements,

12  were they?

13  A    Not that I'm aware of.  It was their statement, though,

14  that was presented, and that's what I looked at.

15  Q    Your second factor, "proximity to a weapon."  Your view

16  is that the reasonableness of the force depends on whether

17  Michael Wyatt was going for a weapon under his torso, correct?

18  A    Yes.

19  Q    You know that Michael Wyatt was not in fact armed at the

20  time, don't you?

21  A    I am not -- I was not aware of that.

22  Q    You were not aware that Michael Wyatt was unarmed?

23  A    The only information I had was that -- if I can go back

24  on that.  It was brought to my attention that they did not

25  have a weapon on him, so he was not --

1    MR. BEATON:  Your Honor, I think we need to clarify

2  this.

3    THE COURT:  Just --

4    MR. BEATON:  Can we approach, please?

5    THE COURT:  It's your testimony that he did not have

6  a weapon when he was on the ground?  Is that your assumption?

7    THE WITNESS:  Yes, that's my assumption.

8    THE COURT:  Does that take care of that?

9  BY MR. BEATON:

10  Q    No officer saw him reaching out with a weapon, did they?

11  A    No officer saw a weapon being drawn.

12  Q    No officer saw him try to assault an officer in any way,

13  did they?  No punch, no kick, no spit, nothing?

14  A    Not that I can recall, no.

15  Q    Third, the ratio of defendants to plaintiff.  You

16  helpfully divided your analysis into three phases, so I will

17  use your three phases.

18    Phase 1:  Investigator Shelton, Investigator Wyatt take

19  Michael to the ground, right?

20  A    Correct.

21  Q    At that point, Michael Wyatt is face down on the

22  pavement, correct?

23  A    He is on -- he is laying prone with his chest to the

24  ground, yes.

25  Q    I think that means face down on the pavement, right?

1  A    I think it kind of goes into some folks' connotation.  I

2  think if you're thinking his face is directly in the ground

3  versus his chest is to the ground.

4  Q    How about flat on the ground?  How is that?  Does that

5  work?

6  A    I would stay with his chest was to the ground, yes.

7  Q    And at this point, the ratio of defendants to plaintiff,

8  to use your analysis, was two -- I'm sorry, not defendants,

9  officers to plaintiff was two to one, correct?

10  A    That's correct.

11  Q    Okay.  Phase 2:  Owens comes up on the right,

12  Nicholson -- on the left; Nicholson comes up on the right?

13  A    Correct.

14  Q    Now we're four to one?

15  A    Uh-huh.

16  Q    Right?

17  A    That's correct.

18  Q    And so under your own analysis, this is an important

19  factor to consider, that, at this moment, the ratio of

20  defendants to plaintiffs is four officers, one suspect.

21  That's important to your analysis, isn't it?

22  A    It's in it, yes.

23  Q    And then when Worsham arrives, it's five to one, right?

24  A    That's correct.

25  Q    Now, earlier you testified your understanding of

1 Worsham's approach.  Being the last officer there, I believe

2 you testified earlier that he was surprised that Mr. Wyatt was

3 not under control, and so he didn't expect to have to use

4 force, but then once he realized, oh, things were different,

5 he accelerated and used more powerful force when he engaged

6 with Mr. Wyatt.  Is that fair?

7 A    That's a fair assessment.

8 Q    Okay.

9        MR. BEATON:  Jason, could you pull up the video to

10 the moment when Officer Worsham's cruiser comes around.  Stop.

11 Back it up to where the white car comes in.  Now just play it

12 until the knee strikes.

13        (Video is played.)

14        MR. BEATON:  You can stop.

15 BY MR. BEATON:

16 Q    So your testimony is Investigator Worsham approached

17 cautiously?

18 A    Yeah.  I didn't see –– I didn't see that as a reckless

19 approach.

20 Q    I didn't say reckless.  But he raced in there, didn't he?

21 He didn't hesitate?

22 A    He was directing his movements.

23 Q    He was running to Mr. Wyatt, wasn't he?

24 A    Yes.  He was moving quickly up to Mr. Wyatt, yes.

25 Q    He was not hesitant, like you said earlier, was he?

Wershbale – Cross

1  A    (No audible response.)

2  Q    I'm sorry, I didn't hear your answer.  He was not

3  hesitant, was he?

4  A    I think it's -- I'm taking into consideration what was in

5  the statement.

6  Q    You're accounting for the statement not the video?

7  A    I looked at both.  And I think you can make an assessment

8  on somebody very quickly, as far as what your intent is,

9  without necessarily physically seeing it.

10 Q    Is it your testimony that his intent is what's relevant

11 to whether the force is reasonable?

12 A    No, that's not what I said.

13 Q    Then I don't understand why we're talking about intent.

14 Did his intent factor into your analysis in this case?

15 A    I'm saying his assessment of the scene.

16 Q    So his intent is or is not relevant to your assessment of

17 the force in this case?

18 A    I'm not exactly sure where you're talking about as far as

19 which intent.

20 Q    I'm just talking about one officer's intent, Officer

21 Worsham.  Is that relevant to your opinion in this case?

22 A    Yes, it's important.  I believe his intent initially that

23 you're seeing here in the video is him coming up to the scene

24 to help take control of the situation.  The assessment that

25 the person was not under control and, thus, the need to move

1  in and work that right arm.

2         MR. BEATON:  Jason, could you show us the rest of the

3  knee strikes, please.

4      (Video is played.)

5  BY MR. BEATON:

6  Q    You also testified earlier that Investigator Worsham

7  threw his knee strikes into Michael Wyatt's shoulder, didn't

8  you?

9  A    Yes.

10 Q    Can you see Mr. Wyatt's shoulder on that video?

11 A    It's difficult to see in this video, yes.

12 Q    You can't see his shoulder in that video, can you?

13 A    That's correct.

14 Q    And you cannot see Robert Worsham's knee hitting his

15 shoulder, can you?

16 A    No, you can't see that.

17 Q    But that's your opinion that's where his knee hit, is in

18 the shoulder?

19 A    That was what my opinion was based on, yes.

20 Q    Based on the video?

21 A    The combination of the video as well as the statements.

22 Q    I think you also testified earlier that Investigator

23 Shelton wasn't sure whether Michael Wyatt's right hand was

24 underneath him or not.  Did I hear you correctly?

25 A    I don't recall that.

1  Q    You don't know whether Shelton thought his right arm was

2  in or out when he took him down and had him by the torso?

3  A    I don't recall that.

4  Q    Okay.  Did you review any investigation of the use of

5  force in this incident?

6  A    As far as the internal investigation of this?

7  Q    Any investigation at all.

8  A    No, I did not.

9  Q    Was there an internal investigation in this case?

10        MR. GUYNN:  Objection.  It's irrelevant, Your Honor,

11 nor has anything been said of it.

12        THE COURT:  Well, sustained.  I mean, did he review

13 one or not?  Did he know whether there was one?

14        Do you know if there was one?

15        THE WITNESS:  I'm not aware that there was one nor

16 did I review one.

17 BY MR. BEATON:

18 Q    Were you aware, when you reached your opinion in this

19 case, that Scott Wyatt had punched Michael Wyatt in the face?

20 A    I believe in one of his statements that he did say he

21 threw a punch as he was taking him down.  I would have to

22 review that.

23 Q    Were you aware that he was punched in the face by Scott

24 Wyatt?

25 A    Specifically in the face, no.

1  Q    Is that relevant to your opinion about the reasonableness

2  of Scott Wyatt's punches, whether they hit him in the face or

3  somewhere else?

4  A    No, it's not pertinent, once again, based on the

5  situation that he was responding to.

6  Q    I thought you testified earlier that there were target

7  areas -- areas you were supposed to target and the areas you

8  were not supposed to target?

9  A    Yes.  And I think that's when I talked about the targets

10 and the shalls and the shoulds.  And shalls are never, shoulds

11 with articulation.  And at that point, a strike to the face is

12 acceptable.

13 Q    But you didn't know he got hit in the face when you

14 reached your opinion in this case, did you?

15 A    Specifically in the face -- I think his statement goes

16 along the side of the head.  But it's still in that general

17 area, so it still was not pertinent to my rationale.

18 Q    Your testimony is that it doesn't matter to your analysis

19 of the reasonableness of force whether a punch hit somebody in

20 the head or elsewhere on their body, that doesn't matter?

21 A    Under the facts and circumstances in this matter, it did

22 not.

23 Q    Of course, you didn't know that when you first reached

24 your opinion in this case, did you?  You didn't know it was an

25 issue because you didn't know anyone got hit in the face?

1   A    Not specifically in the face.

2   Q    "Specifically"?  You said "specifically."  You didn't

3   know anybody got punched in the face generally or

4   specifically, did you?

5   A    Well, there was -- there was a statement that said

6   "towards the head."

7   Q    So the head is okay, but the face isn't?

8   A    They're both acceptable under these circumstances is what

9   I'm saying.

10  Q    And the circumstances we're talking about here are

11  distraction blows, right?  That's your testimony?

12  A    Yes.

13  Q    And you teach distraction blows at Henrico County, don't

14  you?

15  A    I do.

16  Q    And you have never taught anyone that it's okay to punch

17  someone in the face as a distraction blow, have you?

18  A    I think I described earlier that I've taught folks that

19  ideally it's open hand or back of the hand, and that we should

20  avoid using a closed fist simply because it can cause damage

21  to your hand.  But ideally, you should avoid that area because

22  there is the potential.

23  Q    So I'll ask my question again.  Do you ever teach punches

24  to the face as distraction techniques?

25  A    We teach strikes to the face.

1  Q    Okay.  I'm going read your deposition, page 90, line 11.

2       "Question:  Do you ever teach punches to the face as a

3  distraction technique?"

4       "Answer:  Not as a distraction technique."

5       Did you know how many times Mr. Wyatt was punched when

6  you reached your opinion in this case?

7  A    No.

8  Q    Was that relevant to your opinion whether it was once,

9  twice, or four to eight times or six times?  Did that matter?

10 A    Not based on the circumstances in this situation, no.

11 Q    Well, you said earlier you thought it was significant

12 these were rapid strikes, that was more indicative of a

13 distraction blow, right?

14 A    I said that the rapid strikes were indicative of a rapid

15 blow, which corresponds with stunning distraction techniques,

16 yes.

17 Q    But when you reached your opinion in this case, you

18 didn't know anything about rapid strikes because you didn't

19 know whether he was hit more than once or twice, did you?

20 A    I was aware of the strikes that I could see on the video,

21 though the targeted areas were -- weren't very visible, easily

22 seen.

23 Q    You said earlier that Owens' punches hit the upper back,

24 right?  Isn't that what you said this morning?

25 A    I said that based off of how everyone seemed to be lying,

Wershbale - Cross

```
 1  as well as the statements that were made as far as where
 2  people were positioned.
 3  Q    You couldn't see where he hit him, could you?
 4  A    Specific targets, no, but general body areas I can
 5  assume.
 6  Q    You don't know whether or not he hit him in the kidney,
 7  do you?
 8  A    I do not know specifically if he targeted the kidney, no.
 9  Q    Would it be significant to your opinion whether a punch
10  landed on internal organs rather than just the fleshy part of
11  the back?
12  A    As far as a punch, not necessarily.  Once again, when we
13  talk about strikes, if I'm recalling correctly from our
14  deposition, the area that we were talking about that fell
15  under digestive system, cardiovascular, cardiopulmonary --
16  Q    I'll ask a different question.  Is it okay to punch
17  someone in an internal organ area as a distraction strike?
18  A    It's not a specific target.
19  Q    Is it okay to punch someone in an internal organ area as
20  a distraction strike?
21  A    I think I'm answering that by saying that it is not a
22  targeted area, and it would have to be the totality of the
23  circumstances as far as that was an intended strike, not an
24  intended strike, a superficial strike that was not necessarily
25  going to cause any type of specific damage.
```

1  Q    Those are the factors that you would account for in

2  determining whether it was reasonable?

3  A    When I look at situations like it, yes.

4  Q    But you don't know any of those factors, whether it was

5  intended, how many times, where he hit.  If those are the

6  relevant factors and you don't know them, how can you say it's

7  reasonable?

8  A    Once again, I'm looking at the totality of everything as

9  far as the actions, and, obviously, that the person was not

10 under control.  And I know that, based off my training and

11 experience, the longer a situation goes on, that there's

12 potential for somebody to receive more injury.  And sometimes

13 you have to deliver that hard strike in order to take

14 advantage of that person, to get them into that positioning

15 that you need them to.

16 Q    But you didn't even know where he got punched, did you,

17 when you reached your opinion in this case?

18 A    Not specifically, no.

19      MR. BEATON:  Your Honor, I'm not quite close enough

20 to wrap up in the next couple of minutes, so I just wanted to

21 ask whether you had lunch plans or if you wanted me to keep

22 going.

23      THE COURT:  I was hoping to finish this witness.

24 We've been here an hour and a half since the break.  I don't

25 know whether they can hold out or not.

1          Why don't we take a lunch recess now.  And I'll ask

2    the jury to be back at 1:30.  And if the attorneys would just

3    stay here a minute.

4          You may step down.

5      (Jury out at 12:21 p.m.)

6      THE COURT:  Okay.  At lunch I wouldn't mind going --

7    everyone can leave.  I just want to talk to the lawyers, to

8    get it clear on these instructions.

9          I want to try to -- Mr. Guynn, the 20/20 thing -- I

10   think one of the instructions that you thought was not there

11   is there, correct?  I think he read it, told you it was there.

12         The other one, the 20/20 hindsight, I had just -- the

13   instruction we had just has "hindsight."  I continue to

14   consider 20/20 hindsight as sort of a flippant or pejorative

15   term.  I think hindsight is the word I intended to mean,

16   without any comment about it.

17         And what was the other instruction that you had?

18         THE LAW CLERK:  The excessive force factors.

19         THE COURT:  I think I understand your position.  I

20   will take a look at that.

21         Let's talk a minute about that instruction that the

22   defendant had questions about -- I mean the plaintiff had

23   questions about.

24         MR. GUYNN:  Your Honor, if I could?

25         THE COURT:  Yes.

1        MR. GUYNN:  If you could help me with the numbers

2  again.  I'm sorry, which one has the hindsight?

3        THE LAW CLERK:  The hindsight can be found in

4  Instruction 11, and it uses the phrase "without the benefit of

5  hindsight."  Just leaves out the 20/20.  And I don't remember

6  what your other one was.

7        MR. GUYNN:  Well, it was that hindsight includes the

8  amount of force necessary under all the circumstances.  And we

9  don't have any of that.

10        And then the other one was the second paragraph with

11  regard to the intentions.  And the second paragraph says, "You

12  must decide whether the use of force was objectively

13  reasonable from the perspective of a reasonable officer facing

14  the same circumstances."  I didn't see that in the rest of it.

15        THE LAW CLERK:  The "You might decide whether the use

16  of force was excessive from the perspective of a reasonable

17  officer facing the same circumstances that the defendant

18  faced," that's in the second paragraph of Number 11.

19        MR. GUYNN:  Oh, okay.

20        THE LAW CLERK:  It's just in a place you didn't

21  anticipate it being when we were trying to put everything

22  together.

23        MR. GUYNN:  I understand.

24        And then what about the split second of judgments and

25  circumstances that depends on circumstances rapidly evolving?

1          THE LAW CLERK:  We might not have used that exact

2     phrase.  We have a part about hindsight.  I don't know if we

3     used the phrase "split second."  So which number was it of

4     yours?  Which page number?

5          MR. GUYNN:  Page 17.

6          THE LAW CLERK:  How about, Judge, do you want to move

7     on --

8          THE COURT:  Excuse me?

9          THE LAW CLERK:  Do you want to talk about the other

10    instructions while I look into this?

11         THE COURT:  Yes, I wanted to talk about the

12    instruction regarding the prior acts.  Bring the -- I don't

13    have the instructions with me.

14         THE LAW CLERK:  Okay.

15         MR. BEATON:  This is Number 13?

16         THE LAW CLERK:  Yes.  I will bring it up there.

17         MR. GUYNN:  What are you referring to?

18         MR. BEATON:  The draft Number 13.

19         MR. GUYNN:  Yours?

20         MR. BEATON:  No, the Court's draft.

21         THE COURT:  Okay.

22         MR. GUYNN:  I didn't get it.  I don't know what

23    you're talking about, e-mail or whatever.

24         MR. BEATON:  I e-mailed the Court last night, like he

25    asked us to e-mail any issues.

1     The question -- well, to bring you up to speed, the

2 question is whether, in the past uses of force instruction,

3 credibility should be in as we had proposed.

4     THE COURT:  Do you have any comment?

5     MR. GUYNN:  I don't think it should be, Your Honor.

6 But I also don't think the instruction should be given for the

7 reasons I think articulated consistently throughout the trial.

8     THE COURT:  Well --

9     MR. BEATON:  I believe the instruction is in there

10 for the benefit of the defendants, which is what the jury was

11 told at the outset of the trial.

12     THE COURT:  I told the jury that they could consider

13 the evidence for the mistake or accident.  And the problem is

14 Worsham has several -- made several statements about why he

15 threw the blow he did.  And so, I mean, he said that he

16 intended to knee him in the shoulder, but the jury could infer

17 from here that he kneed him in the head or not in the

18 shoulder.  And he has changed his testimony several times.

19     And this evidence I was admitting, what I maybe

20 propose to say now is, "may be considered only for its

21 bearing, if any, on the question of whether you believe

22 Defendant Worsham's explanation for use of force against the

23 plaintiff.  You may not consider the evidence that Defendant

24 Worsham used excessive force -- you may not consider this as

25 evidence that Worsham used excessive force in this case."

1  Other than you don't want the instruction, is that any worse?

2          MR. GUYNN:  I guess.

3          THE COURT:  Do you have any objection to that as I

4  read it?

5          MR. BEATON:  I don't think so.  I just want to make

6  sure, I believe what Your Honor read was striking the second

7  sentence of the draft?

8          THE COURT:  Let me read it.

9          MR. BEATON:  Thank you.  I'm sorry.

10          THE COURT:  "Any evidence that you heard regarding

11  past uses of force by Defendant Worsham may be considered only

12  for its bearing, if any, on the question of whether you

13  believe Worsham's explanation for his use of force against the

14  plaintiff.

15          "You may not consider this as evidence that Defendant

16  Worsham used excessive force in this case.  However, if you

17  find in favor of the plaintiff, against the Defendant Worsham,

18  you may consider evidence of his past uses of force in

19  determining whether to grant punitive damages."

20          MR. BEATON:  Thank you, Your Honor.  That is fine

21  with us.  No objection.

22          MR. GUYNN:  I don't think the second paragraph is

23  appropriate, Your Honor.  I would object.

24          THE COURT:  Well, you object to any punitive damages,

25  right?

1          MR. GUYNN:  Right.

2          THE COURT:  Only for that reason?

3          MR. GUYNN:  For that reason.  And also I don't

4  believe that his past uses of force are evidence to support

5  punitive damages.

6          THE COURT:  I think it would have to be inappropriate

7  use or something, but not just use of force.

8          MR. GUYNN:  Right.  And we haven't had that.  Nobody

9  has testified that they were substantiated.

10          MR. BEATON:  That is incorrect.

11          THE COURT:  Well, he was disciplined.

12          MR. GUYNN:  That's not in evidence, Your Honor.

13          THE COURT:  I thought he got a five-day something, a

14  suspension.

15          MR. GUYNN:  No.

16          MR. BEATON:  Your Honor, the defendant testified that

17  a five-day suspension was determined to be appropriate after

18  the investigation concluded the use of force was excessive and

19  part of an ongoing pattern.  What didn't happen was, the

20  sheriff never implemented that determination.

21          THE COURT:  I think it ought to say, "Any past use of

22  excessive force" -- I don't know.  Not just "force," because

23  it all leads to force.

24          MR. BEATON:  I believe, if Your Honor suggested past

25  inappropriate uses of force a moment ago, that would be fine

1    with me too.

2           THE COURT:  Inappropriate use of excessive force.

3    Use of excessive force.

4           THE LAW CLERK:  I think "excessive" by itself.

5           THE COURT:  Yeah, I think there's evidence of

6    excessive force.

7           THE LAW CLERK:  I think that's fair.

8           THE COURT:  We'll draw those up, so we should be able

9    to hit the ground running when the evidence is in.

10          MR. BEATON:  Thank you, Your Honor.

11          MR. GUYNN:  Your Honor, will you allow –– is your

12   plan then to go ahead and instruct the jury and then we'll put

13   our objections on the record after that, after a break?

14          THE COURT:  Well, any objections to the instructions

15   I would like to hear first.

16          MR. GUYNN:  I think we've made them.

17          THE COURT:  Any motions and anything like ––

18          MR. GUYNN:  I would still maintain the objection even

19   though the instruction is being modified.

20          THE COURT:  Right.  Okay.  We'll hopefully start back

21   right at 1:30.  We've got nearly an hour, anyway.

22        (Recess taken from 12:32 p.m. until 1:31 p.m.)

23          THE COURT:  All right.  Would the witness come back.

24   BY MR. BEATON:

25   Q    Lieutenant, before lunch Mr. Guynn asked you a question

1  that described the scene in the parking lot as a street fight.

2  Do you recall that?

3  A    I do.

4  Q    And you agreed with him that it was a street fight?

5  A    It was a brawl on the ground.

6  Q    But Michael Wyatt never hit anybody, did he?

7  A    I could not see that he did through the video.

8  Q    Do you know, sitting here today, one way or another

9  whether Michael Wyatt hit anyone?

10  A    No, I do not.

11  Q    Any reason to believe he did?

12  A    I have no proof to show one way or the other if he did or

13  didn't, so . . . (pause.)

14  Q    Would it be significant to your expert opinion in this

15  case to know whether or not the suspect hit or tried to hit

16  the officer trying to arrest him?

17  A    It would be significant as to whether he tried to strike

18  him in any way, either by hands or feet.

19  Q    And if I told you that he didn't hit him, would that

20  change your opinion?

21  A    If that's an honest statement, yes, sir.

22  Q    It would change your opinion.  Thank you.

23      Also this morning you testified that because the

24  defendants were in plain clothes, they were plain clothes

25  officers, they didn't have a taser or pepper spray available

1 to them.  Do you remember that?

2 A    I said typically that plain clothes officers do not --

3 I'm not aware that they had any of those items available.

4 Q    So your testimony now is you don't know one way or the

5 other?

6 A    Yeah.  To my knowledge, they did not.  And, typically,

7 plain clothes officers don't carry all the materials.

8 Q    Would it change your opinion if I told you that in the

9 morning, when the officers were looking for Michael Wyatt,

10 they had Kevlar on?

11 A    No.

12 Q    Would it change your opinion if I told you that, in the

13 parking lot, by that time they had taken their Kevlar off?

14 A    No, it would not.

15 Q    You don't know one way or the other whether they started

16 that day with tasers and pepper spray that they could have

17 used against Mr. Wyatt, but by the time they got to that

18 parking lot, they had already taken it off?

19 A    I'm not aware what equipment they had at the start of

20 their day or towards the end.

21 Q    Would it be relevant to your opinion whether there were

22 these other less lethal weapons that they could have used to

23 arrest Michael Wyatt more safely?

24 A    Under the facts and circumstances in this situation, I

25 don't believe those extra tools would have played a role.  I

1  believe I testified earlier some of the shortcomings that are

2  associated with pepper spray at close distances.  Even at a

3  distance, it can blow back and contaminate the officers that

4  are in pursuit.  As well as a taser, it is limited as far as

5  its reach.  Typically they have 21 feet to 25 feet of wire

6  that's attached to the barbs.

7  Q    That's your testimony now.  But you didn't know one way

8  or the other whether they had these available when you reached

9  your opinion in this case, did you?

10 A    That's correct, I did not know whether they had any of

11 those items.

12 Q    Also this morning you mentioned that there was a car

13 chase that preceded the arrest, correct?

14 A    Yes.

15 Q    And you didn't offer any expert opinion one way or the

16 other about the car chase itself, did you?

17 A    I did not.

18 Q    And when you assessed the reasonableness of the use of

19 force, you make that determination based on the moment when

20 the force is used, right?

21 A    You make a determination as far as the use of force at

22 that moment, but you also take into consideration those

23 factors that lead up to it.  That's why I mentioned, for

24 example, the aspect of the officers seeing the hand go towards

25 the right waist, believing that there was a weapon there.

1  Q    The reason you talked about the car chase this morning is

2  you said, well, he was trying to flee, right?  That was your

3  testimony this morning?

4  A    That's correct.

5  Q    When there were four officers holding him down in the

6  parking lot, he was not trying to flee, was he?  He was

7  incapable of fleeing by that point, wasn't he?

8  A    It's my understanding that since he was not in control --

9  or, I'm sorry.  It's my understanding since the officers did

10  not have control of him initially, that there was still the

11  potential that he could still get up, he was actively moving

12  in a way he wasn't being passive in his resistance, nor

13  compliant.

14  Q    When there were four officers holding him down, it is

15  your expert opinion that Michael Wyatt was able to flee?

16  A    He wasn't necessarily able to flee, but he was not in

17  control.  And until a person is in control, there's always the

18  potential that something could happen or the person may flee.

19  Q    I think I understand your answer to be that he was

20  incapable of fleeing when there were four officers on top of

21  him, right?

22  A    He was not actively fleeing, if by "fleeing" you mean

23  running away.  He was on the ground.  But he was not in

24  control.  I'm sorry, the officers were not in control.

25  Q    You told the jury this morning about training that you do

1  from time to time on the use of knee strikes; correct?

2  A    Yes.

3  Q    And when you train a knee strike to hit into the fleshy

4  part of the leg, the main reason that you were talking about

5  destabilization this morning is so that knee strike can take

6  the suspect to the ground, right?

7  A    Yes.  If you're in a standing position, basically going

8  hands-on with a person that is just standing, not running, and

9  you're standing next to them and you go hands-on to what is

10 referred to as a law enforcement grasp, to place them into a

11 control hold, that if you start to sense resistance, you could

12 deliver a knee strike to that common peroneal nerve that runs

13 along the side, in order to use as a stunning distraction or

14 take them off balance, yes.

15 Q    And a knee strike does not work the same for a suspect

16 who is already on the ground, does it?

17 A    Not for destabilization.  But I believe I mentioned the

18 fact that we teach targeted areas, and that as long as you're

19 striking a targeted area, whether you use your hands or your

20 knee or your foot, you're trying to access that point.  It

21 would still --

22 Q    So a knee strike does not work the same for a suspect who

23 is already on the ground, correct?

24 A    I wish I could give you that general answer.  It doesn't

25 work the same as being a destabilization point.  But a knee

1  strike can still work in that area to deliver pain compliance,

2  as far as a stunning distraction.  It's not always the best

3  positioning you can take when down on the ground, because you

4  might not be able to generate the right power right where you

5  need it to be.  Sometimes it might topple you, in a way.

6      If you can imagine yourself down on all fours, over top

7  of somebody, ideally you'd like to deliver a strike with your

8  hand.  But if a hand strike isn't available to you, then a

9  knee strike could suffice if you're looking to target a

10 specific area.

11 Q    So it doesn't work the same on the ground, right?

12 A    Aspects of it do not work the same.  It does not work the

13 same as far as being able to take a person off balance if

14 they're already standing and down on the ground.  But it still

15 works, as far as being able to deliver pain or motor

16 dysfunction.  And that's as long as we're still speaking about

17 that common peroneal nerve.

18 Q    On page 109 of your deposition transcript, I asked you at

19 line 3:  "How would it differ for a person who is already on

20 the ground?"

21     And then you give me an answer about someone who is

22 standing and somebody who is pulling away and sitting up.

23     But at line 22 you state in your answer:  "The difference

24 that would be associated with this is when they are on the

25 ground, they are already in that prone position and they can

1  only roll but so much.  They can still be resisting, but not
2  to the point where they may be able to use their feet to get
3  distance or close the distance with the officer."
4  A    Correct.  And I believe that's in line with what I'm
5  saying.  That part of -- the person standing, when you deliver
6  that knee strike, you want to take them down to the ground.
7  Well, if they're already down on the ground, and as you just
8  read, they can still be resisting, though they might not be as
9  capable to quickly get to their feet to flee.  So I think
10 we -- you reiterated that.
11 Q    Have you seen the photographs of Mr. Wyatt's injuries in
12 this case?
13 A    I have.
14 Q    Do you account for those in reaching your opinion?
15 A    Not really, because I don't have a medical background,
16 sir.
17 Q    Are you familiar with how -- I know you are, because you
18 looked.  You are familiar with how Mr. Wyatt's right eye
19 looked when he got to the hospital, aren't you?
20 A    Yes.  It's been a while, but I saw the pictures, yes.
21 Q    Should we put them up again, or no?
22 A    I don't believe it's necessary.
23 Q    As far as you know, there is nothing that happened in
24 that parking lot other than Robert Worsham's knee that could
25 have caused the injury to Michael Wyatt's right eye, is there?

Wershbale – Cross

1    A    No, I believe I testified earlier that there were a lot

2    of different factors if we're -- I think we were specifically

3    talking about the right side, when he was coming off the

4    running board or the side of his car, I said one possibility

5    was the car door coming back at him.

6         And I believe that the other option was when he actually

7    made contact to the ground not knowing exactly how he landed,

8    if there were hands out, hands in --

9    Q    You don't know which side of his head he landed on, do

10   you?

11   A    I do not.

12   Q    Whether one side was consistent with falling on the

13   ground, and the other side was consistent with blunt force

14   trauma?

15   A    No, I couldn't tell you that.

16   Q    Okay.  Now, when you teach distraction strikes, you

17   testified earlier that the point is to take the suspect's mind

18   off the area that you are trying to control as a law

19   enforcement officer, right?

20   A    Yes.

21   Q    When you teach distraction strikes, you do not teach

22   officers to hit as hard as they can, do you?

23   A    When we teach that block instruction, it falls under

24   stunning and distraction.  Sometimes the question comes up,

25   what do we mean by "stunning" and "distraction"?  I guess the

1  easiest way to explain it is a distraction is a short time.  A

2  stunning distraction would take a little bit longer.

3      And you if you can imagine that in order for something to

4  cause pain or motor dysfunction to take a little bit longer,

5  you have to hit it harder.  Where, in a distraction technique,

6  it doesn't necessarily mean it's a light strike, it doesn't

7  necessarily mean it's a hard strike.

8      I would say it's safe to say a distraction technique

9  might not rise to the level of an all-out, you know, full

10 power hit.  But I guess the example that I could give the jury

11 would be one of our stunning distraction techniques is a smack

12 to the forehead.  Typically, we try to teach that as an open

13 hand or back of the hand, where you might smack someone,

14 someone might say, pretty hard.  So I think it's kind of

15 subjective at that point as far as the hardest you hit.

16 Q    So do you teach officers to hit as hard as they can when

17 they deliver a distraction strike?  You don't, do you?

18 A    Not on all targets for distraction techniques.

19 Q    Not in the head for distraction techniques?

20 A    No, not necessarily.  Like I said, you might use not a

21 punch but a slap.  And I think we've talked about that before,

22 that you might have to generate some power in order to do

23 that.  But I wouldn't necessarily call it a full-out hard

24 strike.  It's a strike, meaning you're making contact, but not

25 a punch I think that some people might have in their head.

1  Q    When you reached your opinion in this case, were you

2  aware that Scott Wyatt admitted hitting Michael Wyatt in the

3  face with his fist as hard as he could?

4  A    I don't recall that.

5  Q    Would it have changed your opinion possibly if you knew

6  that he admitted hitting Michael Wyatt with his fist in the

7  face four to eight times?

8  A    I think under these circumstances I would say, no, it

9  would not.  And the reason I say that is, given the situation

10  at that given time that Investigator Wyatt was dealing with

11  the situation, he had in his head the idea that there was a

12  weapon involved, and I think that raises the stakes as far as

13  dealing with the person that's noncompliant at that point.

14  Q    It would have made no difference to your opinion?

15  A    That's correct.

16  Q    Okay.  I believe you discussed this morning also the

17  notion of providing lethal cover when you believe a person has

18  a weapon on them.  Do you remember that?

19  A    Yes.

20  Q    And you train officers to provide lethal cover when they

21  believe a person has a weapon on them, right?

22  A    A lot of it is situational.  Are you taught to use lethal

23  cover when it's applicable?  Yes.  I think the dynamics of

24  this situation, though, was that it wasn't -- it wasn't the

25  best choice to have a firearm out at that situation, being

1    that you had people that were going hands-on with the person

2    at that time, especially since they had not specifically seen

3    a firearm.  They thought there was, and I think we went into

4    that discussion as far as if someone saw it, that would have

5    changed the dynamics of that situation at that time.

6    Q    I see.  So it's the uncertainty over whether there was a

7    weapon or not?  If they were certain there was a weapon, that

8    would be different, I believe you testified earlier.  But

9    here, they didn't know for sure whether there was a weapon?

10   A    It would have made it easier if that weapon was displayed

11   and seen.  There is uncertainty, though it had not been -- it

12   hadn't been pointed out by any of the officers.

13   Q    It would have been easier on the officers if the gun was

14   visible?

15   A    Can I finish that one?  Yes.  If the weapon was visible,

16   whether it was in the waistband or obviously in the person's

17   hand, they would have known specifically there is a firearm

18   and someone may have drawn their weapon.

19        In this, the dynamics of this situation, their training

20   and experience was that a hand is going to the right side,

21   which is typical of someone that is trying to keep in or pull

22   out something from their waistband; that when they went to the

23   ground and there were that many officers trying to gain

24   control of the person, that pulling the firearm out at that

25   point wasn't -- that wasn't the best option.  There was too

1  much potential that a firearm could have been discharged at

2  one of the officers involved.

3      So it was a conscious decision that was made by -- I

4  believe it would have been Captain Nicholson at the time,

5  though he had his weapon out, it's time to holster up because

6  they were attempting to go hands-on.  And I think we talked

7  about not wanting to have a firearm in our hand when going

8  hands-on.

9  Q    The purpose of providing lethal cover is to protect the

10 handcuffing officer, correct?

11 A    Yes, once the person is in compliance.

12 Q    In case the suspect pulls a gun, you want somebody to

13 have the ability to use lethal force in response, right?

14 A    That's correct.

15 Q    But no one provided lethal cover here, did they?

16 A    No, not in this situation, they were all hands-on.

17 Q    And at the time you reached your opinion in this case,

18 you didn't know why the defendants chose not to provide lethal

19 cover, did you?

20 A    I could only assume as to why they chose not to just

21 based off my training and experience.

22 Q    So you didn't know?

23 A    I didn't know why they chose not to, other than what my

24 assumption would have been based off my training and

25 experience.

1 Q    When you reached your opinion in this case, you didn't

2 know of any reason why Tommy Nicholson would have holstered

3 his gun out, did you -- holstered his gun, rather?

4 A    I'm sorry, can you repeat that?

5 Q    Sure.  When you reached your conclusion in this case, you

6 didn't know of any reason why Tommy Nicholson wouldn't have

7 had his gun out?

8 A    My assessment --

9 Q    Go ahead.

10 A    I was going to say, my assessment would be that he had it

11 out initially but then he holstered his weapon as he was

12 getting ready to go hands-on on that right side of Mr. Michael

13 Wyatt, thus the reason that he put his weapon away.  That

14 would be my rationale as far as why he didn't have it out, if

15 I'm answering your question.

16 Q    I'm not sure if you answered it or not.  You knew of no

17 reason why Nicholson's weapon would not have been out when you

18 reached your opinion in this case, did you?

19 A    A lot of double negatives in there.  I knew of no reason

20 as to -- can you repeat that one more time?

21 Q    Sure.

22 A    Or maybe ask it a different way.

23 Q    You know of no reason at the time you reached your

24 opinion why Nicholson would have put his gun away, did you?

25 A    My reason would be that he was going hands-on, and thus

1  he put his weapon away so he wouldn't have his firearm in his

2  hand as he was attempting to go hands-on.

3  Q    That's your reason today, it was not your reason when you

4  made your conclusion in this case, was it?

5  A    Based off my observations, that would have been part of

6  it.

7  Q    Page 139, line 17.  "Question:  There is no reason why

8  Nicholson's weapon wouldn't have been out in a position to

9  provide some cover, right?"

10     "Answer:  I think there could be a reason.  And this –– I

11 think this would just come from, I guess, him knowing himself.

12 One of the things that, you know, we always talk about as far

13 as factors deal with fatigue and injury.  It seemed to me that

14 when he stood up, he was worn out."

15 A    Okay.  I think ––

16 Q    Is that your opinion today, that he was worn out?

17 A    Well, if I can answer that question.  I think we were

18 talking about two different things.  I thought the initial

19 question was why was he putting his weapon away.  And I think

20 I answered that.

21     As far as why he was standing up, I think he may have

22 either been fatigued or worn out from the adrenaline dump that

23 occurs during that type of trying to get a person in custody,

24 and realizing that he may have not been in the best position

25 to take control.

1    So I feel that you were kind of asking me two different

2  questions:  Why did he put his weapon away?  To go hands-on.

3  Why did he stand up?  I think he may have been tired.

4  Q    I didn't ask you why he stood up.

5    The question was:  "Is there any reason why Nicholson's

6  weapon wouldn't have been out in a position to provide some

7  cover for the officers trying to handcuff Michael Wyatt?"

8    Your answer then was that he might have been tired.

9    Is that your answer today?

10 A    Okay.  Now that we're coming full circle with this, okay.

11 Yes, because part of my answer I believe that day dealt with

12 if he stands up and he is tired and he is pulling three --

13 unholstering his weapon again, and if he is that close to

14 somebody and if he is that tired, there's a good chance he's

15 not going to have that accurate shot if he needed to take it.

16 So I think it was a conscious decision on his part to keep the

17 weapon inside, because it was not necessarily the safest

18 thing.  And he was assessing that situation at hand as far as

19 how those officers were trying to take control of him.

20 Q    Investigator Owens successfully used a wristlock to

21 secure Michael Wyatt's left arm, didn't he?

22 A    Yes.

23 Q    But only after he punched Michael Wyatt six times, right?

24 A    I don't know the number.  I'm not sure as far as what led

25 up to it, but, yeah, eventually he was able to get a wristlock

1    applied on the left side, correct.

2    Q    He didn't try it first, he only tried it after he hit him

3    six times, right?

4    A    I believe so.

5    Q    As an instructor, you do not teach officers to punch

6    anyone who is already on the ground, in the prone position, do

7    you?

8    A    Based on the dynamics of the situation, if you're unable

9    to get your hand placement where you want it to be -- and by

10   "hand placement," to put anyone in any control hold, I

11   mentioned earlier there's a technique that we refer to as the

12   law enforcement grasp, and where you're trying to get ahold of

13   that person is specifically at the wrist and right behind the

14   elbow.  So until you're able to get your hands in those

15   positions, you have -- that's the only way you're going to be

16   able to start transitioning into the different types of joint

17   locks that there are.

18       If a person is tightened up, you may need to deliver

19   stunning distraction techniques into that area, once again, in

20   order to loosen that tightened arm up, in order to take

21   control of it so you can manipulate that arm into that proper

22   positioning in order to eventually get into that wristlock

23   lock that Investigator Owens got into.

24   Q    I'll ask it again.  You do not teach officers to punch

25   suspects laying prone on the ground, do you?

1   A    It's not that easy an answer -- or it's not a

2   black-and-white answer.  There's a gray answer to this,

3   because depending on the situation that you have, you may need

4   to teach that and, yes, we do teach that.  We do teach that if

5   you need to deliver stunning distraction techniques into an

6   arm or wherever to gain control of that appendage, then, yes,

7   it is admissible -- or acceptable.  I'm sorry.

8   Q    So you teach it?  You do?  That's your testimony?

9   A    We do.

10  Q    Punches to the face?  I think you already testified you

11  didn't do that.

12  A    I testified to the fact that we use -- there are stunning

13  distraction areas along the face.  You try to avoid using your

14  fists because it's most likely going to cause damage to you as

15  well as the person.

16  Q    Investigator Owens eventually used that wristlock to

17  secure Michael Wyatt's arm, as you said.

18  A    Yes.

19  Q    You don't know of anything that prevented Investigator

20  Owens or the other officers from using a wristlock, rather

21  than punching, to secure the arm in the first place, do you?

22  A    I would only be assuming that they were unable to get

23  their hands in the proper position as far as I described as

24  the law enforcement grasp, in order to manipulate the arm into

25  that position.  That would be the only thing that I would be

1  able to offer on that.

2  Q    So you don't know of anything that prevented them from

3  using it?

4  A    The only thing that would have prevented him from using

5  it is actually having access to the specific targets on the

6  arm in order to grasp and manipulate.

7  Q    But you didn't know that when you reached your opinion in

8  this case, did you?

9  A    It would have been a reasonable assumption that I made as

10 far as assessing the statements and everything with it.

11 Q    Page 11, line 5.

12      "Question:  What prevented the officers on the –-

13 involved in the Wyatt arrest from using a wristlock to secure

14 the suspect?"

15      "Answer:  What prevented them?"

16      "Uh-huh."

17      "Answer:  I don't know."

18      Almost there.  Let's talk about knee strikes one more

19 time.

20 A    Okay.

21 Q    You teach your officers not to deliver a strike if

22 they're unsure of the target, right?

23 A    That is correct.  They should know their target.

24 Q    Because if a knee strike is used incorrectly, it poses a

25 risk of serious potential injury, right?

1  A    Depending on where it makes contact.

2  Q    I'm sorry, I didn't hear that.

3  A    I said depending on where it makes contact.

4  Q    Right.  There's a potential risk of serious injury?

5  A    Correct.

6  Q    If a person is on the ground, you teach an officer to

7  strike with their hands, not with their knees, right?

8  A    Going back to what I've testified before to is we teach

9  specific targets.  Ideally you would like to use your hands,

10 but sometimes your hands are not an option, so you learn to

11 use other personal body weapons, whether it's your knees, your

12 elbows, your fists, your feet.

13 Q    But you don't train anyone to use a knee on a subject who

14 is already on the ground; you train them to use their hands,

15 right?

16 A    No.  What I'm saying is we teach targets.  And in the

17 training that we provide, that we discuss that as an option,

18 that this may be something that you need to do.

19 Q    Page 110, line 23.  "Question:  Do you teach knee strikes

20 for a subject who is on the ground?"

21      "Answer:  We teach, given the situation, if there was a

22 need to target someone, we would try to deliver a strike, if

23 need be, with our hand, because it's something you are able to

24 control a little bit more."

25 A    Correct, I said that.

1  Q     That was true when you said that, right?

2  A     Yes.  And if I recall, I think that there is more where

3  it talked about utilizing a knee, or using other parts.

4  Q     There is.  "Lifting your leg -- it's -- it's going to put

5  you more off balance, because if you're already on the ground,

6  you want to try to stay as grounded as you are."

7  A     Yes.  And then there was also more where I talked about

8  where the target was in front of me.  And I think I made the

9  reference that your knee, if you can imagine your knee almost

10 like a piston, that you know where it is in front of you, that

11 you can deliver that strike, knowing where your knee is

12 relative to the rest of your body and knowing where that

13 target is, that you can deliver it.

14 Q     I'm happy to read the rest of your answer.

15       "So the technique, a strike to that area if it's

16 accessible, you would still feel it.  But I don't feel how the

17 person who's the ground just -- I guess the physics that are

18 related to that knee coming and generating power into the side

19 of a person, there is a lot of potential for even more, you

20 know, injury to occur to that officer if they are trying to

21 target and not getting the full effect of the technique as

22 when it is standing."

23       That is your full answer.

24 A     And does it go on to talk a little bit about the piston

25 reference?

1  Q    The next question does not involve a piston.

2  A    Okay.

3  Q    Before this case, Lieutenant, you had never seen an

4  officer knee a civilian in the head, had you?

5  A    I had never seen an officer knee somebody in the head

6  during -- no.

7  Q    Because a hard strike to the head is considered a lethal

8  use of force, right?

9  A    Yes.

10 Q    And the strikes you saw on that video were hard strikes,

11 right?

12 A    I saw the strikes; they appeared to be powerful.  I

13 couldn't tell you how hard they hit with, but they appeared

14 powerful.

15 Q    When you reached your opinion in this case, you thought

16 it would be difficult to articulate a justification for a knee

17 to the head area if the civilian's arms were under control,

18 didn't you?

19 A    I said that if a person's arms were under control, that

20 it would be difficult to articulate the knee to deliver a hard

21 strike specifically to the head, yes, sir.

22 Q    You said you would just be speculating if you tried to

23 give a reason why an officer --

24 A    I'm sorry, I didn't hear the first part.

25 Q    No problem.  You said you would just be speculating if

1  you tried to give a reason why an officer would knee a

2  civilian in the head?

3  A    Yes.  Under those circumstances of having hands under

4  control and specifically targeting someone in the head, I

5  would be speculating, yes, sir, that's correct.

6  Q    Michael Wyatt, as I believe you testified earlier this

7  morning, was not a lethal threat when the four officers were

8  holding him down, were they -- was he?

9  A    Was he a lethal threat?

10  Q    Did he create a deadly force situation when there are

11  four officers on top of him?

12  A    Though there was the perception that it could have been,

13  no, not without them specifically seeing a gun.

14  Q    Hypothetically, if a knee strike was intended and

15  actually hit the head, that would be deadly force, wouldn't

16  it, for a subject who is on the ground, held down?

17  A    And just to clarify, held down and under control?

18  Q    One officer is on his left arm, one officer is on his

19  right arm, one officer is on his torso, one officer is on his

20  back, and then there's a knee strike to the head.  That is

21  deadly force, wouldn't it be?

22  A    If it is a specific target to that person's head and they

23  are unable to articulate that this was a lethal situation,

24  yes.

25           MR. BEATON:  I have nothing further.

REDIRECT EXAMINATION

BY MR. GUYNN:

Q    Was Michael Wyatt under control when the knee strikes
were delivered?

A    In my assessment of it, he was not under control; thus,
the need when the fifth officer -- or, I'm sorry,
investigator, Investigator Worsham made his approach, he
wasn't under control.  It wasn't until he delivered those knee
strikes to the area that I believe to be that shoulder, which
seems to be under contention, it was only after those knee
strikes that they were able to place the person in handcuffs.

Q    And, excuse me, I want to make clear.  You assume for
purposes of your opinion that the officers' belief that
Michael Wyatt had a pistol was reasonable?

A    Yes.  That was part of my assessment, that the officers
were going into this situation, that they were dealing with a
person that was a wanted felon, that he was considered armed
and dangerous, that he was in recent possession of a firearm,
and that he had made a movement that most people in law
enforcement would see as an action indicative of someone
trying to either maintain control or retrieve something from
their waistband, knowing that the waistband is a commonplace
that someone would conceal a firearm.

Q    And the force that was used was appropriate based on that
belief?

1  A    I believe that it was an appropriate use of force.

2  Q    If they had pulled his hand out, got him handcuffed, knew

3  he didn't have a gun and used the same force, you wouldn't be

4  here, would you?

5  A    That's correct.

6  Q    Because you don't believe that would have been

7  appropriate, do you?

8  A    (Nods head up and down.)

9  Q    But that belief is what has driven your opinion?

10  A    That's correct.

11       MR. GUYNN:  That's all I have.

12       THE COURT:  All right.  Okay.  Thank you.  You may

13  step down.

14       MR. GUYNN:  The defense rests.

15                    DEFENSE RESTS

16       THE COURT:  All right.  The defendants rest.

17       MR. BEATON:  Could we have just a moment, Your Honor?

18       THE COURT:  All right.

19     (Pause in the proceedings.)

20       MR. TODD:  Your Honor, no redirect -- or no rebuttal.

21  We're done.

22       THE COURT:  All right.  Thank you.

23       Members of the jury, you've heard all the evidence in

24  the case.  It becomes my duty, therefore, to instruct you on

25  the rules of law that you must follow and apply in arriving at

1   your decision in the case.

2           You, as jurors, are judges of the facts, but in

3   determining what actually happened in the case, that is, in

4   reaching your decision as to the facts, it is your sworn duty

5   to follow the law I am now in the process of defining for you.

6           Do you want to put the instructions on the ELMO?

7           THE LAW CLERK:  Do you want to put them up?

8           THE COURT:  Yeah.

9           THE LAW CLERK:  I will need a minute.

10          THE COURT:  You don't have a copy?  I will finish the

11  one I'm reading.

12          You have no right to disregard or give special

13  attention to any one instruction or to question the wisdom or

14  correctness of any rule I may state to you.  That is, you must

15  not substitute or follow your own notion or opinion as to what

16  the law is or ought to be.

17          It is your duty to apply the law as I give it to you,

18  regardless of the consequences.  By the same token, it is also

19  your duty to base your verdict solely upon the testimony and

20  evidence in the case without prejudice or sympathy.

21          That was the promise you made and the oath you took

22  before being accepted by the parties as jurors in this case,

23  and they have the right to expect nothing less.

24          I will go on and read the third instruction, then.

25          In this case, the defendants are governmental

1  officials while the plaintiff is a private citizen.  All

2  parties are equal before the law and are to be dealt with as

3  equals in a court of justice.  All parties are entitled to the

4  same fair consideration.  You are thus not to afford any more

5  credibility to statements made by a witness or a party because

6  he is a governmental official.  And you are not to afford any

7  less credibility to statements made by a witness or a party

8  because he is or was a private citizen.

9       This case should be considered and decided by you as

10 an action between persons of equal standing in the community,

11 of equal worth, and holding the same or similar stations in

12 life.

13      Furthermore, I tell you that an individual who has

14 been charged with or convicted of a crime is entitled to the

15 same fair and impartial consideration of this case as any

16 person before the Court.  Such individual does not forfeit his

17 constitutional rights merely by virtue of his arrest and

18 conviction.

19      As stated earlier, it is your duty to determine the

20 facts, and in so doing you must consider only the evidence I

21 have admitted in the case.

22      The term "evidence" includes the sworn testimony of

23 the witnesses and the exhibits admitted in the record.

24 Testimony or evidence that I struck from the record or that I

25 told you to disregard is not evidence and must not be

1  considered.  Anything you may have seen or heard outside the

2  courtroom is not evidence and must be completely disregarded.

3       I'm on the third paragraph there, if you want to

4  follow me on the screen.  It's also up there.  I don't know

5  whether y'all can read that or not; I can't.  Anyway, you will

6  have a copy of these instructions in the jury room, but try to

7  listen to them too.

8       In considering the evidence, you are not limited to

9  the bald statements of the witnesses.  In other words, you are

10 not limited solely to what you see and hear as the witnesses

11 testify.  On the contrary, you are permitted to draw from the

12 facts which you find to have been proven such reasonable

13 inferences as may seem justified in light of your own

14 experience.  Put differently, you may use reason and common

15 sense to draw deductions or conclusions from facts that have

16 been established by the evidence in this case.

17      There are two types of evidence: direct and

18 circumstantial.  Direct evidence is the direct proof of a

19 fact, such as testimony from an eyewitness.  Circumstantial

20 evidence is proof of facts from which you may infer or

21 conclude that other facts exist.  The law makes no distinction

22 between direct and circumstantial evidence, and you should

23 give all evidence the weight and value you believe it is

24 entitled to.

25      Any statements, objections, or arguments made by the

1  lawyers are not evidence in the case.  It is the duty of the

2  attorneys for each side of a case to object when the other

3  side offers testimony or other evidence which the attorney

4  believes is not properly admissible.  Counsel also has the

5  right and the duty to ask the Court to make rulings of law and

6  to request conferences at the sidebar out of the hearing of

7  the jury.  All those questions of law must be decided by the

8  Court.

9       You should not harbor any prejudice against an

10 attorney or his client because the attorney objected to the

11 admissibility of evidence, or asked for a conference out of

12 the hearing of the jury, or asked the Court for a ruling on

13 the law.

14      My rulings on the admissibility of evidence do not

15 indicate any opinion about the weight or effect of such

16 evidence.

17      You are the sole judges of the credibility of all

18 witnesses and the weight and effect of all evidence.  It is

19 your own recollection and interpretation of the evidence that

20 controls the case.  What the lawyers say is not binding upon

21 you.

22      During the course of a trial I occasionally made

23 comments to lawyers or asked questions of a witness, or

24 admonished a witness concerning the manner in which he should

25 respond to the questions of counsel.  Do not assume from

1    anything I may have said that I have any opinion concerning

2    any of the issues in this case.

3           I have said that you must consider all of the

4    evidence.  This does not mean, however, that you must accept

5    all of the evidence as true or accurate.

6           You are the sole judges of the credibility or

7    believability of each witness and the weight to be given his

8    or her testimony.  You may call upon your own experience and

9    background in your every day affairs in determining the

10   reliability or unreliability of statements made by others.

11          In weighing the testimony of a witness, you should

12   consider the following:

13          (1) The witness's relationship to the plaintiff or to

14   the defendant;

15          (2) The witness's interest, if any, in the outcome of

16   the case;

17          (3) The witness's manner of testifying;

18          (4) The witness's opportunity to observe or acquire

19   knowledge concerning the facts about which the witness

20   testified;

21          (5) The witness's candor, fairness, and intelligence;

22   and

23          (6) The extent to which the witness has been

24   supported or contradicted by other credible evidence.

25          Also, the weight of the evidence is not necessarily

1  determined by the number of witnesses testifying to the

2  existence or nonexistence of any fact.  You may find the

3  testimony of a smaller number of witnesses as to any fact --

4  you may find that the testimony of a smaller number of

5  witnesses as to any fact is more credible than the testimony

6  of a larger number of witnesses to the contrary.

7        A witness may be discredited or impeached by

8  contradictory evidence by a showing that he testified falsely

9  concerning a material matter, or by evidence that at some

10 other time the witness has said or done something or has

11 failed to say or do something which is inconsistent with the

12 witness's present testimony.

13       If you believe that any witness has been so

14 impeached, then it is your exclusive province to give the

15 testimony of that witness such credibility or weight, if any,

16 as you may think it deserves.

17       The fact that a witness has previously been convicted

18 of a felony or any crime where proof of a dishonest act or

19 false statement was required for a conviction is also a factor

20 you may consider in weighing the credibility of that witness.

21 The fact of such conviction does not necessarily destroy the

22 witness's credibility, but it is one of the circumstances you

23 may take into account in determining the weight to be given to

24 his or her testimony.

25       You have heard testimony from expert witnesses.  When

1  scientific, technical, or other specialized knowledge might be
2  helpful, a person who has special training or experience in
3  that field is allowed to state an opinion about the matter.
4  However, you are not required to accept that opinion.  As with
5  any other witness, it is up to you to decide whether to rely
6  upon the testimony and how much weight to accord the expert's
7  testimony.

8      In weighing the opinion testimony, you may consider
9  the witness's qualifications, his or her opinions, the reason
10 for testifying, as well as the other considerations that
11 ordinarily apply when you are deciding whether or not to
12 believe a witness's testimony.

13     The fact that such person has given an opinion does
14 not mean that you are required to accept it.  Nor should you
15 substitute it for your own reason, judgment, and common sense.
16 The determination of the facts in this case rests solely with
17 you.

18     In addition to the testimony of witnesses, the
19 evidence in this case consists of any and all exhibits that
20 have been received into evidence.  Additionally, the parties
21 have stipulated or agreed that certain facts should be
22 considered true.  You must treat those facts as having been
23 proved for the purpose of this case.

24     Certain diagrams may have been shown to you.  These
25 diagrams are used for your convenience and to help explain the

 1  facts of the case.  They are not themselves evidence or proof

 2  of any facts if not admitted into evidence.

 3        The burden is on the plaintiff in a civil action such

 4  as this to prove every essential element of his claim by a

 5  preponderance of the evidence, which is the greater weight of

 6  the evidence.  A preponderance of the evidence means such

 7  evidence as, when considered and compared with that opposed to

 8  it, has more convincing force and produces in your minds a

 9  belief that what is sought to be proved is more likely true

10  than not.  In other words, to establish a claim by a

11  preponderance of the evidence merely means to prove that the

12  claim is more likely so than not so.

13        To state it differently, if you were to put the

14  evidence favorable to the plaintiff and the evidence favorable

15  to the defendants on opposite sides of a scale, the plaintiff

16  would need to have tipped the scale somewhat to his side.

17        In determining whether any fact in issue has been

18  proved by a preponderance of the evidence, the jury may

19  consider the testimony of all the witnesses, regardless of who

20  may have called them, and all the exhibits received in

21  evidence, regardless of who may have produced them.

22        If the proof should fail to establish any essential

23  element of the plaintiff's claim by a preponderance of the

24  evidence, the jury should find for the defendant as to that

25  claim.

1    You may have heard of the phrase "proof beyond a

2  reasonable doubt."  That is a stricter standard of proof and

3  applies only to criminal cases.  It does not apply in civil

4  cases such as this, so you should put it out of your mind.

5    Under the Fourth Amendment, a police officer may use

6  only such force as is objectively reasonable under all the

7  circumstances.  The plaintiff claims the defendants used

8  excessive force when they arrested him.  In making a lawful

9  arrest, a law enforcement officer has the right to use such

10  force as is necessary under the circumstances to effectuate

11  the arrest.  Whether or not that force used in making an

12  arrest was unreasonable is a question to be determined by you

13  in light of all the evidence received in the case.

14    In order to succeed on his claim, the plaintiff must

15  prove by a preponderance of the evidence that at least one of

16  the defendants used excessive force against him on the date of

17  his arrest.  You must decide whether the use of force was

18  excessive from the perspective of a reasonable officer facing

19  the same circumstances.  You must allow for the fact that

20  police officers are often forced to make split-second

21  judgments in circumstances that are tense, uncertain, and

22  rapidly evolving.  You must make this decision based on what

23  the particular defendant actually knew at the time each

24  distinct act of force was used, not based on what you now

25  know.

1    What is an initial use of force was justified does

2 not necessarily mean that all later uses of force were also

3 justified.

4    In determining whether use of force was excessive,

5 you should consider the totality of the circumstances,

6 including:

7        (1) the need for the application of force;

8        (2) the severity of the crime at issue;

9        (3) whether plaintiff posed an immediate threat to

10 the safety of the officers or others as perceived by

11 defendants at the time;

12        (4) the amount of force actually used;

13        (5) the relationship between the threat posed and the

14 actual force;

15        (6) whether the plaintiff was actively resisting

16 arrest or attempting to evade by flight -- arrest by flight;

17        (7) the extent of the injury suffered by the

18 plaintiff;

19        (8) whether a reasonable officer without the benefit

20 of hindsight would have used that much force; and

21        (9) whether the defendants could have obtained

22 compliance through alternative uses of force.

23    In deciding whether the plaintiff has proven that the

24 defendants used excessive force against him, I tell that you

25 the defendants' intentions are not to be considered.  The

1  plaintiff must only show that the force used against him was

2  objectively unreasonable.

3          Any evidence that you heard regarding past uses of

4  excessive force by Defendant Worsham may be considered only

5  for its bearing, if any, on the question of whether you

6  believe Defendant Worsham's explanation for his use of force

7  against the plaintiff.  You may not consider this as evidence

8  that Defendant Worsham used excessive force in this case.

9          However, if you find in favor of plaintiff and

10  against Defendant Worsham, you may also consider evidence

11  of -- strike that word "his," put in "any past uses of

12  excessive force in determining whether to grant punitive

13  damages."  It's up to you to determine whether the evidence

14  showed any such past uses of excessive force.

15          You have heard evidence about whether defendants'

16  conduct complied or violated a given rule or policy.  You may

17  consider this evidence in your deliberations, but remember

18  that the issue is whether defendant used excessive force on

19  plaintiff in violation of the Fourth Amendment, not whether a

20  rule or policy might have been violated.

21          If you find by a preponderance of the evidence that

22  plaintiff has proved that one or more of the defendants used

23  excessive force against him, then you should find for the

24  plaintiff and against such defendant or defendants.  Then go

25  on to consider the question of damages.

1          On the other hand, if you find that the plaintiff has

2    not proved that any one of the defendants used against -- used

3    excessive force against him, then you should find for the

4    defendants, and you will not consider the question of damages.

5          If you find any of the defendants liable, then you

6    must consider the issue of compensatory damages.  You must

7    award the plaintiff an amount that will fairly compensate him

8    for any injury he sustained as a result of any excessive

9    force.

10          You must use sound judgment in fixing an award of

11    damages, drawing reasonable inferences from the facts in

12    evidence.  However, compensatory damages may not be based on

13    speculation or sympathy.  They must be based on the evidence

14    presented at trial and only on that evidence.

15          The plaintiff has the burden of proving compensatory

16    damages by a preponderance of the evidence, but the law does

17    not require that he prove the amount of his losses with

18    mathematical precision.  It only requires as much definiteness

19    and accuracy as circumstances permit.

20          Here the plaintiff claims the following items of

21    damages:

22          (1) physical harm, including physical pain and the

23    discomfort;

24          (2) reasonable -- that "(2)"comes out, doesn't it?

25          MR. BEATON:  Yes, Your Honor.

1          THE COURT:  (2) emotional and mental harm suffered

2     during and after the events at issue, including fear,

3     humiliation, and mental anguish, as well as emotional and

4     mental harm that plaintiff is reasonably certain to suffer in

5     the future.

6          No evidence of the dollar value of such pain needs to

7     be introduced.  There is no exact standard for determining the

8     damages awarded based on pain and suffering.  You are to

9     determine an amount that will fairly compensate plaintiff for

10    the injury.

11         The law that applies to this case authorizes an award

12    of nominal damages.  If you find for the plaintiff but you

13    find the plaintiff has failed to prove damages as defined in

14    these instructions, you must award nominal damages of one

15    dollar.

16         In addition to the damages mentioned in other

17    instructions, you may also award punitive damages to the

18    plaintiff under some circumstances.

19         To obtain punitive damages, the plaintiff must prove

20    by a preponderance of the evidence that Defendant Worsham

21    either knew that his actions violated federal law or acted in

22    reckless and callous indifference to the plaintiff's safety or

23    rights.

24         If the plaintiff satisfies this requirement, it is

25    entirely up to you whether or not to award punitive damages.

1  But it should be presumed that the plaintiff has been made

2  whole by compensatory damages, so you should award punitive

3  damages only if you believe the defendants' conduct requires

4  further sanctions to achieve proper punishment or to deter

5  others from similar conduct in the future.

6         If you decide to award punitive damages, the amount

7  to be awarded is also within your sound discretion.  You may

8  considering the following factors in arriving at a punitive

9  damages award.

10        (1) the nature of the defendant's conduct, (how

11  blameworthy it was);

12        (2) the impact of that conduct on the plaintiff

13  (physical, economic, or both);

14        And, again, I'm striking "economic."  I don't think

15  there's any evidence of that.

16        (3) whether there was violence, intentional malice,

17  or reckless disregard for health or safety;

18        (4) Whether there was any repetition of the same sort

19  of wrongful conduct that harmed the plaintiff;

20        (5) whether -- and to what extent the defendant needs

21  to be punished in order to discourage the defendant and others

22  from similar conduct in the future;

23        (6) The likelihood that the defendant or others would

24  repeat the conduct if the punitive award is not made; and

25        (7) any other circumstances shown by the evidence,

1  including mitigating circumstances, that bear on the question

2  of the size of the award.

3        Of course, the fact that I have given you

4  instructions concerning the issue of plaintiff's damages

5  should not be interpreted in any way as an indication that I

6  believe the plaintiff should or should not prevail in this

7  case.

8        Your verdict must represent the considered judgment

9  of each juror.  In order to return a verdict, it is necessary

10 that each juror agree thereto.  In other words, your verdict

11 must be unanimous.

12       It is your duty as jurors to consult with one another

13 and to deliberate in an effort to reach agreement.  And if you

14 can do so without violence to individual -- if you can do so

15 without violence to individual judgment.  Each of you must

16 decide the case for yourself, but only after an impartial

17 consideration of the evidence in the case with your fellow

18 jurors.

19       In the course of your deliberations, do not hesitate

20 to reexamine your own views and change your opinion if

21 convinced it is erroneous.  But do not surrender your honest

22 conviction as to the weight or effect of the evidence solely

23 because of the opinion of your fellow jurors or for the mere

24 purpose of returning a verdict.

25       Remember at all times you are not partisans; you're

1  judges, judges of the facts.  Your sole interest is to seek

2  the truth from the evidence in the case.

3          The final verdict I will read after the argument.

4          Members of the jury, we're going to take about a

5  15-minute recess before we start with the closing arguments,

6  so don't start deliberating yet, until after you retire

7  following the arguments.  You may go to the jury room.  I'll

8  ask the attorneys to stay just a minute.

9      (Jury out at 2:37 p.m.)

10          THE COURT:  All right.  Anything that I didn't

11  correct in the instructions, that you saw?

12          MR. GUYNN:  It occurred to me, Your Honor, there is

13  not a sympathy, bias, or guesswork.

14          THE COURT:  Not a what?

15          MR. GUYNN:  Not an instruction that advises the jury

16  not to use sympathy, bias, or guesswork.

17          THE COURT:  I think there is.  I remember reading

18  something there.  I'm pretty sure.  Yeah, Instruction 1, the

19  last paragraph.

20          MR. GUYNN:  I'm sorry.

21          THE COURT:  I don't normally, you know, put time

22  limits on the lawyers because -- unless I know they don't have

23  a clock.  But I gather y'all have prepared closing arguments

24  or have some idea what you're going to say?

25          MR. GUYNN:  I would like to think so.

1          MR. TODD:  I do have some prepared remarks.  I don't

2   know how long it will take.  It won't be hours.

3          THE COURT:  Okay.  Well, you all know, as I say very

4   few souls are saved after the first 15 minutes.

5          We need Defendant's Exhibit 1 redacted as agreed on

6   the record yesterday.

7          MR. TODD:  We have that.  I'm going to get it now.

8   We have that.

9          THE COURT:  Okay.  We'll recess.  We'll come back

10  within 15 minutes.

11      (Recess taken from 2:39 p.m. to 2:56 p.m.)

12          THE COURT:  All right, Mr. Todd, you may proceed.

13          MR. TODD:  Thank you, Your Honor.  Welcome back.

14          They say there are three kinds of closings you can

15  give:  The one you prepared the night before, that you intend

16  to give; the one you actually get up and bumble through; and

17  then the phenomenal streamliner you give in the shower the

18  next morning.  We're not in the shower, but I will see what I

19  can do for you.

20          Thanks for bearing with us.  We know this is horrible

21  for you.  But your participation here is very important and

22  critical to justice for both parties, for all the parties.

23      So where are we?  As I told you in my opening, the

24  defendants' use of force in this case is never really going to

25  be contested in any serious degree, and the evidence has

1    largely borne that out.  We've heard some excuses --

2    distraction blows, jabs, a number of strikes, I meant to hit

3    one thing and I hit something else -- but nothing that really

4    changes the equation.

5         Scott Wyatt punched Michael Wyatt in the head or neck

6    four to eight times.  By his own testimony, he used his right

7    hand to peel Mr. Wyatt's head back, and his left hand to

8    deliver powerful punches, four to eight of them, punches as

9    hard as he could punch in the face and neck.

10        And although he denied it at first, when he first

11   testified, he later admitted when confronted with the video

12   that some of these were delivered not from a prone position,

13   but from a kneeling position, powerful, downward punches.

14        Investigator Owens punched Mr. Wyatt in the lower back.

15   These are the strikes, of course, that are most clearly

16   visible on the video, hard, sharp, downward blows.

17        Now, Mr. Owens testified that these punches were merely

18   jabs, distraction blows.  Well, we weren't there, we didn't

19   feel them.  You can watch the video and determine whether

20   these are the kind of short jabs he demonstrated from the

21   witness stand or the sort of arm fully back, full-power blow

22   that both experts testified is not a distraction blow.

23        And, in fact, you'll recall Mr. Owens testified, admitted

24   on cross-examination that he was throwing the hardest punch

25   that one can throw from that position.

1    Thirdly, we have Mr. Worsham.  Mr. Worsham delivered five

2   knee strikes to Mr. Wyatt's upper body.  We believe the

3   evidence shows his head or his neck.  What did we hear from

4   him?  Well, first we heard, "I tried to punch him first."

5   Well, that doesn't really help the situation; that's just one

6   more attempted strike.

7    But then we go to the knee strikes.  Second he tells us

8   that he intended to punch Mr. Wyatt's arm -- or knee Mr.

9   Wyatt's arm, rather.  Well, the truth is that Mr. Worsham has

10  no idea where his blows landed.

11   Today we heard a complete denial, a blanket denial, with

12  confidence, that he hit Mr. Wyatt's head.  Well, that's

13  understandable after the way the evidence came in, because

14  Mr. Worsham knows that a knee thrown purposely or recklessly

15  to the head contravenes every bit of police teaching he's ever

16  heard, and certainly all the evidence from both experts in

17  this case.

18   His testimony today was, of course, as you well know,

19  contrary to his testimony on Tuesday, and utterly and flatly

20  contrary to his sworn deposition given earlier in this case,

21  as I read in the record.  The fact of the matter is he has no

22  idea where they landed.  Maybe they hit the shoulder, maybe

23  they hit the neck, maybe they hit the head.

24   The one place we know that they did not hit was the arm,

25  because Mr. Worsham testified he was focused on this target

1  area.  He was focused on the arm and he didn't see them land,

2  so they didn't hit the arm.  The best evidence of where his

3  blows landed is, sadly, Mr. Wyatt's face.

4      Dr. Smith testified that the right side of Mr. Wyatt's

5  face shows three distinct instances of localized blunt force

6  trauma, including into the eye socket.  The only cause that

7  anyone has talked about in this case that could have caused

8  that injury to that eye is Mr. Worsham's knee, not the

9  pavement.  It's not road rash.  It's not a car door; that

10 doesn't penetrate the eye socket.  It's the end of the knee.

11 That's the cause.

12     There is no serious question, ladies and gentlemen, in

13 this case, as to the force the defendants used.

14     Now, His Honor instructed you a few minutes ago about the

15 question in this case.  And the question isn't whether force

16 was used.  Of course the police are allowed to use force.  Of

17 course, absolutely, they must be able to accomplish lawful

18 objectives.  As Mr. Waller said, we want the police to win,

19 that's the point.

20     The question here is not whether it was used.  The

21 question is whether it was objectively reasonable force or

22 excessive force.  And His Honor instructed you on a number of

23 criteria to consider in answering that question.  And I want

24 to take them in groups.

25     First, the need for the application of force and the

1    amount of force actually used.  What type of situation is

2    this?  And did the officers use force appropriate to that

3    situation?  In answering that question, the sheriff's

4    department own's policy are helpful to look at, because they

5    define deadly force and nondeadly force.

6        The sheriff's policy defines deadly force as, "Any force

7    used against another that is likely to cause death or serious

8    bodily injury."  So death or serious bodily injury equals

9    deadly force.

10       And the other type of force used is nondeadly force.

11   Both experts agree these definitions are widely agreed upon

12   and widely used.

13       Each of the defendants here acknowledged that he has been

14   trained in the use of force and has been trained to avoid

15   certain target areas, whether it's the head, the neck, the

16   spleen, internal organs, the groin.  You avoid these areas

17   ordinarily.

18       The defendants all agreed that strikes should be directed

19   to soft tissue, fleshy areas, muscular parts of the body to

20   impose pain but not cause serious injury.  Both expert

21   witnesses, Mr. Waller and Mr. Wershbale explained to you

22   exactly the same thing, the same training, the same goals.

23       The point of these restrictions are because blows, hard

24   blows to those areas can cause serious physical injury or

25   death.  Knee strikes and punches can crush bone or can break

1  bone, shatter bone, or crush organs.

2       There's one thing that everyone also agreed on, every

3  witness you heard from:  These restrictions do not apply in a

4  deadly force situation.  Gloves are off, the officers can do

5  whatever they need to do to accomplish their objective,

6  because in that case they're fighting for their lives.

7  Everyone agrees with that.

8       What does that mean?  Two things:  First in this case,

9  the officers here used what is by any measure deadly force:

10  Fists to the head, knees to the head, fists to the kidney.

11  Deadly force.

12       So the question for you is:  Was this a deadly force

13  situation?  And we're going to consider the reasonableness of

14  the force used.  Captain, now Major Nicholson, answered that

15  question for us this morning.  No, not a lethal force

16  situation.  He put his gun away.  He was not going to shoot

17  Michael Wyatt in the head.

18       Now, all of the defendants, you will recall, said, "I

19  feared for my life.  I feared there was a gun.  It was a

20  deadly force situation."  Scott Wyatt testified to that

21  precisely, deadly force situation.  Captain Nicholson

22  disagreed.  Mr. Wershbale similarly today said this was not a

23  deadly force situation.

24       If you conclude that Mr. Worsham could have got out of

25  his car, walked over to Mr. Wyatt, and shot him in the head,

1  that's a deadly force situation.  There's no difference

2  legally between a bullet to the head or a knee to the head.

3  Any other situation, a nondeadly force situation, this force

4  was excessive.

5       The fact of the matter, ladies and gentlemen, is that

6  this situation was deescalating, not escalating.  We heard

7  about force ratios: number of officers, number of suspects.

8  Two to one, three to one, four to one, five to one.  It's

9  becoming increasingly less risky, not increasingly more risky.

10 But these officers responded with increasing levels of deadly

11 force: fist to the face, fist to the kidney, knees to the head

12 or neck.  That is an improper response, an objectively

13 unreasonable response.

14      Another criteria His Honor gave you was, was the suspect

15 fleeing or resisting.  Now, we've heard a lot about the car

16 chase.  That's to be expected; hardly a surprise.

17      Now, putting aside that a ten-minute car chase over

18 3.9 miles comes to about 24-mile-per-hour average -- I have a

19 sixth grader, so that's the kind of math I wrestle with on a

20 daily basis.  Putting that aside, the car chase here is not a

21 relevant question.  The question is what happens once

22 Mr. Wyatt is on the ground.

23      The fact that someone has done something, has fled from

24 the police or done something stupid does not justify any

25 subsequent use of force.  Everyone agreed, the experts and the

1  officers agreed that use of force should be assessed in the

2  moment, what's going on at that point in time.  So what is

3  going on after Mr. Wyatt is out of his car, once he's on the

4  ground, that's the relevant point in time.

5       Now, I told you in opening that there will be some

6  variation in the fine details.  For example, which way did

7  Mr. Wyatt run?  Well, we've got three directions.  No one said

8  he ran back towards -- I know I'm pointing that way, but the

9  way he came from.  We've got towards Memorial, towards the

10 building, down the parking lot.

11      Mr. Shelton this morning corroborated Mr. Wyatt's

12 testimony that he actually ran towards Memorial Drive first.

13 That doesn't matter, because what the evidence did show

14 unambiguously was that Mr. Wyatt was on the ground within

15 seconds with two officers, then three officers, then four

16 officers on top of him.

17      At that point, he is not fleeing.  By the officers' own

18 testimony, by Mr. Worsham's testimony in the opening minutes

19 of this trial, he was incapable of fleeing.  He was moving at

20 zero miles an hour.  It's a separate question whether he was

21 resisting.  Let's separate fleeing.

22      The defendants admit that Mr. Wyatt neither punched nor

23 kicked, lashed out in any way, spat, tried to bite, did

24 anything offensive towards any of them.  To the extent he was

25 resisting, it was passive resistance, not active resistance.

1    And that matters, as Mr. Wershbale explained to you.  To the

2    extent he was moving, it was squirming, flinching, or failing

3    to pull out his right arm.  And that's what they're talking

4    about when they're talking about resisting arrest, passive

5    resistance.

6        The fact of that matter is, the defendants put Mr. Wyatt

7    in an impossible situation.  They gave him two instructions:

8    "Stop resisting" or "Stop fleeing," and "Give us your arm."

9    Well, I don't know about you, but my favorite part of the

10   trial was him squawking like a chicken.

11       As Mr. Waller described very aptly, it does not take much

12   force to keep someone on the ground.  In fact, you heard from

13   Mr. Shelton, from Allen Shelton this morning, that he used

14   exactly the technique that Mr. Waller described, a knee to the

15   lower back, the buttocks area.  It stops someone from rising

16   up.

17       Mr. Wyatt was held to the ground by a hold that prevents

18   him from getting up.  He wasn't held down just by one person

19   but four people.  I didn't ask everyone how much they weigh,

20   but you can guess.  I don't know, 800 pounds of officer if

21   they chose to apply that level of force, but at the same time

22   they're arguing, "Give us your right arm."

23       As Mr. Waller demonstrated, you can't pull that arm out.

24   It doesn't move laterally like that.  You have to move to pull

25   that arm out.  And if you move or if your body gets moved by

1  officers pulling and poking on you, you get punched for

2  resisting arrest.

3       They weren't beating him because he was trying to flee or

4  resisting.  They hit him because of the circumstances of their

5  own creation.  That is not fleeing or resisting.

6       The related question is whether the defendants could have

7  achieved compliance through alternative means, and I've

8  already touched on this.  Yes, absolutely.  Means and

9  mechanisms existed for controlling Mr. Wyatt and pulling his

10  arm out safely.  Mr. Waller demonstrated them and

11  Mr. Wershbale demonstrated them.  Get control of the limbs,

12  calm the suspect down, control the suspect, pull the arm out

13  carefully and safely.  The defendants did none of that before

14  they hit him.

15       These types of methods exist for the safety of officers

16  and the public.  Officers are trained so they know how to

17  respond to an emergency situation, so they already know what

18  to do.  It's almost automatic.  It's muscle memory, so they're

19  not making up procedures on the fly and doing something that

20  may put themselves in danger.  So too they're intended to

21  protect the public, because the point is to secure a suspect

22  safely and then let them be arrested and be adjudicated and be

23  punished by the court system, not by the officers.

24       His Honor also instructed you to consider factors such as

25  the risk perceived, the relationship between the risk and the

1   force actually used, and what a reasonable officer would have

2   done in that situation.  And these criteria really come down

3   to the heart of the matter:  Have you heard any evidence that

4   justifies the use of deadly force in this situation?  The only

5   justification the defendants have given is what I told you in

6   opening they would give, this claim that they feared there was

7   a gun, that they had a reasonable fear that Mr. Wyatt had a

8   gun.

9       I told you three things in opening.  First, there would

10  be no gun; secondly, officers had a clear view of his hands;

11  and third, the officers' behavior would be inconsistent with a

12  fear of there being a gun.  I believe the evidence bears out

13  all three.

14      First of all, Mr. Wyatt had no gun in his hand, his

15  waistband.  There's nothing, nothing that would explain a hand

16  near his waistband, so that legitimately calls that testimony

17  into question.

18      Secondly, the officers had clear views of his hands.

19  Mr. Worsham, from up on Memorial Avenue, saw Mr. Wyatt's hands

20  and they were empty when he got out of the car.  He saw

21  Mr. Wyatt run and Mr. Wyatt was running normally.

22      Investigator Wyatt, similarly, from a car and a half

23  away, about this length, saw Mr. Wyatt's hands and they were

24  empty when he got out of the car, and the chase ensues.

25      Investigator Owens saw Mr. Wyatt's right hand as he went

1    by the car, and he saw no gun in that hand.

2        The officers, the defendants, nonetheless argue, want you

3    to believe that at some point between them seeing his hands

4    and him being taken down, a matter of mere seconds, he somehow

5    produced a gun or they saw some movement or a positioning that

6    made them reasonably believe he had a gun.

7        And this is really the heart of the case:  The evidence

8    shows that the defendants' belief -- sorry -- the defendants'

9    conduct from start to finish is inconsistent with them having

10   actually believed that, with them having seen something that

11   made them believe that.  And at the risk of trying your

12   patience, I'm going to offer you ten reasons to think about.

13       First, they had already -- and this precedes the event --

14   they had already removed their tactical gear.  They had no

15   tasers, they have no ASP, they had no mace, any of that.  That

16   was gone.  So when they were searching for him, they

17   apparently thought he wasn't quite dangerous enough that they

18   would take their tactical gear off.  But they show up without

19   it, even those officers who had the time to put it back on,

20   knowing they had seen his car.

21       Secondly, every officer rushed to engage him physically.

22   No one hesitated for a second.  Some run faster than others

23   apparently, but everyone rushed straight in there, behavior

24   inconsistent with believing that a suspect may have a gun and

25   may turn around and shoot you.

1     Third, and relatedly, no officer hung back to provide

2  lethal cover of any sort.

3     Nor, fourth, did any officer pull his weapon, close up or

4  far away.  Both experts explained that when you have multiple

5  officers, everyone doesn't need to get involved physically.

6  You could pull a gun, you could provide cover.  It's not a

7  matter of, can I shoot someone now?  It's a matter of

8  anticipating what might go wrong if they actually have a gun,

9  if a shot actually goes off, if this situation changes.

10     Both experts used the same phrasing:  Action is faster

11  than reaction.  If the gun is already out, you can take action

12  when the unexpected happens.  If you're waiting until then to

13  pull your gun, it's too late.  They had multiple officers

14  here, but no one thought to pull a gun, no one thought to

15  provide lethal cover.

16     Fifth.  None of the officers' conduct was consistent with

17  there actually being a reasonable fear about the right arm.

18  Scott Wyatt claims he punched Mr. Wyatt because his arm was

19  underneath him.  But he stopped punching him when the arm was

20  still underneath him, he stopped using force.

21     Mr. Owens similarly stopped punching while the arm was

22  still underneath.  They didn't continue through until it was

23  out.

24     Captain Nicholson actually grabbed the arm and held it,

25  tried to pull it out, he testified, but then stepped up and

1    stepped away.  Apparently not too concerned about the arm.

2        Sixth.  The defendants claim that they wanted his right

3    arm out as fast as possible, that's what they were trying to

4    do.  This is one of the more important points.  That purpose

5    is completely inconsistent with a fear there is a gun in that

6    hand.

7        You may have noticed this morning when Mr. Guynn was

8    talking to Mr. Wershbale and he asked him the question:  Is

9    there anything inconsistent with the situation about getting

10   the arm out as fast as possible?  And Mr. Wershbale looked

11   very uncomfortable, and Mr. Guynn quickly retracted the

12   question, because he knew the answer, and it wasn't a good

13   answer for the defendants.

14       Pulling that arm out quickly, if there is a gun in there,

15   makes no sense.  It's uncontrolled.  It may still be in his

16   hand.  If it goes off when it's underneath him, he is going to

17   shoot himself.  If you pull it out here, as Mr. Wershbale

18   testified when Mr. Beaton asked him the same question, more

19   chance of accidental discharge.  It would be a poor choice, he

20   said, a poor choice to pull that gun out.  So their attempt to

21   pull the hand out is not consistent with there being a belief

22   that it had a gun in it.  It's actually just consistent with

23   them trying to handcuff him.

24       For the same reason, hitting and kneeing Mr. Wyatt is not

25   consistent with believing he has a gun.  It makes it more

 1   likely that a gun goes off, more likely that someone gets

 2   shot, not less, because as Mr. Waller explained, they're not

 3   control tactics.

 4       Eighth.  Three of the six officers, Nicholson, Shelton,

 5   and the driver of the car that recorded, the incident decided

 6   there was no need for the use of force.

 7       Ninth.  No one ever yelled "gun."  Not only did no one

 8   ever yell "gun" -- I appreciate the testimony about how

 9   officers might react to that -- none of these officers chose

10   to communicate to their fellows that day what they are now

11   communicating to you.  He was running funny, his hand was near

12   his waistband, there may be a gun underneath him, none of this

13   was communicated.

14       If you are so concerned for your safety and the safety of

15   your fellow officers, would you not share that critical piece

16   of information, particularly with Mr. Worsham who is not with

17   you?  He is driving around the corner in his car, he hears

18   none of this.  No one says a word.

19       And, lastly, as the videotape showed, once Mr. Wyatt is

20   handcuffed, none of these five gentlemen -- well, these three

21   gentlemen, take the time to roll him over and look underneath

22   him to see if there was in fact a gun.

23       If you're the arresting officer and you think there may

24   have been a gun there, you don't leave it there under the

25   suspect, whether he's handcuffed or not.  That makes no sense.

1    For all these reasons, ladies and gentlemen, the

2 defendants' claims today, which they could offer in basically

3 any case, "Oh, I thought there was a gun and so, therefore, my

4 use of force was justified," it simply doesn't wash.

5    Lastly -- well, an additional factor His Honor told you

6 to consider, extent of the injuries to the plaintiff.  You've

7 heard them.  I'll talk about them in a minute in the

8 conduct -- in the course of talking about damages.

9    The fact of the matter is these defendants weren't

10 reacting.  This wasn't a split-second decision.  They each had

11 time to think about what they were doing.

12    Scott Wyatt tackled Mr. Wyatt to the ground, wrapped

13 around him and punched him.  That's an offensive reaction, not

14 a defensive reaction.

15    Mr. Owens came running over; he had time to think about

16 it as he was approaching.  Contrast his approach to Captain

17 Nicholson.  Captain Nicholson comes up, puts his gun away,

18 kneels down slowly.  Mr. Owens, right in there, bam, bam, bam,

19 bam.

20    Mr. Worsham had the most time of all.  Drives around the

21 block, drives up, parks, sees the scene, four officers,

22 suspect on the ground immobilized, runs over.  He had plenty

23 of time to think about it before he threw those five knee

24 strikes.  This is not split-second reaction.  This is

25 considered proaction.

1     I've thrown a lot at you like I did earlier.  But at the

2  end of the day, on the question of objective reasonableness,

3  the question of liability in this case, nothing should

4  ultimately distract you from the fact that these defendants,

5  along with two nondefendants, pinned Mr. Wyatt to the ground,

6  immobilized his left arm, immobilized his back and legs -- his

7  right arm was already immobilized by his own body -- peeled

8  his head back and proceeded to pummel him when he was utterly

9  defenseless.  That, I would submit to you, is the definition

10  of objectively unreasonable force.

11     If you agree with that, we move on to damages.  I said at

12  the outset we would ask for compensatory damages against all

13  the defendants and punitive damages against Mr. Worsham.  I'll

14  take them in turn.

15     Compensatory damages.  As His Honor noted while he was

16  reading you the instructions, we haven't submitted a claim for

17  Mr. Wyatt's medical bills or his costs or anything like that.

18  Mr. Wyatt is a poor man; he couldn't afford to pay his medical

19  bills.  There's no claim to be made.

20     What he does claim is a claim for pain and suffering.

21  The law, as His Honor instructed you, doesn't require proof of

22  a specific amount.  It's up to you in your discretion to

23  determine an amount reasonable to compensate him for the

24  injuries he suffered then and continuing through today, and,

25  to the extent you find them, continuing into the future.

1    We respect your judgment in this matter.  We respectfully

2  suggest you consider an amount up to $100,000.  I appreciate

3  that's a substantial sum of money, but recall the injuries

4  that were inflicted on Mr. Wyatt.  The left side of his face:

5  Road rash to be sure.  Perhaps that's legitimate from a tackle

6  but also blows from a fist.

7    The right side of his face:  Three discrete impacts of

8  blunt force trauma that could only have been caused by a knee

9  in this scenario.  Broken rib.  Collapsed lung.  The suffering

10 in the emergency room.  The inability to breathe.  While he

11 was on the side of the road and at the hospital, Mr. Wyatt

12 said, "I can't breathe.  I can't breathe."  They couldn't lay

13 him down to suture him up because his oxygen was so low.

14    Have his external injuries cleared up?  Sure, absolutely.

15 Bruises go away, bones heal, lungs close up again, absolutely.

16 It takes some time, a lot of suffering, a lot of pain.

17    And some of that pain has continued.  Yes, he suffered

18 headaches when he was a child; but as he testified, it went

19 away over time.  Now, since this event, it's back almost

20 daily, excruciating migraines.  It's just a headache.  But if

21 you've had migraine headaches, you know they really hurt.

22    His eyesight never fully recovered.  You could dismiss

23 them as just, oh, floaters.  It's blind spots, substantial

24 blind spots in his eyesight that he continues to suffer to

25 this day.

1    And then he testified about his stress.  Call it

2  posttraumatic stress, traumatic brain injury, the effects of

3  the beating.  You heard a lot of talk about concussions, the

4  long-term effect of concussions.  That's what we're talking

5  about here.

6    Dr. Smith, a highly credentialed, experienced emergency

7  room doctor, an emergency medical expert walked you through

8  these injuries.  And you may have noticed, his testimony was

9  unrebutted.  There is no defense expert on medical bills or

10  medical testimony.  His testimony stands unrebutted in this

11  case.

12    Lastly, we come to the issue of punitive damages.  I'll

13  try to wrap up quickly, I know I'm taking your time here.

14  There are really three categories of officer in this case,

15  from least to most.

16    This morning you heard from Mr. Shelton, the captain,

17  Major Nicholson.  They intervened in the situation, they used

18  appropriate control tactics: knee on the back, pin the arm.

19  They acted appropriately in this case in that they did not use

20  any force.

21    Mr. Wyatt and Mr. Owens used excessive force, they did,

22  punches to the face, punches to the back.  That's more than

23  Mr. Shelton or Mr. Nicholson.  But it is orders of magnitude

24  less than the force used and the damage inflicted by

25  Mr. Worsham.  And that's why we're seeking punitive damages

1  solely against him.

2      His Honor instructed you can consider both his actions in

3  this case and his history.  And that explains Tuesday, why we

4  spent so much time going through that history.

5      You already know what happened in this case.  Mr. Worsham

6  inflicted more injury, more pain, used more force on the least

7  amount of information.

8      Recall where he was.  He was up on Memorial Drive.  He

9  had seen the hands are empty.  He had seen Mr. Wyatt running

10 normally.  He didn't offer you a, "I saw his hand by the

11 waistband, he was running funny" excuse.  He said he was

12 running normally.

13     So he drives around, he is not communicating with the

14 officers in the pile, he is not hearing anything that's being

15 said.  He arrives in his car, near that pile of men, knowing

16 hands empty, running normally.  No one communicates any

17 additional information to him.  No one yells out "gun" or

18 anything else, never saw hands, running funny.  All he knows

19 is empty hands, running normally.  He runs over to the pile

20 and he sees hand underneath, officer still hands-on.

21     But compare his behavior to what the other defendants

22 were doing at that point.  After Johnny Owens' punches, all

23 the other officers stopped using force.  There is a measurable

24 gap in time between -- you can see it on the video here.

25 Mr. Owens stops punching, they're all just holding.  Arm lock

1  going on, arm being restrained, right arm being restrained,

2  and then suddenly boom, boom, boom, boom, boom.  That's a

3  substantial and powerful difference.  And where did those

4  blows go?  As I said earlier, the only evidence is they went

5  to the neck or the head.

6  Now, Mr. Worsham knew the relevant standards.  There's no

7  question he was unaware of the standard of law or Mr. Wyatt's

8  rights.  He was trained and trained repeatedly; trained at the

9  academy, trained at Danville, trained in Pittsylvania County,

10  sent to remedial training.  He knew the standards, he just

11  chose not to apply them.

12  And he chose not to apply them at a time when Mr. Wyatt

13  was laying pinned on the ground with his head exposed.  That

14  makes a big fat target, and boy did he hit it.

15  If you agree that punitive damages are appropriate in

16  this case based on that evidence, you can then consider prior

17  history.  I won't belabor this; you got a full day of it.  But

18  the evidence shows that Mr. Worsham has a long history of

19  aggressive behavior towards the public and questionable use of

20  force, and contempt towards efforts to correct his behavior.

21  Going back to Danville, he testified the chief required

22  him to wear an audio recorder to tape every single interaction

23  with the public on account of his aggressive behavior.  He

24  chose to respond to this requirement not in changing his

25  behavior, but by doing less, by stopping interacting with the

1  public, staying in his car, just doing the bare minimum.

2      Chief Broadfoot explained to him how the recorder would

3  be helpful.  "It would create evidence if you're being falsely

4  complained on."  Because, recall, he had denied every single

5  complaint against him ever.  Was his reaction to welcome that

6  evidence, welcome that corroboration?  No, it was first to not

7  create it by not interacting with people, and then it was to

8  ignore the instructions and not tape the interactions.  When

9  the recorder was off, the old Worsham resurfaced.

10      Ultimately, he leaves Danville, he comes to the County.

11  And again, he has a history of use of force with the County.

12  Again, I won't belabor it, but Sergeant Young detailed a

13  number of investigations into Mr. Worsham under similar

14  circumstances, similar events, similar excuses given, similar

15  questionable use of force.

16      You probably noticed that all of those events were

17  ultimately ruled non-substantiated, not innocent.  Not guilty,

18  sure, but not innocent.  His own account of what happened was

19  insufficient.  It was not sufficiently credible to produce an

20  exoneration of his behavior.  And, of course, in none of those

21  instances was there an audio recording or a video recording,

22  as there is here today.

23      What does come through is a pattern of knee strikes,

24  fists, fear of gun.  What also comes through is a pattern of

25  contempt towards attempts to fix his behavior.

1    Chief Taylor -- Sheriff Taylor, excuse me -- at least

2    sent Mr. Worsham to remedial use of force training.  Scott

3    Wyatt told you about the subjects they covered.  Full day,

4    lots of things, different scenarios, types of force, use of

5    force, appropriate use of force.  Mr. Worsham took a single

6    lesson, a single lesson away from that school:  Throw knees

7    harder.  Didn't even appreciate what Scott Wyatt did.  They

8    were talking about standing up, as Mr. Waller explained, hit

9    someone here, deadens the leg, they go down.

10    Throw knees harder; knees he subsequently used on Linwood

11    Brandon.  And when questioned by Sergeant Young about that,

12    his justification was the class.  He mockingly stated, "That

13    school, that lovely school taught us to throw knee strikes."

14    He used knee strikes on Mr. Brandon and he used them on

15    Mr. Wyatt's face.

16    I've been talking a long time; I will wrap up.

17    Mr. Wyatt is a simple man.  Mr. Wyatt is a poor man.  And

18    now, as he has testified, Mr. Wyatt is an incarcerated man,

19    but a man nonetheless, a man with the same rights as you and

20    I, as any of us.

21    These rules, these constitutional rights, these practices

22    that we're talking about are designed to protect not just some

23    of us but all of us.

24    Process, due process is what we are entitled to: arrest,

25    adjudication, and then punishment.  This was not a process.

 1  This was vigilantism.  This was judge, jury, and executioner.

 2  This was objectively unreasonable force.

 3      I thank you for your time.  I thank you for your

 4  patience.  Thank you.

 5          THE COURT:  Mr. Guynn.

 6          MR. TODD:  I'm sorry, Mr. Guynn.  Before you stand

 7  up, I forgot one thing.  The amount of punitive damages we

 8  suggest that you consider is $500,000.  Thank you.

 9          MR. GUYNN:  Ladies and gentlemen, we began Tuesday

10  morning -- somehow not beginning on Monday has gotten me off

11  on my days.  I'm still convinced it's Wednesday, and I

12  apologize if I refer to it that way.

13          I started off by telling you that, among other

14  things, that Michael Wyatt controlled his own destiny on

15  July 3rd.  He controlled his own destiny the night of

16  July 2nd.

17          That must have been an interesting night.  It must

18  have been an interesting night the way he describes it.  It

19  must have been a very interesting night from the standpoint of

20  the guys that run the PAK store.  Nonetheless, it happened.

21  You heard him testify that it happened.  And then the report

22  went out, and the report received on the morning of July 3rd

23  was he is suspected of an armed robbery and fired a gun.  Now

24  he wants to quibble about that, but, in fact, he was convicted

25  of an armed robbery.

1          But what I told you the other day was this:  If in

2     the hotel parking lot he hadn't jumped in his car and ran

3     through the Taco Bell and over the curb, we wouldn't be here.

4     If he had stopped anywhere in that 3-point-some 9 miles when

5     the lights and siren were behind him, we wouldn't be here.  If

6     he had not jumped the concrete median, driven the wrong way

7     both on the street and up the off-ramp, we wouldn't be here.

8          Heck, if he had pulled in the parking lot and stayed

9     in his car, you know, put his hands out the window -- I think

10    that's what Lieutenant Wershbale was talking about in the

11    felony stop.  If he had stayed in his car and allowed them to

12    use the speaker to say, "Don't move.  Put your hands out the

13    car," we wouldn't be here.

14         So he made all those decisions, and now he's going to

15    say, "You guys used excessive force when you chased me.

16    Notwithstanding the fact that you understood that I used a gun

17    the night before, and notwithstanding the fact that I was

18    running in a way that made you think I had a gun, and

19    notwithstanding the fact that the job you do every day is one

20    of the few in our country where you are not guaranteed of

21    going home."

22         Most of us know what time we're going home.

23    Sometimes it doesn't work that way for guys who do what my

24    friends Robert, Johnny, and Scott do, and in situations where

25    they think you have a gun and you react to that and don't

1  appreciate the concern they have that brings us together

2  today, this type of situation.

3         Ladies and gentlemen, we know, we know what happens

4  when police officers yell "gun." This is a completely

5  different case if they yell "gun." Mr. Wyatt wouldn't be here

6  to testify. When the police officers hear "gun," they're

7  going to pull theirs out, and you know what's coming. That's

8  why they were so circumspect in not yelling "gun" until they

9  saw the darn thing. And it's also why they wanted that arm

10 out from under there so bad. And what are they to think when

11 you don't give them your arm?

12        One of the instructions tells you, decide whether the

13 use of force was excessive from the perspective of a

14 reasonable officer facing the same circumstances. That's

15 objective reasonableness. That's putting yourself in that

16 officer's shoes. What is that perspective? I would submit to

17 you that that perspective is a fellow who used a gun the night

18 before, who is apparently incredibly desperate, so desperate

19 that he did all of those things, got out and tried to run.

20 Incredibly desperate.

21        And yet when he won't give you his arm, nobody has

22 come in here and said, "Well, what should you do if he doesn't

23 give you his arm?" Just hold him down and wait? He will

24 eventually do it? What's an hour, maybe two? Is that really

25 what we want?

Closing Arguments by Mr. Guynn

1     Lieutenant Wershbale said this morning the longer
2  this thing goes on, the worse it gets.  The longer these
3  instances go on, the worse they get.
4     So everything that you hear and have heard from
5  Mr. Wyatt, from Mr. Waller telling us, it's going to take more
6  time.  "Well, we'll work on it, work, work.  We'll pull."  The
7  idea about Captain Nicholson pulling on his arm, couldn't get
8  it out and somehow did the right thing by stepping away, well,
9  he stepped away so somebody else could get the arm out.  That
10 has to be obvious, doesn't it?  He couldn't get it out, he was
11 assuming that somebody else would?
12     So curiously, what happens?  Robert Worsham comes in,
13 uses a knee and the arm comes out, which, as you understand
14 from what Lieutenant Wershbale said this morning, there's -- I
15 will never pronounce it, radial plexus, whatever, but he said
16 if you hit it, that will give you the opportunity for the arm
17 to come out.
18     Now, just made a big thing about Robert Worsham this
19 morning saying, "I didn't hit him in the head."  You know why
20 Robert was able to change that testimony today?  Dr. Smith.
21 The doctor that they say shows that he hit him in the head
22 actually shows that he hit him in the ribs.  Remember
23 yesterday, talked about the broken ribs and he said didn't
24 happen in the fall because it would have been more than one
25 rib broken.  This happened from a blow.

1    What, you've seen in the video 12 times, 15 times?

2 You've seen it a lot.  Did you see anybody other than Robert

3 Worsham throw a blow to Michael Wyatt's right side?  No.  So

4 who broke his rib?  Worsham.

5    Where was the rib broken?  I asked him yesterday,

6 "Dr. Smith, where is that rib?"  It's under your arm.  It's

7 under your arm, down here.  That's where Worsham hit him.

8 It's the only explanation for the broken rib.

9    Speaking of Dr. Smith, he testified there were no

10 bruises recorded at the hospital on Michael Wyatt's back.  I

11 had -- I will say it this way without -- but apparently Johnny

12 Owens didn't hit him hard enough to bruise him.

13    Scott Wyatt got there first.  And as Lieutenant

14 Wershbale said, we're talking about a short distance, a quick

15 run.  This idea that you wouldn't chase somebody you thought

16 had a gun, well, doesn't it depend?  If they're back in the

17 corner, probably not.  But if your back is to me, and you're

18 like this, and there's this distance -- I'm sorry.  If your

19 back is to a police officer, like Scott Wyatt, then, yes, he

20 is going to close that ground on you.  Am I going to do it?

21 Not my job.  That's why we have Scott Wyatt.

22    It is unfair to label these guys who showed courage

23 in chasing him as somehow not believing he had a gun.  It's

24 unfair.

25    So what did these guys know?  And Lieutenant

1   Wershbale said you had to take that into account.  The

2   instruction says you have to take that into account.  They

3   knew what they were told the night before: fired a gun,

4   warrant for armed robbery, consider him armed and dangerous.

5          He then, when they locate him, seeks to escape.  It's

6   another one of the categories telling them that this idea of

7   being careful around him is a good idea.  So they get more

8   than one person; they make sure that there's enough of them to

9   take him into custody.  Not in dispute; nobody argues that

10  part of it didn't happen.

11         The video doesn't show the tackle.  But after that,

12  it shows you the blows from Johnny Owens, which didn't get his

13  arm out, that don't bruise him.  Shows you Scott Wyatt and

14  shows a couple of blows.  Yes, his answer was four to eight.

15  But the video, as the coaches used to say, "The eye in the sky

16  doesn't lie."  The video doesn't really show four to eight

17  punches.

18         Were they up around the head?  Yes.

19         Did Lieutenant Wershbale say, "Gosh, he shouldn't

20  have done that?"  No.  He said it was reasonable given what he

21  knew.

22         Did Robert Worsham -- was Robert Worsham's use of

23  force reasonable?  Yeah, obviously, because he hit him in the

24  ribs, didn't he?  That's the only person that hit him on the

25  right side; it had to be.  Unless, of course, they're going to

 1  stand up in a minute and say, "Well, you probably shouldn't

 2  believe that part of Dr. Smith's testimony."  It was their

 3  witness.

 4       I don't know what of 3.9 miles of math in ten

 5  minutes, I don't know what that means.  All I can tell you is

 6  if you don't think it is a serious pursuit when they jump a

 7  concrete median and go the wrong way and go the wrong way up

 8  an exit, I can't add to that.  I just can't add to it.

 9       This is the difficult spot for police officers.  Once

10  you're there, how do you get them handcuffed and get them

11  under control?  You heard that term over and over and over.

12  And when are they under control?  They're under control when

13  they're handcuffed.

14       Lieutenant Wershbale pointed out that what they did

15  was reasonable because it had to be done in order to get him

16  handcuffed, and you didn't want to let it go any longer than

17  you had to.

18       There is nothing inconsistent with yelling "Stop

19  resisting and give us your arm," when the resistance is you're

20  not giving them your arm.  If you stop resisting and allow

21  your arm to be pulled out, it's very consistent.  Michael

22  Wyatt knew that.

23       They were yelling over and over at him, "Stop

24  resisting.  Give us your arm."  How do we know that would have

25  made a difference?  In the video you'll see -- I think it's

1    Johnny Owens on the left-hand side, in the white T-shirt,

2    reach like this, go like this, and then this.

3    (Demonstrating.)  He has got his handcuffs out and he is

4    handcuffing him, and everybody steps away immediately.

5            So how do we know that this is not some way of being

6    a vigilante or how do we know that it's not to punish him?

7    It's because once they got him cuffed, they achieved their

8    objective and nothing else happened.  These defendants didn't

9    have any further contact with him.

10           Dr. Smith never treated Michael Wyatt.  He talked to

11   him, he said, what, in October?  And I think he said 2016,

12   which would have been about four years -- more than four

13   years -- gosh, time flies -- more than four years after the

14   incident.  So he assumed, I guess, that he could rely on what

15   Michael Wyatt told him four years after the incident about his

16   health and about whether he was good, bad, or indifferent.

17   And I would just leave it to you to decide whether or not that

18   is a good move, whether relying on Mr. Wyatt's credibility is

19   the right move in this case.

20           Dr. Smith said, in addition to there being no back --

21   no bruises on the back, had no concussion.  Does that really

22   in this day and age of concussions, does that really ring a

23   bell, that somebody who supposedly gave these five incredibly

24   powerful knee strikes right to the head, the dude has no

25   concussion?  Really?

1          The CT scan of the head, he said, was normal.  This

2     isn't somebody who has had a huge blow of the head.  The CT

3     scan was normal.

4          Mr. Waller was -- you know, I'll just say it, slick.

5     He has got a slick presentation.  If you are going to pay him

6     $200 an hour, you ought to get a slick presentation.  And it

7     was very easy, and I don't mean any -- I'm not casting

8     aspersions to my compatriots at the bar, but it very easy to

9     take a lawyer, who is not resisting you, in a suit, and lay

10    him face down and show you all this stuff.  It is completely

11    different in a situation where somebody desperately doesn't

12    want to be taken into custody.  Completely different.  And I

13    would submit to you that if Mr. Beaton didn't want to be taken

14    into custody, it would have been not nearly as easy as that,

15    not nearly.

16         There has been, and it was -- I'm glad that the Judge

17    gave you the instruction about objections and the like.  On

18    Tuesday, I took the character assassination of Robert Worsham

19    pretty personal because it's not about this case, because it

20    doesn't have anything to do with this case, and I thought we

21    were here to talk about this case.  And that's why -- and

22    don't hold it against Robert or anybody else, that's why I

23    objected as much as I did.  And I still think it's about this

24    case.  I think that --

25         THE COURT:  I don't know whether you're telling them

1  the instructions are wrong or not.

2          MR. GUYNN:  No.  No.  The instruction is absolutely

3  correct.

4          THE COURT:  And also your personal feelings have

5  nothing to do with this case.  Don't discuss the objections

6  with the jury.  We've ruled on them.  I don't think it's

7  appropriate to --

8          MR. GUYNN:  I wasn't planning on it, Your Honor.  All

9  I was saying was I didn't want the jury mad at me for

10  objecting.

11          THE COURT:  I told the jury that, and they understand

12  that.

13          MR. GUYNN:  In Robert's career in Danville, as he

14  testified, he worked some pretty bad areas.  You were told a

15  few minutes ago that when he was wearing the recorder, that he

16  didn't work.  That isn't what he said.  What he said was, "I

17  was not going to get out at the corner where I suspected that

18  there were these drug deals going down and go over and try and

19  break them up if I was going to get complaints about it."

20  That's what he stopped doing.

21          He did his job.  He patrolled, all that, but he

22  concluded that, you know, if he was going to continue to be --

23  to have to wear a recorder because he did that part of his

24  job, then he simply wasn't going to do that part.  Nobody else

25  was doing it.  And I think there's some concern whether

1    anybody else is doing it today.

2         I would also point out that with all the evidence

3    that has come in, there was one other piece of evidence or one

4    complaint that Robert had used a knee strike previously.  If

5    you look at the -- if you recall the three that were talked

6    about, that was it.  So this isn't a situation where he is out

7    here indiscriminately throwing knee strikes and the like.

8    This is a situation where in this case it worked, they got the

9    arm out.

10        I'm not going to tell you that Mr. Wyatt -- that the

11   pictures lie.  Mr. Wyatt's face, yeah, he had a black eye and

12   he had the road rash.  I disagree with Dr. Smith about having

13   some traumatic brain injury.  There was no diagnosis of that

14   here in Danville, at the hospital, and I don't think you get

15   to say that four years after the fact.

16        He, as the doctor said, probably within six weeks all

17   of that had healed up.  He has made a good recovery.  He

18   didn't have broken bones in his face, he doesn't have

19   disfigurement.  He looked like a guy that had fallen and hit

20   his face on the asphalt.  And as we know, he looked like a guy

21   in this case where he got his arm under him and wouldn't pull

22   it out.  He wouldn't give his hands up to the police.

23        In order to even get to the damages part, you have to

24   figure out whether or not there's liability.  I would submit

25   to you that once you look at this and review the instructions

1  that the judge has given you on what the law are and compare

2  to that what we all heard the facts to be, that you will find

3  there is no liability in the case, and, therefore, you don't

4  get to damages.

5       But I would be remiss and wouldn't be representing my

6  clients fully if I didn't at least mention to you that, in

7  considering damages, you have to look at everything that the

8  instruction says, and realize that there's really very little

9  here as far as expenses or other things that you can actually

10 put a number on.  I don't know how you would go about giving

11 damages in a case like this, under all these circumstances.

12      The burden of proof in the case lies with the

13 plaintiff.  That means, as the Judge said, you know, it's kind

14 of like a scale, and if it's 51 percent, then that burden of

15 proof has been carried.  If it's even, if it's 50/50, if you

16 just can't make up your mind, in that situation the decision

17 goes to the defendants, because the burden of proof is on the

18 plaintiff.

19      Now, you know that the burden of proof lies there for

20 a number of reasons:  They got to go first; we went second

21 with our evidence, went first today; and their attorney gets

22 to make a rebuttal closing argument after I finish.  That's

23 all part of having the burden of proof.

24      This is the last time I'm going to say anything to

25 you.  At least you didn't get up and cheer; that's a good

1  thing.  But I would ask you this:  After that argument is

2  complete, at least give some thought to, I wonder what could

3  have been said in response to that, because I don't have a

4  chance to come back and say anything else to you.

5        The Judge is going to explain the verdict form to

6  you.  I would ask that, as you listen to it and when you go

7  back and look at it, you figure out, first, that there's no

8  liability in this case on behalf of these officers, and then,

9  second, how to fill out that verdict form to show that you're

10 finding in favor of the defendants.

11       We appreciate your service in this case.  We

12 appreciate the time and attention that you've given our case.

13 Thank you.

14       THE COURT:  Mr. Todd.

15       MR. TODD:  Just a few quick final closing points.

16 First, everything that came before in the parking lot.  Was

17 the chase serious?  Yes.  And I didn't mean for a second to

18 suggest otherwise.  Is armed robbery serious?  Yes.  And I

19 didn't for a second mean to suggest otherwise.  But do these

20 things, criminal things or stupid things, justify any and all

21 use of force?  No.

22       Look at what happened in the parking lot.

23       Second, what did happen in the parking lot?  The use

24 of force.  The only use of force I want to touch on is the

25 question of the rib and the knee.  Interesting the way the

 1   testimony plays out.  Maybe you can knee someone in the rib,

 2   through an arm that's still here.  You know what?  I'll give

 3   Mr. Beaton that one, one knee, maybe two.

 4        But what remains unexplained is the right side of

 5   Mr. Wyatt's face.  Three instances of blunt force trauma.  The

 6   only thing that could have caused those was the knee.  That

 7   leaves two for the road.

 8        Third, the experts, Wershbale and Waller.  I like

 9   Lieutenant Wershbale, seems like a good officer.  And his

10   generalized testimony about police practices generally was

11   interesting, informative, and largely complied -- or comported

12   with what Mr. Waller told you.  What wasn't so interesting or

13   helpful was really his testimony specifically about this case.

14        As it turned out, he didn't know that much about this

15   case.  Hadn't read the depositions, hadn't talked to the

16   defendants, didn't sit here and listen to the testimony.  And

17   he testified -- the most important thing he told you was that

18   if he knew that knees had been thrown or fists had been thrown

19   to the head or neck area, that would have changed his opinion.

20   He didn't hear the testimony on whether that actually

21   happened.  You did.  You know.

22        Still on the experts.  Mr. Guynn stood up here just

23   now and said no one came in and explained to you how they

24   should have gotten that arm out.  I guess they just sit there

25   and wait for it to come out.  No.  Both experts explained to

1  you the proper techniques for safely and calmly removing that

2  arm, removing the gun, if there is a gun, which of course

3  there wasn't, and doing it in a safe and controlled manner

4  without endangering the officers or Mr. Wyatt.  That testimony

5  was here and you heard it.

6        Fourth, how the fight ends.  Were the knees

7  effective?  Did Mr. Worsham hit that nerve here and the arm

8  went dead and out it came?  There's no testimony to support

9  that.  There is testimony to support that Mr. Wyatt got hit in

10  the head, whether he was unconscious or not, certainly stunned

11  enough for that arm to come out.  Equally effective ending to

12  the fight.

13        Lastly, remember what I told you at the beginning.

14  These officers held him down and beat him at a time they

15  thought no one was watching.  They didn't know the camera was

16  rolling.  They didn't know not just one but two police

17  cruisers rolled up and were videotaping.

18        You know, police officers have a tough job, no

19  question.  Go out every day, as Mr. Guynn said, and risk their

20  lives, and I take that very seriously.  But practices,

21  procedures, and constitutional norms are there for their

22  protection and ours.  The fact that a job is risky does not

23  mean you can do it any way you want.  You still have to comply

24  with the law.  To protect citizens and to protect good

25  officers, that law should be enforced.

Wyatt v. Owens, et al. - 4/20/17

1    The only question for you here is was the force here
2    in the parking lot, by these defendants, on Mr. Wyatt
3    objectively reasonable or excessive?  I think the evidence
4    supports a verdict for the plaintiff.  Thank you.
5    Thank you, Your Honor.
6    THE COURT:  All right.  Members of the jury, you've
7    heard all the arguments, and upon retiring to the jury room,
8    you should select one of your number to act as your foreman or
9    forewoman who will preside over your deliberations and will be
10   your spokesman here in court.
11   The form verdict has been prepared for your
12   convenience.
13   If you would put up the verdict form.
14   You will notice on the form that you consider each
15   defendant separately.  And the questions are, do you find
16   Defendant Owens used excessive force?  And you go to answer
17   that yes or no.  And Defendant Scott Wyatt, yes or no?  And
18   Defendant Worsham, yes or no?  And if all of your answers are
19   "no," you just have your foreperson sign the verdict and
20   notify the marshal that you've finished.
21   But if your answers are -- if you answer the question
22   under Roman numeral I as "yes," then you proceed to Roman
23   numerals II and III regarding damages.  That if you answered
24   "yes" to any questions I, II, or III, then you proceed to the
25   damages issue.

 1    With regard to the compensatory damages, I instructed

 2  you on the manner how you should consider arriving at those

 3  damages.  You should assess the damages that you find

 4  according to -- as to each defendant.  If you find only

 5  against one defendant, then it would be -- of course,

 6  100 percent of any damages that you award would be against

 7  that defendant.

 8    Now, with regard to punitive damages, you would only

 9  consider those with regard to Defendant Worsham.  And if you

10  do decide that punitive damages -- under the instructions

11  punitive damages should be awarded, you should answer the

12  questions and put in the amount you find to be the appropriate

13  amount considering the instructions.

14    Now, you will take the verdict form to the jury room,

15  and when you've reached a unanimous agreement as to your

16  verdict, you will have your foreperson fill it in, date and

17  sign it, and then return to the courtroom.

18    If during your deliberations you should desire to

19  communicate with the Court, please reduce your message or

20  question to writing, signed by the foreperson, and pass the

21  note to the marshal, who will bring it to my attention.  I

22  will then respond as promptly as possible, either in writing

23  or by having you return to the courtroom, so that I can

24  address you orally.

25    I caution you, however, with regard to any message or

1    question you might send that you should never state or specify

2    your numerical division at the time.

3          It now seems to be about 4:00 o'clock, and I would

4    like for you to deliberate as long as you wish to.  We can

5    come back tomorrow.  And I told you, you can leave every day

6    at 5:00 o'clock.  If all of you want to deliberate past 5:00

7    o'clock to try to resolve the case tonight, you may do so.

8    But don't try to rush to reach a verdict just so the case can

9    be over.  If you need to, you can come back tomorrow.  No

10   pressure on you to finish from the Court or anyone.

11         But at about 5:00 o'clock, I wish you would send me a

12   note and tell me whether you wish to stay for a while.  And if

13   you need food or anything, if you decide you want to stay, let

14   me know if you want a sandwich; we can, of course, get that.

15   If you need to call someone at home, tell them you're going to

16   be late, we can arrange for that.  I want you to take all the

17   time this case needs.  Don't feel any pressure to remain after

18   5:00 o'clock.  And that means pressure from anybody on the

19   jury.

20         So I'm going to let you go back to the jury room.

21   You will have in the jury room the exhibits that have been

22   admitted into evidence and also the jury instructions that

23   I've given you.  And I think we're going to have now -- you'll

24   have an iPad with those exhibits about the chase scene and

25   that sort of thing and the scene in question.  I think it's

 1  Exhibits 1, 2, and 3; is that right?

 2          THE CLERK:  Yes, sir.

 3          THE COURT:  Anyway, are you going to show them how to

 4  use that?

 5          INFORMATION TECHNOLOGY SPECIALIST:  (Nods head up and

 6  down.)

 7          THE COURT:  You want to do that now?

 8          INFORMATION TECHNOLOGY SPECIALIST:  The iPad is

 9  locked down to one specific application that has the three

10  videos on it.  If you want to select one of the videos, you

11  tap on it, it will be played.  And then just like any other

12  iPad app, you have access to pause it, scroll through the

13  video.

14          If you like, we also have -- way down here in the

15  bottom corner is a lock.  You can enhance the playback speed

16  if you like.

17          If you want to switch to another video, simply tap

18  "done," and you can select another video, watch that video.

19          In the bottom left-hand corner is the audio control.

20  So if you want to turn the volume up, simply turn it up; turn

21  it down, you can turn it down.  If you need to charge it,

22  there will be a charger and cable as well.

23          THE COURT:  And if you have any trouble and you want

24  to see it, you can't get it to operate, just notify the

25  marshal and let him bring it out and cut it on for you, at

 1  least cut on the video you wish to see.

 2          So you may retire to the jury room.

 3      (Jury out at 4:05 p.m.)

 4          THE COURT:  All right.  I want to thank all of you

 5  now for the civility that has been shown to the Court and each

 6  other.  It made it a very pleasant case to try.  And both

 7  sides I think were represented extremely well.  I don't know

 8  what anyone could have done better for their client than has

 9  been done in this case.  Thank you.

10          MR. BEATON:  Thank you, Your Honor.

11      (Recess taken from 4:06 p.m. until 5:03 p.m.  Court

12  reconvened outside the presence of the jury.)

13          THE COURT:  I have a note from the jury that says,

14  "The jury has decided to deliberate past 5:00.  We'll update

15  around 5:30 or 6:00, if necessary."  I can't read the name.

16  It looks like Chris or something, foreman.  Chris Ford.  He's

17  the guy that was sitting --

18          THE CLERK:  Number 2.

19          THE COURT:  Someone said he is a librarian?  He

20  looked like he knew how to operate an iPad.

21          MR. BEATON:  He was excited about that iPad.

22      (Recess taken from 5:04 p.m. until 5:47 p.m.  Court

23  reconvened outside the presence of the jury.)

24          THE COURT:  I have a note from the jury.

25          "We heard mentioned earlier in case that in Virginia,

1  quote, in control, end quote, means that suspect is handcuffed

2  and in custody.  Is this law or just an accepted view across

3  Virginia law enforcement agencies?

4        MR. BEATON:  No law I know of.

5        MR. GUYNN:  I don't think we're allowed to say, are

6  we?

7        THE COURT:  I don't think in control, that in

8  Virginia "in control" means the suspect is handcuffed.  We

9  tell them it's not law.

10       MR. BEATON:  It's not even evidence, is it?

11       THE COURT:  Well, I don't recall that.  I recall

12  something being said about control.

13       MR. GUYNN:  Both experts mentioned it.

14       MR. BEATON:  Mentioned what?

15       MR. GUYNN:  Having him under control.

16       MR. BEATON:  But nothing to do with whether in

17  Virginia that's the standard.

18       MR. GUYNN:  Right.

19       MR. BEATON:  Yes, there was certainly discussion of

20  being under control, but not a specific Virginia rule of any

21  sort.

22       THE COURT:  No.  I mean I can give them another

23  instruction.  I mean, I hate to just ignore the question.  I

24  could say there's no evidence on the subject.  There was no

25  evidence.

Wyatt v. Owens, et al. – 4/20/17

1      MR. GUYNN:  But there was evidence on control.

2      THE COURT:  There was evidence on control, but there

3  was no evidence concerning whether it was law or custom.

4      MR. GUYNN:  Could we just say that the experts

5  addressed control?

6      MR. BEATON:  I would really resist leaving any

7  impression that there is a standard out there, because it's

8  not a law or evidence that they've been told about.

9      MR. GUYNN:  How about the only law comes from your

10  instructions.

11      THE COURT:  Well, I could say "in control" is the

12  ordinary meaning which you would give to it.  I mean the words

13  "in control" -- give the phrase "in control" its ordinary

14  meaning.

15      MR. BEATON:  I just would hate to leave the

16  impression that that's the interpretation of some legal

17  standard that they have in mind.

18      THE COURT:  Well, you know, I could say -- I think

19  the best thing is just to say "in control" has an ordinary

20  meaning, which we don't give them the definition for.

21      MR. GUYNN:  I guess both experts haven't addressed

22  it.

23      THE COURT:  Well, neither one said it was law.

24      MR. GUYNN:  Right.

25      MR. BEATON:  What about the sentence you suggested,

1  and, in addition, say, "There is no legal rule that you were

2  instructed about on this point," rather than just leaving them

3  to the instructions, which is -- which would require them to

4  go through it, hunting for something.  We all know there is

5  actually nothing in the instructions, and that's what they

6  should apply.

7        THE COURT:  What about just saying then, "I have not

8  instructed you that the law -- I've instructed you on the law,

9  what the law is applicable to the case"?

10        MR. GUYNN:  Right.

11        THE COURT:  "The words in the instruction that are

12  not defined are to be given their ordinary meaning."

13        MR. GUYNN:  That's probably about all you can do.

14        MR. BEATON:  Is that phrase in the instructions?  Is

15  that phrase in the instructions?

16        MR. GUYNN:  No, it's not in the instruction.

17        MR. BEATON:  I have no objections with what you said.

18  I'm just worried that that's going to send them through the

19  jury instructions, and if we could clarify --

20        THE COURT:  I would just say that, "I have not

21  instructed you" --

22        MR. GUYNN:  They're going through the jury

23  instructions now.

24        THE COURT:  "I have instructed you on the law

25  applicable" --

1      (Discussion off the record between the Court and the

2  law clerk.)

3      THE COURT:  What about saying, "'In control' has no

4  special meaning"?

5      MR. TODD:  Certainly constitutionally that's correct.

6  Constitutionally that's correct.

7      MR. GUYNN:  But both our experts addressed it.

8      THE COURT:  Well, they addressed it but they didn't

9  say -- the jury thing is wanting to know if "in control" means

10  that the suspect is handcuffed.

11      MR. TODD:  If they're wondering if it's a

12  black-and-white test.

13      THE COURT:  Yeah.

14      MR. TODD:  And it's clearly not constitutional.  It's

15  a part of practice.

16      THE COURT:  Well, what I was suggesting, the phrase,

17  "If used, 'in control' will be given its ordinary meaning.

18      MR. TODD:  That's the entire response?

19      THE COURT:  Well, I would say, "I have instructed you

20  on the law applicable to the case.  The phrase 'in control,'

21  if it was used -- if used during the trial, should be given

22  its ordinary meaning."

23      MR. TODD:  How is the jury's question phrased again?

24      (Jury question is handed to Mr. Todd.)

25      MR. TODD:  My concern is that that answer doesn't

1    answer the question.

2              THE COURT:  Right.

3              MR. TODD:  The answer to the question is "no."  It's

4    not a legal term within the legal confines of this case.  It's

5    one element through one piece.

6              THE COURT:  It's neither law nor -- there's no

7    evidence that it is the accepted view across the state.

8    There's no --

9              MR. GUYNN:  I thought Mr. Wershbale said that he

10   thought --

11             THE COURT:  Well, you were just saying that --

12             MR. GUYNN:  You didn't ask me.

13             THE COURT:  Well, I was asking what --

14             MR. GUYNN:  I don't think that we can --

15             MR. BEATON:  I wonder if there's even any evidence.

16             MR. TODD:  We had the discussion with both experts

17   whether they should testify to the law, and both experts were

18   told not to testify to the law.  And their question goes to

19   what the law is, not police practice, which is one subset of

20   the applicable test here.

21         (Pause in the proceedings.)

22             THE COURT:  All right.  "I have instructed you on the

23   law applicable to the case.  That is the only law you should

24   consider.  You should give the testimony of any witness such

25   weight as you find it is entitled."

1      MR. TODD:  The concern with that under this question,

2  Your Honor --

3      THE COURT:  Sir?

4      MR. TODD:  The concern with that, given this

5  question, Your Honor, is that, as I understand it, there is no

6  witness testimony on that point.  Mr. Guynn made the argument

7  in his comments that control equaled handcuffing or

8  handcuffing equaled control.  Then you instructed the jury --

9      THE COURT:  You couldn't find the testimony in that

10 witness's --

11      THE COURT REPORTER:  Control, regarding control and

12 handcuffing?  It would take a little while to find it, but I

13 mean --

14      MR. TODD:  I thought Mr. Guynn acknowledged it a

15 second ago.

16      MR. GUYNN:  I think I did say something to that

17 effect in opening statement.  But I think my expert said, in

18 his opinion, that the plaintiff would have been in control

19 when he was handcuffed.

20      MR. TODD:  That's different.

21      MR. GUYNN:  That's different.

22      THE COURT:  That's not practice -- that's not a

23 commonly accepted definition among police departments.

24      MR. GUYNN:  Right.

25      THE COURT:  Why don't I say it's neither law nor --

1          MR. GUYNN:  I thought what you had was right.  I
2    think that's the correct statement, isn't it?
3          THE COURT:  "Or an accepted view across law
4    enforcement agencies."
5          MR. TODD:  It leaves open the implication that
6    there's evidence, Your Honor, which there is not.  You've
7    instructed the jury that our arguments are not evidence, and
8    the jury is clearly confused on that point.
9          MR. GUYNN:  They have the instruction.
10          THE COURT:  "I have instructed you on the law
11   applicable to the case.  That is the only law you should
12   consider.  The words 'in control' are not to be given any
13   special meaning."
14          MR. TODD:  I think that's appropriate as far as it
15   goes.  I would also recommend the Court repeat the instruction
16   previously given that lawyer argument is not evidence, because
17   I believe that's where the confusion is coming from.
18          THE COURT:  Well, I don't want to get into it too
19   much.  What do you say?
20          MR. GUYNN:  I don't think you should repeat any
21   instructions.
22      (Discussion off the record between the Court and the
23   clerk.)
24          THE COURT:  Okay.  This is what's going to the jury:
25   "I have instructed you on the law applicable to the case.

1  That is the only law you should consider.  The words, quote,

2  'in control' are not to be given any special meaning."

3          Where is the marshal?

4          THE CLERK:  And I'm going to make copies, because

5  sometimes they can throw this in the trash.

6          MR. TODD:  Thank you.

7      (Recess taken from 6:09 p.m. until 6:31 p.m.)

8      (Jury present.)

9          THE COURT:  You may have a seat.

10         Have you agreed upon a verdict?

11         THE FOREPERSON:  Yes, sir.

12         THE COURT:  Would you hand it to the marshal.

13     (Verdict is handed to the Court.)

14         THE CLERK:  Ladies and gentlemen, is this your

15  verdict?

16         THE JURY:  Yes.

17         THE CLERK:  *Michael Wyatt v. Johnny Owens, et al.*  We

18  the jury unanimously find the following by a preponderance of

19  the evidence:

20         As to excessive force as to Defendant Johnny Owens:

21         No.

22         As to Defendant Scott Wyatt:

23         No.

24         As to defendant Robert Worsham:

25         Yes.

1          Compensatory damages.

2          As a result of the excessive force used in

3   apprehending, arresting, and restraining Mr. Wyatt, he

4   sustained damages in the amount of $50,000.

5          The compensatory damages are attributed to the

6   defendants in the following proportions:

7          Zero percent as to Johnny Owens.

8          Zero percent as to Scott Wyatt.

9          100 percent as to Robert Worsham.

10         Punitive damages as to Robert Worsham:

11         Yes.

12         If you decided not to award punitive damages, stop at

13  this point and return the form to the Court.

14         We, the jury, award Mr. Wyatt punitive damages

15  against Robert Worsham in the amount of $100,000.

16         Signed by the foreperson, Christopher Ford.

17         Do you and each of you agree upon this verdict so say

18  you all?

19         THE JURY:  Yes.

20         THE COURT:  Any motion before the jury is discharged?

21         MR. GUYNN:  Yes, Your Honor.  I would move to poll.

22         THE COURT:  Members of the jury, as your name is

23  called, if this is your verdict, say it is.  If it is not, say

24  it is not.

25         THE CLERK:  Prence Craft.

Wyatt v. Owens, et al. - 4/20/2017

1        JUROR CRAFT:  It is.

2        THE CLERK:  Christopher Ford.

3        JUROR FORD:  It is.

4        THE CLERK:  Iris Gillispie.

5        JUROR GILLISPIE:  It is.

6        THE CLERK:  Richard Pike.

7        JUROR PIKE:  It is.

8        THE CLERK:  Connie Rogers.

9        JUROR ROGERS:  Yes.

10        THE CLERK:  Janet Taylor.

11        JUROR TAYLOR:  Yes.

12        THE CLERK:  Cynthia Thompson.

13        JUROR THOMPSON:  Yes.

14        THE CLERK:  Vanessa Waddell.

15        JUROR WADDELL:  Yes.

16        THE COURT:  Members of the jury, thank you for your

17  service.  I appreciate it and I know everyone appreciates the

18  time you have spent on this and how much you've contributed.

19        And you're going to be excused at this time.  And

20  thank you again.  You may leave.

21      (Jury out at 6:34 p.m.)

22        THE COURT:  Will there be any other motions at this

23  time?

24        MR. GUYNN:  Not at this time.

25        THE COURT:  We'll recess court.

1      Court recessed at 6:34 p.m.)

2

3                          CERTIFICATE

4   I,  Judy K. Webb, certify that the foregoing is a

5   correct transcript from the record of proceedings in

6   the above-entitled matter.

7

8   /s/  Judy K. Webb              Date:  5/12/17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25