**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| Michael E. Wyatt | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:14-cv-492-NKM-RSB |
| | ) | |
| v. | ) | |
| | ) | |
| Johnny Owens, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**ATTORNEYS' FEES, EXPENSES, AND COSTS**

Defendant Robert Worsham's attempt to cast this lawsuit as simple and largely unsuccessful cannot obscure the tremendous result Michael Wyatt achieved at trial: $50,000 in compensatory damages and $100,000 in punitive damages, awarded against an individual law-enforcement officer, for pain, suffering, emotional distress, and callous indifference suffered by an incarcerated felon. Juries in the Western District of Virginia do not hand down verdicts like that every day, particularly not in cases that began with a handwritten complaint filed by a prisoner who could not find a local lawyer.

To achieve this result, Wyatt had to overcome five adverse eyewitnesses, a defense expert, multiple summary-judgment motions, and dilatory discovery tactics. Counsel's diligence uncovered a lengthy but unreported pattern of excessive force and dubious reporting by Worsham that featured prominently at trial. The opposition tries to minimize the efforts that followed Judge Moon's decision to seek representation for Wyatt in early 2016. But by any reasonable measure, this case was neither "simple" nor "largely unsuccessful." Opp. 7.

In accordance with Congress' aim for counsel to vindicate constitutional rights, therefore, Wyatt's fee request warrants a fully compensatory award for achieving an excellent result. Worsham quibbles with the adequacy of Wyatt's submission and second-guesses the thoroughness of counsel's representation. The opposition, though, does not and cannot deny that Wyatt's attorneys made a tremendous investment of time and out-of-pocket expenses, with no guarantee of any return, to enforce the constitutional rights of Wyatt and deter the violation of others' rights. This is precisely the effort Congress sought to induce by authorizing fee-shifting under 42 U.S.C. § 1988(b). Nor does Worsham even acknowledge the substantial concessions Wyatt made in his fee motion, which demonstrate the overall reasonableness of the request. Further "drastically reduc[ing]" Wyatt's request, Opp. at 1, would undermine § 1988 and discourage counsel from litigating meritorious civil rights.

## ARGUMENT

At the invitation of the Court, Sidley Austin LLP ("Sidley") assumed representation of Wyatt in early 2016. In keeping with the firm's policy and counsel's ethical obligations, plaintiff's counsel treated Wyatt the same as they would any fee-paying client, despite the significant risk that Sidley would never receive a dime for the representation—and the certainty that the firm would never fully realize its investment of time and resources. Indeed, Wyatt's fee motion preemptively reduced the hours, tasks, and rates requested for recovery, writing off hundreds of hours of legal services, halving standard billing rates to levels consistent with awards in this and neighboring districts, and requesting only expenses ordinarily charged to fee-paying clients.

Worsham, however, attacks nearly every aspect of Wyatt's fee motion. Taken together, these critiques would limit the fee award to one that would barely compensate a single attorney for doing the bare minimum of work. There is no reason to believe Wyatt would have succeeded

with such barebones representation, and every reason to expect such an approach would deter lawyers in this district from prioritizing the rights and representation of indigent clients. The Supreme Court has made clear, moreover, that the "essential goal in shifting fees … is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Wyatt's fee motion easily meets this standard of reasonableness.

The opposition proposes no reasonable alternative award. It makes four basic objections, none of which has merit: that Wyatt achieved only "limited success," Opp. 6-10; that the requested hourly rates are unreasonable for lawyers in Danville, *id.* at 10–11; that a number of timekeeping entries are block-billed, clerical, or duplicative, *id.* at 2-6; and that ordinary litigation expenses, regularly paid by clients, are unreasonable, *id.* at 11-15.

## I.     Wyatt Obtained a Significant Victory.

Worsham does not deny that Wyatt is a prevailing party. Instead, Worsham argues that Wyatt's six-figure damages verdict against a sworn law-enforcement officer represents only "minimal" or "limited" success, entitling Wyatt's attorneys only to a "small percentage" of the requested fees, expenses, and costs. Opp. 6-10. But in both substance and size, this was an "excellent result" entitling Wyatt's attorneys to a "fully compensatory fee." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983).

The opposition asserts "[o]ut of … six proposed defendants, only defendant Worsham was found liable." Opp. 7. This is highly misleading and ultimately irrelevant. Defendants Thomas Nicholson and Lester Shelton settled with Wyatt on the eve of trial. *See* ECF No. 174. That cannot be characterized as failure, and provides no basis to reduce Wyatt's fee award. And the opposition either ignores or misunderstands that the fee motion *does not seek fees* associated

Case 7:14-cv-00492-NKM-RSB   Document 193   Filed 07/10/17   Page 3 of 21   Pageid#: 3569

with Wyatt's motion to add Sheriff Michael Taylor as a defendant. *See* Mot. 6, 10.[1] Thus the only "proposed defendants" found not liable were Scott Wyatt and Johnny Owens.

The jury's decision to hold Worsham solely responsible, moreover, does not diminish Wyatt's victory. Worsham treats the defendants as equivalent, adding each to the denominator of the fraction ("one of five … [or] six") that he says represents Wyatt's limited success. Opp. 15. But the defendants are not equivalent; Worsham was by far the most culpable defendant, the only defendant against whom Wyatt sought punitive damages, and the focal point of trial. The Supreme Court has the type of fuzzy math Worsham proposes, recognizing that civil-rights cases "cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff." *Hensley*, 461 U.S. at 435.

The Fourth Circuit likewise has "rejected the notion that a court may calculate an award of attorneys' fees by means of a purely mathematical comparison between the number of claims pressed and the number prevailed upon." *Brodziak v. Runyon*, 145 F.3d 194, 197 (4th Cir. 1998). Neither will the Fourth Circuit "punish" plaintiffs with a reduced fee award if they "fil[e] their claims against a number of Defendants" where it is "difficult … to determine which officers might have acted in a potentially unconstitutional manner." *Randall v. Prince George's Cty.*, 302 F.3d 188, 212 (4th Cir. 2002) (affirming full compensatory award though plaintiff prevailed against only 11% of defendants and on only some claims). By contrast, the Fourth Circuit held that it *was* an abuse of discretion to reduce the fee awarded to a party who prevailed on one of three claims because "he received a sizable verdict and all three counts arose from 'a common

---

[1] The Fee Motion voluntarily excluded the researching, drafting, and arguing of the motion to add Sheriff Taylor. *See* Mot. 6, 10. Many of the Taylor hours identified by Worsham relate to Wyatt's separate and *successful* motion to amend the initial, pro se complaint to add Defendants Worsham and Nicholson. Other time Worsham seeks to exclude related to the telephonic motions hearing on September 28, 2016, during which Wyatt successfully prevailed on several discovery motions. Due to a clerical oversight, the fee petition included a handful of entries related solely to the motion to add Sheriff Taylor. Those 29.7 hours ($7,727.25) have been deducted from Wyatt's fee request, *see infra* page 21 & Ex. A.

core of facts.'" *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1419 (4th Cir. 1992) ($25,000 compensatory damages and $175,000 punitive damages).

And even if such parsing were appropriate, that two defendants settled and two were not found liable is no basis for reducing Wyatt's entitlement to attorneys' fees. Success of any kind in a civil-rights action against law-enforcement officers is difficult to obtain. *See, e.g.*, *Weaver v. City of Santa Clara*, 2014 WL 6330402, at *8 (N.D. Cal. Nov. 14, 2014) ("Civil rights cases, especially those involving police misconduct . . . can be difficult to win."). Wyatt not only prevailed, but the jury awarded Wyatt exactly what he sought in this litigation: compensatory and punitive damages against the officer responsible for his injuries.

Wyatt sought primarily compensatory damages for his pain, suffering, and emotional distress connected with his injuries: severe facial trauma, permanent damage to his right eye, a traumatic brain injury, and a broken rib. *See, e.g.*, T. Tr. 420:4–421:17 (Dr. Jeffrey Smith describing Wyatt's injuries). While it was "difficult action to determine" *ex ante* which defendants acted unconstitutionally, *Randall*, 302 F.3d at 212 (4th Cir. 2002), the evidence at trial confirmed that Worsham's repeated strikes to the right side of Wyatt's head and body overwhelmingly caused his injuries. In closing, defense counsel acknowledged that Worsham alone struck Wyatt on his right side—where he suffered the most significant facial trauma—and broke Wyatt's rib. *See* T. Tr. 630:1–4 ("Did you see anybody other than Robert Worsham throw a blow to Michael Wyatt's right side? No. So who broke his rib? Worsham."); *see also* T. Tr. T. Tr. 422:20–423:1, 435:17–436:7 (Dr. Smith testifying that the injuries to the right side of Wyatt's face were "not related to the fall at all" but were "consistent with … knees to the face").

Had Wyatt never sued the other four defendants, moreover, the time spent investigating, deposing, seeking discovery regarding, and examining those eyewitnesses—who all testified at

trial—would remain largely unchanged. *See* Mot. 5. Wyatt's briefing and trial strategy applied to all five defendants—except for questions of timeliness, evidence, and damages that pertained to Worsham in particular. *See, e.g.*, ECF No. 58 (motion to add Worsham and Nicholson as defendants); No. 115 (motion to depose Michael Young regarding investigations of Worsham); No. 144, at 3–9 (opposition to motion to exclude Worsham's disciplinary history).

In addition, Wyatt sought and obtained punitive damages against only Worsham. In *Brown v. Mountainview Cutters LLC*, 222 F. Supp. 3d 504 (W.D. Va. 2016), the court found a fee reduction was not appropriate, despite the plaintiff obtaining $0 in compensatory damages and just $20,000 in punitive damages. *Id.* at 515. The court recognized that a punitive damages award is "significant[]" and reflects "the successful vindication of 'important civil and constitutional rights that cannot be valued solely in monetary terms.'" *Id.* (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986)). So too here, the $100,000 punitive damages award both vindicated Wyatt's constitutional rights and served the important public policy aims of § 1983.

The opposition compares Wyatt's $150,000 verdict to the "technical" success and nominal damages in *Love v. Haigler*, 47 F.3d 1165 (4th Cir. 1995) (unpublished). This strained comparison is telling—and absurd. Opp. 6–7. In *Love*, the plaintiff litigated for three years and received effectively only $907.54 after failing overwhelmingly on various theories of liability against various defendants, all but two of whom obtain summary judgment or judgment as a matter of law in their favor. *Love*, 47 F.3d, at *1. The district judge described the outcome as "only a limited, if not technical, success." *See* Appellees' Brief at 31, *Love*, 47 F.3d 1165 (No. 94-1051), 1994 WL 16511218 (quoting district court order). Wyatt, by contrast, alleged one cause of action, overcame multiple summary judgment motions, overwhelmingly prevailed on pretrial

motions, achieved a settlement with two defendants, prevailed at trial against the most culpable defendant, and received damages that exceeded those ordered in *Love* by orders of magnitude.

Worsham also implies that Wyatt's fee award should be limited to some (unstated) ratio of the damages award. Opp. 8. But § 1988's purpose is to induce attorneys to take on low-value yet meritorious constitutional claims. In fact, the very precedent Worsham cites to support a proportional reduction "reject[s] the proposition that fee awards under § 1988 should necessarily be proportionate to the amount of damages a civil rights plaintiff actually recovers." *City of Riverside*, 477 U.S. at 574. Relying on *City of Riverside*, this Court has awarded attorneys fees five times larger than the underlying damages award—comparable to the ratio requested here—recognizing that "the attorney's fees are provided … as an incentive (because, if attorney's fees were not awarded, cases such as the instant matter would typically not be brought)." *Hummel v. Hall*, No. 6:11-CV-00012, 2012 WL 4458450, at *2 & n.5 (W.D. Va. July 18, 2012) (Moon, J.). Given Wyatt's undeniable success, his attorneys are entitled to a fully compensatory fee.

## II. The Requested Fee Award Is Reasonable.

The balance of the opposition falls squarely within the sort of post hoc nitpicking that the Supreme Court has rejected in fee-shifting litigation. *See Hensley*, 461 U.S. at 437 (a fee award "should not result in a second major litigation"). "[T]rial courts need not, and indeed should not, become green-eyeshade accountants" seeking "auditing perfection." *Fox*, 563 U.S. at 838. Instead, trial courts are charged with "do[ing] rough justice …, tak[ing] into account their overall sense of a suit." *Id.* Worsham's broad-brush objections to the hourly rates, billing practices, and voluntary reductions proposed in the fee motion are niggling, unsupported, and incorrect.

## A.    The Requested Hourly Rates are Reasonable in the District.

Worsham objects to the requested hourly rates because, he contends, they "exceed the market rate for comparable attorneys *in Danville*."  Opp. 10 (emphasis added).  According to Worsham, the maximum hourly rate for "experienced trial attorneys handling § 1983 cases *in Danville*" is $275 per hour.  *Id.* (emphasis added).  But the "relevant legal community" for determining the appropriate hourly rate is the Western District of Virginia—not the City of Danville.  *See* Mot. 11.  A district-based determination of rates is well-established in circuit and district case law.  *See, e.g.*, *Rum Creek Coal Sales, Inc v. Caperton,* 31 F.3d 169, 179 (4th Cir. 1994) ("[T]he relevant legal community is generally that in which the district court sits."); *Scott v. Clarke*, No. 3:12-CV-00036, 2014 WL 1463755, at *6 (W.D. Va. Apr. 15, 2014) (Moon, J.) (hourly rate of $400 consistent with rates awarded throughout the district).  Plaintiff's declarants each confirmed that legal practice in the district is regional, and that clients in Danville routinely retain attorneys from elsewhere in the district.  Mot. Exs. 2–4.  And of course Worsham's own lawyer is from Roanoke.  Anecdotes about rates *in Danville* are insufficient to rebut Wyatt's showing that the requested rates are reasonable *in this district*.  *See People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1313 (7th Cir. 1996) ("Once an attorney provides evidence of his billing rate, the burden is upon the defendant to present evidence establishing a good reason why a lower rate is essential."); *accord Dee v. Borough of Dunmore*, 548 F. App'x 58, 60 (3d Cir. 2013).

Worsham also understates the market rates for Danville.  Four years ago, for example, in a § 1983 case against Worsham's employer, a federal judge in Danville awarded a public-interest lawyer an hourly rate of $350 per hour.  *Hudson v. Pittsylvania Cty.*, No. 4:11-cv-00043, 2013 WL 4520023, at *4 (W.D. Va. Aug. 26, 2013), *aff'd,* 774 F.3d 231 (4th Cir. 2014).  And two

8

years before that, another judge in the Danville Division awarded hourly rates of us to $360. *See CIT Small Bus. Lending Corp. v. Kamguia*, No. 4:10CV00021, 2011 WL 182116 (W.D. Va. Jan. 20, 2011). Judge Moon similarly has noted that a rate of at least $400 per hour has been appropriate in even the "remote" parts of the district. *Scott*, 2014 WL 1463755, at *6 (citing *Quesenberry v. Volvo Group North America, Inc.*, No. 1:09–cv–00022, 2010 WL 2836201 (W.D. Va. July 20, 2010) (Abingdon Division)). Neighboring districts in Virginia and West Virginia have awarded even higher hourly rates. *See McAfee v. Boczar*, 738 F.3d 81, 91 (4th Cir. 2013) ($365 to $585 per hour reasonable in the Eastern District of Virginia); *McGee v. Cole*, 115 F. Supp. 3d 765 (S.D. W. Va. 2015) (awarding attorney hourly rates from $275 to $500 per hour in West Virginia for DC-based counsel).

Worsham offers no legal analysis why Danville rates alone should matter. This is wrong as a matter of law and as a matter of fact. One of Worsham's declarants refers to the "large number of lawyers in the Virginia marketplace." Opp. Ex. A ¶ 6. But Wyatt tried and failed to find a local lawyer willing to take his case—despite its merit. *See* Mot. 18 & Ex. 5 ¶ 2. Counsel's rates cannot be limited to a market that could not or would not supply Wyatt with representation. The apparent undesirability of the case, the difficulty of prevailing, Wyatt's incarceration, and the community standing of the defendants all show why § 1988 authorizes fee awards, and why Judge Moon invited members of the bar of the Western District of Virginia to enter an appearance on behalf of Wyatt.

### B. The Requested Hours are a Conservative and Sufficiently Detailed Accounting of the Time Reasonably Expended on this Case.

The time entries submitted in the fee motion are appropriate and sufficiently detailed for the Court to determine whether the overall award is just and reasonable. Worsham quibbles over individual line items and questions whether it was necessary for counsel to represent Mr. Wyatt

9

as thoroughly as they did. But what he does not and cannot do is show that the requested award is unjust, unreasonable, or a windfall—particularly in light of the hundreds of hours counsel voluntarily wrote off. *See* Mot. 7.

**1. Counsel's timekeeping allows for review of the award's reasonableness.** Worsham asks the Court to impose an unspecified "across-the-board reduction" based on "staggering" block billing. Opp. 3. He asserts block billing categorically "inhibit[s] the court's ability to ascertain whether the block entries are reasonable." Opp. 2. Worsham's principal authority, however, recognized that "block billing is not unreasonable *per se*" and is in fact "acceptable *unless* it prevents the court from assessing reasonableness." *Elderberry of Weber City, LLC v. Living Centers-Se., Inc.*, No. 6:12-CV-00052, 2014 WL 3900389, at *13–14 (W.D. Va. Aug. 11, 2014). Worsham does not argue that counsel's billing actually hindered the Court's review.

The cases Worsham relies on involved counsel who *exclusively* or *excessively* block-billed. *See, e.g.*, *id.* at *14 ("consistent practice by all billing attorneys of combining multiple tasks"); *Two Men & A Truck/Int'l, Inc. v. A Mover Inc.*, 128 F. Supp. 3d 919, 928 (E.D. Va. 2015) ("excessive use of block billing"). These fee petitions also involved rampant imprecision and evidentiary failings beyond block billing. *See, e.g.*, *E.E.O.C. v. Nutri/Sys., Inc.*, 685 F. Supp. 568, 574 (E.D. Va. 1988) (entries lacked dates and critical details, and counsel made no effort to justify proposed hourly rate). That is not the case here. Even by Worsham's count,[2] block billing represents less than 7% of the entries. Nearly all occurred soon after Sidley's appearance in the case; only 18 occurred after August 2016. Early block-billing is not uncommon for a new matter the firm has taken on pro bono, before timekeepers are focused on the prospect of fee litigation. And the total number of hours listed in Worsham's exhibit are dwarfed by the approxi-

---

[2] Not all the identified entries are block-billed. Several offer greater detail on a single task. For example, Mr. Todd's entry for April 19, 2017, can hardly be considered unspecific for a day spent in the courtroom. *See* Opp. Ex. 1, at 5 ("Trial; final witness examinations and cross examinations; jury charge and deliberations, and verdict").

mately 700 hours written off entirely.  *See* Mot. 7.  Thus Worsham is wrong to contend these entries somehow impeded the court's ability to assess the reasonableness of counsel's work.[3]

**2.  Paralegal time is compensable under § 1988.**  Worsham objects to time incurred (at a rate lower than any lawyer's) by Wyatt's paralegal, Opp. 3–4, but the Supreme Court has recognized the "self-evident proposition that the 'reasonable attorney's fee' provided for by statute should compensate the work of paralegals."  *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989).  Worsham disregards this principle in favor of *dicta* from cases involving non-legal tasks performed by *attorneys*.  As a result, Worsham seeks to exclude work (much of which he admits is appropriate, Opp. 4 n.1) performed by Erin Lyons, a paralegal with extensive experience in litigation involving incarcerated clients.  *See* Mot. 13.

Worsham's dismissal of Ms. Lyons's contributions as "clerical" and "requir[ing] no specialized knowledge" is wrong and demeaning.  The time Ms. Lyons spent reviewing court records, maintaining strategy documents, uploading discovery, drafting engagement letters and deposition notices, revising motions, and conducting legal research are legal tasks compensable under § 1988.  *See, e.g.*, *Jenkins*, 491 U.S. at 288 n.10 (appropriate paralegal work includes "factual investigation, including locating and interviewing witnesses; assistance with depositions, interrogatories, and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence"); *Campbell v. D.C.*, 202 F. Supp. 3d 121, 130 (D.D.C. 2016) ("printing and organizing documents," "organization of files and deposition documents," and "researching and communicating with outside vendors about the demonstrative exhibits" are compensable at paralegal rates).  Worsham's lead case, in fact, demonstrates that some of the supposedly "clerical" assignments performed by Ms. Lyons are in fact appropriate paralegal pro-

---

[3] Even if a reduction were appropriate, it should not exceed 10% and should apply only to the subset of entries listed in Exhibit 1 that are, in fact, block entries.  The one cited case that reduced fees by 25% involved a fee petition that "fail[ed] to meet even minimal documentation standards."  *Nutri/Sys., Inc.*, 685 F. Supp. at 574.

jects. *Compare Chapman v. Astrue*, No. 2:08CV00040, 2009 WL 3764009, at *2 (W.D. Va.

Nov. 9, 2009) (awarding paralegal rates for "the organization of a client's medical records"),

*with* Opp. Ex. 2 (seeking to deny entries for reviewing and organizing Wyatt's medical records).

That Ms. Lyons occasionally scheduled meetings or coordinated travel logistics does not

disqualify nearly half of her billable time, as the opposition contends. As recognized in *Elder-

berry*, which Worsham cites elsewhere with approval, even *an attorney* may seek compensation

for handling scheduling matters when it is "more economical or efficient … than delegat[ing]

them to an administrative assistant." 2014 WL 3900389, at *15. The question is simply "wheth-

er the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an em-

ployee at the next rung lower on the pay-scale ladder." *People Who Care*, 90 F.3d at 1315.

Throughout this litigation, Ms. Lyons made valuable contributions to the litigators, often

handling tasks that might reasonably have been performed by a junior associate. The scheduling

and logistics she occasionally handled related to depositions, prison visits and calls, and travel

arrangements coordinated among several lawyers and witnesses. This required familiarity with

prison protocol and the case calendar. A secretary could not have efficiently handled these tasks

without significant oversight from an attorney. That these tasks did not require legal training is a

reason for compensating for these tasks "at [the] lesser rate" of a paralegal, *Jenkins*, 491 U.S. at

288 n.10, as Wyatt requests, not a reason to exclude these hours entirely.

**3. Counsel appropriately devolved significant responsibility to more junior attor-**

**neys.** Worsham asserts that time spent by senior attorneys reviewing and revising drafts written

by more junior lawyers "resulted in excessive billing." In fact, such practices are reasonable,

common, and substantially *reduce* the overall cost of legal services. "[M]eetings between junior

and senior lawyers to discuss the progress of research and review completed assignments are rea-

sonable and appropriate means to secure proper supervision and efficient staffing." *McKenzie v. Kennickell*, 645 F. Supp. 437, 450 (D.D.C. 1986). And "where a more senior attorney keeps costs down by delegating work to a junior attorney (or a legal assistant), it typically is appropriate to allow recovery of fees incurred in the supervision of that work." *Banco Popular de Puerto Rico v. Gilbert*, 424 F. App'x 151, 154 n.2 (3d Cir. 2011).

Worsham's preferred staffing would have required senior lawyers to spend far more time drafting motions and briefs, rather than delegating initial drafting to junior lawyers. This would be inefficient and uneconomical. Worsham criticizes Wyatt's Rule 26 disclosures, for example, which necessitated 8.5 hours of drafting by Morgan Branch, a junior associate, and 2 hours of review by Benjamin Beaton, a senior associate. Worsham does not suggest the time spent drafting the disclosures was unreasonable; he objects only that a second (more senior) attorney reviewed the disclosures. Given the difference in billing rates, the cost of a senior attorney drafting the disclosures alone would have been nearly 25% *higher* than with a junior drafter and senior reviewer. Similarly, Worsham's objections to the drafting of two motions in limine, Ex. 4, at 4–7[4]; motion to depose Michael Young, *id.* at 6-7; and plaintiff's mediation statement, *id.* at 7, are limited to Mr. Beaton's and Mr. Todd's review of these filings—not to the time it took two junior associates to draft them. But again, by delegating primary drafting responsibility to associates in their first or second year of practice, counsel realized tremendous cost savings compared to soup-to-nuts research, drafting, and editing by senior lawyers.

Indeed, the supervision that Worsham criticizes as "duplicative, multi-tiered revisions of work product," was often required by ethical standards and professional norms. Professional standards and standard law-firm practice require supervision of junior lawyers and of non-

---

[4] This example contains numerous unrelated time entries. The example begins with several time entries from September 2016 that deal with other motions and an opposition. The example also incudes time spent by Mr. Todd "review[ing] draft Smith examination," which has nothing to do with these motions.

lawyers preparing drafts of legal work product. *See, e.g.*, Va. R. Prof'l Conduct 5.1, 5.3. Worsham, for example, objects to time spent reviewing deposition notices prepared by a paralegal, Ex. 4, at 3, but serving these notices without attorney review would have breached professional ethics, and tasking lawyers with their drafting would have cost substantially more.

Far from being a basis for reducing the award, counsel's delegation to junior lawyers underscores the fee motion's overall reasonableness. *See, e.g., Johnston v. Harris Cty. Flood Control Dist.*, 869 F.2d 1565, 1583 (5th Cir. 1989) (commending counsel for "minimiz[ing] the cost of this litigation" by delegating responsibility "to young, and thus less expensive, attorneys"); *Saleh v. Moore*, 95 F. Supp. 2d 555, 582 (E.D. Va. 2000) (efficient delegation to junior lawyers and legal assistants "resulted in fees that were considerably less than could have been expected absent the delegation"), *aff'd sub nom. Saleh v. Upadhyay*, 11 F. App'x 241 (4th Cir. 2001).

**4. Meetings and internal communications are appropriate and reasonable**. Worsham further asserts that lawyers should not be compensated for discussing strategy and work product internally. The case law says otherwise: "conferences between attorneys to discuss strategy and prepare for oral argument are an *essential part* of effective litigation." *McKenzie*, 645 F. Supp. at 450; *see also Banco Popular*, 424 F. App'x at 154 n.2 ("It is also proper for the attorneys in a firm to confer concerning legal issues. Indeed, that conferring may save hours of research."); *Petties v. D.C.*, No. CIV.A. 95-0148 PLF, 2009 WL 8663462, at *8 (D.D.C. Oct. 20, 2009) ("[T]ime billed for 'strategizing' was necessary and appropriate and that plaintiffs should receive compensation for this work."); *Am. Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas Cty.*, 278 F. Supp. 2d 1301, 1315 (M.D. Fla. 2003) ("Furthermore, time spent in attorney conferences is generally compensable for each participant."). Because "attorneys must spend at least some of their time conferring with colleagues, particularly their subordinates, to

ensure that a case is managed in an effective as well as efficient manner," compensation for this time is "well within the District Court's discretion." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1337 (D.C. Cir. 1982).

**5. Limiting Wyatt to a single attorney would have been unreasonable and less effective.** Worsham's most far-reaching critique is his repeated assertion that "[t]his case required the representation of only one attorney." *E.g.*, Opp. 6. Such a rule would be novel, arbitrary, and at odds with both parties' actual practice in this case. Reducing the number of attorneys does not necessarily reduce total fees, and can in fact increase them, *see supra* 12–14. Regardless of the number of timekeepers, the question under § 1988 remains whether the time spent on a particular task was reasonable.

Worsham seemingly seeks support for a one-attorney rule from *Faircloth v. Colvin*, No. 2:13CV156, 2014 WL 5488809 (E.D. Va. Oct. 29, 2014). That case was far less complex than Wyatt's. The plaintiff sought fees associated with a Social Security judge's denial of disability benefits. *Id.* at *1–2. The litigation involved a single motion with a developed agency record, and after prevailing, the plaintiff sought compensation for 201 hours of legal service—which the court subsequently reduced to 39 hours. *Id.* at *6.

Here, counsel's representation of Wyatt required extensive briefing, several hearings, more than a dozen depositions, substantial written discovery, three experts' reports and testimony, and preparation for trial—which was delayed once at defendants' request. The complexity of the case, moreover, increased because of defendants' tendency to deny access to critical discovery. At every turn, for example, defendants sought to bar discovery of Worsham's history of disregarding arrestees' constitutional rights—delaying producing Worsham's personnel records, opposing the deposition of a witness first identified in this late-produced discovery, and moving

to exclude the evidence at trial. Losing at any stage could have undermined Wyatt's eventual victory. Trial preparation likewise involved a substantial degree of complex evidentiary work, with Wyatt successfully excluding highly prejudicial but extraneous evidence concerning a gun, drug paraphernalia, and criminal history, plus the testimony of two witnesses not disclosed until the eve of trial. It is unreasonable to expect a single senior attorney to handle this volume of litigation alone while juggling the responsibilities of other paying clients.

Worsham also cites *Marvin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1360 (4th Cir. 1995), for the proposition that a district court may (not must) "exclude hours spent by an attorney in attending trial when that attorney examined no witnesses at trial." Opp. 4–5. Wyatt's time entries, however, make clear that he does not seek fees for lawyers merely observing trial. Only the three attorneys who examined witnesses—Mr. Todd, Mr. Beaton, and Ms. Branch—billed for time spent in court. Daniel Hay and Robin Wright attended trial but did not participate in the trial presentation, and the fee motion writes off the hours they spent observing trial. Their billing entries during trial covered discrete and necessary legal projects performed in support of the trial team, such as preparing witness files, researching evidentiary issues, and drafting trial motions outside the courtroom. Similarly, the hours billed by Ms. Lyons, who did not attend trial, reflect tasks performed in support of the trial team, such as preparing copies of exhibits requested by the Court. Plaintiff's counsel appropriately and efficiently staffed this case, and the Court therefore should reject Worsham's invitation to impose arbitrary and unreasonable staffing limitations.

### III. The Requested Costs and Expenses are Reasonable and Appropriate.

Worsham does not dispute Wyatt's entitlement to recover reasonable, out-of-pocket expenses. *See* Opp. 11. Instead, he contends that almost every one of plaintiff's expenses were unreasonable. But Wyatt's expenses were entirely consistent with those ordinarily charged to clients, and are entitled to recovery under § 1988.

**A.    Wyatt Seeks Only Expenses Ordinarily Charged to Fee-Paying Clients.**

Worsham argues, largely without support, that three types of expenses are "overhead" not ordinarily charged to fee-paying clients.  But every expense listed in the fee motion is one ordinarily charged to fee-paying clients.  *See* Todd Supp. Decl., ECF No. 187-1, ¶ 3; *Duke v. Hill*, 790 F.2d 1071, 1084 n.18 ("An attorney's practices in billing clients for expenses may be relevant to the question of whether compensation for litigation expenses is proper….").

**Legal research.**  According to Worsham, legal research costs "are not typically billed to clients."  Opp. 11.  Worsham's declarants do not endorse this position, probably because this Court has recognized that "the cost of … computer research" is a "type of expenses routinely billed to and paid by clients in this district."  *Quesenberry*, 2010 WL 3521998, at *2.  The one dated out-of-district decision Worsham cites to the contrary obviously does not control.  Opp. 13 (citing *O'Bryhim v. Reliance Std. Life Ins. Co.*, 997 F. Supp. 728, 737 (E.D. Va. 1998)).  Several more recent decisions agree with this Court's precedent that "Lexis and Westlaw research fees" are compensable.  *Alvarez v. ReadyClean Indus. Servs., Inc.*, No. 1:14-CV-00490, 2015 WL 5793605, at *4 (E.D. Va. Sept. 29, 2015)).[5]  It is also Sidley's standard practice to pass on legal research expenses to clients, so there is no basis to assume, as Worsham does, that these expenses are factored into the firm's billing rates.  *See* Opp. 13.

**Printing/duplication and telephone costs**.[6]  As this Court has recognized, "the cost of photocopying [and] scanning … are the type of expenses routinely billed to and paid by clients in this district."  *Quesenberry*, 2010 WL 3521998, at *2; *accord Duke*, 790 F.2d at 1084 n. 18 ("It

---

[5] *See also Quesenberry*, 2010 WL 3521998, at *2; *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 369 F.3d 91 (2d Cir. 2004); *Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243 (10th Cir. 1998); *Haroco v. Am. Nat'l Bank & Trust*, 38 F.3d 1429, 1440 (7th Cir. 1994); *Terry Props., Inc. v. Standard Oil Co.*, 799 F.2d 1523 (11th Cir. 1986).

[6] Worsham also challenges approximately $300 in phone charges.  Sidley ordinarily bills clients for these costs, which in any event were modest considering the year-long course of this litigation.

is customary for attorneys to bill clients for duplicating expenses."). *Contra* Opp. 14 n.11. The standard federal provision authorizing taxing of costs, 28 U.S.C. § 1920(4), authorizes recovery of a far narrower category of expenses than § 1988, *Daly*, 790 F.2d at 1083–84, but even it includes "the costs of making copies of any materials where the copies are necessarily obtained for use in the case." These duplication and binding costs, which primarily related to printing deposition and trial exhibits, were necessary and appropriate.[7]

**Discovery/Electronic Document Processing.** Electronically stored information produced by the Defendants had to be converted, processed, scanned, and stored. As is standard in litigation for paying clients, counsel charged standard rates for these services, which are by now an ordinary and important facet of civil litigation. Courts routinely award far higher sums as compensable costs. The only decision Worsham cites is an inapposite Eastern District decision excluding electronic-data processing fees incurred in a defendants' abandoned attempt to review *its own documents*—which plainly does not apply to Wyatt's review of Defendants' documents in this case. *Fells v. Virginia Dep't of Transp.*, 605 F. Supp. 2d 740, 741 (E.D. Va. 2009). In any event, that decision applied § 1920 request for more than $15,000 in expenses, while this request involves a § 1988 request for less than $5,000.

**B. The Requested Fees Are Reasonable and Sufficiently Detailed.**

Worsham's opposition second-guesses several other ordinary litigation expenses. The fee motion, however, requests only those expenses ordinarily and necessarily incurred to litigate a civil case.

**Travel.** Worsham posits it was unreasonable to fly on trips to Danville and Independence because it was "only" an eight-to-ten-hour roundtrip from Washington, D.C. Opp. 13–14.

---

[7] A substantial portion pertained to reproducing still images of Wyatt's beating. Because Wyatt could not watch the crucial arrest video from his prison, counsel printed a paper copy for him to review.

This overlooks that plaintiff's counsel—for the convenience of defendants and defense counsel—agreed to depose the defendants and their colleagues at their place of business, not in Washington. *See* Fed. R. Civ. P. 30(b)(1). It also ignores that plaintiff's counsel conducted as many as three depositions in a single day, and up to six in a single trip, in order to conserve attorney time and travel costs. And it disregards that flying allowed Wyatt's lawyers to work in transit and *reduce* the hours billed for unproductive travel time (which the fee motion could have sought—but voluntarily wrote off). *See* Mot. 6, 10; *Henry v. Webermeier*, 738 F.2d 188, 194 (7th Cir. 1984) (Posner, J.) ("When a lawyer travels for one client he incurs an opportunity cost that is equal to the fee he would have charged that or another client if he had not been traveling. That is why lawyers invariably charge their clients for travel time…."). In all, plaintiff's counsel booked just six trips by plane,[8] always economy class and at the lowest possible fare.

**Meals.** Worsham contends, without support, that reimbursement "for attorney meals should be significantly reduced or altogether eliminated." Opp. 13. The requested meal expenses—both individually and in the aggregate (less than $2,000)—are reasonable.[9] Worsham's inscrutable objection that the court should allow only the "part of the cost of each meal [that] is attributable … to this case," Opp. 14 n.10, is at odds with precedent. *See, e.g.*, *Quesenberry*, 2010 WL 3521998, at *2 ("meals … are the type of expenses routinely billed to and paid by clients in this district"). Further, Worsham's invitation for the court to scrutinize the amounts spent on individual meals—none of which was extreme, and most of which were quite inexpensive—is

---

[8] This excludes Mr. Beaton's trip to Milwaukee, WI, for the deposition of Dennis Waller, which Worsham concedes was necessary. Opp. 15 n.12.

[9] Worsham incorrectly states that "Mr. Todd dined for $100.60 by himself," Opp. 14, but this receipt covered the trial team, which should have been apparent based on the lack of meal expenses on that date.

the type of "green-eyeshade account[ing]" that trial courts "need not, and indeed should not" do. *Fox*, 563 U.S. at 838. [10]

**Deposition costs.** Worsham cursorily objects to deposition costs as insufficiently detailed, even though his opposition makes clear that he knows exactly how those costs were incurred. Wyatt used local court reporters at standard rates, as described in the attached invoices. Ex. B. And notwithstanding Worsham's objection to video depositions, courts regularly allow their cost even under the less generous standard of § 1920(2). *See, e.g.*, *Taylor v. Republic Servs., Inc.*, No. 1:12-CV-00523-GBL, 2014 WL 325169, at *13 (E.D. Va. Jan. 29, 2014). The decision to videotape these depositions is standard practice for plaintiff's counsel, in part to preserve the testimony of witnesses who become unavailable (as defense witness Sheriff Taylor did before the first trial was rescheduled).

**Consultants/litigation support and services.** Consultants perform an important role in trial practice that is not replicable or cost-effective if performed by attorneys. Sidley regularly engages consultants whose expenses are paid by clients. In this case, Sidley engaged three consultants with specialized knowledge: an audio/video engineer to enhance the dash camera and cellphone videos (used by both sides) that captured Wyatt's beating; a technician to set up printers and other technology at trial, given that plaintiff's counsel had no office space or supplies available during trial; and a courtroom technician from Opveon Litigation Services, a nationally recognized trial consulting firm (at a substantially discounted rate) to display plaintiff's video, photo, and documentary exhibits at trial. These expenses are all reasonable and appropriate. [11]

---

[10] When Congress intends to cap certain fees or expenses, it knows how to do so. *Cf.* 28 U.S.C. § 1821(d)(2) (meals and lodging for witnesses, including experts, capped at "the maximum per diem allowance prescribed by the Administrator of General Services"). Section 1988 simply requires "reasonable" meal expenses.

[11] Notably, defense counsel used Opveon's audio-visual set up at trial to play video exhibits and redact a documentary exhibit. In response to Worsham's objection that the Opevon expenses lack detail, Wyatt submits as Exhibit C Opveon's original invoice.

## CONCLUSION

The Court should award reasonable attorneys fees of $850,764 and reasonable costs and expenses of $129,748.38, plus post-judgment interest. If it would aid the Court's consideration of this motion, counsel for Wyatt would be pleased to participate in a hearing on these issues.

Dated: July 10, 2017                                    Respectfully submitted,


<u>/s/ Gordon D. Todd</u>
Gordon D. Todd
Benjamin Beaton
Morgan Branch
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
gtodd@sidley.com
*Counsel for Michael E. Wyatt*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2017 I caused a copy of the foregoing Reply in Support of Plaintiff's Motion for Attorneys' Fees, Expenses, and Costs to be served via ECF on the following counsel:


Jim H. Guynn, Jr.
Theresa Joan Fontana
Guynn & Waddell, PC
415 S. College Avenue
Salem, VA 24153
T: (540) 387-2320
F: (540) 389-2350
jimg@guynnwaddell.com
*Counsel for Defendants*


<u>/s/ Gordon D. Todd</u>